# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AFRICAN COMMUNITIES TOGETHER; SAMUEL DOE; STEPHEN DOE; and ABAL DOE, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>KRISTI NOEM, in her official capacity as Secretary of the U.S. Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; and UNITED STATES OF AMERICA,<br><br>*Defendants*. | **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR ADMINISTRATIVE STAY, PRODUCTION OF THE CERTIFIED ADMINISTRATIVE RECORD, AND TO POSTPONE FEBRUARY 13, 2026, EFFECTIVE DATE OF AGENCY ACTION**<br><br><u>ORAL ARGUMENT REQUESTED</u><br><br>Civil Action No. 1:26-cv-10278<br><br>Pursuant to L. R. 5.1(c), Plaintiffs note they are requesting **emergency relief** against agency action taking effect at **11:59pm on February 13, 2026**, and leave to proceed pseudonymously. |

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ........................................................................................................ 1

II.   BACKGROUND ......................................................................................................... 3

      A.    Statutory Framework and Related Agency Practices for TPS Periodic
            Reviews.......................................................................................................... 3

      B.    Ethiopia's Initial TPS Designation and Ensuing Extension and
            Redesignation................................................................................................. 5

III.  STANDARD OF REVIEW ........................................................................................ 6

IV.   ARGUMENT.............................................................................................................. 6

      A.    Plaintiffs are Likely to Succeed on the Merits of their APA Claims...................... 6

      B.    Plaintiffs Face Irreparable Harm Through Termination Resulting from
            Defective Periodic Review, and the Balance of Hardships, Equities, and
            Public Interest Favor Plaintiffs.. ................................................................... 18

V.    CONCLUSION.......................................................................................................... 19

## *TABLE OF AUTHORITIES*

**Cases**                                                                                                                    **Page(s)**

*African Cmtys. Together v. Noem,*
  *1:25-cv-13939-PBS (D. Mass. Dec. 23, 2025)* ...................................................................2

*Anderson ex rel. Dowd v. City of Bos.,*
  *375 F.3d 71 (1st Cir. 2004)* ...............................................................................15, 16

*Bolling v. Sharpe,*
  *347 U.S. 497 (1954)* .............................................................................................15

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.,*
  *996 F.3d 37 (1st Cir. 2021)* ...............................................................................15, 16

*California v. Kennedy,*
  *802 F. Supp. 3d 273, 281 (D. Mass. 2025)* ...........................................................8

*Centro Presente v. U.S. Dep't of Homeland Sec.,*
  *332 F. Supp. 3d 393* ....................................................................................7, 9, 17

*Doe v. Noem,*
  *No. 1:25-cv-08686 (S.D.N.Y. Nov. 19, 2025)* ...................................................7, 13

*Doe v. Trump,*
  *766 F. Supp. 3d 266 (D. Mass. 2025)* ....................................................................6

*F.C.C. v. Fox Television Stations, Inc.,*
  *556 U.S. 502 (2009)* .............................................................................................15

*Loper Bright Enterprises v. Raimondo,*
  *603 U.S. 369* .........................................................................................................9

*Make The Road N.Y. v. Noem,*
  *No. 25-5320, 2025 WL 3563313 (D.C. Cir. Nov. 22, 2025)* ....................................6

*McNary v. Haitian Refugee Ctr., Inc.,*
  *498 U.S. 479 (1991)* ...............................................................................................7

*Mhany Mgmt., Inc. v. Cnty. of Nassau,*
  *819 F.3d 581 (2d Cir. 2016)* .................................................................................16

*Nat'l TPS All. v. Noem,*
  *No. 25-cv-01766-EMC (N.D. Cal. Mar. 24, 2025)* ....................................... passim

*Nat'l TPS All. v. Noem,*
  *No. 25-cv-05687-TLT, 2025 WL 2233985 (N.D. Cal. July 31, 2025)* ........................ passim

*Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.,*
    407 F. Supp. 2d 323 (D. Mass. 2005) ...................................................................19

*New York v. McMahon,*
    784 F. Supp. 3d 311 (D. Mass. 2025) ..................................................................19

*Nken v. Holder,*
    556 U.S. 418 (2009) ............................................................................................19

*R.I. Coal. Against Domestic Violence v. Bondi,*
    794 F. Supp. 3d 58 (D.R.I. 2025) ..........................................................................6

*Ramos v. Nielsen,*
    336 F. Supp. 3d 1075 (N.D. Cal. 2018), reh'g en banc granted, opinion
    vacated, 59 F.4th 1010 (9th Cir. 2023) ...............................................................2, 4

*Ramos v. Wolf,*
    975 F.3d 872 (9th Cir. 2020) .................................................................................4

*Saget v. Trump,*
    375 F. Supp. 3d 280 (E.D.N.Y. 2019) ........................................................... passim

*Sampiao v. Hyde,*
    No. 1:25-CV-11981-JEK, 2025 WL 2607924 (D. Mass. Sept. 9, 2025) .................19

*Trump v. Hawaii,*
    585 U.S. 667 (2018) ............................................................................................16

*Valentin v. Town of Natick,*
    707 F. Supp. 3d 88 (D. Mass. 2023) ....................................................................16

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
    429 U.S. 252 (1977) .................................................................................15, 16, 17

*Washington v. Davis,*
    426 U.S. 229 (1976) ............................................................................................15

**Statutes**

*5 U.S.C. § 704* .............................................................................................................6

*5 U.S.C. § 706* ..................................................................................................... passim

*8 U.S.C. § 1254a* ................................................................................................. passim

*8 U.S.C. § 1254b* ................................................................................................. passim

*Administrative Procedure Act Section 705* .....................................................1, 2, 6, 8

*Judiciary Act of 1789* ...................................................................................................................*6*

**Other Authorities**

*101 Cong. Rec. H25811 (daily ed. Oct. 25, 1989)* ...........................................................................*3*

*87 Fed. Reg. 76,074–81  (Dec. 12, 2022)* ........................................................................*5, 11, 12*

*89 Fed. Reg. 26,172–80 (Apr. 15, 2024)* .........................................................................*5, 11, 12*

*90 Fed. Reg. 58,028, 58,030, 58,031 (Dec. 15, 2025)* ........................................................ *passim*

*H.R. Rep. No. 100-627 (1988)* .....................................................................................................*1*

I.    **<u>INTRODUCTION</u>**

Defendants seek to imminently terminate Ethiopia's Temporary Protected Status ("TPS") designation based on a fatally defective review process that was driven by pretext, discrimination, and other irrelevant factors instead of the review of objective evidence that Congress requires in the governing statute.  Ethiopia is in the midst of active armed conflict and several other ongoing humanitarian crises.  Without prompt intervention by this Court, Plaintiffs and other individuals with a vested interest in lawful periodic reviews of Ethiopia's TPS designation face severe and irreparable harms, including (1) the immediate loss of immigration status under the TPS program and related federal and state benefits, (2) an immediate risk of immigration confinement and forced separation from loved ones and community members, and (3) an immediate risk of deportation to Ethiopia or other countries where they face life-threatening danger.

Plaintiffs in this case—three Ethiopian TPS holders and African Communities Together, an organization that represents the interests of impacted individuals—seek emergency postponement of the termination of Ethiopia's TPS designation (the "Termination") under Section 705 of the Administrative Procedure Act ("APA") so that this Court can fully adjudicate whether the periodic review that resulted in the Termination was lawful.  Judicial review of this issue may benefit from an examination of the certified administrative record ("CAR").  In a closely analogous matter in this District challenging the periodic review underlying Defendants' decision to terminate the TPS designation for South Sudan, the court maintained a temporary administrative stay to allow expedited production of the CAR and supplemental briefing regarding that evidence.[1] Plaintiffs respectfully submit that this Court should follow the same procedure here.

---

[1] *See African Communities Together v. Noem*, Case No. 1:25-cv-13939-PBS (D. Mass. Jan. 15, 2026) ("*ACT I*"), Dkt. 53. *See also ACT I*, Dkt. 35 (plaintiffs' letter brief elaborating Court's authority to enter an interim (continued…)

1

Even without the administrative record, however, emergency postponement is warranted under Section 705 because:  (1) Plaintiffs are likely to succeed in demonstrating that the "periodic review" underlying the Termination violated the procedural requirements of the TPS statute, the APA, and the equal protection guarantees of the Fifth Amendment of the Constitution; (2) Plaintiffs will face irreparable harm if the Termination is allowed to take immediate effect; and (3) the balance of the equities and public interest favor granting emergency postponement to preserve the status quo and allow for full adjudication of these weighty issues.[2]

The TPS designation for Ethiopia is set to terminate at 11:59 p.m. on February 13, 2026. Plaintiffs respectfully request the Court enter an Order granting emergency postponement of the Termination under Section 705 of the APA.  To the extent the Court believes that it would benefit from consideration of evidence contained in the CAR, as occurred in the closely analogous South Sudan TPS case, Plaintiffs alternatively request that this Court (1) enter an Order requiring Defendants to produce the CAR in an expedited fashion and (2) grant an administrative stay of the Termination to preserve the status quo until the Court can rule on Plaintiffs' request for emergency postponement.

---

administrative stay under comparable circumstances); *ACT I*, Dkt. 37 (granting interim administrative stay). *Nat'l TPS All. v. Noem*, Case No. 3:25-cv-01766-EMC (N.D. Cal. Mar. 24, 2025) ("*NTPSA I*"), Dkt. 91 (ordering production of two CARs within 7 days, respectively concerning the periodic reviews and terminations for the TPS designations of Venezuela and Haiti); *Nat'l TPS All. v. Noem*, Case No. 3:25-cv-05687-TLT (N.D. Cal. July 15, 2025) ("*NTPSA II*"), Dkt. 47 (ordering production of three CARs within 7 days, respectively concerning periodic reviews and terminations for TPS designations of Nicaragua, Honduras, and Nepal); *Ramos v. Nielson*, Case No. 3:18-cv-01554-EMC (N.D. Cal. June 25, 2018), Dkt. 34 at 4 (ordering production within 10 days of CARs concerning periodic reviews and terminations of TPS designations of Sudan and Nicaragua and of El Salvador and Haiti one week later).

[2] In a similar case involving the termination of the TPS designation of Burma, a judge in the District of Northern Illinois just granted a postponement of agency action considering these same factors. *Doe v. Noem*, No. 25-cv-15483 (ND. Ill. Jan. 23, 2026), Dkt. 51.

II.    **BACKGROUND**

    A.    **Statutory Framework and Related Agency Practices for TPS Periodic Reviews.**

Congress created the TPS program in 1990 to provide "a more formal and orderly mechanism for the selection, processing, and registration" of individuals "from countries experiencing turmoil."[3] The TPS program replaced the prior practice of ad hoc presidential action while additionally insulating related agency decision-making from domestic political whims.[4] TPS is a temporary immigration status granted to nationals of certain countries experiencing conditions making it unsafe or otherwise impractical to deport them to that country. *See* 8 U.S.C. § 1254b. While a country is designated for TPS, beneficiaries from those countries receive employment authorization and protection from immigration removal and related confinement within the United States. 8 U.S.C. §§ 1254a(a)(1), (a)(4), (d)(4); 8 C.F.R. §§ 244.5, 244.10(a), (e).

The TPS statute allows the Government to designate a country for TPS if any of several conditions apply to the country, including ongoing armed conflict that poses a serious threat to the safety of returning nationals and/or "extraordinary and temporary conditions" preventing the safe return of nationals. 8 U.S.C. § 1254a(b)(1)(A), (B), (C).

Congress severely constrained agency discretion during the periodic review process of a country's TPS designation. *See* 8 U.S.C. § 1254a(b)(3)(A). The decisionmaker—in this instance, the Department of Homeland Security ("DHS") Secretary—must "consult[] with appropriate agencies of the Government," "review the conditions in the foreign state," and determine whether conditions for TPS designation "continue to be met." *Id.* Courts have held that this statutory

---

[3] H.R. Rep. No. 100-627, at 4 (1988).

[4] *See* 101 Cong. Rec. H25811, 25837–38 (daily ed. Oct. 25, 1989) (statements of Reps. Levine and Richardson) (commenting on the rationales underpinning the immediate precursor to the TPS statute), https://www.congress.gov/101/crecb/1989/10/25/GPO-CRECB-1989-pt18-7-1.pdf).

language requires "objective assessment" of the relevant country conditions. *See, e.g.*, *Saget v. Trump*, 375 F. Supp. 3d 280, 299–300, 333 (E.D.N.Y. 2019).

The "appropriate agencies" include U.S. Citizenship and Immigration Services ("USCIS") and the U.S. Department of State ("State Department"). *See* Ex. 5 at 8–9, 15–16 ("GAO Report") (describing agency practices for periodic reviews).[5] Historically, USCIS has managed and coordinated the TPS periodic review process for the Secretary. USCIS would solicit a country-conditions report from the Refugee, Asylum, and International Operations ("RAIO") unit within USCIS and reports and recommendations from the State Department turning on objective and available evidence of relevant country conditions. *See, e.g.*, Ex. 5 (GAO Report) at 15–21. After considering the materials received, USCIS would issue a decision memorandum, or "Director Memo," from its Office of Policy and Strategy, containing its recommendation to the Secretary regarding the nation's TPS designation. Traditionally, DHS Secretaries have given a "high level of deference" to the Director's Memo and its included recommendation. *Saget*, 375 F. Supp. 3d at 300 (internal quotations omitted).

Only after reviewing reports and recommendations from the appropriate agencies and available and objective evidence of country conditions may the Secretary "terminate the [TPS] designation by publishing notice in the Federal Register" if she "determine[s]" that a country "no longer continues to meet the conditions for designation under" 8 U.S.C § 1254a(b)(1); § 1254a(b)(3)(B). Termination is ordinarily effective 60 days after the notice is published, but the Secretary can postpone the effective date "to provide for an orderly transition." *Id;* § 1254a(d)(2). Before the Trump Administration's second term in office, DHS provided a 6- to

---

[5] *See also Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1082 (N.D. Cal. 2018), *vacated and remanded sub nom. Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023) (describing the TPS redesignation decision process).

18-month transition period for *each* of the twelve most recent TPS terminations over a span of two decades. *See* Ex. 6 (TPS Terminations and Associated Transition Periods Prior To Current Trump Administration ("Transition-Period Chart")).

**B.    Ethiopia's Initial TPS Designation, Ensuing Extension and Redesignation, and Termination Decision.**

The DHS Secretary first designated Ethiopia for TPS status on December 12, 2022.[6]  The notice identified several conditions warranting TPS designation, including ongoing armed conflict (and economic pressure caused by such conflict), significant humanitarian suffering, massive displacement of persons, extrajudicial killings and arrests, severe food insecurity, drought and floods, and outbreaks of communicable diseases.[7]  On April 15, 2024, the Secretary extended and redesignated Ethiopia's TPS status for 18 months, until December 15, 2025, based on the fact "armed conflict and extraordinary and temporary conditions supporting Ethiopia's TPS designation remain."[8]

On December 15, 2025, Defendants issued a notice in the Federal Register terminating Ethiopia's TPS designation, effective February 14, 2026 (the "Termination").[9]  However, the Termination reflects DHS's failure to abide by the TPS statute, APA, and agency policy and practice in their periodic review process of Ethiopia's TPS designation.  Furthermore—recipients, applicants, and their U.S.-based loved ones were given only 60 days to plan for their futures.[10]

---

[6] Designation of Ethiopia for Temporary Protected Status, 87 Fed. Reg. 76,074 (Dec. 12, 2022).
[7] *Id.* at 76,076–78.
[8] Extension and Redesignation of Ethiopia for Temporary Protected Status, 89 Fed. Reg. 26,172, 26,174–176 (Apr. 15, 2024).
[9] Termination of the Designation of Ethiopia for Temporary Protected Status, 90 Fed. Reg. 58,028 (Dec. 15, 2025).
[10] *See id.*

III.     **STANDARD OF REVIEW**

In considering whether to postpone the effective date of agency action under Section 705 of the APA, courts follow the same four-factor test governing adjudication of preliminary injunctions and temporary restraining orders. *R.I. Coal. Against Domestic Violence v. Bondi*, 794 F. Supp. 3d 58, 65 (D.R.I. 2025). Plaintiffs are therefore entitled to relief if they show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to them if denied the postponement; and that (3) the balance of the hardships and (4) the public interest favor Plaintiffs. *Id.* at 66; *see also Doe v. Trump*, 766 F. Supp. 3d 266, 277–78 (D. Mass. 2025). The Court's power to stay agency action under Section 705 until a decision is reached on the merits is distinct from its injunctive power under the Judiciary Act of 1789, operating directly "on the legal source of authority for an agency to act at all" rather than "simply insulat[ing] certain parties from enforcement measures." *Make The Road N.Y. v. Noem*, No. 25-5320, 2025 WL 3563313, at *35 (D.C. Cir. Nov. 22, 2025).

IV.     **ARGUMENT**

This Court should grant emergency postponement of the Termination because: (1) Plaintiffs are likely to succeed on the merits of their claims; (2) Plaintiffs will suffer severe and irreparable harm, including deadly harm, if emergency postponement is not granted; and (3) the balance of the equities and public interest favors Plaintiffs.

A.     **Plaintiffs are Likely to Succeed on the Merits of their APA Claims.**

1.     This Court has Jurisdiction Over Plaintiffs' APA Claims.

This Court has jurisdiction to review the periodic review process underlying the Termination as a final agency action under 5 U.S.C. § 704. It is true that the TPS statute contains a narrow jurisdiction-stripping provision that precludes "judicial review of any *determination* of the [Secretary of Homeland Security] with respect to the designation, or termination or extension

6

of a designation, of a foreign state under this subsection." 8 U.S.C. § 1254a(b)(5)(A) (emphasis added). But the operative word is "determination." The Supreme Court has interpreted "determination" to mean "*a single act* rather than a group of decisions or a *practice or procedure* employed in making decisions." *McNary v. Haitian Refugee Ctr., Inc.,* 498 U.S. 479, 492 (1991) (emphases added). The "determination" in the TPS statute during the periodic review process is "whether the conditions" in a given country meet or "continue to" meet the "conditions for such designation." 8 U.S.C. § 1254a(b)(3)(A), (C). Here, Plaintiffs are not challenging the "determination" regarding Ethiopia's country conditions, but rather the defective "practice or procedure" of the periodic review process that led to the determination.

Every court to consider the scope of Section 1254a(b)(5)(A) has found that it does *not* bar judicial review of the underlying periodic review process. *See e.g, Doe v. Noem*, No. 1:25-cv-08686 (S.D.N.Y. Nov. 19, 2025), Dkt. 21 at 11–12 (collecting cases); *see also Saget*, 375 F. Supp. 3d at 330–33; *Centro Presente v. U.S. Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 417 (D. Mass. 2018). Just as in those other cases, the point of Plaintiffs' case here is not to dispute the outcome of termination itself, but rather to hold the Defendants to their statutory and Constitutional obligations. To be clear, Plaintiffs are *not* asking this Court to order Defendants to reach a different outcome on the merits. Instead, Plaintiffs merely seek to vindicate their interests in a lawful periodic review process that comports with the TPS statute, the APA, and the Constitution.

2. <u>Defendants' Periodic Review Violated the APA.</u>

The APA authorizes courts to set aside and hold unlawful agency actions, findings, or conclusions that are contrary to law. *See* 5 U.S.C. § 706(2)(a). Defendants' actions during the periodic review of Ethiopia's TPS designation were contrary to law in several ways.

7

a)      *Defendants Unlawfully Made a Preordained Decision to Terminate TPS for Ethiopia as Part of an Overarching, Politically Motivated Initiative to Systematically Restrict Access to TPS.*

By law, the Secretary's decision to extend or terminate TPS designations must be made *after*, and based on, "consultation with appropriate agencies" and a "review [of] the conditions in the foreign state." 8 U.S.C. § 1254a(b)(3)(A). This statutory language "evinces Congressional intent that the Secretary undertake a periodic review grounded in fact—*i.e.,* based on objective conditions in the foreign country and regardless of any government official's political motives— and in good faith." *Saget,* 375 F. Supp. 3d at 346. Finally, the TPS statute requires the Secretary to publish "the true and factual basis for termination" in the Federal Register. *Id.* at 346–47; *see* 8 U.S.C. § 1254a(b)(3)(B); 5 U.S.C. § 706(D), (E), (F). When periodic review procedures violate these statutory mandates, they are "not in accordance with the law." *Saget*, 375 F. Supp. 3d at 345–46.

Defendants' statements and actions illustrate that any "review" here was defective and pretextual and that termination of Ethiopia's TPS designation was in fact driven by a premeditated policy of constraining access to TPS for the nationals of majority non-white, non-European nations. *See generally* Compl. ¶¶ 102–08 (detailing statements of Administration officials expressing intent to systematically take away TPS and insinuating it to be or describing it as "illegal");[11] Exs. 8–12, 37–54 (same); Compl. ¶¶ 112–36 (detailing overarching pattern of defective periodic reviews by Defendants). Indeed, President Trump campaigned on a message that if elected, he would end humanitarian immigration programs across the board. Ex. 41. And at her confirmation hearing, Defendant Noem asserted that TPS "has been abused and manipulated

---

[11] In reviewing a motion for postponement of agency action under Section 705 of the APA, this Court may accept as true well-pled allegations in the complaint and uncontroverted affidavits. *California v. Kennedy*, 802 F. Supp. 3d 273, 281 (D. Mass. 2025) (citations omitted).

by the Biden administration . . ." and that extensions "will no longer be allowed." Ex. 8 at 27; *see also* Ex. 10 (reflecting political motive to eliminate or shrink "the TPS system" as a whole, which the Administration claims "has been abused and exploited by illegal aliens for decades.").

President Trump and Defendant Noem followed through on their promise of eliminating access to TPS by terminating TPS designations for *twelve* non-white, non-European countries so far: Ethiopia, Somalia, South Sudan, Cameroon, Haiti, Syria, Afghanistan, Nepal, Burma, Nicaragua, Honduras, and Venezuela. In doing so, Defendants ignored their statutory Constitutional obligations and broke with longstanding agency practices. *See* Ex. 13 at 4–5 (describing TPS decision-making of prior administrations).

To accomplish the goal of systematically shrinking TPS, DHS issued new guidance specifying that periodic reviews of TPS designations should "[f]ocus on conditions described in the original designation," *Nat'l TPS All. v.* Noem, No. 3:25-cv-5687 (N.D. Cal. Nov. 4, 2025), *("NTPSA II")*, Dkt. 176-2 at 1693—while disregarding intervening, objective, and available evidence relevant to the legal grounds underlying given designations. *See generally* Exs. 14–22 (internal agency emails and a Court order reflecting policy change). Indeed, the new policy rigs periodic reviews to cherry-pick evidence of supposed "improvements" skewed towards justifying terminations. *See* Compl. ¶¶ 65, 67, 119–30. Such a change in policy, indicative of the political motivation inherent in this administration's TPS decisions, has been found to likely violate the APA due to departure from prior agency practice.[12] The Court owes no deference to such an unexplained shift in the agency's interpretation of the TPS statute. *See* Compl. ¶ 64; *see generally Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).

---

[12] *See, e.g., Centro Presente*, 332 F. Supp. 3d at 416–17 (in challenge alleging unlawful review of TPS designation for El Salvador, finding plaintiffs had plausibly alleged APA violations based on defendants' unexplained shift to use of this policy during the TPS review process).

b)      *Defendants Did Not Consult with Appropriate Agencies as Required by Statute.*

In her periodic review of Ethiopia's TPS designation, Defendant Noem was required to consult appropriate agencies to develop an objective understanding of country conditions. *See* 8 U.S.C. § 1254a(b)(3)(A); *see also* Ex. 5 (GAO Report) at 18–23 (detailing usual agency consultation process). As with her other periodic reviews of TPS designations, she failed to do so.

Courts have found, and discovery taken in closely analogous cases has shown, that Defendant Noem failed to properly consult with appropriate agencies during TPS periodic reviews. Indeed, these court orders and discovery reflect a lack of consultation entirely with certain agencies before termination and a lack of proper consultation with others. *See Nat'l TPS All. v. Noem*, No. 25-cv-01766-EMC, 2025 WL 2578045, at *30–31 (N.D. Cal. Sep. 5, 2025) ("NTPSA I") (Venezuela) (noting lack of meaningful consultation with agencies prior to Venezuela's TPS termination as well as total failure to conduct meaningful country conditions review); Exs. 14–16 (internal emails reflecting DHS authored termination memos *before* reviewing country conditions of Nicaragua and Honduras); Ex. 17 (internal emails reflecting attempts from Homeland Security officials to cherry pick positive improvements to support predetermined termination decision); *see* Exs. 18–22 (illustrating DHS's pretextual decisions to terminate TPS status). *See also Saget*, 375 F. Supp. 3d at 347–50 (finding APA violation based on periodic review of Haiti's TPS designation non-compliant with statutorily mandated procedures and driven by pretext).

Discovery in similar cases even reveals that DHS stopped receiving country conditions information from the State Department as part of the TPS periodic review process, continuing DHS's abrupt shift away from longstanding practices. *See* Compl. ¶ 64 (citing MacLean Decl., Ex. 21 at 1504_003, *Nat'l TPS All. v. Noem ("NTPSA II")*, No. 25-cv-05687-TLT (N.D. Cal. Nov. 4, 2025), Dkt. 176-22; *id.*, Ex. 26 at 1524, Dkt. 176-27; *id.*, Ex. 27 at 2342, Dkt. 176-28).

10

Ethiopia's Termination notice suggests that Secretary Noem applied the same approach to Ethiopia's Termination.[13]  A review of the administrative record underlying DHS's Termination of Ethiopia's TPS designation may shed more light on this issue.

c)    *Defendants Did Not Consider Available and Objective Evidence of Ongoing Armed Conflict.*

The face of the Termination notice combined with publicly available extrinsic evidence strongly shows that Defendant Noem violated the TPS statute by failing to consider available and objective evidence of ongoing armed conflict in Ethiopia, including evidence relevant to considerations the agency had previously assessed in designating Ethiopia for TPS and reviewing the designation.  *See* Compl. ¶¶ 69–84 (detailing  evidence of ongoing armed conflict in Ethiopia which has involved unlawful killings of civilians, gender-based and sexual violence related to the conflict, and forced recruitment of child soldiers by government and government-affiliated forces); 89 Fed. Reg. 26,172–80 (extension and redesignation for Ethiopia considering comparable factors); 87 Fed. Reg. 76,074–81 (initial designation for Ethiopia considering comparable factors).

The Notice claims that the Ethiopian government's willingness to take back its nationals is a sign of safe conditions there, but that is directly contradicted by objective and available evidence that the Ethiopian government itself is an *ongoing source of danger* for many of its nationals.  *See* Compl. ¶¶ 77–81 (detailing and linking to relevant evidence).  The Termination notice fails to note that fundamental issue, and there is no indication that Defendants even considered it. The Termination notice also makes no mention of President Trump's announcement—made just three months prior—that he was maintaining a declaration of a national

---

[13] *See* Termination of Designation of Ethiopia for Temporary Protected Status, 90 Fed. Reg. 58,028 (Dec. 15, 2025).  The Notice makes several references to "consult[tation] with appropriate U.S. Government agencies[.]" *See, e.g., id.* at 58,028, 58,029.  However, the Notice fails to mention what agencies were consulted and the nature of the consultations. The Notice makes no mention of solicitation of a USCIS country conditions report.  *See id.*

emergency in Ethiopia because of "activities [in the country] that threaten the peace, security, and stability of Ethiopia and the greater Horn of Africa region."  Compl. ¶ 83.  In the aggregate, the Termination notice on its face and combined with extrinsic, objective evidence of ongoing armed conflict in Ethiopia reflect Defendant Noem's failure to conduct a statutorily compliant periodic review of the armed-conflict basis for Ethiopia's TPS designation.  *See* 8 U.S.C. § 1254a(b)(3)(A); *see also, e.g.*, *Saget,* 375 F. Supp. 3d at 333, 346, 362, 372.

> d)    *Defendants Did Not Consider Available and Objective Evidence of Other Extraordinary Circumstances.*

Defendant Noem's Termination notice references supposed improvement in food insecurity and disease outbreaks in Ethiopia.  Publicly available evidence, however, demonstrates that she (1) failed to objectively evaluate those narrow indicators and (2) failed to consider objective evidence of other "extraordinary circumstances" that fed into what the agency had previously assessed in connection with this legal ground for Ethiopia's designation, in violation of the TPS statute.  *Compare* 90 Fed. Reg. 58,028–32, *with* Compl. ¶¶ 85–94 (detailing evidence of ongoing and severe climatic shocks, mass internal displacement, lack of humanitarian access to food, water, and medicine, and human trafficking); 89 Fed. Reg. 26,172–80 (extension and redesignation for Ethiopia considering comparable factors); 87 Fed. Reg. 76,074–81 (initial designation for Ethiopia considering comparable factors).

DHS's assertion that food insecurity in Ethiopia has improved is belied by State Department analysis of relevant country conditions, which indicate violations of both the statutory requirement to consider relevant objective evidence of country conditions *and* to consult with appropriate agencies.  Specifically, the State Department-run Famine Early Warning Systems Network ("FEWS NET") released a report in December of 2025, which noted that large swathes of Ethiopia were already in "crisis" conditions with respect to food insecurity.  Ex. 25 (FEWS

12

NET Food Security Outlook Update, Ethiopia).  The same report indicated FEWS NET expected food insecurity to get *worse* in 2026, because of "historic drought conditions" in 2025 with "water points . . . already near depletion" in portions of Southern Ethiopia as the country enters its dry season in January of 2026.  *Id.*

Instead of engaging in an objective assessment of Ethiopia's country conditions, Defendant Noem pieced together a few illusory "improvements" in Ethiopia's situation to serve the Trump Administration's goal of eliminating TPS for countries of non-white individuals, all the while ignoring mountains of less promising objective data, in violation of the TPS statute.  *See, e.g., Saget*, 375 F. Supp. 3d at 346, 360; 8 U.S.C. § 1254a(b)(3)(A); Compl. ¶¶ 85–94.

> e)    *Defendants Impermissibly Considered Purported Domestic "National Interests" of the United States in Their Periodic Review, Contrary to the TPS Statute and Past Agency Practice.*

The only grounds for terminating a TPS designation under the TPS statute is that the *conditions in the foreign country* no longer warrant designation.  *See* 8 U.S.C. § 1254a(b)(3)(A) (during periodic reviews, the Secretary "shall review the conditions *in the foreign state*" for which "a designation is in effect under this subsection" (emphases added)); *id*. § 1254(b)(3)(B) (allowing termination if the Secretary determines that the foreign state no longer continues to meet the *conditions* for designation); *id*. § 1254a(b)(1)(A) (initial designations based on armed conflict in the foreign country with no reference at all to domestic "national interest"); *id*. § 1254a(b)(1)(C) (initial designations based on extraordinary and temporary conditions and referencing domestic "national interest" not as a "condition" for designating the foreign country but *as an exception to* designating the foreign country).  "National interest" is not a factor that can be considered at the periodic review stage, nor for TPS designations for countries facing armed conflict.  *See* Oral Order at 19–20, *Doe v. Noem, 1:25-cv-08686*, (S.D.N.Y. Oct. 20, 2025) (Dkt. No. 57) (reviewing the TPS statute and finding that "periodic review, including review for termination, is limited to

13

consideration of country conditions, and not to proclamations of the national interest divorced from those country conditions").

Until 2025, no periodic review relied on U.S. domestic interests in considering termination of a TPS designation. Ex. 7 at ¶ 12 (Reichlin-Melnick Decl.). Nevertheless, Defendant Noem's Termination reflects that her periodic review found the continued temporary presence of Ethiopian TPS beneficiaries in the United States was contrary to the "national interest" of the United States, citing various purported examples,[14] each of which fails under APA principles. *See* Compl. ¶¶ 95–97 (unsubstantiated, vague, boilerplate allegations as to supposed security concerns presented by some individual TPS holders, with no explanation for why stringent individual eligibility requirements insufficient to address putative security concerns, calls putative security concerns into question as true justification for Termination); *id*. ¶ 98 (addressing purported concerns about visa-overstay rates as pretext and proxy for impermissible considerations violative of the TPS statute and APA).

Considering domestic "national interest"—particularly where, as here, it serves as a proxy for political considerations that Congress sought to temper with the TPS statute—constitutes both a departure from past agency practice that is arbitrary and capricious under the APA and a shift in agency interpretation of the TPS statute that violates the APA and warrants no deference. *See Loper Bright*, 603 U.S. 369.

f)    *Defendants' Periodic Review was Arbitrary and Capricious Because it Departed from Past Agency Practice.*

The Termination notice was published 60 days before its effective date,[15] the minimum required under the statute. This is a significant departure from established policy and practice of

---

[14] 90 Fed. Reg. 58,031.
[15] 90 Fed. Reg. 58,031.

14

a more orderly transition period of six months or longer.  Ex. 6 (Transition-Period Chart); Ex. 7 at ¶ 12 (Reichlin-Melnick Decl.).  Generally, "[a]n agency may not . . . depart from a prior policy *sub silentio*."  *F.C.C. v. Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009).  When an agency does depart from established policy, it "must show that there are good reasons for the new policy." *Id.*

For the twelve most recent terminations of TPS that preceded the Trump Administration's second term in office—terminations that span two decades—the Agency provided at least a six-month period for an orderly transition.  More commonly there was a twelve- or eighteen-month transition period.  *See* Ex. 6 (Transition-Period Chart); Ex. 7 at ¶ 12 (Reichlin-Melnick Decl.). Defendant Noem has given no explanation for this departure from established practice. Unexplained departures from prior practice, as here, demonstrate an arbitrary and capricious decision under the APA and warrant immediate postponement of the Termination.

g)      *Defendants' Periodic Review Was Unconstitutional.*

5 U.S.C § 706(2)(B) provides a mechanism for the Court to set aside unconstitutional agency action.  Defendants' actions here violate the Fifth Amendment's Due Process Clause, which "contains an equal protection component" that prohibits federal government officials from discriminating on the basis of certain immutable characteristics, including race and national origin. *Washington v. Davis*, 426 U.S. 229, 239 (1976); *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).  The Termination violates Plaintiffs' equal protection rights because it was motivated by animus and resulted in disparate impact upon people who are non-white and non-European.

Courts apply strict scrutiny to cases where a plaintiff establishes that a discriminatory purpose motivated a facially neutral government action.  *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*, 996 F.3d 37, 45 (1st Cir. 2021) (citing *Anderson ex rel. Dowd v. City of Bos.*, 375 F.3d 71, 80–83 (1st Cir. 2004)).  The limited exception for deferential review,

15

adopted in *Trump v. Hawaii,* 585 U.S. 667 (2018), applies only to restrictions on entry *into* the United States and does not apply to challenges to periodic review of TPS designations by individuals already in the country. *See Saget,* 375 F. Supp. 3d at 367; *NTPSA I*, 2025 WL 2578045, at *35 (Venezuela); *NTPSA II,* 2025 WL 2233985, at *14–15 (N.D. Cal. July 31, 2025) (Nepal and Honduras).

To establish an equal protection claim, plaintiffs must allege that "a discriminatory purpose [was] a motivating factor" in the challenged government action. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977). Plaintiffs can establish a discriminatory purpose in one of two ways: (1) where a "clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action[,]" or (2), "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*, 996 F.3d 37, 45 (1st Cir. 2021) (citing *Vill. Of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)) (internal quotations omitted). "Factors bearing on discriminatory intent may include 'the degree of disproportionate racial effect, if any, of the policy; the justification, or lack thereof, for any disproportionate racial effect that may exist; and the legislative or administrative historical background of the decision.'" *Bos. Parent Coal for Acad. Excellence Corp.*, 996 F.3d at 45 (citing *Anderson ex rel. Dowd v. City of Bos.*, 375 F.3d 71, 83 (1st Cir. 2004)). Defendants' use of "charged code words" may serve as "evidence of discriminatory intent by sending a clear message and carrying the distinct tone of racial motivations and implications." *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 609 (2d Cir.

16

2016) (internal citation omitted) (cited in *Valentin v. Town of Natick*, 707 F. Supp. 3d 88, 99 (D. Mass. 2023)).

Plaintiffs have—even before discovery—marshalled compelling evidence of discriminatory intent.  As more fully described in the Complaint, both Defendant Noem and President Trump have repeatedly used "charged code words" in describing policy goals that dehumanize non-white, non-European people.  The animus of Defendant Noem, President Trump, and others in his Administration has been particularly acute in reference to majority Black and African nations.  *See* Compl. ¶¶ 138–69.  President Trump has referred to such nations as "shithole countries" and described immigrants from those places as "vicious" and "violent."  *See* Compl. at ¶¶ 155, 164; Exs. 27–70 (noting specific instances reflecting animus).  President Trump has recently vowed to "pause migration from all Third-World Countries to allow the U.S. system to fully recover[.]"  Ex. 27 (November 27, 2025 Truth Social post from @realDonaldTrump).

Further, the "historical background of the decision" to terminate TPS for Ethiopia shows that it is the latest in "a series of official actions taken for invidious purposes."  *Arlington Heights,* 429 U.S. at 267.  The decision to terminate TPS for Ethiopia is the eleventh in as many months, and courts have already found that the preceding terminations were motivated by the same improper animus.  *See NTPSA I*, 2025 WL 957677 at *855–66; *NTPSA II*, 2025 WL 2233985 at *14-17; *see also NTPSA I*, 2025 WL 2578045 at *35–36 (denying government's motion for summary judgment on equal protection claims).  Defendants' abrupt, unacknowledged, and unreasoned shifts in policy when issuing the determination, *see* Compl. ¶ 63, also evince discriminatory motive.  *Centro Presente v. U.S. Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 415 (plaintiffs plausibly alleged that TPS terminations violated equal protection where terminations

17

rested on an "unreasoned shift in policy."). The periodic review resulting in the termination of TPS for Ethiopia, like the others before it, sounds squarely in racial and/or national origin animus.

Finally, the disparate "impact of the official action," and "whether it bears more heavily on one race," is obvious in this case, where the impact of the challenged action is felt overwhelmingly by non-white Africans. *Arlington Heights,* 429 U.S. at 266 (internal quotation marks omitted). The overall impact of the broader Trump Administration's policy of terminating TPS for all non-white, non-European countries "bears more heavily" on those specific races and/or national origins. *Id*. Simultaneously with its blanket terminations of TPS for non-white, non-European countries, the Administration has encouraged admission of white Afrikaners from South Africa, Ex. 71, and it has posted a series of charged images on social-media depicting fair-skinned white people as emblematic of the "American dream." *See* Exs. 55–60; Compl. at ¶ 154, Figures A–F; *see also* Exs. 33 & 71 (describing Trump Administration's preferential treatment of white refugees from South Africa); *but cf.* Exs. 65, 71–72; Compl. ¶¶ 167, fn. 141 (describing entry bans imposed on nationals of non-European countries who are majority non-white).

This historical and contemporaneous evidence of decision-makers' animus towards non-white, non-European immigrants is more than sufficient to show that Plaintiffs are likely to succeed on the merits of their equal-protection based APA claim, or, at the very least, that there are "serious questions" going to the merits.

**B.      Plaintiffs Face Irreparable Harm Through Termination Resulting from Defective Periodic Review, and the Balance of Hardships, Equities, and Public Interest Favor Plaintiffs.**

Plaintiffs and other Ethiopian TPS holders and applicants would face irreparable harm from an imminent and procedurally defective Termination because it would (1) immediately strip them of immigration status and access to related federal and state benefits (including work authorization, driver's licenses, and healthcare coverage) and (2) subject them to deportation proceedings and

related immigration confinement that would tear them apart from loved ones and community and expose them to forced removal to Ethiopia or other third countries where they will face serious and even deadly danger. These circumstances significantly hurt entire communities because "immigrants without legal status are less likely to report crimes or testify in court, reducing public safety and making effective law enforcement more difficult." *NTPSA I*, 2025 WL 957677, at \*841. And severe economic costs are also inevitable, given that TPS holders are employed at high rates, Ex. 26.    All of the relevant harms are compounded here by the agency's departure from a longstanding practice of more orderly transition periods spanning 6–18 months and by a flood of extremely severe new policies limiting affirmative access to alternative immigration status and to defensive access claims against removal and to fair procedures in contesting removal. Compl. ¶¶ 9–28, 174–95.

The final considerations—the balance of hardships and public interest—merge when the government is a party. *Nken v. Holder,* 556 U.S. 418, 435 (2009).  These considerations weigh heavily in favor of Plaintiffs. *See, e.g.*, *New York v. McMahon*, 784 F. Supp. 3d 311, 372 (D. Mass. 2025) (public interest in agencies' compliance with the rule of law); *see also Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*, 407 F. Supp. 2d 323, 343 (D. Mass. 2005) (same); *Sampiao v. Hyde*, No. 1:25-CV-11981-JEK, 2025 WL 2607924, at \*12 (D. Mass. Sept. 9, 2025) (unlawful immigration enforcement hurts public interest).

Additionally, postponement of the Termination is in the public interest.  The Secretary's unlawful termination of Ethiopia's TPS designation will impose significant harms on the communities in the United States where Ethiopian TPS holders currently live, because "immigrants without legal status are less likely to report crimes or testify in court, reducing public safety and making effective law enforcement more difficult." *NTPSA I*, 2025 WL 957677 at \*841.

19

The Termination would also impose significant economic costs on those communities since TPS holders are employed at high rates. *See* Ex. 26.

## V.   **CONCLUSION**

Plaintiffs respectfully ask the Court to administratively stay Defendants' Termination of Ethiopia's TPS Designation pending judicial review on the merits. Plaintiffs have a substantial likelihood of success on the merits and will face irreparable harm if denied the postponement. The balance of the hardships and the public interest strongly favor Plaintiffs. With an administrative stay until expedited production of the administrative record, the parties will be able to submit supplemental briefing based on what the administrative record reveals.

Dated: January 25, 2026                      Respectfully Submitted,

/s/ Joy Chen
Joy Chen ((BBO No. 714192)
COVINGTON & BURLING LLP
One International Place
Suite 1020
Boston, MA 02110-2627
(617) 603-8821
Jchen@cov.com

/s/ Mark Lynch
Mark H. Lynch (*pro hac vice* forthcoming)
Stephen Petkis (*pro hac vice* forthcoming)
Paul Killebrew (*pro hac vice* forthcoming)
Ayana M. Lindsey (*pro hac vice* forthcoming)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
MLynch@cov.com
SPetkis@cov.com
PKillebrew@cov.com
ALindsey@cov.com

/s/ Nargis Aslami
Nargis Aslami (MA Bar Number: 714848)
Golnaz Fakhimi (*pro hac vice* forthcoming)
Collin Poirot (*pro hac vice* forthcoming)
Abbey Rutherford (*pro hac vice* forthcoming)
MUSLIM ADVOCATES
1032 15th Street N.W. #362,
Washington, D.C. 20005
(202) 897-2622
Nargis@muslimadvocates.org
Golnaz@muslimadvocates.org
Collin@muslimadvocates.org
Abbey@muslimadvocates.org

/s/ Eric Crew
Erik Crew (*pro hac vice* forthcoming)
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
(949) 603-7411
ecrew@haitianbridge.org

Sarah Leadem (*pro hac vice* forthcoming)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
(415) 591-6000
SLeadem@cov.com

Michael E. Cunniff (*pro hac vice* forthcoming)
COVINGTON & BURLING LLP
30 Hudson Yards
New York, NY 10001
(212) 841-1000
MCunniff@cov.com

*Counsel for Plaintiffs African Communities Together, Samuel Doe, Stephen Doe, Abal Doe, and the Proposed Class*

21