# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AFRICAN COMMUNITIES TOGETHER, SAMUEL DOE, STEPHEN DOE, and ABAL DOE on behalf of themselves and all others similarly situated,<br><br><br>*Plaintiffs*,<br><br><br>v.<br><br><br>KRISTI NOEM, in her official capacity as Secretary of the U.S. Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; and UNITED STATES OF AMERICA,<br><br><br>*Defendants*. | Civil Action No. 1:26-cv-10278 |

**DECLARATION OF AMAHA KASSA**

I, Amaha Kassa, declare, based on my personal knowledge:

1. I am a first-generation Ethiopian immigrant and the Founder and Executive Director of African Communities Together (ACT).

2. As Executive Director, I have knowledge of ACT's membership, including its members' circumstances, needs, and priorities. I am acutely aware of the devastating impact that the loss of Temporary Protected Status ("TPS") has had and can have on ACT's members.

1

**Background on African Communities Together and Its Membership**

3. ACT is a non-profit organization of African immigrants fighting for civil rights, opportunity, and a better life for families and communities here in the United States. ACT was incorporated in New York in 2013 and is a membership-based organization.

4. ACT's mission is to empower African immigrants and help them integrate socially, advance economically, and engage civically in the United States. ACT offers a variety of free services to its members, including immigration legal services, assistance with health insurance and public-school enrollment, support in applying for identification, job recruitment programs, leadership development, referrals for food and housing, and more.

5. ACT has thousands of members nationwide comprising African immigrants and their families.

6. One of the ways members join ACT is by meeting with ACT intake staff and filling out an individual membership form, which is available on our website. During the intake process, ACT staff ask new members what services they need and give them the opportunity to provide information about their immigration status.

7. Staff recruit members from within the African immigrant community by sharing information about membership with those who come to ACT seeking services, as well as hosting targeted recruitment events, tabling at community events, and hosting informational webinars that include information about joining ACT.

8. Membership in ACT is voluntary and free.

9. Members set ACT's priorities and shape its work in a variety of ways. Members attend monthly membership meetings at each chapter, during which they can provide feedback and recommendations about ACT's work and its campaigns. Members can also join committees that run ACT's advocacy campaigns. Members on committees have the opportunity to participate in various training programs, including regarding the legislative process, organizing, and media training.

10. ACT is specifically involved in efforts to preserve, defend, and expand TPS designations and related benefits, due to the substantial role TPS plays in protecting our members and their families.

11. ACT's membership is diverse and includes people around the U.S. who are the nationals or descendants of myriad African nations, as well as their family members. ACT's membership has diverse citizenship and immigration statuses and includes TPS holders and/or applicants from Ethiopia and other African countries, including South Sudan and Sudan.

12. ACT's members who are Ethiopian TPS recipients and/or applicants live around the United States, including in Massachusetts.

13. ACT provides its members with free, high-quality immigration legal services, including case-by-case assistance with applications and reapplications for TPS and for related employment authorization.

14. ACT undertakes public education on TPS through community webinars and resource sheets.

15. ACT develops and engages in policy and advocacy campaigns calling for the designation, redesignation, and extension of TPS for African countries facing dangerous conditions, in line with the statute's humanitarian principles and intent. For example, ACT and 35 other U.S.-based organizations issued a letter in October 2025 calling on the Administration to issue an 18-month extension and redesignation of TPS for Ethiopia due to multiple ongoing crises there, including ongoing armed conflict, floods and drought, mass internal displacement, severe food insecurity, and disease outbreaks.

16. To advance ACT's goals of defending TPS from unlawful terminations and attacks, ACT is part of Communities United for Status and Protection ("CUSP"), which brings together grassroots community groups to advocate for permanent status for TPS-holders from African, Afro-Caribbean, Afro-Latinx, Arab, Middle Eastern, and Asian Pacific Islander communities. The other organizational members of CUSP are the Haitian Bridge Alliance, the UndocuBlack Network, Adhikaar, and the National Network for Arab American Communities.

17. ACT recognizes that, without changes and improvements in U.S. immigration policies, the communities it serves can face many roadblocks and are often threatened unlawfully with being uprooted from their families and communities. That is why ACT supports its members in participating in TPS-related litigation, like this lawsuit. *See also ACT v. Noem*, No. 1:25-cv-13939-PBS (D. Mass.); *Ramos v. Nielsen*, No. 3:18-cv-01554 (N.D. Cal.).

18. ACT is all too aware that the current Trump Administration has terminated the TPS designation of every country facing periodic review of its designation. ACT discerns in that pattern anti-Black racism and other discriminatory animus driven by a motive of eliminating access to TPS for non-white, non-European-descended people generally and for Black and African people, specifically.

**The Termination of Ethiopia's TPS Harms ACT's Members**

19. The anti-Black racism and discriminatory animus that ACT discerns to be a cause of or contributor to the Administration's decision to terminate TPS for Ethiopia is deeply

harmful—not only for ACT's members but for the diverse and pluralistic fabric of American society.

20. ACT's members who are Ethiopian TPS recipients or applicants, or who are the U.S.-based family members of such people, face severe and myriad other harms from the imminent termination of Ethiopia's TPS designation, scheduled to take effect beyond February 13, 2026.

21. For the TPS recipients, those harms can include: losing TPS as a sole source of immigration status; losing eligibility for related federal benefits (such as work authorization); losing eligibility for related state benefits (such as drivers' licenses); facing the risk of deportation charges and of related immigration confinement; facing related, forced separation from loved ones and community in the U.S.; and facing forced removal to Ethiopia and the risks of harm there, including deadly harm.

22. For the TPS applicants, the harms include no longer having any basis for consideration of their pending application for TPS and losing access to TPS and related protection against deportation and immigration confinement.

23. For all of the TPS recipients, TPS applicants, and their U.S.-based family members, the harms include the stress and torment of possible forced separation from each other and the fear that the applicants and recipients could face grave harm, including death, if forcibly removed to Ethiopia or another country where they could face harm.

24. All of these harms are compounded by the fact that the Administration only provided a 60-day wind-down period for Ethiopia TPS recipients, which is insufficient for current holders, applicants, and U.S.-based family members of holders or applicants to respond or plan fairly.

25. The unfairness of the 60-day wind-down is exacerbated by other severe policy changes that the Administration has implemented, including:

   a. A November 27, 2025, policy change of U.S. Citizenship and Immigration Services (USCIS) that requires negative consideration of "country-specific" factors in the review of any application for any discretionary immigration benefit that USCIS receives on or after November 27, 2025;

   b. A December 2, 2025, set of policy changes from USCIS announcing (1) a blanket pause on all processing of affirmative asylum applications and (2) a blanket pause on the processing of immigration benefits applications for applicants who come from countries whose nationals are subject to the entry bans instituted effective June 9, 2025;

   c. A January 1, 2026, announcement of USCIS expanding the December 2 blanket pause on the processing of immigration benefits applications for applicants who

4

come from any of the additional countries subject to entry bans that the President announced through a December 16, 2025, proclamation; and

d. A January 14, 2026, announcement of the U.S. Department of State indefinitely pausing the issuance of immigrant visas (entry permits) to the nationals of over 75 countries, including Ethiopia and 34 other countries that are African or whose nationals are majority Black and descended from Africans.

26. The blanket USCIS pause on asylum processing that is currently in place renders virtually impossible any affirmative access to asylum for Ethiopian TPS holders and/or applicants, ahead of the February 13, 2026, termination date for TPS for Ethiopia.

27. Additionally, the Administration's decisions to terminate TPS for Ethiopia and to pause the issuance of immigrant visas (entry permits) to Ethiopians makes ACT fear that:

a. USCIS will pause the processing of pending benefits requests from Ethiopians within the interior of the U.S., particularly since USCIS under its December 2, 2025, and January 1, 2026, policies has otherwise paused the processing of such pending requests from applicants who are nationals of countries subject to entry bans; and

b. USCIS will apply negative weight to Ethiopian national origin in its consideration of any application filed by an Ethiopian on or after November 27, 2025, pursuant to USCIS's November 27, 2025, policy announcement.

28. The individual plaintiffs in this lawsuit are all members of ACT.

29. In addition to representing the interests of the individual plaintiffs and other ACT members, ACT seeks to be a representative for all people injured by the unlawful termination of TPS for Ethiopia, comprising the following classes:

a. All nationals of Ethiopia or individuals without any nationality who last habitually resided in Ethiopia who are present in the U.S. and are current recipients or holders of TPS for Ethiopia (the "Recipient Class");

b. All nationals of Ethiopia or individuals without any nationality who last habitually resided in Ethiopia who are present in the U.S. and have pending applications for TPS for Ethiopia that reflect their prima facie eligibility for it (the "Applicant Class"); and

c. All U.S. citizen dependents or immediate relatives of any member of the Applicant Class or Recipient Class (the "Family Class").

30. ACT's mission, history, expertise, advocacy, membership, and networks amply equip it to competently be a representative for the proposed classes anticipated within this lawsuit.

31. If this lawsuit were successful in (1) postponing the February 13, 2026, termination date for Ethiopia's TPS designation and/or (2) resulting in a determination that the

5

termination is unlawful—either or both of those outcomes would further the interests of ACT's members as well as of the proposed classes anticipated within this lawsuit.

Executed on January 22, 2026.

/s/ Amaha Kassa

AMAHA KASSA