# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AFRICAN COMMUNITIES TOGETHER; SAMUEL DOE; STEPHEN DOE; and ABAL DOE, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; and UNITED STATES OF AMERICA,<br><br>*Defendants*. | **SUPPLEMENTAL MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO POSTPONE AGENCY ACTION**<br><br>Civil Action No. 1:26-cv-10278-BEM |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................ 1

I.   THE CERTIFIED ADMINISTRATIVE RECORD CONFIRMS THAT
     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. .................................... 1

     A.   The CAR Shows that Defendants Did Not Consult Appropriate Agencies
          as Required by the TPS Statute............................................................................. 2

     B.   The CAR Shows the Periodic Review Process was Arbitrary and
          Capricious. ............................................................................................................ 4

          1.   Defendants Did Not Solicit a Country Conditions Report from the
               State Department, Continuing a *Sub Silentio* Change in Agency
               Policy. ....................................................................................................... 5

          2.   Defendants' Consideration of National Interests Was Arbitrary and
               Capricious. ................................................................................................ 6

     C.   The CAR Shows Defendants Either Did Not Review Objective Evidence
          of Conditions in Ethiopia or Disregarded Such Evidence to Reach a Pre-
          Determined Conclusion. ....................................................................................... 7

          1.   The CAR Shows Defendants Did Not Consider Available and
               Objective Evidence of Ongoing Armed Conflict....................................... 8

          2.   The CAR Shows that Defendants Did Not Consider Available and
               Objective Evidence of Other Extraordinary Circumstances. ..................... 9

          3.   Alternatively, the CAR Shows Defendants Review Was Arbitrary
               and Capricious. ........................................................................................ 11

     D.   The CAR Shows that Defendants Impermissibly Considered U.S. National
          Interests. .............................................................................................................. 12

II.  THE CERTIFIED ADMINISTRATIVE RECORD CONFIRMS THAT
     PLAINTIFFS FACE SEVERE AND IRREPARABLE HARM ABSENT
     POSTPONEMENT. ......................................................................................................... 13

CONCLUSION............................................................................................................................15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aung Doe et. al v. Noem et. al*,
    No. 1:25-cv-15483, 2026 WL 184544 (N.D. Ill. Jan. 23, 2026) ...................................... *passim*

*Cal. Wilderness Coal. v. U.S. Dep't of Energy*,
    631 F.3d 1072 (9th Cir. 2011) ........................................................................................... 2

*Campanale & Sons, Inc. v. Evans*,
    311 F.3d 109 (1st Cir. 2002) ........................................................................................... 2, 3

*Dahlia Doe v. Noem*
    1:25-cv-08686, (S.D.N.Y. Oct. 20, 2025) ......................................................................... 13

*F.C.C. v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ........................................................................................................... 4

*FDA v. Wages & White Lion Invs., L.L.C.*,
    604 U.S. 542 (2025) ........................................................................................................... 4

*Nat'l TPS All. v. Noem*,
    No. 3:25-cv-05687-TLT, 2025 WL 4058572 (N.D. Cal. Nov. 4, 2025) ................................ 5

*Saget v. Trump*,
    375 F. Supp. 3d 280 (E.D.N.Y. 2019) .......................................................................... 7, 14

**Statutes**

5 U.S.C. § 705 ................................................................................................................. 1, 5, 15

8 U.S.C. § 1254a(b)(3)(A) .................................................................................................. *passim*

**Other Authorities**

87 Fed. Reg. 76,074 (Dec. 12, 2022) ....................................................................................... 11, 12

89 Fed. Reg. 26,172 (Apr. 15, 2024) ....................................................................................... 11, 12

90 Fed. Reg. 58,028 (Dec. 15, 2025) .................................................................................... *passim*

Executive Order 14159 ................................................................................................................ 7

## INTRODUCTION

The Certified Administrative Record ("CAR") demonstrates that Secretary Noem did not follow the process required by the Temporary Protected Status ("TPS") statute when she terminated Ethiopia's TPS designation (the "Termination") and that her decision contravened the TPS statute and the Administrative Procedure Act ("APA") on several grounds. As described herein, the CAR establishes that Plaintiffs are likely to succeed on the merits in demonstrating the periodic review process violated the APA. Further, the extensive objective evidence of ongoing armed conflict and extraordinary conditions in Ethiopia establish Plaintiffs will suffer irreparable harm if the Termination takes immediate effect. Accordingly, postponement of the Termination is warranted under APA Section 705 pending full judicial review.

**I.    THE CERTIFIED ADMINISTRATIVE RECORD CONFIRMS THAT PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.**

The CAR shows conclusively that Defendant Noem did not perform her statutory obligation to "consult[] with appropriate agencies." 8 U.S.C. § 1254a(b)(3)(A); *see also* Mem. of Law in Supp. of Pls' Emergency Mot. ("Memo in Support"), Dkt. 15-1 at 15–16. That failure, standing alone, shows that Plaintiffs are likely to succeed on the merits of their claim that the periodic review underlying the Termination was unlawful. *Afr. Communities Together v. Noem*, No. 25-CV-13939-PBS, 2026 WL 395732 (D. Mass. Feb. 12, 2026) ("*ACT I*"), Dkt. 65 at 36 ("Plaintiffs are likely to succeed on their claim that Secretary Noem acted contrary to law by failing to consult with appropriate agencies."). But that is not all. The CAR also clearly demonstrates that Defendants, in their periodic review process, (1) departed from past agency practice in a way that was arbitrary and capricious, (2) failed to consider objective evidence of armed conflict and extraordinary circumstances, and (3) unlawfully considered the United States' domestic "national interests."

1

### A. The CAR Shows that Defendants Did Not Consult Appropriate Agencies as Required by the TPS Statute.

At the periodic review stage, Congress provided that the Secretary "shall" review conditions in the TPS-designated country "*after* consultation with appropriate agencies of the Government." 8 U.S.C. § 1254a(b)(3)(A) (emphasis added). In this Circuit, "consultation means what consultation ordinarily means . . . the act of asking the advice or opinion of someone." *Campanale & Sons, Inc. v. Evans*, 311 F.3d 109, 117 (1st Cir. 2002) (cleaned up).[1] As a procedural requirement of the periodic reviews of TPS designations, "[c]onsultation is a process that requires reciprocal communication of some substance; it is not satisfied by a rubber stamp or a sign-off on a decision that has already been made." *Aung Doe et. al v. Noem et. al*, No. 1:25-cv-15483, 2026 WL 184544 (N.D. Ill. Jan. 23, 2026) (litigation concerning periodic review and termination of TPS for Burma), Dkt. 51 at 28. Under the TPS statute, "consultation" requires meaningful deliberation, which demands "weighing and examining the reasons for and against a contemplated act or course of conduct." *ACT I*, Dkt. 65 at 34 (granting stay of agency action based on lack of meaningful consultation).

The CAR contains no indication that DHS "consulted" with another agency in the manner required by law. The *only* communication with another agency in the CAR is a single October 2025 email from the State Department to DHS titled "Consultation between DOS and DHS Pertaining to Ethiopia Determination" in the index which reads: "I verify that State has no foreign policy concerns with a termination of [TPS] for Ethiopia." *See* Leadem Decl., Ex. 1 at Ethiopia TPS AR000330. *Id.* This email is not in response to any request by DHS to "advise" or for an

---

[1] Other Circuits have held that "consultation" has a similarly robust meaning. *See, e.g.*, *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1088 (9th Cir. 2011) (noting that consultation is an "affirmative duty" that must be "meaningful" and occur before deciding).

"opinion" from the State Department; there is no communication *from* DHS to State *at all*. *But cf. Campanale*, 311 F.3d at 117. It fails to reflect any modicum of "weighing" or "examining" the considerations relevant for periodic review, and, far from evidencing any consultation, the State Department provides nothing more than a summary "verification," "sign[ing]-off on a decision that has already been made." See *Aung Doe*, No. 1:25-cv-15483, Dkt. 51 at 28.

The one-line email also only mentions *foreign policy* concerns related to the Termination and does not speak to the only relevant considerations permitted under the TPS statute—the "conditions in the foreign state" or whether the "conditions for [TPS] designation . . . continue to be met." *See* 8 U.S.C. 1254a(b)(3)(A). The failure to consider required topics and the reference to a topic—foreign policy concerns—not mentioned in the statute, are further evidence that DHS's decision to "end[] the TPS designation" for Ethiopia was made *prior* to the State Department's email, directly violating the process required by statute: an objective review of country conditions and ultimate determination "after" the requisite consultation has taken place. *Id.* There is *no* evidence in the CAR that anyone in DHS consulted the State Department—or any other government agency—regarding country conditions in Ethiopia as required by the TPS statute.

Notably, in cases where Defendants submitted similarly cursory emails from the State Department noting no "foreign policy concerns" with terminating TPS, courts have found such emails insufficient "consultation" under the TPS statute. *See Aung Doe*, No. 1:25-cv-15483, Dkt. 51 at 29–30; *ACT I*, Dkt. 65 at 32, 34. The court in *Aung Doe* found a single email *exchange* with the State Department featuring similar language insufficient for two reasons.[2] *First*, as here, there

---

[2] Unlike the CAR in this case, the CAR in *Aung Doe* included an initial email from DHS notifying the State Department that four countries' TPS were coming up for review, a response from the State Department indicating no "foreign policy concerns" with terminating TPS, and a follow up email from DHS looping USCIS into the exchange. *Aung Doe*, No. 1:25-cv-15483, Dkt. 51 at 29. Similarly, in *ACT I*, the CAR included an initial email from DHS and a response from State. *ACT I*, Dkt. 65 at 32. Here, the (continued…)

3

was no back-and-forth, and the State Department's response suggested a "foregone conclusion that the Secretary would terminate the listed TPS designations, a logical assumption based on the Secretary's recent practice of terminating each TPS designation up for review." *Aung Doe*, No. 1:25-cv-15483, Dkt. 51 at 30. *Second*, the conclusory statement by the State Department addressed only "foreign policy concerns with ending these TPS designations, a distinct issue from the statute's reference to whether the conditions for [TPS] designation under this subsection continue to be met." *Id.* (cleaned up). In *ACT I*, the same email exchange was held to be "plainly . . . inadequate" consultation. *ACT I*, Dkt. 65 at 34. The same conclusion applies here with even greater force. In those other cases, there had at least been an email from DHS to State seeking State's views, while here, the State Department's email seems to have arrived at DHS out of the blue.

### B.     The CAR Shows the Periodic Review Process was Arbitrary and Capricious.

The CAR further reveals that the periodic review process departed from past agency practice without explanation, making that process arbitrary and capricious. While "agencies are free to change their existing policies as long as they provide a reasoned explanation for the change," *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 568 (2025) (quotation omitted), generally, "[a]n agency may not . . . depart from a prior policy *sub silentio*," *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). When an agency does depart from established policy, it "must show that there are good reasons for the new policy," *id.*, and "display awareness that it *is* changing position," *White Lion*, 604 U.S. at 568.

Here, the CAR demonstrates that the periodic review underlying the Termination arbitrarily departed from prior policy in three ways. *First*, the CAR demonstrates that Defendants did not

---

CAR only contains a single email from the State Department with no initial DHS email or follow up. This is even less "consultation" than occurred in *Aung Doe* or *ACT I*.

solicit or consider a country conditions report from the State Department. *Cf.* Memo in Support, Dkt. 15 at 15–16 (citing extrinsic evidence of this shift, generally, across periodic reviews of TPS designations). *Second*, the CAR demonstrates that Defendants considered U.S. "national interests" in the periodic review process that culminated in a termination decision for Ethiopia based, in part, on U.S. "national interests" and contrary to prior agency practice. *Cf. id.* at 18–19 (citing extrinsic evidence of this shift, generally, spanning periodic reviews of different countries' designations and contrasting it with prior agency practice). *Third*, the CAR demonstrates that Defendants disregarded evidence of conditions in Ethiopia relevant to factors the agency had considered in prior periodic reviews of Ethiopia's designation. *Id.* at 16–18

These unexplained departures from prior agency practice show the periodic review was not undertaken in good faith but to arrive at a pre-ordained conclusion. The CAR thus demonstrates Plaintiffs are likely to succeed on the merits of the claim that the Termination was arbitrary and capricious under the APA, and thus warrants postponement of the Termination pending the Court's full review of the agency's action. 5 U.S.C. § 705.

        1.    <u>Defendants Did Not Solicit a Country Conditions Report from the State Department, Continuing a *Sub Silentio* Change in Agency Policy.</u>

As revealed in discovery related to termination of TPS for Nepal, Honduras, and Nicaragua, DHS stopped receiving country conditions information from the State Department as part of periodic review in or around March 2025. *See* Memo in Support, Dkt. 15 at 10–11 (citing *Nat'l TPS All. v. Noem*, No. 3:25-cv-05687-TLT, 2025 WL 4058572 (N.D. Cal. Nov. 4, 2025), Exs. in Supp. of Pls' Mot. for SJ, Dkt. 176-22 at 1504_0002–1504_0003 (April 8, 2025, DHS emails noting that "DOS [Department of State] is no longer providing country conditions"); *id.*, Dkt. 176-27 at 1525 (March 11, 2025, DHS emails remarking that State Department personnel "are going to provide a letter instead of country conditions"); *id.*, Dkt. 176-28 at 2342 (March 21, 2025, DHS

5

emails remarking that "State will no longer submit detailed COI [] reports for TPS decision-making")). These communications reflect a sharp break in agency practice of soliciting and reviewing State Department country conditions reports as part of periodic review. *See* Dkt. 15-6 at 15–28 (guidance from U.S. Government Accountability Office laying out the steps normally taken by DHS and the State Department in periodic review).

The CAR here shows the same: while there is a country conditions report from the Refugee, Asylum, and International Operations ("RAIO") Directorate *within* DHS, Leadem Decl., Ex. 2 at Ethiopia TPS AR000196-223, there is no report from the State Department. Defendants provide no rationale for this abrupt shift in procedure, making it arbitrary and capricious.

2. Defendants' Consideration of National Interests Was Arbitrary and Capricious.

As described above, Defendants improperly considered U.S. domestic "national interests" during the periodic review process. In addition to being a consideration not provided for in the statute, *see* § D *infra* and 8 U.S.C. § 1254a(b)(3)(A), it is a consideration no prior TPS termination decision had rested on prior to 2025. In postponing the termination of Burma's TPS status, the district court found Plaintiffs were likely to succeed on their claim that Defendant Noem's reliance on national interest in her termination notices was arbitrary and capricious because it deviated from past policy with no explanation of why. *Aung Doe*, No. 1:25-cv-15483, Dkt. 51 at 49–51.

Here, Defendant Noem relied on a similar national interest claim when she stated that "a significant portion of the Ethiopian [TPS] population have been under administrative investigation for risk to national security, public safety, or for attempting to obtain immigration benefits through fraud or misrepresentation." 90 Fed. Reg. 58,028, 58,231 (Dec. 15, 2025), Leadem Decl., Ex. 5 at Ethiopia TPS AR0000045. This conclusion is contrary to evidence in the CAR, which shows *not a single* TPS holder was found to have committed fraud and *only five* out of 5,524 holders (.09%)

6

were associated with public safety records. *See* Leadem Decl., Ex. 3 at Ethiopia TPS AR000246. Thus, the CAR shows Defendants' unexplained policy change to consider domestic national interests, and the purported rationale for doing so, were both arbitrary and capricious. *See* Memo in Support, Dkt. 15 at 19; Compl. ¶¶ 95–99, 131–33.

      **C.**    **The CAR Shows Defendants Either Did Not Review Objective Evidence of Conditions in Ethiopia or Disregarded Such Evidence to Reach a Pre-Determined Conclusion.**

The TPS statute calls for "review of conditions in the foreign state" at the periodic review stage. Defendant Noem was required to base this review on "objective conditions in the [] country," "regardless of any government official's political motives." *Saget v. Trump*, 375 F. Supp. 3d 280, 346 (E.D.N.Y. 2019); *see also* 8 U.S.C. § 1254a(b)(3)(A). Here Defendants either (a) did not review objective evidence contained in the CAR of current conditions in Ethiopia; or (b) cherry-picked from the record only evidence that supported the decision to terminate the TPS designation. Either way, the Termination was arbitrary and capricious.

Plaintiffs have shown that statements made by Defendant Noem, President Trump, and other administration officials created considerable pressure to terminate TPS designations, regardless of the objective country conditions in the foreign states.[3] These statements were not just empty rhetoric: Defendant Noem followed through by terminating TPS status for all 13 countries for which she has overseen periodic review.[4] Given Defendants' wider conduct in terminating TPS designations at every turn, the failure to consider the objective evidence in the record as laid out

---

[3] *See, e.g.*, Leadem Decl. Ex. 4, Ethiopia TPS AR000019–24 (Executive Order 14159 titled "Protecting the American People Against Invasion," which purported to raise the alarm about an "unprecedented flood of illegal immigration" and called on the DHS Secretary to ensure that TPS designations are "limited in scope and made for only so long as may be necessary to fulfill[.]" statutory requirements); Dkt. 15 (Exs. 8–11, 37–52) (compiling statements of Defendant Noem, President Trump, and others committing to "end" TPS).

[4] These 13 countries include Venezuela, Afghanistan, Cameroon, Nepal, Honduras, Nicaragua, Syria, South Sudan, Burma, Haiti, Ethiopia, Yemen, and Somalia.

7

herein "suggests that the Secretary did not review the evidence regarding any of these countries . . . as required by the TPS statute." *Aung Doe,* No. 1:25-cv-15483, Dkt. 51 at 36.

        1.    <u>The CAR Shows Defendants Did Not Consider Available and Objective Evidence of Ongoing Armed Conflict.</u>

Plaintiffs previously noted that the contents of the Termination notice are relevant evidence that Defendant Noem failed to consider objective evidence of ongoing armed conflict during the periodic review process for Ethiopia's designation. *See* Memo in Support, Dkt. 15-1 at 11–12. The Termination notice states that "residual challenges in regions affected by the conflicts remain," including "sporadic and episodic violence" and "an increase in incidents of violence against civilians in the Amhara region." 90 Fed. Reg. 58,028–32 (Dec. 15, 2025), Leadem Decl., Ex. 5 at Ethiopia TPS AR0000042–46.

The Termination notice, however, does not address other, relevant information contained in the CAR that the agency *did consider* in its prior periodic reviews of Ethiopia's designation.[5] Nor does the Termination notice explain this departure. The CAR demonstrates that DHS *itself* specifically warned that armed conflict has persisted since the prior TPS extension in April 2024. A country conditions report from DHS's RAIO covering January 1, 2023, to August 14, 2025, notes that, "[w]hile two years of armed conflict in the Tigray region ended with a Cessation of Hostilities Agreement in November 2022, armed violence has continued in the two largest regional states of the country: Amhara and Oromia. These conflicts have caused the deaths of hundreds of thousands of people including civilians, along with large-scale displacement, and destruction of public property, cultural heritage, and infrastructure." Leadem Decl., Ex. 2 at Ethiopia TPS

---

[5] *See* Memo in Support, Dkt. 15 at 5 (describing the factors relied on by the DHS Secretary in its initial designation of Ethiopia's TPS); Compl. at ¶¶ 82, 86, 93.

AR000196.[6] The RAIO report also notes that ongoing armed conflict impacts "almost all regions of the country," as "[p]opulations across Ethiopia continue to be at risk due to clashes between armed groups and government forces, as well as inter-communal violence, often fueled by ethnic and political tensions." *Id.* at AR000206 (internal quotations omitted). Failure to address any of this objective evidence in the periodic review is a violation of Congress's mandate that the Government "shall" review conditions in the foreign state and renders the periodic review process unlawful. 8 U.S.C. § 1254a(b)(3)(A); *see also* Memo in Support, Dkt. 15-1 at 7–18. And failure to explain why given information in the CAR was not considered—when comparable information had been considered during prior periodic reviews—is arbitrary and capricious in violation of the APA. *See* Memo in Support, Dkt. 15-1 at 11–12; Compl. ¶¶ 69–84, 223–227.

### 2. The CAR Shows that Defendants Did Not Consider Available and Objective Evidence of Other Extraordinary Circumstances.

Similarly, Plaintiffs previously noted that Defendant Noem's consideration of extraordinary circumstances in Ethiopia appears to include only cherry-picked indicia of minor positive developments. The CAR spans more than 3,300 pages, mostly containing articles and reports detailing Ethiopia's complex humanitarian crisis that span factors the agency previously did consider in its periodic reviews and had addressed in its related Federal Register notices. *See* Memo in Support, Dkt. 15-1 at 12–13; Compl. ¶¶ 85–94. Defendant Noem appears to have considered only three developments of extraordinary circumstances: a statistic reporting the number of internally displaced people who have returned to their area of origin as of June 2024;

---

[6] The CAR is replete with evidence of ongoing conflict, *see* Leadem Decl., Ex. 2 at AR000201–203 (noting that in Amhara "fighting has continued with no significant reduction in intensity" since June 2024 and "shows no signs of abating with, both sides suffering military escalation over negotiations."); *id.* at AR000204–205 (noting that in Oromia armed conflict has shifted geographically with a sharp increase in attacks in North Shewa and violence against civilians has persisted in 2025).

9

the transition of the United States food assistance program in northern Ethiopia to the Joint Emergency Operations Program in July 2025; and a nationwide measles campaign in August 2025. 90 Fed. Reg. 58,028, 58,030 (Dec. 15, 2025), Leadem Decl., Ex. 5 at Ethiopia TPS AR0000044; *see also* Memo in Support, Dkt. 15-1 at 12–13.

The skimpy considerations noted in the Termination notice contrast significantly with the CAR, which is replete with voluminous, objective evidence that is relevant to the assessment of whether extraordinary circumstances continue to exist and comparable to evidence the agency had assessed in its prior periodic reviews and addressed in its related Federal Register notices. For example, the RAIO report states that "Ethiopia is currently facing a difficult humanitarian situation driven by armed conflict, drought, floods, disease outbreaks, and mass displacement," which have led to "widespread food insecurity, malnutrition, and loss of lives and livelihoods." Leadem Decl., Ex. 2 at Ethiopia TPS AR000210. The report also notes armed violence has continued to destroy the country's healthcare infrastructure and disrupt delivery of supplies and services, while the country battles "outbreaks of cholera, malaria, and measles" and has some of the highest mortality rates in the world for adults and children under age five. *Id.* at AR000214–215.

In short, Defendant Noem's own agency provided her with available and objective evidence of ongoing extraordinary circumstances—evidence that Congress requires her to consider. 8 U.S.C. § 1254a(b)(3)(A). Her failure to reference any of it in the Termination notice indicates that she did not do so, and the process therefore is contrary to law. *See* Memo in Support, Dkt. 15-1 at 7–13. Failure to explain why certain information in the CAR was not considered where comparable information had been considered during prior periodic reviews is also arbitrary and capricious. *See* Memo in Support, Dkt. 15-1 at 12–13; Compl. ¶¶ 85–94, 223–227.

       3.      <u>Alternatively, the CAR Shows Defendants Review Was Arbitrary and Capricious.</u>

Even if the Court concludes that Defendants did review conditions in Ethiopia, they did so in a manner that was arbitrary and capricious. Defendants failed to consider a mountain of evidence in the CAR when it determined that no "ongoing armed conflict" warranting extension of TPS existed because "there are signs of improvement in the country." 90 Fed. Reg. 58,028, 58,030 (Dec. 15, 2025), Leadem Decl., Ex. 5 at Ethiopia TPS AR0000044. In addition to not being in accordance with the law, this conclusion reflects an unexplained change in the standard for what constitutes "ongoing armed conflict" that is arbitrary and capricious.

Ethiopia's civil war in the Tigray region began in November 2020 and formally ended in November 2022. *See* Leadem Decl., Ex. 6 at Ethiopia TPS AR000007. However, Ethiopia's initial TPS designation occurred *after* the war had officially ended and stated that "[w]hile this agreement [was] an important step in curbing violence in northern Ethiopia, it [did] not address violence in other parts of Ethiopia." 87 Fed. Reg. 76,074, 76,076 (Dec. 12, 2022). Ethiopia's TPS was later extended and redesignated *two years after* the war had officially ended because (i) internal armed conflict in Amhara and violence across multiple regions persisted, and (ii) human rights abuses by armed actors and indiscriminate attacks on civilians remained prevalent. 89 Fed. Reg. 26,172, 26,174 (Apr. 15, 2024), Leadem Decl., Ex. 7 at Ethiopia TPS AR000027.

The most recent RAIO report reflects armed violence remains ongoing with "no signs of abating." *See* Ethiopia TPS AR000196–223 (noting "ongoing tensions" in Tigray "could escalate into a broader conflict involving Eritrea and other regional actors" and "clashes between armed groups and government forces, as well as inter-communal violence" impact almost all regions (internal quotations removed)). The Termination notice fails to evaluate these ongoing conditions. Instead, it states that "signs of improvements in the country" like "a record-breaking national

budget of $33.7 billion," "suggest there is no longer an ongoing armed conflict that poses a serious threat to the personal safety of returning Ethiopian nationals." 90 Fed. Reg. 58,028, 58,030 (Dec. 15, 2025), Leadem Decl., Ex. 5 at Ethiopia TPS AR0000044. Consequently, the Termination notice reflects an unexplained change in the agency's standard by which armed conflict is assessed.

Similarly, the Termination notice does not explain why Defendant Noem did not consider ongoing humanitarian conditions—including internal displacement, food insecurity, and disease outbreaks—that were considered in the initial designation and 2024 redesignation in determining whether other extraordinary circumstances still exist in Ethiopia. *Compare* 90 Fed. Reg. 58,028, 58,030 (Dec. 15, 2025) (citing supposed improvements in extraordinary and temporary conditions without considering evidence of ongoing humanitarian needs as detailed in the RAIO report), *with* 87 Fed. Reg. 76,076–78 (Dec. 12, 2022), 89 Fed. Reg. 26,174–76 (Apr. 15, 2024); *see also* Memo in Support, Dkt. 15-1 at 12–13. Both of these unexplained changes in standards governing the assessment of conditions relevant to legal grounds for TPS redesignation are arbitrary and capricious and violate the APA.

> **D.     The CAR Shows that Defendants Impermissibly Considered U.S. National Interests.**

Congress omitted consideration of U.S. domestic "national interests" from periodic reviews of TPS designations, textually limiting such periodic reviews to consideration of the "conditions in the foreign state" for which "a designation is in effect," in order to determine "whether the conditions for such designation . . . continue to be met." *See* 8 U.S.C. § 1254a(b)(3)(A). Significantly, the armed-conflict basis for designation makes *no* reference to domestic "national interests." *See id.* § 1254a(b)(1)(A). Even as to designations involving "extraordinary and temporary conditions" in the foreign state, domestic "national interests" are not a statutorily permissible consideration during a periodic review because they are not a "condition"

12

for that designation that the DHS Secretary must determine "continue[s] to be met;" they are an *exception* to an initial designation, despite the existence of extraordinary and temporary conditions *in the foreign state* that otherwise *support* designation. *See id.* § 1254a(b)(1)(C); *see also Dahlia Doe v. Noem*, 1:25-cv-08686, (S.D.N.Y. Oct. 20, 2025), Dkt. 57 at 19-20 (finding the TPS statute only allows consideration of the foreign country's conditions in periodic review, not domestic national interests divorced from those conditions); Memo in Support, Dkt. 15-1 at 18–19.

Nevertheless, Defendant Noem's Termination reflects that her periodic review found that the continued presence of Ethiopian TPS beneficiaries in the U.S. is contrary to the "national interest" of the United States, a finding that is divorced from country conditions in Ethiopia. 90 Fed. Reg. 58,028, 58,031 (Dec. 15, 2025), Leadem Decl., Ex. 5 at Ethiopia TPS AR0000045. The CAR confirms that these impermissible U.S. "national interest" factors played a role in the periodic review that led to Termination. *See, e.g.*, Leadem Decl., Ex. 8 at Ethiopia TPS AR000226 (DHS Decision Memo evaluating "relevant national interest considerations"). Indeed, the single State Department email *only* discussed whether there were any U.S. "foreign policy concerns" with terminating Ethiopia's TPS designation. *See* Leadem Decl., Ex. 1 at Ethiopia TPS AR000330.

In addition, the Termination proclaims that "a significant portion of the Ethiopian Temporary Protected Status population have been under administrative investigation for risk to national security, public safety, or for attempting to obtain immigration benefits through fraud or misrepresentation." 90 Fed. Reg. 58,028, 58,031 (Dec. 15, 2025), Leadem Decl., Ex. 5 at Ethiopia TPS AR0000045. This is not a valid consideration in the periodic review stage under the TPS statute, which instructs the executive branch to "review the conditions *in the foreign state*." 8 U.S.C. § 1254a(b)(3)(A) (emphasis added). Additionally, this assertion is contrary to Defendants' own data. A report from DHS's Fraud Detection and National Security Data System ("FDNS-DS")

13

shows that—out of 5,524 Ethiopian TPS holders—there were *zero* determinations of fraud and only five records where a TPS holder was "associated" with a public safety record. *See* Leadem Decl., Ex. 3 at Ethiopia TPS AR000246;[7] *see also* Compl. ¶¶ 95–99.

Reliance on such flawed factual assertions demonstrates that the Termination notice does not provide a "true and factual" basis for the Termination. *Saget*, 375 F. Supp. 3d at 346–347; *ACT I*, Dkt. 65 at 30-31 (noting a similar record of no fraud or public safety concerns for South Sudanese TPS holders and finding that the contrary statement in the Federal Register notice reflected the use of "stock language . . . regardless of USCIS's actual findings"); *see also* Compl. ¶ 133 (noting that Defendant Noem used verbatim language for Afghanistan, Haiti, Syria, and Somalia). Such reliance also supports Plaintiffs' contention that the decision was a predetermined action to restrict TPS designations generally, and not based on the specifics of Ethiopia's country conditions, as required. *See, e.g.*, Compl. ¶¶ 112–18 (detailing statements and actions of Administration officials reflecting their intent to systematically take away TPS and insinuating it to be, or describing it as, "illegal").

**II.     THE CERTIFIED ADMINISTRATIVE RECORD CONFIRMS THAT PLAINTIFFS FACE SEVERE AND IRREPARABLE HARM ABSENT POSTPONEMENT.**

The CAR is also replete with evidence of irreparable harm Plaintiffs will suffer should the Court not postpone the Termination. The RAIO report warns that returning to Ethiopia "remains difficult" as "[m]any conflict-affected areas remain unsafe" due to "the presence of armed groups and militias." Leadem Decl., Ex. 2 at Ethiopia TPS AR000219. Further objective evidence in the

---

[7] While the CAR indicates that 28% of Ethiopian TPS holders have "at least one TECS hit in their immigration benefit request history," Treasury Enforcement Communications System (referred to as "TECS") hits are merely indicators for further review and, in USCIS's own words, "do[] not always lead to derogatory findings or a negative adjudicative outcome." Leadem Decl., Ex. 9 at Ethiopia TPS AR000242. There is no evidence in the CAR that a single TECS hit for an Ethiopian TPS holder reflects a determination of fraud and only five individuals (less than .1% of TPS holders) have been "associated" with public safety records. *See* Leadem Decl., Ex. 3 at Ethiopia TPS AR000246.

CAR demonstrates TPS holders forced to return to Ethiopia would enter "a difficult humanitarian situation" with overlapping crises, "including armed conflicts, natural disasters such as drought and floods, [and] disease outbreaks." *Id.* at AR000210–211. "In 2025, more than 21 million people [in Ethiopia] need humanitarian assistance" with food, shelter, medical care, and protection, "including 16.7 million children and women, and nearly 4.5 million displaced people." *Id.*

The CAR also states that years of armed conflict "have caused human suffering, including large-scale displacement, destruction of infrastructure, and deterioration of the regional economy." *Id.* at AR000211. Meanwhile, the humanitarian crisis continues to deepen as civilians are attacked in extrajudicial killings and drone strikes, *id.*, amidst ongoing conflict across a country mired in "war crimes," "crimes against humanity," and "grave human rights abuses, *id.* at AR000196. Moreover, a "power struggle between [] factions in Tigray risks igniting another civil war and triggering another round of economic, humanitarian, and security risks." *Id.* at AR000200–201. All of these conditions demonstrate risks of grave and even deadly harms that Plaintiffs and other Ethiopian TPS holders and applicants face upon return to Ethiopia. If Termination takes immediate effect without postponement, it is cold comfort to them that they may be able to raise limited, back-footed legal defenses if DHS undertakes enforcement actions against them. *See* Compl., Dkt. 1 ¶¶ 179–85 (detailing litany of policies rendering access to alternative forms of immigration status prohibitive, if not impossible, including defensively).

For these and the many other reasons Plaintiffs have provided, allowing the Termination to take immediate effect would cause irreparable harm to them, other Ethiopian TPS holders and applicants, and their loved ones. *See* Memo in Support, Dkt. 15-1 at 18–20.

## CONCLUSION

For all of these reasons, the Court should exercise its authority under 5 U.S.C. § 705 to postpone the effective date of Ethiopia's termination.

Dated: February 24, 2026                    Respectfully Submitted,

/s/ Sarah Leadem
Sarah Leadem (*pro hac vice*)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
(415) 591-6000
SLeadem@cov.com


Mark H. Lynch (*pro hac vice*)
Stephen Petkis (*pro hac vice*)
Paul Killebrew (*pro hac vice*)
Ayana M. Lindsey (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
MLynch@cov.com
SPetkis@cov.com
PKillebrew@cov.com
ALindsey@cov.com

Michael E. Cunniff (*pro hac vice*)
COVINGTON & BURLING LLP
30 Hudson Yards
New York, NY 10001
(212) 841-1000
MCunniff@cov.com


/s/ Nargis Aslami
Nargis Aslami (MA Bar Number: 714848)
Golnaz Fakhimi (*pro hac vice*)
Collin Poirot (*pro hac vice*)
Abbey Rutherford (*pro hac vice*)
MUSLIM ADVOCATES
1032 15th Street N.W. #362,
Washington, D.C. 20005
(202) 897-2622
Nargis@muslimadvocates.org
Golnaz@muslimadvocates.org
Collin@muslimadvocates.org

16

Abbey@muslimadvocates.org

*/s/ Erik Crew*
Erik Crew (*pro hac vice*)
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
(949) 603-7411
ecrew@haitianbridge.org

*Counsel for Plaintiffs African Communities Together, Samuel Doe, Stephen Doe, Abal Doe, and the Proposed Class*

17