UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AFRICAN COMMUNITIES TOGETHER, et al., <br><br> Plaintiffs, <br><br> v. <br><br> KRISTI NOEM, *in her official capacity as Secretary of Homeland Security*, et al., <br><br> Defendants. | Case No. 26-cv-10278-BEM |

## **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO POSTPONE**

# TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................... 1

II.  BACKGROUND .................................................................................................. 3

A. Legal Background ............................................................................................ 3

B. Factual Background ......................................................................................... 5

III. STANDARD ....................................................................................................... 7

IV.  ARGUMENT ...................................................................................................... 7

A. The Court lacks jurisdiction over Plaintiffs' claims. ..................................... 7

    1.   Section 1254a prohibits judicial review of Plaintiffs' claims. ................. 7

    2.   Section 1252(f)(1) precludes Plaintiffs' requested relief. ..................... 12

B. Plaintiffs' claims are not likely to succeed on the merits. ........................... 13

    1.   Plaintiffs are unlikely to succeed on their APA claims. ....................... 14

       a.   The Secretary lawfully terminated Ethiopia's TPS designation after considering the relevant factors. ...................................................... 14

       b.   Plaintiffs' counterarguments lack merit. ........................................ 16

    2.   Plaintiffs are unlikely to succeed on their constitutional claim. .......... 22

C. Plaintiffs' alleged harms flow directly from the inherently temporary nature of TPS benefits, not any alleged wrongdoing by Defendants. ............................. 27

D. The balance of the equities and public interest weigh against injunctive relief. ...................... 29

E. Any relief must be limited to the Plaintiffs. ................................................. 30

V.   CONCLUSION ................................................................................................. 30

i

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Akebia Therapeutics, Inc. v. Azar*,
443 F. Supp. 3d 219 (D. Mass. 2020) ........................................................................ 7

*Atieh v. Riordan*,
797 F.3d 135 (1st Cir. 2015) ...................................................................................... 14

*Bakran v. Sec'y, USDHS*,
894 F.3d 557 (3d Cir. 2018) ....................................................................................... 9

*Biden v. Texas*,
597 U.S. 785 (2022) .................................................................................................... 13

*California v. Kennedy*,
No. 25-cv-12019-NMG, 2025 WL 2807729 (D. Mass. Oct. 1, 2025) ....................... 7

*Centro Presente v. United States Dep't of Homeland Sec.*,
332 F. Supp. 3d 393 (D. Mass. 2018) ................................................................. 10, 27

*City of Rialto v. W. Coast Loading Corp.*,
581 F.3d 865 (9th Cir. 2009) ..................................................................................... 11

*DCH Reg'l Med. Ctr. v. Azar*,
925 F.3d 503 (D.C. Cir. 2019) .............................................................................. 9, 10

*Delgado v. Quarantillo*,
643 F.3d 52 (2d Cir. 2011) .......................................................................................... 9

*Dep't of Commerce v. New York*,
588 U.S. 752 (2019) ......................................................................................... 11, 16-17

*Dep't of Homeland Security v. D.V.D.*,
145 S. Ct. 2153 (2025) ............................................................................................... 29

*Dep't of Navy v. Egan*,
484 U.S. 518 (1988) .................................................................................................... 30

*FAA v. Cooper*,
566 U.S. 284 (2012) ..................................................................................................... 8

*FDA v. Wages and White Lion Invs., LLC*,
604 U.S. 542 (2025) .................................................................................................... 20

*Fiallo v. Bell*,
    430 U.S. 787 (1977)..................................................................................... 23

*Fla. Power & Light Co. v. Lorion*,
    470 U.S. 729 (1985)..................................................................................... 26

*Galvan v. Press*,
    347 U.S. 522 (1954)..................................................................................... 23

*Garland v. Aleman Gonzalez*,
    596 U.S. 543 (2022)..................................................................................... 12

*Garland v. Ming Dai*,
    593 U.S. 357 (2021)............................................................................... 18, 22

*Hecht v. Bowles*,
    321 U.S. 321 (1944)..................................................................................... 30

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010)......................................................................................... 28

*Hollingsworth v. Perry*,
    558 U.S. 183 (2010)..................................................................................... 10

*INS v. Legalization Assistance Project*,
    510 U.S. 1301 (1993)................................................................................... 29

*Int'l Ass'n of Machinists & Aerospace Workers v. E. Air Lines, Inc.*,
    826 F.2d 1141 (1st Cir. 1987)...................................................................... 13

*Jagers v. Federal Crop Ins. Corp.*,
    758 F.3d 1179 (10th Cir. 2014).................................................................... 16

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972)..................................................................................... 23

*Kreis v. Secretary of Air Force*,
    866 F.2d 1508 (D.C. Cir. 1989).................................................................... 14

*Lamar, Archer & Cofrin, LLP v. Appling*,
    584 U.S. 709 (2018)....................................................................................... 8

*Lincoln v. Vigil*,
    508 U.S. 182 (1993)..................................................................................... 21

*Little Sisters of the Poor v. Pennsylvania*,
  591 U.S. 657, 674, 685 (2020) ………………………………………………………………..17

*Martinez v. Napolitano*,
  704 F.3d 620 (9th Cir. 2012) ......................................................................................... 9

*Maryland v. King*,
  567 U.S. 1301 (2012) ................................................................................................... 29

*Mathews v. Diaz*,
  426 U.S. 67 (1976) ....................................................................................................... 23

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ........................................................................................................11

*Nat'l TPS All. v. Noem*,
  773 F. Supp. 3d 807 (N.D. Cal. 2025) ........................................................................... 9

*Nixon v. Fitzgerald*,
  457 U.S. 731 (1982) ..................................................................................................... 26

*Nken v. Holder*,
  556 U.S. 418 (2009) ..................................................................................................... 28

*Noem v. Doe*,
  145 S. Ct. 1524 (2025) ................................................................................................. 29

*Noem v. Nat'l TPS All.*,
  2025 WL 1427560 (May 19, 2025) ................................................................................ 1

*Noem v. Nat'l TPS All.*,
  2025 WL 2812732 (Oct. 3, 2025) .............................................................................. 2, 9

*Patel v. Garland*,
  596 U.S. 328 (2022) ....................................................................................................... 8

*Proyecto San Pablo v. INS*,
  189 F.3d 1130 (9th Cir. 1999) .......................................................................................11

*Rajah v. Mukasey*,
  544 F.3d 427 (2d Cir. 2008) ........................................................................................ 23

*Ramos v. Wolf*,
  975 F.3d 872 (9th Cir. 2020) ....................................................................................... 12

iv

*DHS v. Regents of Univ. of Cal.*,
   591 U.S. 1 (2020) .................................................................................................. 25

*River St. Donuts, LLC v. Napolitano*,
   558 F.3d 111 (1st Cir. 2009) ................................................................................ 14

*Sampson v. Murray*,
   415 U.S. 61 (1974) ................................................................................................ 30

*Skagit Cty. Pub. Hosp. Dist. No. 2 v. Shalala*,
   80 F.3d 379 (9th Cir. 1996) .................................................................................... 9

*Starbucks Corp. v. McKinney*,
   602 U.S. 339 (2024) .............................................................................................. 30

*Trump v. Boyle*,
   145 S. Ct. 2653 (2025) .......................................................................................... 29

*Trump v. CASA, Inc.*,
   606 U.S. 831 (2025) .............................................................................................. 30

*Trump v. Hawaii*,
   585 U.S. 667 (2018) .............................................................................................. 23

*U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*,
   508 U.S. 439 (1993) .............................................................................................. 13

*United States v. Nixon*,
   418 U.S. 683 (1974) .............................................................................................. 25

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) .............................................................................................. 25

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ............................................................................................. 7, 27

*Wisconsin Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985) .............................................................................. 28

*Yale New Haven Hospital v. Becerra*,
   56 F.4th 9 (2d Cir. 2022) ........................................................................................ 8

## STATUTES AND REGULATIONS

The Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002)...................... 4

The Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (1990)................................. 3

8 C.F.R. § 244.13(b) ........................................................................................................... 20

8 C.F.R. § 244.19 ................................................................................................................ 20

1 U.S.C. § 204(a) ................................................................................................................ 13

5 U.S.C. § 701(a)(2) .............................................................................................................. 8

5 U.S.C. § 705 ........................................................................................................ 1, 10, 30

5 U.S.C. § 706(2) ................................................................................................................ 14

6 U.S.C. § 557 ....................................................................................................................... 4

8 U.S.C. § 1103(a) ................................................................................................................ 4

8 U.S.C. § 1252(f)(1) ...................................................................................................2, 12-13

8 U.S.C. § 1254a(b) .............................................................................................................. 1

8 U.S.C. § 1254a(b)(1)........................................................................................................ 24

8 U.S.C. § 1254a(b)(1)(C) ......................................................................................4, 17, 19-21

8 U.S.C. § 1254a(b)(3)(A) .................................................................... 14, 18, 19, 22, 26

8 U.S.C. § 1254a(b)(3)(B) ............................................................................................ 4, 20

8 U.S.C. § 1254a(b)(5)(A) ..................................................................................2, 4, 7-8, 10

8 U.S.C. § 1254a(d)(2).......................................................................................................... 20

## OTHER AUTHORITIES

*Designation of Ethiopia for Temporary Protected Status*,
87 Fed. Reg. 76,074 (Dec. 12, 2022) ...................................................................... 5

*Termination of the Designation of Ethiopia for Temporary Protected Status*,
90 Fed. Reg. 58,028 (Dec. 15, 2025) .......................................................... *passim*

## I.    INTRODUCTION

Congress created Temporary Protected Status (TPS) to provide temporary protection to individuals who cannot safely return to their home country because of a natural disaster, armed conflict, or "extraordinary and temporary conditions in the foreign state."  8 U.S.C. § 1254a(b).  The Secretary of Homeland Security may designate a country for TPS only if the Secretary determines that certain statutory criteria justifying the designation are met.  Consistent with the temporary nature of TPS, Congress has required the Secretary to regularly review a country's TPS designation and to terminate that designation if she determines that the conditions for the designation are no longer met.  Congress further provided that "[t]here is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state" for TPS.  *Id.* § 1254a(b)(5)(A).

Exercising that statutory authority, Secretary Noem terminated the TPS designation for Ethiopia effective February 13, 2026.  In accordance with statutory and regulatory requirements, the Secretary provided 60 days' notice of the termination, published in a Federal Register Notice that explained the bases for the Secretary's determination.  *See Termination of the Designation of Ethiopia for [TPS]*, 90 Fed. Reg. 58,028 (Dec. 15, 2025).  Plaintiffs—an interest organization and three Ethiopian nationals—subsequently filed this suit seeking to challenge the termination under the Administrative Procedure Act (APA) and the Due Process Clause of the Fifth Amendment.  Doc. No. 1.  Plaintiffs also filed a motion under 5 U.S.C. § 705, seeking to postpone the effective date of the Secretary's TPS termination.  Doc. No. 14.  The Court should deny Plaintiffs' motion.

Earlier this year, another district court stayed the termination of TPS for Venezuela.  The Supreme Court, however, granted a stay of that determination with only a single Justice noting a dissent.  *Noem v. Nat'l TPS All.*, No. 24A1059, 2025 WL 1427560 (May 19, 2025).  When the

same district court later entered judgment in the plaintiffs' favor, the Supreme Court again intervened and granted a stay. *Noem v. Nat'l TPS All.*, No. 25A326, 2025 WL 2812732, at *1 (Oct. 3, 2025). Similarly, when a different district court stayed termination of TPS for Honduras, Nepal, and Nicaragua, the Ninth Circuit unanimously stayed that decision too. *Noem v. Nat'l TPS All.*, No. 25-4901, Dkt. No. 19.1 (9th Cir. Aug. 20, 2025). And when the district court entered partial final judgment, the Ninth Circuit again intervened and granted a stay. *Noem v. Nat'l TPS All.*, No. 26-199, Dkt. No. 11.1 (9th Cir. Feb. 9, 2026). The Fourth Circuit, for its part, denied a request to stay termination decisions regarding Afghanistan and Cameroon pending appeal. *CASA, Inc. v. Noem*, No. 25-1792, Dkt. No. 12 (4th Cir. July 21, 2025). In doing so, the Supreme Court, Fourth Circuit, and Ninth Circuit all determined that the government was likely to succeed on the merits on similar claims and that the balance of similar harms favored giving effect to the termination during litigation. The same result should obtain here for four reasons.

*First*, Congress has barred judicial review in this context. The TPS statute expressly prohibits "judicial review" of "*any* determination of the Secretary with respect to" TPS designations, terminations, or extensions. 8 U.S.C. § 1254a(b)(5)(A) (emphasis added). The Secretary's determination to terminate Ethiopia's TPS designation is thus shielded from "judicial review." *Id.*

*Second*, 8 U.S.C. § 1252(f)(1) independently bars the relief Plaintiffs seek. Section 1252(f)(1) provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to *enjoin or restrain* the operation of the provisions of part IV of this subchapter . . . other than with respect to the application of such provisions to an individual alien against whom proceedings . . . have been initiated." *Id.* § 1252(f)(1) (emphasis added). Section 1254a is one

such covered provision, and an order postponing the Secretary's TPS termination would plainly constitute an order "enjoin[ing] or restrain[ing]" the Secretary that § 1252(f)(1) prohibits.

*Third*, even if Plaintiffs' APA and constitutional claims were properly before the Court, Plaintiffs have failed to demonstrate likely success on the merits. The Secretary's TPS determination fully complied with the TPS statute and was both reasonable and reasonably explained. Plaintiffs' constitutional claim fares no better because Plaintiffs fail to identify any specific evidence indicating that the Secretary was motivated by discriminatory animus. To the contrary, the evidence demonstrates that the Secretary's termination determination reflects an immigration policy that is rationally related to government objectives.

*Finally*, Plaintiffs have failed to establish irreparable harm, and the balance of equities and public interest weigh against preliminary relief. The Government and the public share an interest in ensuring that the process established by Congress—under which the Secretary can carry out her responsibilities to weigh the statutory factors governing TPS designations—is followed. And in this case, as the Secretary found, the conditions for Ethiopia's TPS designation are no longer met. Delay of the Secretary's determination threatens to undermine the United States' foreign policy and national interests, particularly where Congress has provided the Secretary with broad discretion to assess conditions in foreign countries and reach determinations regarding TPS.

For these reasons and those discussed below, the Court should deny Plaintiffs' motion.

## II.    BACKGROUND

### A.  Legal Background

The Immigration Act of 1990 established a program to create a means for providing temporary and discretionary protection in the United States for aliens from designated countries experiencing ongoing armed conflict, "extraordinary and temporary conditions" that temporarily

prevent nationals of the country from safely returning, or an environmental disaster that temporarily renders the country unable to adequately handle the return of its nationals.  Pub. L. No. 101-649, 104 Stat. 4978 (1990).  The statute authorizes the Secretary,[1] "after consultation with appropriate agencies of the Government," to designate countries for TPS if the Secretary finds that "there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state  . . .  would pose a serious threat to their personal safety," 8 U.S.C. § 1254a(b)(1)(A), or if the Secretary finds that there are

> extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

8 U.S.C. § 1254a(b)(1)(C).  Initial TPS designations are discretionary, and the Secretary must conduct periodic reviews to determine whether the conditions for a country's TPS designation continue to be met.  8 U.S.C. § 1254a(b)(2), (b)(3)(A).  If the Secretary "does not determine" that the foreign state "no longer meets the conditions for designation," the TPS designation is extended. *Id.* § 1254a(b)(3)(C).  If the Secretary determines that the foreign state "no longer continues to meet the conditions for designation," however, the Secretary "shall terminate the designation[.]" 8 U.S.C. § 1254a(b)(3)(B).  "There is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection."  8 U.S.C. § 1254a(b)(5)(A).

---

[1] Congress transferred the Attorney General's TPS authority to the Secretary. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, § 1517, 116 Stat. 2135, 2311 (2002) (codified at 6 U.S.C. § 557); 8 U.S.C. § 1103(a).

**B. Factual Background**

Ethiopia was initially designated for TPS on December 12, 2022, on the dual bases of ongoing armed conflict and extraordinary and temporary conditions in Ethiopia that prevented nationals of Ethiopia from safely returning.  *Designation of Ethiopia for [TPS]*, 87 Fed. Reg. 76,074 (Dec. 12, 2022).  Following the initial designation, Ethiopia's TPS was extended and re-designated on April 15, 2024, for an additional eighteen months, expiring on December 12, 2025. *Extension and Redesignation of Ethiopia for [TPS]*, 89 Fed. Reg. 26,172 (Apr. 15, 2024).  On December 15, 2025, Secretary Noem announced that Ethiopia's TPS designation would be terminated on February 13, 2026.  *Termination of the Designation of Ethiopia for [TPS]*, 90 Fed. Reg. 58,028 (Dec. 15, 2025).

The Secretary determined that "the situation in Ethiopia no longer meets the criteria for an ongoing armed conflict that poses a serious threat to the personal safety of returning Ethiopian nationals" for several reasons.  *Id.* at 58,029.  *First*, the conflict in the Tigray and Oromia regions that led to the initial TPS designation resolved when both parties signed a "Cessation of Hostilities" agreement in November 2022.  *Second*, although there was increased fighting between the Ethiopian National Defense Forces and Oromo Liberation Army into early 2024, a peace agreement was reached in December 2024.  *Id.* at 58,030.  Since then, "political violence has been decreasing in the region" and hundreds of Oromo Liberation Army fighters entered government rehabilitation camps designed to facilitate their reintegration into society.  *Id.*  *Lastly*, while the internal conflict among Amharas that emerged in 2023 remains in flux, an April 2025 Armed Conflict Location & Event Data Project report observed a decrease in clashes and "signs of improvements in the country."  *Id.*  The Secretary underscored that in September 2025 the Ministry of Finance released a "record-breaking national budget of $33.7 billion for their fiscal year that

focuses heavily on Ethiopia's infrastructure and human development needs." *Id.*  The Secretary noted that while "some sporadic and episodic violence" remains, considering these recent improvements, "the situation no longer meets the criteria for an ongoing armed conflict that poses a serious threat to the personal safety of returning Ethiopian nationals." *Id.* at 58,030.

Additionally, the Secretary determined that a "review of the extraordinary and temporary conditions that gave rise to past designations such as internal displacement, food insecurity, and disease outbreaks" are "showing signs of improvement" which would "allow aliens to safely return to the country and live in the regions not affected by the conflict." *Id*.  The Secretary observed that 3.3 million internally displaced people have returned to their area of origin as of June 2024. *Id.*  Moreover, as of July 2025, Ethiopia has enhanced access to food and basic social services via the Joint Emergency Operation Program.  90 Fed. Reg. at 58,030.  In August 2025, Ethiopia successfully completed its 2025 nationwide integrated measles campaign.  *Id.*  This involved routine vaccination of more than 300,000 children, among other health services.  *Id.*  Based on these developments, the Secretary determined that Ethiopia is "not experiencing extraordinary and temporary conditions to the same extent as when the country was designated for [TPS], and these conditions no longer hinder the safe return of aliens to Ethiopia." *Id.*

The Secretary also underscored that enforcement of the immigration laws is "critically important to the national security and public safety of the United States", and that, according to the Fiscal Year 2025 Department of Homeland Security Entry/Exit Overstay Report, Ethiopia had a B-1/B-2 visa overstay rate of 8.27% and an F, M, and J visa overstay rate of 13.95%—over 250% higher and over 330% higher, respectively, than the average visa overstay rates of all countries. *Id.* at 58,031.  According to the Secretary, these overstay rates pose a direct challenge to the national interest by eroding immigration laws and overburdening immigration enforcement. *Id.*

The Secretary also referenced data that Ethiopian nationals have requested advance parole documents for travel back to Ethiopia, and that the government of Ethiopia cooperates with U.S. Immigration and Customs Enforcement in facilitating the removal of aliens to Ethiopia, underscoring that safe return to Ethiopia is possible. 90 Fed. Reg. at 58,030.

## III.    STANDARD

"The same standard that governs the issuance of a stay under § 705 is the standard that governs the issuance of a preliminary injunction." *California v. Kennedy*, No. 25-cv-12019-NMG, 2025 WL 2807729, at *3 (D. Mass. Oct. 1, 2025). Accordingly, to obtain their requested relief, Plaintiffs "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). The moving party "bears the burden of satisfying each of these four elements," using evidence to support its contentions. *Akebia Therapeutics, Inc. v. Azar*, 443 F. Supp. 3d 219, 225 (D. Mass. 2020). But, even then, "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24.

## IV.    ARGUMENT

### A.  The Court lacks jurisdiction over Plaintiffs' claims.

#### 1.  Section 1254a prohibits judicial review of Plaintiffs' claims.

The TPS statute unambiguously provides that "[t]here is no judicial review of *any* determination of the [Secretary] with respect to the designation, *or termination* or extension of a designation, of a foreign state" for TPS. 8 U.S.C. § 1254a(b)(5)(A) (emphasis added). The statute clearly commits TPS termination determinations to the Secretary's unreviewable authority and precludes courts from hearing lawsuits challenging the legality of those determinations. Plaintiffs'

lawsuit seeks to challenge—indeed, set aside or vacate—the Secretary's determination to terminate Ethiopia's TPS. The Court should therefore deny Plaintiffs' motion—and dismiss this case—for lack of jurisdiction based on a straightforward application of § 1254a(b)(5)(A).[2]

The plain meaning of the statute's terms confirms its broad sweep. The modifier "any"—in the phrase "any determination"—sweeps broadly and encompasses determinations "of 'whatever kind.'" *Patel v. Garland*, 596 U.S. 328, 338 (2022). The term "respecting" likewise "has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018); *accord Patel*, 596 U.S. at 339. Indeed, the Supreme Court has held similar jurisdiction-stripping language in the INA was expansive enough to preclude judicial review of factual findings. *Patel*, 596 U.S. at 337-40 (statute barring review of "any judgment regarding the granting of relief" covers "any authoritative decision" on the matter).

At minimum, § 1254a(b)(5)(A) bars review of Plaintiffs' arbitrary-and-capricious claims. "'[I]f a no-review provision shields particular types of administrative action, a court may not inquire whether a challenged agency decision is arbitrary, capricious, *or procedurally defective*.'" *Yale New Haven Hospital v. Becerra*, 56 F.4th 9, 20 (2d Cir. 2022) (citation omitted); *see, e.g.*,

---

[2] In all events, to sue a federal agency and its officials, a plaintiff must identify an express waiver of sovereign immunity and show that its claim falls within the waiver's scope. *See FAA v. Cooper*, 566 U.S. 284, 290 (2012). Although the APA contains a limited waiver of sovereign immunity for claims seeking non-monetary relief, it does not affect "other limitations on judicial review," and does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought. 5 U.S.C. § 702. Moreover, the APA does not permit challenges to "agency action" that "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Here, the TPS statute contains a direct limitation on judicial review, expressly (or, at minimum, impliedly) forbids the relief Plaintiffs seek, and commits TPS termination determinations to the Secretary's discretion. 8 U.S.C. § 1254a(b)(5)(A). Plaintiffs therefore cannot rely on the APA's waiver of sovereign immunity to bring their claims.

*Bakran v. Sec'y, USDHS*, 894 F.3d 557, 563 (3d Cir. 2018) (provision barring review of a "decision" "preclude[s] [a court] from reviewing both the decision and the process for reaching it"); *Martinez v. Napolitano*, 704 F.3d 620, 623 (9th Cir. 2012) (preclusion provision barred APA claim "challeng[ing] the procedure and substance" of the determination); *Delgado v. Quarantillo*, 643 F.3d 52, 55 (2d Cir. 2011) (preclusion provision barred review of APA claim "indirectly challenging" the underlying unreviewable order); *Skagit Cty. Pub. Hosp. Dist. No. 2 v. Shalala*, 80 F.3d 379, 386 (9th Cir. 1996) (preclusion provision applies when "a procedure is challenged only in order to reverse the individual [unreviewable] decision"). To hold otherwise "would eviscerate the statutory bar, for almost any challenge to [a determination] could be recast as a challenge to its underlying methodology." *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 505-507 (D.C. Cir. 2019).

In related litigation, the Supreme Court has granted the government's stay applications that relied on this same judicial-review argument. *See NTPSA II*, 2025 WL 2812732, at *1. In that litigation, a district court twice held—first in a preliminary posture and then in entering final judgment—that it had jurisdiction to review the plaintiffs' claims that the Secretary had acted arbitrarily and capriciously in terminating the TPS determination for Venezuela. *See Nat'l TPS All. v. Noem*, 773 F. Supp. 3d 807 (N.D. Cal. 2025). The government sought relief from the Supreme Court, arguing that § 1254a(b)(5)(A) precluded judicial review of those arbitrary-and-capricious claims. *Noem v. Nat'l TPS All.*, No. 25A326, Appl. 19; *Noem v. Nat'l TPS All.*, No. 24A1059, Appl. 15-20. And the Supreme Court twice intervened, staying both the district court's preliminary order and its final judgment. *Nat'l TPS All.*, 2025 WL 2812732, at *1. The Supreme Court necessarily determined that the government was likely to succeed on the merits of its

reviewability argument as to those claims.[3]  *See Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010).

Similarly, the Ninth Circuit granted a stay pending appeal, and the Fourth Circuit denied a request

for a § 705 stay pending appeal in TPS cases.  *See supra* p. 2.[4]

Plaintiffs suggest that § 1254a(b)(5)(A) precludes courts from reviewing a final

determination but not the "practice or procedure" that led to it.  Doc. No. 15 at 12.  But the *NTPSA*

district court made the same distinctions in the orders that the Supreme Court stayed.  773 F. Supp.

3d at 831; 2025 WL 2578045, at *16.  The TPS statute provides no such workarounds, for the

reasons explained.  It forecloses judicial review of "any determination . . . with respect to the . . .

termination" of a TPS designation, without exceptions for challenges to the underlying review

process.  8 U.S.C. § 1254a(b)(5)(A).  Reading a procedure vs. outcome-based distinction into §

1254a(b)(5)(A) would render the provision effectively meaningless, because—again—"almost

any challenge to [a determination] could be recast as a challenge to its underlying methodology."

*DCH Reg'l Med. Ctr.*, 925 F.3d at 505-507; *see supra* p. 9.  Even if truly process-based challenges

were reviewable (which they are not), Plaintiffs here seek to directly (and impermissibly) challenge

---

[3] Additionally, the Solicitor General filed with the Supreme Court an application to stay an order postponing agency action issued by the United States District Court for the South District of New York after the Second Circuit denied the government's motion to stay the postponement pending appeal.  *See Kristi Noem. v. Dahlia Doe*, No. 25A952 (Feb. 26, 2026).  In addition to the stay, the Solicitor General requested that the Supreme Court treat its application as a petition for a writ of certiorari before judgment.  *Id.*

[4] In 2018, another session of this Court (Casper, J.) found that § 1254a(b)(5)(A) did not apply to a "collateral" challenge to the Secretary's determination to terminate certain TPS designations.  *Centro Presente v. United States Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 409 (D. Mass. 2018).  The Court should not, however, find that decision persuasive, as it did not benefit from the more recent Supreme Court caselaw reaffirming the expansive use of the phrases "any" and "related to," or the Supreme Court's recent stay decisions in *NTPSA I and NTPSA II*.  Additionally, another session of this Court (Saris, J.) allowed postponement of South Sudan's TPS designation termination under 5 U.S.C. § 705.  *See African Communities Together v. Noem*, ---F. Supp. 3d---, 2026 WL 395732 (D. Mass. Feb. 12, 2026).

the Secretary's discretionary TPS termination.  For example, Plaintiffs argue that the Secretary's determination was contrary to law because it was "preordained" and "politically motivated."  Doc. No. 15 at 13-14.  But such a claim, by definition, constitutes a challenge to the determination itself. *See, e.g.*, *Proyecto San Pablo v. INS*, 189 F.3d 1130, 1141 (9th Cir. 1999) (the claim that a decision "was pretextual is no different from [an] argu[ment] that [the decision] was wrong"); *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019) (Commerce Secretary's inadequate and potentially "pretextual" rationale for his decision to reinstate a citizenship question rendered the decision arbitrary and capricious, even if not "substantively invalid").

Plaintiffs also claim that the Secretary's determination failed to comply with the substantive requirements of the TPS statute.  Yet, whether an agency determination "met the substantive requirements of the [relevant] statute" is "decidedly" a  "substantive" challenge—not a procedural one.  *City of Rialto v. W. Coast Loading Corp.*, 581 F.3d 865, 876 (9th Cir. 2009).  Plaintiffs similarly allege that the Secretary gave undue weight to certain evidence, while failing to credit other "available and objective evidence."  Doc. No. 15 at 16-18.  But the criteria that a Secretary deems important in arriving at a particular TPS determination and the weight that the Secretary accords to those criteria cannot be separated from the determination itself.  And insofar as Plaintiffs assert that the Secretary failed to consider important aspects of the issue, such a claim plainly involves a challenge to the agency decision itself—not review of some collateral matter. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In sum, Plaintiffs unquestionably seek to challenge the legality of the Secretary's determination to terminate Ethiopia's TPS designation.  That this challenge rests on perceived deficiencies in the process and considerations underlying this determination does not render it any less of a challenge to the determination itself.  Tellingly, Plaintiffs do not seek relief directing the

11

Secretary to re-conduct her review of Ethiopia's TPS designation in accordance with their view of the proper procedure. Rather, Plaintiffs seek to set aside or vacate the Secretary's determination, thus confirming the true nature of their suit—a direct attack on that determination. Doc. No. 1 at 77; *see Ramos v. Wolf*, 975 F.3d 872, 893 (9th Cir. 2020) (claims were not true collateral challenges partly because they "seek direct relief from the challenged decisions"), *vacated*, 59 F.4th 1010, 1011 (9th Cir. 2023).[5] Plaintiffs' claims fall within the core of the judicial-review bar, and so the Court should dismiss this case for lack of jurisdiction.

### 2. Section 1252(f)(1) precludes Plaintiffs' requested relief.

In addition, granting Plaintiffs' motion would impermissibly restrain the Secretary's operation of the TPS statute in violation of 8 U.S.C. § 1252(f)(1), which strips "court[s] (other than the Supreme Court)" of "jurisdiction" to "enjoin or restrain the operations of part IV of this subchapter," in any "action or claim" by any "party" (with one exception not relevant here). This provision "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022).

Section 1254a is one of the statutory provisions that § 1252(f)(1) covers. In the U.S. Code, § 1254a appears in part V of the relevant subchapter. The public law enacted by Congress, however, strips lower courts of the authority to enjoin or restrain "the provisions of chapter 4 of title II," which contains the TPS statute (section 244 of the INA as amended). Illegal Immigration Reform and Immigrant Responsibility Act of 1996, div. C, Pub. L. No. 104-208, §§ 306 (enacting § 1252(f)), 308 (specifying section 244 as part of chapter 4), 110 Stat. 3009. When the enacted

---

[5] *En banc* review was granted, vacating the panel decision, but the case became moot before a decision issued.

text and the U.S. Code conflict, the enacted text prevails. *U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 448 (1993) ("United States Code is 'prima facie' evidence that a provision has the force of law, 1 U.S.C. § 204(a), [but] it is the Statutes at Large that provides the 'legal evidence of laws,' [1 U.S.C.] § 112. . . .").

Additionally, § 1252(f)(1) is not limited to injunctions; it prohibits any orders that "enjoin or restrain" the operation of a covered statute, "[r]egardless of the nature of the action or claim." 8 U.S.C. § 1252(f)(1).  This provision thus "generally prohibits" lower courts from entering orders that require "federal officials to take or to *refrain from taking actions* to enforce, implement, or otherwise carry out the specified statutory provisions." *Biden v. Texas*, 597 U.S. 785, 797 (2022) (citation and quotation marks omitted; emphasis added).  However phrased, an order pursuant to § 705 in this case would prevent—i.e. "enjoin or restrain"—DHS from implementing the Secretary's determination to vacate the TPS designation for Ethiopia.  It would "inhibit" or "stop" the "Government's efforts to enforce or implement" the TPS statute, which plainly "restrain[s]" the government's operation of the statute. *Aleman Gonzalez*, 596 U.S. at 549-50.  And the fact that the preliminary-injunction standard applies to motions for stays under § 705 further underscores the point that § 705 relief is functionally indistinguishable from a forbidden preliminary injunction. Thus, even if § 1254a(b)(5)(A) did not apply, § 1252(f)(1) would independently bar the Court from granting Plaintiffs' motion.

**B.  Plaintiffs' claims are not likely to succeed on the merits.**

Because the Court lacks jurisdiction over Plaintiffs' claims, Plaintiffs necessarily cannot demonstrate a likelihood of success on the merits.  *See Int'l Ass'n of Machinists & Aerospace Workers v. E. Air Lines, Inc.*, 826 F.2d 1141, 1145 (1st Cir. 1987) ("the likelihood of success on the merits of the permanent injunction is nil, as the district court lacks subject matter jurisdiction").

Even if judicial review were available, however, Plaintiffs could not show a likelihood of success because, as discussed below, their claims lack merit.

### 1. Plaintiffs are unlikely to succeed on their APA claims.

#### a. The Secretary lawfully terminated Ethiopia's TPS designation after considering the relevant factors.

Plaintiffs cannot demonstrate a likelihood of success on their APA claims because the Secretary reasonably terminated Ethiopia's TPS designation after considering relevant factors. "Under the APA, a reviewing court may set aside an agency's decision if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" *Atieh v. Riordan*, 797 F.3d 135, 138 (1st Cir. 2015) (citing 5 U.S.C. § 706(2)). "This standard is quite narrow: a reviewing court 'may not substitute its judgment for that of the agency, even if it disagrees with the agency's conclusions.'" *Id.* (citing *River St. Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009)).

Moreover, "the question whether a particular action is arbitrary or capricious must turn on the extent to which the relevant statute, or other source of law, constrains agency action." *Kreis v. Sec'y of Air Force*, 866 F.2d 1508, 1514 (D.C. Cir. 1989). Here, the TPS statute requires the Secretary to review periodically "the conditions in the foreign state" for which a TPS designation is in effect to determine "whether the conditions for such designation . . . continue to be met." 8 U.S.C. § 1254a(b)(3)(A). The Secretary must "consult[] with appropriate agencies" in conducting her review, and, if she determines that a country's TPS designation is no longer justified, must "terminate the designation by publishing notice in the Federal Register of th[at] determination." *Id.* § 1254a(b)(3)(A), (B). The notice must explain the "basis for the determination." *Id.*

The termination of Ethiopia's TPS designation satisfied each of those criteria. Secretary Noem "considered whether Ethiopia continues to meet the conditions" for TPS designation "after consulting with appropriate U.S. Government agencies" and having "reviewed country conditions

14

in Ethiopia[.]" 90 Fed. Reg. at 58,029. And, after concluding that the conditions for Ethiopia's TPS designation were no longer met, she published notice of her determination in the Federal Register and explained her reasons for doing so. *See id.* at 58,028-58,032.

The Secretary acknowledged that episodic fighting carried into early 2024, but that a peace agreement was reached in December 2024 and that, since then, "political violence has been decreasing in the region." *Id.* at 58,030. Moreover, the Secretary noted that hundreds of army fighters entered government rehabilitation camps set up to facilitate the integration of militants back into society. *Id.* The Secretary also acknowledged ongoing conflict among Amharas, but referenced an April 2025 report that that observed a decrease in clashes between the government and militia. *Id.* Additionally, the Secretary described "signs of improvement" in Ethiopia, culminating in September 2025 with a record-breaking national budget of $33.7 billion for the fiscal year that focuses heavily on Ethiopia's infrastructure and human development. *Id.* Based on these developments, the Secretary determined that, "while some sporadic and episodic violence occurs in Ethiopia, the situation no longer meets the criteria for ongoing armed conflict that poses a serious threat to the personal safety of returning Ethiopian nationals." 90 Fed. Reg. at 58,030.

The Secretary also reasonably concluded that the "extraordinary and temporary conditions" that gave rise to past designations—such as displacement, food insecurity, and disease outbreaks— are showing signs of improvement that would allow aliens to safely return and live in regions not affected by conflict. *See id.* The Secretary noted that Ethiopia has made progress in addressing its internal displacement and, as of July 2025, Ethiopia enjoys enhanced access to food and basic social services via the Joint Emergency Operations Program. The Secretary also referenced improved healthcare, including increased vaccinations rates, screenings, and referrals for health services. *Id.* Based on these developments, the Secretary determined that Ethiopia was "not

15

experiencing extraordinary and temporary conditions to the same extent as when the country was designated for [TPS], and these conditions no longer hinder the safe return of aliens to Ethiopia." *Id.* The Secretary also underscored that enforcing the immigration laws "is critically important to the national security and public safety of the United States" and referenced data that Ethiopian visa overstay rates far exceeded national averages for other countries. 90 Fed. Reg. at 58,031. Ultimately, although Plaintiffs may disagree with the Secretary's determination, it was reasonable and reasonably explained and, therefore, accords with the APA.

### b. Plaintiffs' counterarguments lack merit.

Plaintiffs' arguments to the contrary lack merit. For example, Plaintiffs first claim that the Secretary's determination was "contrary to law" because—in their view—she made a "preordained" decision to terminate Ethiopia's TPS based on political motivations. Doc. No. 15 at 13–14. They specifically contend that the Secretary terminated Ethiopia's TPS designation as part of a premeditated effort to constrain access to TPS for non-white, non-European nations. Doc. No. 15 at 13. They appear to base this argument on the fact that TPS designations have been terminated for other countries that, in Plaintiffs' view, are part of an overall effort to "systematically shrink[] TPS" altogether. Doc. No. 15 at 13-14. But, as just one example, Plaintiffs' allegations cannot be squared with the automatic extension of South Sudan's TPS designation that the Secretary allowed to occur in May 2025. 90 Fed. Reg. 50,485.

Even assuming that the Secretary had an unstated predisposition towards terminating Ethiopia's TPS designation, that would not render her otherwise rational and fully supported determination invalid under the APA. "[A] court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons." *Dep't of Commerce*, 588 U.S. at 781; *see also Jagers v. Fed. Crop Ins. Corp.*, 758 F.3d 1179, 1185-86 (10th

16

Cir. 2014) (rejecting argument that "the agency's subjective desire to reach a particular result must necessarily invalidate the result, regardless of the objective evidence supporting the agency's conclusion"). Moreover, policymakers may validly hold and express preexisting views on government policy. "It is hardly improper for an agency head to come into office with policy preferences and ideas, discuss them with affected parties, sound out other agencies for support, and work with staff attorneys to substantiate the legal basis for a preferred policy." *Dep't of Commerce*, 588 U.S. at 78; *see also Little Sisters of the Poor v. Pennsylvania*, 591 U.S. 657, 674, 685 (2020) (underscoring that so long as an agency complies with "the APA's objective criteria," courts may not "rebuke[]" agencies for "purported attitudinal deficiencies"). Indeed, "[i]t is expected—perhaps even critical to the functioning of government—for executive officials to conform their decisions to the administration's policies." *Ramos*, 975 F.3d at 897. To that end, it would not be surprising for the Secretary to be skeptical that a designation Congress intended to be "temporary" and based on "extraordinary and temporary conditions," 8 U.S.C. § 1254a(b)(1)(C), remained justified 4 years after it was first implemented.

Next, Plaintiffs claim that the Secretary "did not consult with appropriate agencies as required by statute." Doc. No. 15 at 15; Doc. No. 43 at 5-7. To start, the termination notice itself confirms that the Secretary made her determination "after consulting with appropriate U.S. Government agencies." 90 Fed. Reg. at 58,028. And the administrative record further confirms correspondence between DHS and the State Department in October 2025 before the termination occurred. Ethiopia TPS AR000330. Given that consultation with appropriate agencies plainly occurred, Plaintiffs go on to claim that the consultation was insufficient because, in their view, consultation requires "weighing and examining the reasons for and against a contemplated act or course of conduct." Doc. No. 43 at 5. But the TPS statute does not impose any requirements

dictating *how* the Secretary must consult with appropriate agencies.  *See Garland v. Ming Dai*, 593 U.S. 357, 365 (2021) (it is "settled" that a court may not impose "additional judge-made procedural requirements on agencies that Congress has not prescribed and the Constitution does not compel") (citing *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 524 (1978)); *cf. La. Forestry Ass'n Inc. v. Sec'y, U.S. Dep't of Labor*, 745 F.3d 653, 674 (3d Cir. 2014) (holding that similar INA provision requiring consultation with "appropriate agencies" afforded DHS wide discretionary latitude in fulfilling that requirement).    Plaintiffs thus cannot claim that the Secretary violated the TPS statute by not consulting with appropriate agencies in their preferred manner.

As alternative support, Plaintiffs claim that discovery in different cases involving different countries (Venezuela, Nicaragua, Honduras, Haiti) demonstrated that the Secretary "failed to properly consult with appropriate agencies during TPS periodic reviews."  Doc. No. 15 at 15.  But, even if that were true, it would not constitute relevant and admissible evidence concerning the review process for Ethiopia.  And, in all events, it does not speak to whether *the Secretary* reviewed the conditions in Ethiopia before making her determination.  The TPS statute provides that the Secretary "shall review the conditions in the foreign state" as part of her periodic review.  8 U.S.C. § 1254a(b)(3)(A).  And the Secretary expressly confirmed that she "reviewed country conditions in Ethiopia" in the course of making her determination.  90 Fed. Reg. 58,029.  The record demonstrates that the Secretary did just that.  Ethiopia TPS 0000223-233.  Plaintiffs are therefore unlikely to succeed on their claim that Defendants violated the TPS statute by failing to (properly) consult appropriate agencies.

Next, Plaintiffs claim that Defendants violated the TPS statute by failing to consider "available and objective evidence" concerning the two bases for Ethiopia's prior designation.  *See* Doc. No. 15 at 16-17; Doc. 43 at 10-15.  To start, Plaintiffs do not explain what they mean by

18

"available" evidence. Insofar as Plaintiffs mean that the Secretary must consider *all publicly available* evidence of the conditions in a country—no matter its source or quality or whether it was even presented to the Secretary—that claim necessarily fails, as the TPS statute imposes no such requirement. It is similarly unclear how Plaintiffs would draw the line between permissible "objective" evidence and impermissible "subjective" evidence, but the key point remains that the TPS statute does not impose such a test. The statute provides that the Secretary "shall review the conditions in the foreign state." 8 U.S.C. § 1254a(b)(3)(A). It does not remotely prohibit the Secretary—in evaluating those conditions—from considering judgment calls or assessments over which different people could disagree. At bottom, Plaintiffs take issue with the way in which the Secretary weighed the evidence—accusing her of having "cherry pick[ed]" certain positive "improvements" in Ethiopia while overlooking "less promising objective data[.]" Doc. No. 15 at 9, 13. But when reviewing agency action under the APA, a court "may not substitute its judgment for that of the agency, even if it disagrees with the agency's conclusions." *River St. Donuts*, 558 F.3d at 114.

Plaintiffs also claim that the Secretary impermissibly considered the United States' "national interests[.]" Doc. No. 15 at 18-19; Doc. 43 at 15-17. But the statute *requires* the Secretary to consider whether "permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States." 8 U.S.C. § 1254a(b)(1)(C). The Secretary "shall terminate" a designation if she determines the country "no longer continues to meet the conditions for designation under [§ 1254a(b)(1)]." *Id.* § 1254a(b)(3)(B). And Ethiopia was designated for TPS because it met the "condition" set forth in § 1254a(b)(1)(C), which requires that the designation be in the "national interest." Once the Secretary determined that the designation was "contrary to the national interest," the "condition[ ] for designation under [§

1254a(b)(1))]" "no longer continue[d] to [be] me[t]," and the statute required the Secretary to terminate the designation. *Id.* § 1254a(b)(1)(C), (3)(B). The Secretary did not violate the statute by complying with its explicit mandate.

Plaintiffs further claim that the Secretary's determination was arbitrary and capricious because it departed from past agency practice. Doc. No. 15 at 14-15; Doc No. 43 at 7-10. First, Plaintiffs note that the determination here was published "60 days before its effective date," whereas termination determinations by prior administrations had allowed for a "transition period of 6 month[s] or longer." Doc. No. 15 at 14-15. But the TPS statute explicitly allows the Secretary to publish a termination notice 60 days in advance. 8 U.S.C. § 1254a(b)(3)(B) (termination "shall not be effective earlier than 60 days after the date the notice is published"). And the relevant regulations make clear that TPS protections can end "upon the sixtieth (60th) day after the date notice of termination is published in the Federal Register." 8 C.F.R. § 244.19; *see also* 8 C.F.R. § 244.13(b). In her discretion, the Secretary "may" provide for a longer transition period. 8 U.S.C. § 1254a(d)(2). But the government has never made a "hard-and-fast commitment" to offer longer periods—nor has it taken an "earlier [agency] position" that could have conferred a legitimate reliance interest on a TPS recipient. *FDA v. Wages and White Lion Invs., LLC*, 604 U.S. 542, 573-85 (2025). Even if the agency's past choices of wind-down periods for other countries could create a "hard-and-fast commitment," those past choices reflect variation, not consistency, on the length of wind-down periods. Moreover, even if this argument had merit, it could at most justify relief regarding the winddown period, not the termination itself.[6]

---

[6] In any event, the INA bars judicial review of the Secretary's decision regarding whether to afford an additional "orderly departure" period. *See* 8 U.S.C. § 1252(a)(2)(B)(ii). Section 1252(a)(2)(B)(ii) bars review of any "decision or action of … the Secretary of Homeland Security the authority for which is specified under [the INA] to be in the discretion of … the Secretary …" The text of § 1254a(d)(3) exudes deference to the Secretary. The statute contains clear

Second, Plaintiffs claim that the Secretary departed from past practices in considering "U.S. domestic interests." Doc. No. 15 at 19; Doc. 43 at 9-10. But, again, the Secretary *must* consider the "national interest" in deciding whether a country continues to meet the conditions for designation in § 1254a(b)(1)(C). And nowhere does the TPS statute constrain what the Secretary can consider when deciding what is in the national interest—let alone require her to focus solely on foreign country conditions. As the Secretary observed in the Federal Register notice, "'National interest' is an expansive standard that may encompass an array of broad considerations, including foreign policy, public safety (e.g., potential nexus to criminal gang membership), national security, migration factors (e.g., pull factors), immigration policy (e.g., enforcement prerogatives), and economic considerations (e.g., adverse effects on U.S. workers, impact on U.S. communities)." 90 Fed. Reg. at 58031 & n.18 (citing cases). The question of what serves the national interest offers "no meaningful standard against which to judge the agency's exercise of discretion." *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993). Moreover, the Secretary's legitimate concerns regarding visa overstays are supported by the record. Ethiopia TPS 0000114-178. The Secretary's consideration of domestic interests in evaluating the United States' "national interest" thus could not have been arbitrary and capricious. Congress plainly did not enact a statute in which the interests of U.S. citizens and nationals are irrelevant or impermissible to consider.

---

discretionary language that commits the termination date to the Secretary's discretion: it provides the Secretary with the "option"—that is, "the right or power to choose," Black's Law Dictionary (12th ed. 2024)—whether to select a particular transition that "the [Secretary] determines to be appropriate." 8 U.S.C. § 1254a(d)(3); *see Bouarfa v. Mayorkas*, 604 U.S. 6, 13015 (2024) (holding that 8 U.S.C. § 1252a(2)(B)(ii) applies where, as here, the INA uses terms that "exude[ ] deference," "Congress has in no way prescribed how that discretion must be exercised," and "[t]here are no conditions that the Secretary must satisfy before" she can exercise her authority).

Finally, Plaintiffs claim the Defendants did not solicit a country conditions report from the State Department, and that Defendants otherwise disregarded factors it previously considered. Doc. 43 at 8. But Defendants are not required to solicit a country conditions report from the State Department, nor do Plaintiffs ever identify a commitment that could amount to adopting a policy of soliciting a country conditions report from the State Department or any other party with a reliance interest on whether the Secretary solicits a country conditions report. The statute requires the Secretary to review periodically "the conditions in the foreign state" for which a TPS designation is in effect to determine "whether the conditions for such designation . . . continue to be met." 8 U.S.C. § 1254a(b)(3)(A). But the statute does not impose any requirements dictating *how* the Secretary must conduct her review, which factors should weigh most heavily, or from where she must receive information. *See Garland v. Ming Dai*, 593 U.S. 357, 365 (2021). And the record is clear the Secretary satisfied her obligation to review the conditions in Ethiopia. Ethiopia TPS 000223-000233.

### 2. Plaintiffs are unlikely to succeed on their constitutional claim.

Plaintiffs also claim that the Secretary's determination violated the equal protection component of the Fifth Amendment. Doc. No. 15 at 20-23. They claim that it "was motivated by animus and resulted in disparate impact upon people who are non-white and non-European." *Id.* at 20. Even if the Court had jurisdiction to review such a claim, which it does not, Plaintiffs are not likely to succeed on the merits under any standard.

Plaintiffs claim that "[c]ourts apply strict scrutiny" when evaluating equal protection claims in this context. Doc. No. 15 at 20. But that contention ignores the longstanding deference afforded to Executive Branch immigration policies involving the types of foreign policy judgments at issue here. The Supreme Court "ha[s] long recognized the power to expel or exclude aliens as

a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977). Because determinations in these matters implicate "relations with foreign powers" and involve "classifications … defined in the light of changing political and economic circumstances," such judgments "are frequently of a character more appropriate to either the Legislature or the Executive." *Mathews v. Diaz*, 426 U.S. 67, 81 (1976); *see also Galvan v. Press*, 347 U.S. 522, 531 (1954).

Accordingly, in *Trump v. Hawaii*, 585 U.S. 667 (2018), the Supreme Court made clear that rational-basis review governs constitutional challenges to Executive Branch immigration policies and that such policies pass muster so long as they are "plausibly related" to the government's policy objective. *Id.* at 704; *see also Kleindienst v. Mandel*, 408 U.S. 753, 766-70 (1972). As the Supreme Court explained, "the upshot of [its] cases in this context is clear: 'Any rule of constitutional law that would inhibit the flexibility' of the President 'to respond to changing world conditions should be adopted only with the greatest caution,' and [judicial] inquiry into matters of entry and national security is highly constrained." *Hawaii*, 585 U.S. at 704. Plaintiffs briefly contend that the deferential standard of review articulated in *Hawaii* "applies only to restrictions on entry *into* the United States," and not to policies affecting "individuals already in the country." Doc. No. 15 at 21. But the Supreme Court drew no such distinction. Indeed, the Supreme Court explained that that the rational-basis standard applies "across different contexts and constitutional claims." 585 U.S. at 703-04. And, in support of that proposition, the Supreme Court cited the Second Circuit's decision in *Rajah v. Mukasey*, 544 F.3d 427, 438 (2d Cir. 2008), a case which,

like this one, involved an equal protection challenge to an Executive Branch action brought by aliens within the United States.[7]  *Id.*

Like the policy at issue in *Hawaii*, TPS termination determinations involve unique country-specific determinations that both "implicate relations with foreign powers" and "involve classifications defined in the light of changing political and economic circumstances," *id.* at 702, precisely the situation in which the Supreme Court has repeatedly applied rational-basis review. The TPS statute requires the Secretary to determine whether a foreign state is able "to handle adequately the return" of its nationals and whether conditions in the country prevent the country's nationals "from returning to the state in safety."  8 U.S.C. § 1254a(b)(1).  Such determinations are fraught with potential implications for our relations with the relevant country, as the Secretary recognized and explained in announcing her determination to terminate Ethiopia's TPS.

The Secretary categorically denies that any racial, ethnic, or other animus motivated her determination, which easily passes rational-basis review.  Ethiopia's TPS designation was terminated because "Ethiopia no longer continues to meet the conditions for [TPS]" under the TPS statute.  90 Fed. Reg. at 58,028.  That determination reflected the Secretary's judgment that permitting Ethiopian nationals to remain temporarily in the U.S. is contrary to our "national interest," considering the foreign policy, public safety, and national security considerations that she identified.  *Id.* at 58,030-58,031.  It was thus "plausibly related" to the government's foreign relations interests, border security priorities, and the objectives of the TPS program.  *Hawaii,* 585

_____

[7] In addition, nationality-based classifications drawn by Congress or the Executive under the immigration laws are reviewed for rational basis.  *See Kandamar v. Gonzales*, 464 F.3d 65, 73-74 (1st Cir. 2006); *Narenji v. Civiletti*, 617 F.2d 745, 747 (D.C. Cir. 1979).  Moreover, as in *Kandamar*, "[t]here is nothing in this record to demonstrate outrageous discrimination."  464 F.3d at 74 (citing *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 491 (1999)).

U.S. at 704-05. Her determination was fully consistent with Congress's goal of providing temporary relief to aliens until the conditions necessitating that relief come to an end.

Plaintiffs insist that the Court should instead apply the heightened standard set forth in *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977). Doc. No. 15 at 21. But their claim would fail even under that heightened standard. Under *Arlington Heights*, to establish an equal protection claim, Plaintiffs would need to prove that a racially "discriminatory purpose has been a motivating factor in the [government's] decision." 429 U.S. at 265-66. None of Plaintiffs' arguments could establish such a purpose. First, Plaintiffs point to allegedly "charged code words" used by President Trump and Secretary Noem in unrelated contexts. Doc. No. 15 at 22. But they cannot show discriminatory animus through statements taken out of context and without direct links to the Secretary's determination. *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 34-35 (2020) (disparate impact, unusual recission history, and pre- and post-election statements failed "to raise a plausible inference that the recission was motivated by animus"); *see also Ramos*, 975 F.3d at 897 (rejecting similar constitutional claim "due to the glaring lack of evidence tying the President's alleged discriminatory intent to the specific TPS terminations"). Such statements— similar to those challenged and rejected in *Hawaii*—were "remote in time and made in unrelated contexts" and therefore "do not qualify as 'contemporary statements' probative of the decision at issue." *Regents*, 591 U.S. at 35.[8]

---

[8] Moreover, President Trump's prior statements do not and cannot establish animus by the Secretary, much less animus infecting this particular TPS determination. *See, e.g.*, *Ramos*, 975 F.3d at 897 ("We doubt that the 'cat's paw' doctrine of employer liability in discrimination cases can be transposed to th[e] particular context" of TPS terminations). Such an approach would invite judicial second-guessing of an agency official's actions based on mere allegations that a different government official harbored some discriminatory motive. And it would in turn open the door to impermissible intrusion on privileged executive branch deliberations, *see United States v. Nixon*,

Second, Plaintiffs claim the "historical background" of the determination demonstrates a discriminatory purpose because it was one of multiple termination determinations this year, and other courts have found certain of those other determinations motivated by discriminatory animus. Doc. No. 15 at 22. But they do not explain how the mere number of termination determinations could demonstrate animus, especially considering that the TPS statute *requires* the Secretary to consider whether to terminate a designation before it is set to end. *See* 8 U.S.C. § 1254a(b)(3)(A). A series of termination decisions by Secretary Noem follows from the misuse of TPS by the previous administration, which would necessitate termination of improperly designated TPS when the TPS statute requires. Concluding that the number of prior terminations supports animus would require falsifying the premise that the terminations corrected previous misuse of the TPS statute and verifying the premise that each termination was unjustified—all without affected parties or distinct administrative records before this Court. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985). And the rulings from other district courts concerning different termination determinations and different countries do not constitute evidence of a discriminatory purpose in *this case*. Moreover, Plaintiffs' claim that the determination here involved an "unacknowledged" and "unreasoned" shift in policy, Doc. No. 15 at 22, simply ignores the Secretary's announcement, which acknowledged the prior designations and gave several reasons for her determination that the conditions for such a designation were no longer met. 90 Fed. Reg. at 58,030-58,032.

Third, Plaintiffs argue that the Secretary's termination determinations over the past year have had a "disparate impact" on "non-white Africans." Doc. No. 15 at 23. But the relevance of any disparate impact naturally depends on the specific demographics at issue. Relevant here,

---

418 U.S. 683, 708 (1974), and potential litigant-driven discovery that would disrupt the President's execution of the laws, *see Nixon v. Fitzgerald*, 457 U.S. 731, 749-50 (1982).

almost "every country that has been designated for TPS since its inception has been 'non-European' . . . and most have majority 'non-white' populations." *Ramos*, 975 F.3d at 898. Thus, under Plaintiffs' logic, "almost any TPS termination in the history of the program would bear 'more heavily' on 'non-white, non-European' populations and thereby give rise to a potential equal protection claim," which "cannot be the case." *Id.* Indeed, the Supreme Court has squarely rejected this type of "disparate impact" evidence as sufficient to state a plausible equal protection claim. *Regents*, 591 U.S. at 34 ("[B]ecause Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. . . . Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds.").

Accordingly, none of the evidence cited by Plaintiffs suffices to support a claim that the Secretary's TPS determination was motivated by racial animus, even if the *Arlington Heights* test were applied. And there is no serious question that the termination determination can "reasonably be understood to result from a justification independent of unconstitutional grounds." *Hawaii*, 585 U.S. at 705. Plaintiffs are thus unlikely to succeed on their constitutional claim.[9]

### C. Plaintiffs' alleged harms flow directly from the inherently temporary nature of TPS benefits, not any alleged wrongdoing by Defendants.

Plaintiffs have also failed to show that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. Plaintiffs assert that without TPS they would lose immigration status and potentially be subject to deportation. Doc. No. 15 at 23-24.

---

[9] Again, this Court should not be persuaded by the decision in *Centro Presente* where Judge Casper found that because the determinations at issue did "not concern national security," the heightened scrutiny set forth in *Arlington Heights* applies. 332 F. Supp. 3d at 411, 416. The same cannot be said in this case.

But any harms flowing from the loss of temporary protection from removal and its associated benefits inhere in the statutory scheme that Congress designed.  Under the TPS statute, TPS recipients receive *temporary* protection from removal.  *See* 8 U.S.C. § 1254a(b)(1)(B)(i) ("substantial, but temporary"), (b)(1)(B)(ii) ("unable, temporarily"), (b)(1)(C) ("extraordinary and temporary"), (g) ("remain in the United States temporarily").  The statute does not allow for indefinite protection.  Because the loss of temporary benefits flows from the statute itself, Plaintiffs cannot show that their alleged harms "directly result from the action which [they] seek[] to enjoin." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

In any event, "removal alone," let alone the mere possibility of future removal after removal proceedings have been completed, "cannot constitute the requisite irreparable injury" to justify a stay.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Plaintiffs argue that their removal to Ethiopia or unnamed other countries "will" result in "deadly harm."  Doc. No. 15 at 24.  But that speculative prediction does not establish a clear likelihood that such harm will occur.  And the severity of an alleged harm does not speak to its likelihood of occurring.  Moreover, in Secretary Noem's unreviewable judgment, the number of Ethiopian nationals that have requested advanced parole documents for travel back to Ethiopia evidences their ability to safely return.  90 Fed. Reg. at 58,030.  Plaintiffs clearly disagree, but in matters involving such foreign policy judgments, the Court should defer to the Executive Branch. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010) ("when it comes to collecting evidence and drawing factual inferences in this area, the lack of competence on the part of the courts is marked, and respect for the Government's conclusions is appropriate" (quotation marks and citation omitted)).

**D.  The balance of the equities and public interest weigh against injunctive relief.**

Plaintiffs have also failed to show that the remaining equitable factors weigh in their favor, especially considering the Supreme Court's stays in *NTPSA*.  There, on two occasions, the Supreme Court granted the government's applications for stays of district court orders—both on preliminary relief and at final judgment—in a lawsuit in which the plaintiffs made similar arguments as to irreparable harm, the balance of the equities, and the public interest.  *See supra* pp. 2 & 9-10; *see also Noem v. Doe*, 145 S. Ct. 1524 (2025) (stay of injunction suspending termination of immigration parole program); *see also DHS v. D.V.D.*, 145 S. Ct. 2153 (2025) (stay of immigration-related preliminary injunction for nationwide class).  That conclusion should dictate the disposition of this motion, which presents substantially the same considerations.  *See Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025) (Supreme Court decisions on interim relief "inform how a court should exercise its discretion in like cases").

Moreover, the government suffers irreparable injury "[a]ny time" it is "enjoined by a court from effectuating statutes enacted by representatives of [the] people."  *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).  The relief Plaintiffs seek would frustrate the Secretary's substantive judgment as to how to implement the TPS statute in line with the government's interests, and would require her to permit individuals from Ethiopia to remain in the country, with work authorization and protection from removal or even initiation of removal proceedings, notwithstanding her reasoned determination that doing so is contrary to the statute and to the national interest.  *See INS v. Legalization Assistance Project*, 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers) (warning against "intrusion by a federal court into the workings of a coordinate branch of Government").  The Judiciary should not interfere with sensitive, ongoing diplomacy—an area that is "the province and responsibility of the Executive" and where

"the courts have traditionally shown [it] the utmost deference."  *Dep't of Navy v. Egan*, 484 U.S. 518, 529–30 (1988) (quotation marks omitted).

**E.  Any relief must be limited to the Plaintiffs.**

Even if postponement of the termination were appropriate under 5 U.S.C. § 705, it should be limited to the Plaintiffs.  Under settled constitutional and equitable principles, the Court may not issue relief broader than necessary to remedy actual harm shown by specific plaintiffs.  *Trump v. CASA, Inc.*, 606 U.S. 831 (2025).  Limits on courts' equitable authority apply just as squarely to APA relief under § 705 as to preliminary injunctions.  Nothing in § 705 rebuts the presumption that traditional equitable rules apply, and so § 705 does not authorize universal relief.  *See Hecht v. Bowles*, 321 U.S. 321, 330 (1944) (courts should not "lightly imply" a "major departure" from the "long tradition" of equity).  Section 705's text embraces principles of equity, authorizing "all necessary and appropriate process" and making clear that "irreparable harm," a traditional equitable inquiry, is a key consideration.  5 U.S.C. § 705; *see Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (interpreting similar statutory text to incorporate traditional equitable principles).  The Supreme Court and commentators thus recognize that § 705 "was primarily intended to reflect" the "existing law," not to "fashion new rules," unmoored from principles of equity.  *Sampson v. Murray*, 415 U.S. 61, 80 n.15 (1974). In sum, § 705 does not depart from the "party-specific principles" that "permeate our understanding of equity," and the Court should therefore limit any relief to the Plaintiffs here.  *CASA*, 606 U.S. at 844.

**V.    CONCLUSION**

The Court should deny the motion to postpone.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

Dated: March 3, 2026          By:          */s/ Nicole M. O'Connor*
NICOLE M. O'CONNOR
Assistant United States Attorney
U.S. Attorney's Office
1 Courthouse Way, Ste. 9200
Boston, MA 02210
(617) 748-3112
nicole.o'connor@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Nicole M. O'Connor*
NICOLE M. O'CONNOR
Assistant U.S. Attorney

31