**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **AFRICAN COMMUNITIES TOGETHER, et al.,** )<br>)<br>) | |
| **Plaintiffs,** ) | |
| ) | **Civil Action No.** |
| **v.** ) | **26-10278-BEM** |
| ) | |
| **KRISTI NOEM, et al.,** ) | |
| **Defendants.** ) | |

**MEMORANDUM AND ORDER ON**
**PLAINTIFFS' MOTION FOR POSTPONMENT OF AGENCY ACTION**

**MURPHY, J.**

Fundamental to this case—and indeed to our constitutional system—is the principle that

the will of the President does not supersede that of Congress. Presidential whims do not and cannot

supplant agencies' statutory obligations.

The Constitution requires that the President "take Care that the Laws be faithfully

executed,"[1] a directive which includes enforcing the laws in accordance with congressional

commands.[2] And administrative agencies granted executive authority by Congress may operate

---

[1] U.S. Const. art. II, § 3.

[2] *See Little v. Barreme*, 6 U.S. (2 Cranch) 170, 177–78 (1804) (stating that, because the President has the "high duty . . . to 'take care that the laws be faithfully executed,'" he must enforce a law in accordance with congressional commands where Congress has "prescribed . . . the manner in which [the] law shall be carried into execution"); *see also Learning Res., Inc. v. Trump*, 607 U.S. — , 146 S. Ct. 628, 653 (2026) (Gorsuch, J., concurring) ("Article I of the Constitution vests all federal legislative power in Congress, and Article II charges the executive branch with seeing that Congress's laws are faithfully executed. In a very real sense, then, when it comes to legislative power, Congress is the principal and executive officials are the agents.").

only within the bounds Congress has set.[3]  Yet, in this case, Defendants have disregarded both that foundational principle and the statutory scheme enacted by Congress.

At the heart of this case is the Temporary Protected Status ("TPS") program, which Congress created to provide humanitarian relief to foreign nationals in the United States who could not safely return to their countries of origin because of armed conflict, environmental disasters, or other extraordinary conditions.  *See* 8 U.S.C. § 1254a(b)(1).  Congress established a series of procedures by which the Secretary designates a TPS country when such conditions are present and extends that designation when the conditions remain, or terminates the designation when the conditions cease.  *See generally id.* § 1254a.  Ethiopia was designated for TPS in 2022 in recognition of widespread armed conflict, large-scale displacement, and severe climatic shocks, and extended in 2024 through December of 2025 because the dangerous conditions that necessitated the initial designation remained prevalent.[4]

Then, on his first day back in office, President Trump issued an Executive Order claiming that many "aliens unlawfully within the United States present significant threats to national security and public safety, committing vile and heinous acts against innocent Americans" and that "[o]thers are engaged in hostile activities, including espionage, economic espionage, and preparations for terror-related activities."[5]  The order directed the Secretary of Homeland Security

---

[3] *See, e.g.*, *Util. Air Regul. Grp. v. Env't Prot. Agency*, 573 U.S. 302, 327 (2014) ("The power of executing the laws necessarily includes both authority and responsibility to resolve some questions left open by Congress that arise during the law's administration.  But it does not include a power to revise clear statutory terms."); *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) ("[A]n agency is not free simply to disregard statutory responsibilities."); *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 53 (Thomas, J., concurring in the judgment in part and dissenting in part) ("It is axiomatic that an administrative agency's power . . . is limited to the authority granted by Congress." (alteration in original) (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988))).

[4] Designation of Ethiopia for Temporary Protected Status, 87 Fed. Reg. 76074, 76075–76 (Dec. 12, 2022); Extension and Redesignation of Ethiopia for Temporary Protected Status, 89 Fed. Reg. 26172, 26172–73 (Apr. 15, 2024).

[5] Exec. Order No. 14159, 90 Fed. Reg. 8443, 8443 (Jan. 20, 2025).

to ensure that TPS designations "are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute."[6] On the surface, this reads as a directive to follow the law. In substance, it is a troubling mischaracterization of the statute, which is intentionally and specifically responsive to dangerous conditions in other countries, rather than the immigration policy of any particular president.[7] As one proponent of the TPS bill stated, foreign nationals in the United States displaced by warfare "should not be subject to the vagaries of our domestic politics."[8] Yet the order's directive—that TPS designations be intentionally limited in scope and time—signals that the outcome of designation, extension, and termination decisions will be preordained, rather than based on a meaningful review of in-country conditions, as directed by "the textual requirements" enacted by Congress. The directive is all the more troubling following on the heels of the President's sweeping, divisive rhetoric about criminal activity by "aliens unlawfully within the United States," which is wholly inapplicable to TPS holders.[9]

Perhaps it is unsurprising that the termination of Ethiopia's TPS designation was announced eleven months later, when it came time for review. Ethiopia's was the eleventh termination announced after the Executive Order was issued; since then, two more have followed.[10]

---

[6] *Id.* at 8446.

[7] Congress explicitly dictated that national interests of the United States may only be considered when designating a country based on "extraordinary and temporary conditions." 8 U.S.C. § 1254a(b)(1)(C).

[8] 101 Cong. Rec. H25811, 25838 (daily ed. Oct. 25, 1989) (statement of Rep. Levine).

[9] First, TPS holders have *lawful* status. *See* 8 U.S.C. § 1254a(a)(1). Second, foreign nationals of TPS countries do not qualify for TPS if they have "been convicted of any felony or [two] or more misdemeanors committed in the United States." *Id.* § 1254a(c)(2)(B)(i).

[10] *See infra* note 29.

3

Plaintiffs brought suit to challenge the lawfulness of the termination, arguing that Defendants had violated the TPS statute, the Administrative Procedure Act, and the Equal Protection Clause. Before the Court is Plaintiffs' motion to postpone the effective date of the termination pending resolution of the merits. Because Defendants terminated Ethiopia's TPS designation without regard for the process delineated by Congress, the Court will grant Plaintiffs' motion.

## I.      Background

### A.      TPS Program

In 1990, Congress created the TPS program, under which "noncitizens from designated countries may apply for work authorization and temporary protection against removal." *Afr. Cmtys. Together v. Noem*, — F. Supp. 3. —, 2026 WL 395732, at *1 (D. Mass. Feb. 12, 2026) [*hereinafter ACT*] (citing 8 U.S.C. § 1254a(a)(1)), *appeal docketed*, No. 26-1254 (1st Cir. Mar. 15, 2026). "[A]fter consult[ing] with appropriate agencies," the Secretary of Homeland Security "may designate any foreign state" for TPS where at least one of three conditions is satisfied.[11] 8 U.S.C. § 1254a(b)(1). First, she "finds that there is an ongoing armed conflict within the state" such that "requiring the return of aliens who are nationals of that state . . . would pose a serious threat to their personal safety." *Id.* § 1254a(b)(1)(A). Second, she finds that there has been an environmental disaster such that "the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state" and the state has requested the TPS designation. *Id.* § 1254a(b)(1)(B). Or third, she "finds that there exist extraordinary and temporary

---

[11] "Although the [Immigration and Nationality Act ("INA"), under which the TPS program falls,] refers to the Attorney General, the Homeland Security Act of 2002 . . . transferred the immigration powers previously exercised by the Attorney General to the Secretary of Homeland Security and divisions of DHS." *Ozturk v. Trump*, — F. Supp. 3d —, 2025 WL 3514320, at *1 n.2 (D. Mass. Dec. 8, 2025) (internal quotation marks omitted), *appeal docketed sub nom.*, *Ozturk v. Hyde*, No. 26-1135 (1st Cir. Feb. 7, 2026).

conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless [she] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States." *Id.* § 1254a(b)(1)(C).

TPS designations are temporary; the initial designation period lasts between six and eighteen months. *Id.* § 1254a(b)(2). Accordingly, the Secretary must engage in a "periodic review" at least 60 days before the designation (or redesignation) expires to determine, "after consultation with appropriate agencies[,] . . . whether the conditions for such designation . . . continue to be met." *Id.* § 1254a(b)(3)(A).

**B.        Ethiopia's TPS Termination**

Ethiopia was first designated for TPS on December 12, 2022. *See* Designation of Ethiopia for Temporary Protected Status, 87 Fed. Reg. 76074, 76075 (Dec. 12, 2022). In designating Ethiopia, the Secretary recognized that "Ethiopia faces armed conflict in multiple regions of the country resulting in large-scale displacement. In addition, Ethiopia has been experiencing severe climatic shocks exacerbating humanitarian concerns over access to food, water, and healthcare." *Id.* at 76076. On April 15, 2024, the Secretary redesignated Ethiopia and extended the existing designation for eighteen months, from June 13, 2024, to December 12, 2025. *See* Extension and Redesignation of Ethiopia for Temporary Protected Status, 89 Fed. Reg. 26172, 26172 (Apr. 15, 2024). The Federal Register notice explained that "an 18-month TPS extension is warranted because ongoing armed conflict and extraordinary and temporary conditions supporting Ethiopia's TPS designation remain." *Id.* at 26174. Specifically, the notice stated:

> Ethiopia continues to face internal armed conflict in Amhara and violence in multiple other regions of the country. Human rights abuses by armed actors are prevalent, and civilians are facing indiscriminate attacks. Droughts, floods, and disease outbreaks have put millions of people's lives and livelihoods at risk. These overlapping humanitarian crises have resulted in "ongoing high and urgent humanitarian needs."

*Id.* (footnotes omitted).

On December 15, 2025, the Secretary terminated Ethiopia's TPS designation, effective February 13, 2026. *See* Termination of the Designation of Ethiopia for Temporary Protected Status, 90 Fed. Reg. 58028, 58028 (Dec. 15, 2025). The notice stated that "the situation [in Ethiopia] no longer meets the criteria for an ongoing armed conflict that poses a serious threat to the personal safety of returning Ethiopian nationals" and that "a review of the extraordinary and temporary conditions that gave rise to past designations such as internal displacement, food insecurity, and disease outbreaks are showing signs of improvement which would allow aliens to safely return to the country and live in the regions not affected by the conflict." *Id.* at 58029–30.

### C.      **Procedural Background**

On January 22, 2026, Plaintiffs African Communities Together, Samuel Doe, Stephen Doe, and Abal Doe (together, "Plaintiffs") brought a class action against then-Department of Homeland Security Secretary Kristi Noem, the Department of Homeland Security ("DHS"), U.S. Citizenship and Immigration Services ("USCIS"), and the United States (together, "Defendants").[12] Dkt. 1. The complaint alleged violations of the Administrative Procedure Act ("APA") (Counts 1–4) and the Fifth Amendment (Count 5). *Id.* ¶¶ 203–39. Three days later, Plaintiffs moved on an emergency basis for an administrative stay, production of the certified administrative record, and postponement of the February 13 effective date of termination under section 705 of the APA. Dkt. 14; *see also* Dkt. 15. The Court ordered Defendants to respond to Plaintiffs' emergency motion by January 30, 2026. Dkt. 24. On January 29, 2026, the parties submitted a joint statement regarding the case schedule, Dkt. 33, which the Court considered at a scheduling conference on

---

[12] The Court granted Plaintiffs' motion for leave to proceed under pseudonyms. *See* Dkts. 4, 31. For the sake of brevity, the Court refers to former Secretary Noem as "Secretary Noem" or "the Secretary" throughout. Note that Markwayne Mullins, the current DHS Secretary, "is automatically substituted as a party." Fed. R. Civ. P. 25(d).

January 30, 2026, Dkt. 35. At the conference, the Court stayed the effective date of the termination to preserve the status quo while the Court considered the merits of Plaintiffs' emergency motion. Dkt. 36.

Plaintiffs filed a supplemental memorandum in support of their emergency motion on February 24, 2026. Dkt. 43. Defendants filed the administrative record on the docket on February 25, 2026. Dkt. 45. Defendants filed their opposition to Plaintiffs' emergency motion on March 3, 2026, Dkt. 46, and Plaintiffs filed their reply on March 10, 2026, Dkt. 48. The Court held a hearing on March 26, 2026, and took the motion under advisement.

## II.    Legal Standard

The APA authorizes courts to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending" judicial review. 5 U.S.C. § 705. Such preliminary relief "is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "It is warranted only when the moving party demonstrates that 1) he is likely to succeed on the merits of his case, 2) he is likely to suffer irreparable harm in the absence of injunctive relief, 3) the 'balance of equities' favor him and 4) [preliminary relief] is in the public interest." *California v. Kennedy*, 802 F. Supp. 3d 273, 281 (D. Mass. 2025) (quoting *New Jersey v. Trump*, 131 F.4th 27, 33 (1st Cir. 2025)).[13]

When reviewing a motion for preliminary relief, "[t]he court may accept as true 'well-pleaded allegations [in the complaint] and uncontroverted affidavits.'" *C&W Facility Servs. Inc. v. Mercado*, 2018 WL 4854630, at *2 (D. Mass. Oct. 5, 2018) (alteration in original) (quoting *Rohm & Haas Elec. Materials, LLC v. Elec. Cirs. Supplies, Inc.*, 759 F. Supp. 2d 110, 114 n.2

---

[13] "The same standard that governs the issuance of a stay under § 705 is the standard that governs the issuance of a preliminary injunction." *California*, 802 F. Supp. 3d at 281.

(D. Mass. 2010)).    "The Court may also rely on otherwise inadmissible evidence, including hearsay," *Bos. Taxi Owners Ass'n v. City of Boston*, 84 F. Supp. 3d 72, 78 (D. Mass. 2015) (citing *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986)), and take judicial notice of information on official government websites, *see Gent v. CUNA Mut. Ins. Soc'y*, 611 F.3d 79, 84 n.5 (1st Cir. 2010) (relying on the contents of a government agency's website).

## III.    Discussion

### A.    Likelihood of Success on the Merits

#### 1.    Reviewability

As a threshold matter, Defendants argue that the Court lacks jurisdiction over Plaintiffs' claims because the TPS statute exempts the Secretary's TPS determinations from review.  Dkt. 46 at 14–19.  Section 1254a of the TPS statute provides that "[t]here is no judicial review of any *determination* of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection," 8 U.S.C. § 1254a(b)(5)(A) (emphasis added),

8

which Defendants argue entirely bars the Court from considering Plaintiffs' claims, Dkt. 46 at 14–19. [14]

The Supreme Court, however, has deemed "the presumption favoring judicial review of administrative action" "a familiar principle of statutory construction." *Kucana v. Holder*, 558 U.S. 233, 251 (2010). Thus, "when a statutory provision 'is reasonably susceptible to divergent interpretation, [courts] adopt the reading that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review.'" *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020) (quoting *Kucana*, 558 U.S. at 251). With this principle in mind, the Court concludes, for the reasons set forth below, that section 1254a does not preclude the Court from evaluating, at a minimum, whether the Secretary followed proper process in reaching her determination. It bears noting that *every* court to consider this question in the aftermath of the Secretary's recent suite of TPS terminations—including those courts that

---

[14] Technically speaking—and notwithstanding some courts' framing of the issues—the Court does not find that these arguments implicate the Court's "jurisdiction," in the strictest sense of that word. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 510 (2006) ("'Jurisdiction,' this Court has observed, 'is a word of many, too many, meanings.'" (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 90 (1998))). Section 1254a(b)(5)(A), discussed in this section, "does not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts." *Id.* at 515 (quoting *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394 (1982)). Insofar as section 1254a(b)(5)(A) interacts with the APA's exception for "statutes preclud[ing] judicial review" or for "agency action . . . committed to agency discretion by law," 5 U.S.C. § 701(a), that goes to the merits of the claim rather than the jurisdiction of the Court, *see Oryszak v. Sullivan*, 576 F.3d 522, 525 (D.C. Cir. 2009) ("Because the APA does not apply to agency action committed to agency discretion by law, a plaintiff who challenges such an action cannot state a claim under the APA. Therefore, the court has jurisdiction over his case pursuant to [28 U.S.C.] § 1331, but will properly grant a motion to dismiss the complaint for failure to state a claim."); *see also Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 186 (D.C. Cir. 2006) ("[T]he 'APA's waiver of sovereign immunity applies to any suit whether under the APA or not.'" (quoting *Chamber of Com. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996))). In a footnote, Defendants argue that the APA's sovereign immunity waiver, on its own terms, "does not apply" to Plaintiffs' claims because of its exception, applicable where "any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." Dkt. 46 at 15 n.2 (quoting 5 U.S.C. § 702). But section 1254a(b)(5)(A) does not "grant[] consent to suit." *Id.* Thus, it is not implicated. And although section 1252(f)(1), discussed *infra* Section III.D, does refer to a court's "jurisdiction or authority," 8 U.S.C. § 1252(f)(1), the Supreme Court has confirmed that this is a *remedial* limitation, not a *jurisdictional* one, *Biden v. Texas*, 597 U.S. 785, 801 (2022) ("In short, we see no basis for the conclusion that section 1252(f)(1) concerns subject matter jurisdiction.").

ultimately concluded the plaintiffs had failed to show a likelihood of success on the merits—has likewise concluded that it is authorized to consider at least some of the plaintiffs' claims.[15]

As with all questions of statutory interpretation, the Court "begin[s] with the text." *SEC v. Lemelson*, 138 F.4th 618, 623 (1st Cir. 2025) (quoting *Lackey v. Stinnie*, 604 U.S. 199, 199 (2025)). The statute prohibits judicial review of any "determination," which, in the context of TPS periodic review, refers to "the Secretary's decision regarding 'whether the conditions for [the TPS] designation' of a foreign state 'continue to be met.'" *ACT*, 2026 WL 395732, at *5 (alteration in original) (quoting 8 U.S.C. § 1254a(b)(3)(A)). That is, "the substantive decision to designate a country for TPS, or to terminate such designation, is the Secretary's alone, and the Court cannot, for example, second-guess the weight she ascribes to conditions in the foreign state at issue." *Id.* However, "procedural requirements are distinct from the substantive 'determination' of whether conditions for TPS designation continue to be met." *Id.*

---

[15] *See, e.g.*, *Nat'l TPS All. v. Noem*, 773 F. Supp. 3d 807, 824–33 (N.D. Cal. 2025) (motion to postpone), *aff'd*, 150 F.4th 1000 (9th Cir. 2025); *Nat'l TPS All. v. Noem*, — F. Supp. 3d —, 2025 WL 4058572, at *7–12 (N.D. Cal. Dec. 31, 2025) (motions to dismiss and for summary judgment), *appeal docketed*, No. 26-199 (9th Cir. Jan. 9, 2026) (proceedings stayed by Ninth Circuit pending resolution of Supreme Court appeal in related cases); *Nat'l TPS All. v. Noem*, 798 F. Supp. 3d 1108, 1132–41 (N.D. Cal. 2025) (motion for summary judgment), *aff'd,* 166 F.4th 739 (9th Cir. 2026); *CASA, Inc. v. Noem*, 792 F. Supp. 3d 576, 588–96 (D. Md. 2025) (denying the plaintiffs' motion on the merits), *aff'd*, 2025 WL 2028397 (4th Cir. July 21, 2025) (same); *Doe v. Noem*, 2025 WL 4477179, at *1 (S.D.N.Y. Nov. 19, 2025), *stay pending appeal denied*, 2026 WL 544631 (2d Cir. Feb. 17, 2026), *cert. granted before judgment*, 2026 WL 731088 (U.S. Mar. 16, 2026) (mem.); *ACT*, 2026 WL 395732, at *4–9; *Doe v. Noem*, — F. Supp. 3d —, 2026 WL 184544, at *4–12 (N.D. Ill. Jan. 23, 2026); *Miot v. Trump*, — F. Supp. 3d —, 2026 WL 266413, at *9–20 (D.D.C. Feb. 2, 2026) [hereinafter *Miot I*], *stay pending appeal denied*, 2026 WL 659420 (D.C. Cir. Mar. 6, 2026), *cert. granted before judgment*, 2026 WL 731087 (U.S. Mar. 16, 2026) (mem.) [hereinafter *Miot II*].

Note that the Supreme Court gave no explanation for its recent stays of related, but not identical, district court orders. *See Noem v. Nat'l TPS All.*, 145 S. Ct. 2728, 2729 (2025) (mem.) (staying district court's postponement order); *Noem v. Nat'l TPS All.*, 606 U.S. —, 146 S. Ct. 23, 24 (2025) (mem.) (partially staying district court's order of final judgment). Nor did the Supreme Court explain its subsequent decision *not* to stay the district court orders in two consolidated cases in which the Supreme Court granted certiorari before judgment less than a month ago. *See Miot II*, 2026 WL 731087, at *1 (deferring application for stay pending oral argument); *Doe v. Noem*, 2026 WL 731088, at *1 (same). Therefore, there is no reason to assume that the Supreme Court is of the opinion that section 1254a bars district courts from considering Plaintiffs' claims, or that section 1252(f)(1) bars district courts from granting relief under the APA, *see infra* Section III.D, notwithstanding Defendants' arguments to the contrary, Dkt. 46 at 16–17. If anything, that the Supreme Court most recently declined to stay the district court orders suggests that the Supreme Court believes district courts *are* authorized to consider such claims.

The Supreme Court so concluded when considering similar language in another provision of the Immigration and Nationality Act ("INA") in *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479 (1991). The provision at issue in *McNary* provided that "[t]here shall be no administrative or judicial review of a determination respecting an application for adjustment of status." *Id.* at 492 n.12 (quoting 8 U.S.C. § 1160(e)(1)). The Supreme Court concluded that "the reference to 'a determination' describe[d] a single act rather than a group of decisions or a practice or procedure employed in making decisions." *Id.* at 492; *see also Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 56 (1993) (same). Accordingly, the *McNary* Court concluded that the provision did not bar "collateral challenges to unconstitutional practices and policies used by the agency in processing applications." 498 U.S. at 492.

Following the Supreme Court's reasoning in *McNary* and *Reno*, the Court concludes that section 1254a does not bar *every* challenge related in *any* way to a TPS determination.[16] Rather, the Court may review whether the Secretary actually made the kind of decision Congress charged her with making *in the manner Congress prescribed*. As another court has put it, "the TPS statute shields the Secretary's substantive determination from district court review. But procedurally, the Secretary may not provide sham or pretextual justifications as the basis for the decision under the statute, and the Secretary must review the conditions of the foreign state." *Saget v. Trump*, 375 F. Supp. 3d 280, 347 (E.D.N.Y. 2019) (citation omitted). Section 1254a likewise does not shield Plaintiffs' claim that the Secretary failed to follow the statutory procedures enacted by

---

[16] Defendants argue that the term "any" modifying "determination" and the phrase "with respect to" both broaden the scope of the provision, "ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." Dkt. 46 at 14–15 (quoting *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018)). "But the provision prohibits review 'of' a determination 'with respect to the designation, . . . termination[,] or extension' of a foreign state for TPS." *ACT*, 2026 WL 395732, at *6 (alterations in original) (quoting 8 U.S.C. § 1254a(b)(5)(A)). "The phrase 'with respect to' thus refers to the *types* of determinations implicated—*i.e.*, determinations relating to designations, terminations, and extensions of TPS, as described in other portions of § 1254a(b)." *Id.* (emphasis in original).

Congress—namely, by failing to consult with appropriate agencies as required by 8 U.S.C. § 1254a(b)(3)(A). Claims on these grounds "do not seek a substantive declaration that [Ethiopia] [is] entitled to [TPS] status." *McNary*, 498 U.S. at 495. "Nor would the fact that [Plaintiffs] prevail on the merits of their purportedly procedural objections have the effect of establishing [Ethiopia's] entitlement to [TPS]." *Id.* Therefore, such claims are not barred by section 1254a.

This conclusion accords with "the strong presumption that Congress intends judicial review of administrative action." *Traynor v. Turnage*, 485 U.S. 535, 542 (1988) (quoting *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986)). And indeed, in this vein, the *McNary* Court itself highlighted that, "had Congress intended the limited review provisions . . . of the INA [at issue in that case] to encompass challenges to INS procedures and practices, it could easily have used broader statutory language." 498 U.S. at 494. The same goes here, where the relevant statutory language is much the same.

Defendants contend that a distinction between procedure and substance "would render the provision effectively meaningless, because 'almost any challenge to [a determination] could be recast as a challenge to its underlying methodology.'" Dkt. 46 at 17 (alteration in original) (quoting *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 505–07 (D.C. Cir. 2019)). Not only does this mischaracterize *DCH Regional Medical Center v. Azar*,[17] but it overstates the conclusion this

---

[17] As Judge Reyes helpfully explained, when confronted with an identical argument from Defendants in a case challenging the termination of Haiti's TPS designation:

> [Defendants] replaced the original case language "estimates" with "determination." This was no small change. *DCH* involved a bar on judicial review of Medicare "estimate" payments to hospitals. The D.C. Circuit held that "a challenge to the methodology for estimating uncompensated care is unavoidably a challenge to the estimates themselves." [*DCH*, 925 F.3d] at 506. Change the methodology, necessarily change the estimates. Not so here. After changing her process to comport with the APA, the Secretary can determine to keep or end Haiti's TPS designation.

*Miot I*, 2026 WL 266413, at *13.

Court, and all other district and appellate courts to have opined on the issue, has reached.[18]  If the Secretary follows the statutorily mandated process and makes a determination after weighing the requisite evidence, the Court is entirely without authority to evaluate the propriety of that determination, even if the Court would have weighed the evidence differently.

Finally, Defendants claim that the remedy Plaintiffs seek—vacatur of the Secretary's determination, rather than "directing the Secretary to re-conduct her review of Ethiopia's TPS designation in accordance with their view of the proper procedure"—reveals that the suit is actually "a direct attack on that determination." Dkt. 46 at 18–19.  In one sense, this argument puts the cart before the horse because the "nature of the relief available after jurisdiction attaches is, of course, different from the question whether there is jurisdiction to adjudicate the controversy." *Avco Corp. v. Aero Lodge No. 735, Int'l Ass'n of Machinists & Aerospace Workers*, 390 U.S. 557, 561 (1968).  This is especially true where, as here, the case is in a preliminary posture, and so the question of final relief is yet far off in the distance.  In another sense, Defendants' argument fails to appreciate the real thrust of Plaintiffs' procedural claims, which go to *how* the determination was made rather than *of what* the determination consists.  "After changing her process to comport with the APA, the Secretary can determine to keep or end [Ethiopia's] TPS designation."  *Miot v. Trump*, — F. Supp. 3d —, 2026 WL 266413, at *13 (D.D.C. Feb. 2, 2026) [hereinafter *Miot I*], *stay pending appeal denied*, 2026 WL 659420 (D.C. Cir. Mar. 6, 2026), *cert. granted before judgment*, 2026 WL 731087 (U.S. Mar. 16, 2026) (mem.) [hereinafter *Miot II*].

Some of Plaintiffs' claims—namely, that the Secretary failed to consider certain evidence of armed conflict and other extraordinary circumstances—tread much closer to the substantive side

---

[18] *See supra* note 15.

13

of the procedure-substance line.[19]  However, because the Court has determined that Plaintiffs are likely to succeed on the merits of two claims that are clearly reviewable by this Court—the failure to consult with appropriate agencies and the pretextual nature of the determination, *see infra* Section III.A.2—the Court need not resolve the reviewability of the remaining claims.

### 2.      **Plaintiffs' Claims**

The Court now considers the merits of Plaintiffs' claims that Defendants' conduct violated the APA.  The APA authorizes courts to set aside agency actions, findings and conclusions that are arbitrary, capricious, an abuse of discretion, contrary to law, or that fail to observe procedure required by law.  5 U.S.C. § 706(2).[20]

---

[19] *See ACT*, 2026 WL 395732, at *6 ("Plaintiffs' argument that Secretary Noem wrongly viewed armed conflict short of full-scale civil war as insufficient to satisfy the armed-conflict-based designation condition is unreviewable.  Similarly, the Court cannot review Plaintiffs' challenge to Secretary Noem's alleged failure to consider factors such as acute food insecurity, widespread flooding, and barriers to humanitarian access in determining whether extraordinary and temporary circumstances permit an extension of South Sudan's TPS designation." (citations and internal quotation marks omitted)).

[20] Defendants argue in a footnote that "the APA does not permit challenges to 'agency action' that 'is committed to agency discretion by law.'"  Dkt. 46 at 15 n.2 (quoting 5 U.S.C. § 701(a)(2)).  Insofar as the Court understands the argument, much of its substance is already covered through the Court's discussion of section 1254a(b)(5)(A), which Defendants (wrongly) frame as a jurisdictional issue.  *See supra* note 14.  Insofar as Defendants mean to make a separate or distinct argument on this as a merits issue, the Court fails to see the distinction and, in any event, "[t]he First Circuit has 'repeatedly held that arguments raised only in a footnote or in a perfunctory manner are waived.'"  *Modeski v. Summit Retail Sols., Inc.*, 470 F. Supp. 3d 93, 110 (D. Mass. 2020) (quoting *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 60 n.17 (1st Cir. 1999), *aff'd sub nom.*, *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000)), *aff'd*, 27 F.4th 53 (1st Cir. 2022).  Nevertheless, as to the merits, the Supreme Court has interpreted the section 701 exception "quite narrowly, restricting it to those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."  *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019) (cleaned up).  Another court in this District to consider the issue has held that:

> The TPS statute does not present such rare circumstances; on the contrary, it imposes categorical requirements that the Secretary of Homeland Security consult with appropriate agencies, review country conditions, and publish the basis for her determination in the Federal Register.  Even if the substantive weight ascribed by the Secretary to certain country conditions is discretionary, these procedural requirements are not.

*ACT*, 2026 WL 395732, at *9 (cleaned up).  This Court agrees.

a.    **Failure to Consult**

Plaintiffs argue that Secretary Noem failed to consult with appropriate agencies before terminating Ethiopia's TPS designation, in violation of the TPS statute. *See* Dkt. 15 at 15–16; Dkt. 43 at 5–7. The Court finds that Plaintiffs are likely to prevail on this claim.

The TPS statute mandates that the Secretary, "*after consultation with appropriate agencies* of the Government, *shall* review the conditions in the foreign state . . . for which a designation is in effect under this subsection and *shall* determine whether the conditions for such designation under this subsection continue to be met." 8 U.S.C. § 1254a(b)(3)(A) (emphases added). The inclusion of "after" makes clear that the Secretary must first consult with appropriate agencies before reviewing country conditions or making any determination. And because "shall" makes clear that both reviewing country conditions and making a determination are mandatory, so too is consultation. *See Mallard v. U.S. Dist. Ct. for S. Dist. of Iowa*, 490 U.S. 296, 302 (1989) (explaining that "shall" indicates a statutory instruction is "compulsory").

The question, then, is what does "consultation" demand? Numerous courts have explained that consultation generally requires seeking information from or exchanging information with someone. *See, e.g.*, *Campanale & Sons, Inc. v. Evans*, 311 F.3d 109, 117 (1st Cir. 2002) ("'[C]onsultation' means what consultation ordinarily means."); *id.* (defining consultation as "[t]he act of asking the advice or opinion of someone" (quoting *Consultation*, Black's Law Dictionary (7th ed. 1999))); *see also Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1087 (9th Cir. 2011) ("An ordinary meaning of the word consult is to 'seek information or advice from (someone with expertise in a particular area)' or to 'have discussions or confer with (someone), typically *before* undertaking a course of action.'" (emphasis in original) (quoting *The New Oxford Dictionary* 369 (2001))); *Schneider Ints., L.P. v. Comm'r*, 119 T.C. 151, 154 (2002)

("[C]onsultation . . . connote[s] discussion, deliberation, and an interchange of ideas, thoughts, and opinions between the parties." (internal quotation marks omitted)).

This interpretation is especially logical as applied to the TPS statute when the statutory provision is read as a whole: the Secretary must seek information relevant to the TPS designation from "appropriate agencies," only after which she "shall review the conditions in the foreign state" and make a final determination. 8 U.S.C. § 1254a(b)(3)(A). Congress clearly expected that the "consultation with appropriate agencies" would provide meaningful, relevant information foundational to the Secretary's determination. *Id.*

In the instant case, the administrative record reveals only two communications between DHS and any other agency, neither of which discusses or even references conditions in Ethiopia. The first occurred between DHS employees and Department of State officials in July 2025. Dkt. 47-3 at 1–2. On July 21, 2025, a DHS employee emailed a Department of State official stating:

> The following TPS designations are coming up for review:
> - Syria: Aug. 1 decision deadline
> - South Sudan: September 3 decision deadline
> - Burma: September 26 decision deadline
> - Ethiopia: October 13 decision deadline

*Id.* at 2. The next day, the Department of State official stated in response, "I confirm that State has no foreign policy concerns with ending these TPS designations on or before those dates. As you are aware, sanctions on Syria have recently been lifted, and we have partnered with South Sudan on immigration-related issues."[21] *Id.* at 1.

---

[21] It bears noting that this limited communication concerns only foreign policy, which is "a distinct issue from the statute's reference to whether 'the conditions for [TPS] designation under this subsection continue to be met.'" *Doe*, 2026 WL 184544, at *14 (alteration in original) (quoting 8 U.S.C. § 1254a(b)(3)(A)). *See infra* note 30.

"Under any reasonable interpretation of the word 'consultation,'" this email exchange "plainly is inadequate." *ACT*, 2026 WL 395732, at \*12; *see also Doe v. Noem*, — F. Supp. 3d —, 2026 WL 184544, at \*14 (N.D. Ill. Jan. 23, 2026) (concluding that this same "exchange does not qualify as a consultation" because "[t]here was no 'meaningful exchange of information'" given that "the State Department's response did not individually consider the circumstances in those nations" and "[t]here was no back-and-forth discussion about the issue at all" (citation omitted)). "[T]he State Department official's response suggests that it was a foregone conclusion that the Secretary would terminate the listed TPS designations, a logical assumption based on the Secretary's recent practice of terminating each TPS designation up for review." *Doe*, 2026 WL 184544, at \*14.

These same shortcomings permeate the second communication, in which the same Department of State official from the July exchange emailed two DHS employees on October 8, 2025, and stated, seemingly unprompted, "I verify that State has no foreign policy concerns with a termination of Temporary Protected Status for Ethiopia." Dkt. 45-1 at 336. Together, these two brief emails cannot satisfy the statutory requirement. Put simply, "[c]onsultation is a process that requires reciprocal communication of some substance; it is not satisfied by a rubber stamp or a sign-off on a decision that has already been made." *Doe*, 2026 WL 184544, at \*13.

The Court is unpersuaded by Defendants' arguments to the contrary. Defendants argue that "the termination notice itself confirms that the Secretary made her determination 'after consulting with appropriate U.S. Government agencies.'" Dkt. 46 at 24 (quoting Termination of the Designation of Ethiopia for Temporary Protected Status, 90 Fed. Reg. at 58028). This assertion is belied by the record, as discussed above. Defendants argue further that "the TPS statute does not impose any requirements dictating *how* the Secretary must consult with appropriate agencies"

17

and that "Plaintiffs thus cannot claim that the Secretary violated the TPS statute by not consulting with appropriate agencies in their preferred manner." Dkt. 46 at 24–25 (emphasis in original). But the Court "assume[s] that the words that Congress chose to implement its wishes, if not specifically defined, carry their ordinary meaning and accurately express Congress's intent." *Boivin v. Black*, 225 F.3d 36, 40 (1st Cir. 2000). Therefore, this is not a question of Plaintiff's "preferred manner" of consultation, but merely what "consultation," as defined by its plain meaning, demands. These two emails, without more, are plainly insufficient. "[S]tatutory requirements are not mere bureaucratic hoops to jump through, but rather are the stated will of Congress, and the people, and as such should be adhered to with great care." *Coos Cnty. Bd. of Cnty. Comm'rs v. Kempthorne*, 531 F.3d 792, 808 (9th Cir. 2008) (quoting *Wyoming v. U.S. Dep't of the Interior*, 360 F. Supp. 2d 1214, 1229 (D. Wyo. 2005), *aff'd on other grounds*, 442 F.3d 1262 (10th Cir. 2006)).

Accordingly, Plaintiffs are likely to succeed on the merits of their claim that Secretary Noem failed to consult with appropriate agencies as required by the TPS statute.

### b. Pretext

Plaintiffs also argue that the decision to terminate Ethiopia's TPS designation was pretextual—that is, "it was preordained and driven by a politically motivated objective to dismantle the TPS program." Dkt. 48 at 11; *see also* Dkt. 15 at 13–14. The Court finds that Plaintiffs are likely to prevail on the merits of this claim.

The Court takes as a starting point the principle that agencies are permitted, and indeed expected, to change policies in response to the priorities of a new democratically elected administration. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part and dissenting in part) ("A change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations."). For that reason,

"a court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities." *Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019). On the other hand, shifting Presidential priorities do not excuse non-compliance with the statutory requirements established by Congress. *See State Farm*, 463 U.S. at 59 (Rehnquist, J., concurring in part and dissenting in part) ("*As long as the agency remains within the bounds established by Congress*, it is entitled to assess administrative records and evaluate priorities in light of the philosophy of the administration." (emphasis added) (footnote omitted)); *id.* at 59 n.* ("Of course, a new administration may not choose . . . to ignore statutory standards in carrying out its regulatory functions."). This is especially true where, as here, the statute at issue was enacted to insulate beneficiaries from the swings of the political pendulum.[22]

When the Secretary terminates a TPS designation, she is statutorily required to provide the true basis for the termination. First, the APA so demands. *See ACT*, 2026 WL 395732, at *9 ("Where there is 'a significant mismatch between the decision the [agency] made and the rationale [it] provided,' the 'contrived' rationale is inadequate under the APA." (alterations in original) (quoting *Dep't of Com.*, 588 U.S. at 783, 785)). Moreover, the TPS statute itself requires that the Secretary "articulate and publish the true and factual basis for termination."[23] *Saget*, 375 F. Supp. 3d at 346–47; *see* 8 U.S.C. § 1254a(b)(3)(B) ("[T]he Attorney General shall terminate the

---

[22] *See* 101 Cong. Rec. H25811, 25837 (daily ed. Oct. 25, 1989) (statement of Rep. Richardson) (stating that the TPS bill would create "an orderly, systematic procedure . . . to replace the current ad hoc, haphazard regulations and procedures"); *id.* ("The current bureaucratic procedure is not only arbitrary but it is so discretionary that aliens currently under temporary stays are never certain that they are truly protected. It is unclear what the aliens' rights are, how the Justice Department determines what countries merit [the precursor to TPS] status or how long they will be able to stay.").

[23] This is particularly noteworthy given the unusual freedom that the Executive traditionally enjoys to *not* explain its decisions where international relations are implicated. *See, e.g.*, *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 491 (1999) (stating, with respect to removal, that "[t]he Executive should not have to disclose its 'real' reasons for . . . wishing to antagonize a particular foreign country by focusing on that country's nationals").

19

designation by publishing notice in the Federal Register of the determination under this subparagraph (including the basis for the determination)."); *see also Saget*, 375 F. Supp. 3d at 346 ("Congress's use of 'shall,' . . . in requiring the Secretary to 'review the conditions in the foreign state,' evinces its intent that the Secretary undertake a periodic review grounded in fact—*i.e.*, based on objective conditions in the foreign country and regardless of any government official's political motives—and in good faith." (quoting 8 U.S.C. § 1254a(b)(3)(A))).  To permit meaningful judicial review of whether an agency acted within the relevant statutory bounds, the agency "must 'disclose the basis of its order' and 'give clear indication that it has exercised the discretion with which Congress has empowered it.'" *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167–68 (1962) (quoting *Phelps Dodge Corp. v. Nat'l Lab. Rels. Bd.*, 313 U.S. 177, 197 (1941)).  Here, there is reason to be skeptical of the rationale provided.

On his first day back in office, President Trump issued an executive order directing officials to "promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States," including by "ensuring that designations of [TPS] are consistent with the provisions of [8 U.S.C. § 1254a], and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute."[24] Exec. Order No. 14159, 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025).  Only days before, Secretary Noem herself claimed during her confirmation hearing that the TPS program "has been abused and manipulated by the Biden Administration," and expressed "alarm[]" about "extensions" of a

---

[24] It bears repeating that it is a category error to call any current TPS holder an "illegal alien[]."  *See* Exec. Order No. 14159, 90 Fed. Reg. at 8443.  Their status in this country is, by any definition, lawful until that benefit is revoked.

20

program that "was intended to be temporary."[25]   These statements are in line with others made by

the President and other executive officials characterizing TPS as "a magic amnesty wand," "not

legal," and a "little trick," and with Vice President Vance's claim that "[w]e're going to stop doing

mass grants of Temporary Protected Status."[26]   After vacating Venezuela's TPS status, Secretary

Noem posted a video of a CNN interview on X in which she stated that, "when the President gives

a directive, the Department of Homeland Security will follow it."[27]   And follow it she did.

---

[25] *Homeland Security Secretary Nominee Gov. Kristi Noem Testifies at Confirmation Hearing*, C-SPAN (Jan. 15, 2025), https://www.c-span.org/program/senate-committee/homeland-securitysecretary-nominee-governor-kristi-noem-testifies-at-confirmation-hearing/654484 (at approximately 1:50:54) (cited at Compl. ¶ 112 & n.74); *see also* Dkt. 15-9 at 28 (certified transcript of the January 15, 2025, confirmation hearing of Secretary Kristi Noem).

[26] Gabe Whisnant, *JD Vance Confronted on Putting Constituents 'at Risk' With Haitian Claims*, Newsweek (Sept. 16, 2024, at 10:59 ET), https://www.newsweek.com/jd-vance-cnn-confronted-ohio-haitian-immigrant-claims-1954036 (cited at Compl. ¶ 114 & n.79); Damita Menezes & Ali Bradley, *Trump on Springfield Haitian Migrants: 'They Have to Be Removed'*, NewsNation (Oct. 2, 2024, at 21:41 CT), https://www.newsnationnow.com/politics/2024-election/trump-springfield-haitian-migrants-removed/ (starting at approximately 12:00) (cited at Compl. ¶ 115 & n.81); Charisma Madarang, *Trump Says Legal Haitian Migrants Are Illegal 'As Far As I'm Concerned'*, Rolling Stone (Oct. 9, 2024), https://www.rollingstone.com/politics/politics-news/trump-claims-legal-haitian-migrants-illegal-123512 (cited at Compl. ¶ 116 & n.82); Timothy Nerozzi, *Trump Ends Temporary Protected Status for More Than 300,000 Venezuelans in US*, Wash. Exam'r (Feb. 3, 2025, at 12:08 ET), https://www.washingtonexaminer.com/policy/immigration/3308462/trump-ends-temporaryprotected-status-venezuelans/ [https://perma.cc/Q39J-ZZLB] (cited at Compl. ¶ 117 & n.83); *see also* Dkt. 15-10 at 2.

[27] Secretary Kristi Noem (@Sec_Noem), X (Jan. 29, 2025, 18:57 ET), https://x.com/sec_noem/status/1884752724194963594?s=46&t=DFMGDqrcqeJ4X9klKmN2s [https://perma.cc/RZE2-CUZ7] (statement appears in posted video clip from CNN interview) (cited at Compl. ¶ 122 & n.86).

As of the date of the executive order, entitled "Protecting the American People Against Invasion," seventeen countries had TPS designations.[28]  In the twelve months between the issuance of the order and filing of this suit, Secretary Noem announced the termination of twelve TPS countries—*every single* TPS country for which she conducted a periodic review during that

---

[28] *See* Extension and Redesignation of Afghanistan for Temporary Protected Status, 88 Fed. Reg. 65728, 65728 (Sept. 25, 2023) (extended through May 20, 2025); Extension and Redesignation of Cameroon for Temporary Protected Status, 88 Fed. Reg. 69945, 69945 (Oct. 10, 2023) (extended through June 7, 2025); Extension and Redesignation of Burma (Myanmar) for Temporary Protected Status, 89 Fed. Reg. 20682, 20682 (Mar. 25, 2024) (extended through November 25, 2025); Extension of the Designation of El Salvador for Temporary Protected Status, 90 Fed. Reg. 5953, 5953 (Jan. 17, 2025) (extended through September 9, 2026); Extension and Redesignation of Ethiopia for Temporary Protected Status, 89 Fed. Reg. 26172, 26172 (Apr. 15, 2024) (extended through December 12, 2025); Extension and Redesignation of Haiti for Temporary Protected Status, 89 Fed. Reg. 54484, 54484 (July 1, 2024) (extended through February 3, 2026); Reconsideration and Rescission of Termination of the Designation of Honduras for Temporary Protected Status; Extension of the Temporary Protected Status Designation for Honduras, 88 Fed. Reg. 40304, 40304 (June 21, 2023) (extended through July 5, 2025); Designation of Lebanon for Temporary Protected Status, 89 Fed. Reg. 93641, 93641 (Nov. 27, 2024) (initial TPS designation lasting through May 27, 2026); Reconsideration and Rescission of Termination of the Designation of Nepal for Temporary Protected Status; Extension of the Temporary Protected Status Designation for Nepal, 88 Fed. Reg. 40317, 40317 (June 21, 2023) (extended through June 24, 2025); Reconsideration and Rescission of Termination of the Designation of Nicaragua for Temporary Protected Status; Extension of the Temporary Protected Status Designation for Nicaragua, 88 Fed. Reg. 40294, 40294 (June 21, 2025) (extended through July 5, 2025); Extension and Redesignation of Somalia for Temporary Protected Status, 89 Fed. Reg. 59135, 59135 (July 22, 2024) (extended through March 17, 2026); Extension and Redesignation of South Sudan for Temporary Protected Status, 88 Fed. Reg. 60971, 60971 (Sept. 6, 2023) (extended through May 3, 2025); Extension of the Designation of Sudan for Temporary Protected Status, 90 Fed. Reg. 5944, 5944–45 (Jan. 17, 2025) (extended through October 19, 2026); Extension and Redesignation of Syria for Temporary Protected Status, 89 Fed. Reg. 5562, 5563 (Jan. 29, 2024) (extended through September 30, 2025); Extension of the Designation of Ukraine for Temporary Protected Status, 90 Fed. Reg. 5936, 5936 (Jan. 17, 2025) (extended through October 19, 2026); Extension and Redesignation of Venezuela for Temporary Protected Status, 88 Fed. Reg. 68130, 68130 (Oct. 3, 2023) (extended for existing beneficiaries through September 10, 2025; redesignated for first-time applicants effective through April 2, 2025); Extension and Redesignation of Yemen for Temporary Protected Status, 89 Fed. Reg. 56765, 56765 (July 10, 2024) (extended through March 3, 2026).

22

period.[29]    Perhaps it has been a banner year for disaster recovery and geopolitical stability worldwide.  The evidence, and common sense, suggests otherwise.

The administrative record is replete with evidence, including reports by DHS itself from as recent as August and September of 2025, that armed conflict and natural disasters continue to create dangerous conditions in Ethiopia.  *See infra* Section III.B.  Certainly, as discussed above, the Court cannot reweigh the evidence itself, nor second guess Secretary Noem's weighing of the evidence.  But neither must the Court "exhibit a naiveté from which ordinary citizens are free."

---

[29] *See* Vacatur of 2025 Temporary Protected Status Decision for Venezuela, 90 Fed. Reg. 8805, 8806 (Feb. 3, 2025) (effectively immediately); Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 9040, 9041 (Feb. 5, 2025) (effective April 7, 2025); Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. 20309, 20309 (May 13, 2025) (effective July 14, 2025); Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. 23697, 23697 (June 4, 2025) (effective August 4, 2025); Termination of the Designation of Nepal for Temporary Protected Status, 90 Fed. Reg. 24151, 24151 (June 6, 2025) (effective August 5, 2025); Termination of the Designation of Nicaragua for Temporary Protected Status, 90 Fed. Reg. 30086, 30086–87 (July 8, 2025) (effective September 8, 2025); Termination of the Designation of Honduras for Temporary Protected Status, 90 Fed. Reg. 30089, 30089 (July 8, 2025) (effective September 8, 2025); Termination of the Designation of Syria for Temporary Protected Status, 90 Fed. Reg. 45398, 45398 (Sep. 22, 2025) (effective November 21, 2025); Termination of the Designation of South Sudan for Temporary Protected Status, 90 Fed. Reg. 50484, 50484 (Nov. 6, 2025) (effective January 5, 2026); Termination of the Designation of Burma (Myanmar) for Temporary Protected Status, 90 Fed. Reg. 53378, 53378 (Nov. 25, 2025) (effective January 26, 2026); Termination of the Designation of Haiti for Temporary Protected Status, 90 Fed. Reg. 54733, 54733 (Nov. 28, 2025) (effective February 3, 2026); Termination of the Designation of Ethiopia for Temporary Protected Status, 90 Fed. Reg. 58028, 58028 (Dec. 15, 2025) (effective February 13, 2026); Termination of the Designation of Somalia for Temporary Protected Status, 91 Fed. Reg. 1547, 1547 (Jan. 14, 2026) (effective March 17, 2026).  Note that the designation for South Sudan was extended automatically by statute, *see* Extension of South Sudan Designation for Temporary Protected Status, 90 Fed. Reg. 19217, 19217 (May 6, 2025), before Secretary Noem announced the subsequent termination because the Secretary was "unable to make an informed determination . . . by the March 4, 2025 statutory deadline," Termination of the Designation of South Sudan for Temporary Protected Status, 90 Fed. Reg. 50484, 50484 (Nov. 6, 2025) (effective January 5, 2026).  In addition, after this suit was filed, the Secretary announced the termination of Yemen's TPS designation.  *See generally* Termination of the Designation of Yemen for Temporary Protected Status, 91 Fed. Reg. 10402, 10402 (Mar. 3, 2026) (effective May 4, 2026).

The TPS designations for El Salvador, Sudan, and Ukraine were extended another 18 months in federal register notices on January 17, 2025, before the President issued the executive order.  *See* Extension of the Designation of El Salvador for Temporary Protected Status, 90 Fed. Reg. 5953, 5953 (Jan. 17, 2025) (extended through September 9, 2026); Extension of the Designation of Sudan for Temporary Protected Status, 90 Fed. Reg. 5944, 5944–45 (Jan. 17, 2025) (extended through October 19, 2026); Extension of the Designation of Ukraine for Temporary Protected Status, 90 Fed. Reg. 5936, 5936 (Jan. 17, 2025) (extended through October 19, 2026).  The TPS designation for Lebanon extends through May 27, 2026.  *See* Designation of Lebanon for Temporary Protected Status, 89 Fed. Reg. 93641, 93641 (Nov. 27, 2024).

*Dep't of Com.*, 588 U.S. at 785 (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.)).

Further evidence that the termination was preordained, and the explanation provided pretextual, is the Federal Register notice itself.  The notice announcing the termination states that "DHS records indicate a significant portion of the Ethiopian [TPS] population have been under administrative investigation for risk to national security, public safety, or for attempting to obtain immigration benefits through fraud or misrepresentation."  Termination of the Designation of Ethiopia for Temporary Protected Status, 90 Fed. Reg. at 58031.  But this is, at best, irrelevant to the determination, which suggests that Defendants were casting about for explanations to justify a predetermined outcome.[30]  And even if this statement *were* relevant to the TPS determination, it is demonstrably untrue as revealed by the administrative record itself, which shows that of 5,524 Ethiopian TPS holders, there are zero records of fraud and only five individuals with any public safety records.  Dkt. 45-1 at 252.

"Altogether, the evidence tells a story that does not match the Secretary's explanation for [her] decision."  *Dep't of Com.*, 588 U.S. at 784.  And the Court "cannot ignore the disconnect

---

[30] The TPS statute permits the Secretary to consider domestic interests only *after* finding that "extraordinary and temporary conditions" in a country justify a TPS designation, not when armed conflict or other dangerous conditions are present.  *See* 8 U.S.C. § 1254a(b)(1)(C) (permitting the Secretary to designate a country for TPS after she "finds that there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is *contrary to the national interest of the United States*" (emphasis added)); *see also id.* § 1254a(b)(1)(A)–(B) (providing other conditions that justify TPS designations and not mentioning "national interests of the United States" as a mitigating factor).  The Court need not resolve whether the directive to "determine whether the conditions for such designation under this subsection continue to be met" during periodic reviews permits consideration of national interests.  *Id.* § 1254a(b)(3)(A).  That is, whether, when reviewing TPS designations for extension or termination, the Secretary may consider national interests when the conditions at issue are "extraordinary and temporary conditions," or whether national interests only factor into the *initial* designation decision.  *Compare* Dkt. 46 at 26–27 (Defendants arguing national interests continue to be a required consideration during periodic review), *with* Dkt. 48 at 17–18 (Plaintiffs arguing national interests are not a permissible consideration during periodic review).  Because the Secretary did not find "extraordinary and temporary conditions" in Ethiopia, considering national interests was irrelevant at best, even if not procedurally improper.

24

between the decision made and the explanation given." *Id.* at 785. "If judicial review is to be more than an empty ritual, it must demand something better than the explanation offered for the action taken in this case." *Id.* The plain disconnect between the decision to terminate Ethiopia's TPS designation and the explanation provided demands that the Court be skeptical that the explanation published in the Federal Register was the requisite "true and factual basis." *Saget*, 375 F. Supp. 3d at 346–47. Indeed, in light of the above statements by the Secretary and other White House officials and all the other evidence in the record, including the complete lack of any meaningful consultation with the appropriate government agencies, to say that the Court finds it unlikely would be an understatement. *See ACT*, 2026 WL 395732, at *11 ("This minimal evidence of consultation bolsters Plaintiffs' claim that the default Defendants were predetermined to terminate South Sudan's TPS designation.").

In sum, Plaintiffs have shown that they are likely to demonstrate that the termination of Ethiopia's TPS designation was a preordained decision and that the reasons given for it were pretextual. Having determined that Plaintiffs are likely to succeed on the merits of two of their claims, the Court need not address the merits of the remaining claims.

### B.    Irreparable Harm

Plaintiffs have clearly demonstrated that they are "likely to suffer irreparable harm in the absence of" the requested relief. *California*, 802 F. Supp. 3d at 281. "To establish irreparable harm there must be an actual, viable, presently existing threat of serious harm." *Univ. of Notre Dame (USA) in Eng. v. TJAC Waterloo, LLC*, 2016 WL 1384777, at *6 (D. Mass. Apr. 7, 2016) (quoting *Sierra Club v. Larson*, 769 F. Supp. 420, 422 (D. Mass. 1991)), *aff'd*, 861 F.3d 287 (1st Cir. 2017). If the effective date of the termination is not postponed, individual Plaintiffs will lose access to their livelihoods and immediately face arrest and removal to a country where the Government has previously found they face serious risk of harm. *See* Dkt. 15 at 23–24; Dkt. 43

25

at 17–18; *see also, e.g.*, Dkt. 45-1 at 203–04 (August 2025 USCIS report on Ethiopia TPS considerations, noting that region-wide armed conflict in Ethiopia "continued throughout 2024 and into 2025, with both the government and Amhara forces reportedly committing war crimes and other serious abuses" (cleaned up)); Dkt. 45-1 at 202–29 (August 2025 USCIS report describing ongoing dangers in Ethiopia, "including armed conflicts, natural disasters such as drought and floods, disease outbreaks," "war crimes," "crimes against humanity," "grave human rights abuses," inadequate humanitarian assistance to the local population, various infrastructure and economic challenges, and the risk of another civil war); Dkt. 45-1 at 230–32 (September 2025 USCIS report on Ethiopia TPS policy considerations, noting that "[o]ngoing conflict and violence, particularly in the Amhara and western Oromia regions, disrupt humanitarian operations and essential services" but also noting that, "[a]lthough there have been reports of attacks on civilians and civilian infrastructure, the armed conflict between the Ethiopian military and Fano militia is largely limited to the Amhara and Oromia regions, as a fragile treaty in Tigray continues to hold"). This Court, for the reasons well-articulated by those courts that have already dealt with this question, finds these to be irreparable injuries. *See, e.g.*, *Nat'l TPS All. v. Noem*, 798 F. Supp. 3d 1008, 1035–36 (N.D. Cal. 2025); *ACT*, 2026 WL 395732, at \*13; *Doe*, 2026 WL 184544, at \*24–25. "On this score, Plaintiffs easily meet their burden." *ACT*, 2026 WL 395732, at \*13.

Defendants largely do not dispute that Plaintiffs face serious, irreparable harm in Ethiopia.[31]  Instead, Defendants predominantly argue that "any harms flowing from the loss of temporary protection from removal and its associated benefits inhere in the statutory scheme that

---

[31] Defendants suggest that the risk of grave harm Plaintiffs describe is merely "speculative." Dkt. 46 at 35. But Plaintiffs have pointed to the Government's own statements regarding the current conditions in Ethiopia to illustrate that these risks are more than mere 'speculation.' *See, e.g.*, Dkt. 43 at 17–18 (citing to the administrative record); *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) ("Damocles's sword does not have to actually fall . . . before the court will issue [relief].").

26

Congress designed." Dkt. 46 at 35. Specifically, because "[t]he statute does not allow for indefinite protection[,] . . . Plaintiffs cannot show that their alleged harms 'directly result from the action which [they] seek[] to enjoin.'" *Id.* (final two alterations in original) (quoting *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)). But the temporary nature of the statutory scheme is precisely the point: Congress intended to protect from removal nationals of countries to which those individuals could not return safely *until* the dangerous conditions were *no longer present*. *See* 8 U.S.C. § 1254a(b)(3)(A) ("[The Secretary] shall determine whether the conditions for such designation . . . *continue to be met*." (emphasis added)); *id.* § 1254a(b)(3)(B) ("If the [Secretary] determines . . . that a foreign state . . . *no longer continues to meet the conditions for designation . . .*, the [Secretary] shall terminate the designation." (emphasis added)); *id.* § 1254a(b)(3)(C) (automatically extending TPS designations unless the Secretary "determine[s] . . . that a foreign state . . . *no longer meets the conditions for designation*" (emphasis added)).

Prematurely terminating a country's TPS status—that is, declining to extend a TPS designation without following the statutory requirements that Congress saw fit to impose on the periodic review process—imposes on affected TPS holders exactly the kind of harms Congress sought to avoid in enacting the program. *Sanchez v. Mayorkas*, 593 U.S. 409, 412 (2021) ("[T]he TPS program . . . provides humanitarian relief to foreign nationals in the United States who come from specified countries" which are "beset by especially bad or dangerous conditions, such as arise from natural disasters or armed conflicts."); *see also Nat'l TPS All. v. Noem*, — F. Supp. 3d —, 2025 WL 4058572, at *2 (N.D. Cal. Dec. 31, 2025) ("Congress established [TPS] . . . to provide humanitarian relief to foreign nationals within the United States who are unable to return to their country of origin due to potential threats to their personal safety from natural disaster, civil strife and armed conflict, or other extraordinary and temporary conditions."), *appeal docketed*,

27

No. 26-199 (9th Cir. Jan. 9, 2026) (proceedings stayed by Ninth Circuit pending resolution of Supreme Court appeal in related cases). Surely it cannot be that the very circumstances that motivated Congress to enact TPS in the first place do not constitute irreparable harm simply because, if those conditions were to cease in a specific country, the protected status would no longer be needed by nationals of that country.[32]

### C.      Balance of the Equities and Public Interest

Finally, the Court must weigh the balance of the equities and determine whether preliminary relief would be in the public interest. "These two inquiries merge in a case like this one, where the Government is the party opposing the preliminary [relief]." *Devitri v. Cronen*, 289 F. Supp. 3d 287, 297 (D. Mass. 2018) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). For the reasons discussed below, these factors favor Plaintiffs.

"To begin with, the Plaintiffs' likelihood of success on the merits lightens [Defendants'] stated interests." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 734 (D.C. Cir. 2022). The Supreme Court has confirmed that "our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Ala. Ass'n of Realtors v. Dep't Health & Hum. Servs.*, 594 U.S. 758, 766 (2021); *see also Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 120–21 (2022) (staying an unlawful vaccine mandate even though the Government said the mandate would save more than 6,500 lives); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582, 589 (1952) (affirming district court's preliminary injunction of an unlawful executive order even though a wartime president said his order was "necessary to avert a national catastrophe").

---

[32] Defendants' position is akin to snatching a man's umbrella in the middle of a rainstorm and then claiming there was no harm because he would have had to close it at some point anyway.

As to public interest, courts in this District have repeatedly explained that "[t]he public has an important interest in making sure government agencies follow the law." *Ozturk v. Trump*, — F. Supp. 3d —, 2025 WL 3514320, at \*10 (D. Mass. Dec. 8, 2025) (quoting *Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*, 407 F. Supp. 2d 323, 343 (D. Mass. 2005), *aff'd*, 463 F.3d 50 (1st Cir. 2006)), *appeal docketed sub nom.*, *Ozturk v. Hyde*, No. 26-1135 (1st Cir. Feb. 7, 2026); *see also California v. Trump*, 786 F. Supp. 3d 359, 394 (D. Mass. 2025) (same); *New York v. McMahon*, 784 F. Supp. 3d 311, 372 (D. Mass. 2025) ("[T]here is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016))), *appeal dismissed*, 2025 WL 3451815 (1st Cir. Sept. 15, 2025).

For their part, Defendants argue that the Supreme Court's stays in *Noem v. National TPS Alliance*, 2025 WL 1427560 (U.S. May 19, 2025) (mem.), and *Noem v. National TPS Alliance*, 606 U.S. —, 146 S. Ct. 23 (2025) (mem.), should "dictate the disposition of this motion, which presents substantially the same considerations." Dkt. 46 at 36. But to the extent this Court's decision is informed by interim docket orders, that offers little help to Defendants, given that the Supreme Court, less than one month ago, in its most recent interim orders, declined to immediately stay the district courts' orders in TPS cases even more similar to the instant case. *See Miot II*, 2026 WL 731087; *Noem v. Doe*, 2026 WL 731088 (U.S. Mar. 16, 2026) (mem.).[33]

Defendants also argue that "the government suffers irreparable injury '[a]ny time' it is 'enjoined by a court from effectuating statutes enacted by representatives of [the] people.'" Dkt. 46 at 36 (alterations in original) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). But injunctive relief is not at issue here. Despite what Defendants

---

[33] In the consolidated cases, the Supreme Court deferred the applications for stay, pending oral argument.

29

claim, granting a stay would not actually "require [Secretary Noem] to permit individuals from Ethiopia to remain in the country, with work authorization and protection from removal or even initiation of removal proceedings, notwithstanding her reasoned determination that doing so is contrary to the statute and to the national interest."  Dkt. 46 at 36.  Granting Plaintiffs' motion merely delays the effect of a specific action that, at this junction, appears to have been undertaken unlawfully.  Further, even if injunctive relief were at issue, that generalized injury would be significantly watered down here, where the Court has found that Plaintiffs are likely to succeed on the merits of their claims.  *See New Eng. Synod v. Dep't of Homeland Sec.*, 2026 WL 412329, at *29 (D. Mass. Feb. 13, 2026) ("Generally, the government is not harmed by an injunction enjoining it from implementing an unlawful or unconstitutional policy, because the government has no legitimate interest in following such a policy.").  And the fact that the only harm Defendants identify is the generalized grievance that they may not implement a statute as they see fit suggests that Defendants face no other irreparable harm as a result of this stay.  Therefore, the balance of the equities and public interest tip in Plaintiffs' favor.

### D.    Remedy

Finally, Defendants argue that 8 U.S.C. § 1252(f)(1), which directs that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter," precludes the Court from considering Plaintiffs' claims.  Dkt. 46 at 19–20.  Even assuming arguendo that "the provisions of part IV of this subchapter" captures the TPS statute, which the parties dispute, *see id.*; Dkt. 48 at 25, section 1252(f)(1) presents no bar to Plaintiffs' claims because Plaintiffs do not seek "to enjoin or restrain the operation of" the TPS statute, 8 U.S.C. § 1252(f)(1).

In *Biden v. Texas*, the Supreme Court considered the nature of section 1252(f)(1) and concluded that there is "no basis for the conclusion that section 1252(f)(1) concerns subject matter

30

jurisdiction."[34]   597 U.S. 785, 801 (2022).  Instead, the provision merely "withdraws a district court's 'jurisdiction or authority' to grant a particular form of relief": that which "'enjoin[s] or restrain[s] the operation of' the relevant sections of the statute."  *Id.* at 798 (quoting 8 U.S.C. § 1252(f)(1)).   Further, the Supreme Court specifically "express[ed] no view" on whether 1252(f)(1)'s "limitation on 'jurisdiction or authority' . . . extends to other specific remedies, such as declaratory relief and relief under section 706 of the APA." *Id.* at 801 n.4.  However, the First Circuit has directed that section 1252(f)(1) does not prevent a district court from hearing a claim for declaratory relief, *see Brito v. Garland*, 22 F.4th 240, 251–52 (1st Cir. 2021) (describing declaratory relief as "'a milder remedy' than an injunction[] [because] it 'does not, in itself, coerce any party or enjoin any future action'" (quoting *Ulstein Mar., Ltd. v. United States*, 833 F.2d 1052, 1055 (1st Cir. 1987))), and another session of this Court extended that conclusion to vacatur, *see ACT*, 2026 WL 395732, at *8.  "[B]ecause a postponement of agency action under § 705 'functions as a "temporary form of vacatur,"' not as a preliminary injunction 'that operate[s] *in personam*,' Plaintiffs' requested relief in the instant motion is not barred by § 1252(f)(1)." *Id.* (alteration in

---

[34] The Supreme Court observed, as evidence in support of this conclusion, that if the provision "deprived lower courts of subject matter jurisdiction to adjudicate *any* non-individual claims" under the relevant INA provisions, "no such claims could ever arrive at this Court, rendering the provision's specific carveout for Supreme Court injunctive relief nugatory." *Biden v. Texas*, 597 U.S. 785, 799 (2022) (emphasis added) (quoting the portion of section 1252(f)(1) stating "[N]o court (other than the Supreme Court) shall have jurisdiction or authority. . ." (alteration in original)).

original) (quoting *Make the Rd. N.Y. v. Noem*, 2025 WL 3563313, at *16 (D.C. Cir. Nov. 22, 2025) (per curiam)).[35]

## IV.    <u>Conclusion</u>

For the foregoing reasons, Plaintiffs' motion to postpone the effective date of the termination of Ethiopia's TPS designation is GRANTED.

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy
Judge, United States District Court

Dated: April 8, 2026

---

[35] The Court need not devote much time to Defendants' argument that "the fact that the preliminary-injunction standard applies to motions for stays under § 705" renders a section 705 stay "functionally indistinguishable from a forbidden preliminary injunction" and therefore also barred by this provision. Dkt. 46 at 20. The Court will only note that this proposition is news to federal courts, which treat these two distinct forms of relief as anything but "functionally indistinguishable," notwithstanding the fact that the same standards for preliminary relief apply. Indeed, "[t]here are meaningful differences between an injunction, which is a 'drastic and extraordinary remedy,' and vacatur, which is 'a less drastic remedy.'" *Texas v. United States*, 40 F.4th 205, 219–20 (5th Cir. 2022) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)) (holding that section 1252(f)(1) does not extend to vacatur, which "does nothing but re-establish the status quo absent the unlawful agency action" and "neither compels nor restrains further agency decision-making").