**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AFRICAN COMMUNITIES TOGETHER; SAMUEL DOE; STEPHEN DOE; and ABAL DOE, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>MARKWAYNE MULLIN, in his official capacity as Secretary of the U.S. Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; and UNITED STATES OF AMERICA,<br><br>*Defendants*. | **AMENDED COMPLAINT**<br><br>Civil Action No. 1:26-cv-10278-BEM<br><br>Pursuant to L.R. 5.1(c), Plaintiffs request **emergency relief** against agency action that was scheduled to take effect at **11:59 p.m. on February 13, 2026**. |

**INTRODUCTION**

1.      Ethiopia is a country in humanitarian crisis.  Due to the presence of both armed conflict and extraordinary conditions, in 2022, the United States granted Ethiopian nationals a form of statutory and humanitarian protection called Temporary Protected Status ("TPS"), which protects certain individuals who are already in the United States from being subjected to immigration confinement within the U.S. and forcibly returned to countries designated unsafe on account of dire country conditions like armed conflict, natural disaster, or other extraordinary circumstances.  TPS provides eligible beneficiaries with the right to live and work legally in the United States during a period when it is unsafe for them to return to their countries of origin.  Since 2022, the United States has repeatedly redesignated or extended the designation for Ethiopia, recognizing the ongoing, devastating, and widespread armed conflict in the country—which has included gender-based and sexual violence, arbitrary arrests and confinement, torture and physical violence, and the killing of civilians.  Every redesignation has also recognized other extraordinary circumstances, such as food insecurity, destructive droughts and flooding, population displacement, barriers to accessing humanitarian relief, and disease outbreaks.  Today, over 5,000 Ethiopian nationals currently have TPS and, as a result, find refuge in the United States. Over 260 Ethiopian nationals have pending applications hoping for that same protection.

2.      Plaintiffs are African Communities Together ("ACT"), a non-profit, membership organization representing African immigrants, their families, and their communities across the United States, and three of its members who are Ethiopian nationals with TPS or pending applications for TPS (hereinafter, "Individual Plaintiffs," and together with ACT, "Plaintiffs"). Individual Plaintiffs and ACT's TPS-holder and TPS-applicant members from Ethiopia represent the diverse population of Ethiopians who have relied on TPS to provide the most basic forms of human security—a stable place to live and a chance to work for a living, with protection against

deportation and related immigration confinement in the U.S. during a time of severe crisis in their home country.  They include health care professionals and researchers, educators, and students, who live across the country, with homes, extended families, jobs, and deep community ties.

3.      Plaintiffs bring this action to challenge Defendants' unlawful periodic review of Ethiopia's TPS designation and the resulting decision to terminate it.  On December 15, 2025, through a notice in the Federal Register, U.S. Department of Homeland Security ("DHS") Secretary Kristi Noem announced the termination of TPS for Ethiopia ("the Termination"), effective at 11:59 p.m. on February 13, 2026.  Defendants' actions put current TPS holders and applicants, including Individual Plaintiffs and members of ACT, at imminent risk of losing critical, Congressionally designated humanitarian protection—including protection against deportation and related immigration confinement—and rob people with pending applications of the opportunity to have their applications adjudicated.  Should TPS for Ethiopia be terminated, all Plaintiffs will face impossible choices:  to uproot their lives yet again in search of a pathway to safety in a third country; to remain in the United States without lawful immigration status, at risk of imminent immigration confinement and removal; or to relocate to Ethiopia, a country still suffering violent conflict—including killings, torture, gender-based violence, arbitrary confinement, and inter-communal violence—as well as other unsafe country conditions, including mass internal displacement, severe flooding and droughts, disease outbreaks, acute food insecurity, and the inaccessibility of humanitarian aid, including food, water, and health services.

4.      Secretary Noem's decision to terminate TPS for Ethiopia—giving TPS-holders, applicants, and their loved ones 60 days to plan for life without TPS—is the latest in a series of terminations resulting from premeditated, pretextual, procedurally defective, and

discriminatory reviews of TPS designations[1] for several non-European countries whose nationals are majority non-white.  These defective reviews and resulting termination decisions, including for Ethiopia, were made as part of the Trump Administration's ongoing effort to effectively eliminate access to the Congressionally authorized TPS program for people who are non-white and non-European, the apparent goal of which is to significantly reduce the number of non-white and non-European immigrants in the United States.

5.      Specifically, here, Defendants' decision to terminate TPS for Ethiopia— resulting from a periodic review process lacking meaningful consultation with appropriate agencies, without regard to Ethiopia's dire conditions, including the Administration's own formal continuation of the National Emergency with respect to Ethiopia in September 2025, and with reliance on impermissible factors—violates the procedural requirements of the TPS statute and the Administrative Procedure Act ("APA").  Defendants' unexplained decisions to rely on domestic national interests in terminating Ethiopia's TPS designation and to provide only 60 days' notice before the termination takes effect are stark departures from past agency practices and separately violate the APA.

6.      The insufficiency of the 60-day wind-down period is compounded by a myriad of severe and new policy changes within DHS that restrict access to alternative forms of immigration status in the U.S., both affirmatively and defensively (within removal proceedings) and otherwise raise the specter of removal to dangerous third countries.

7.      The Termination of Ethiopia's TPS designation also violates the Constitution in multiple respects. *First*, the Termination violates the Equal Protection Clause

---

[1] To date, the current Trump Administration has sought to terminate TPS for:  Ethiopia, Somalia, Burma, South Sudan, Syria, Nicaragua, Honduras, Nepal, Cameroon, Afghanistan, Haiti, and Venezuela.

because it was motivated, at least in part, by racial, ethnic, and national origin-based animus. The dehumanizing rhetoric that Secretary Noem, President Trump, and officials in his Administration have consistently used to describe and justify their TPS decisions demonstrates their underlying animus against immigrants who are not white or descended from Europeans, including Ethiopian immigrants. That animus and related rhetoric have been particularly stark for the nationals of majority Black countries. *Second*, the Termination violates the Due Process Clause. TPS holders have substantial liberty and property rights in their TPS status, which confers both protection from removal and work authorization. And the TPS statute itself establishes procedural safeguards that are constitutionally necessary to protect those interests. By issuing the Termination in violation of those procedures, the Secretary violated the due process rights of Ethiopian TPS holders and applicants, who now face the summary loss of their liberty and property interests.

8. In the alternative, and under Federal Rule of Civil Procedure 8(d)(2)–(3), Plaintiffs allege that the DHS Secretary lacked statutory authority to terminate Ethiopia's TPS designation under 8 U.S.C. § 1254a. Congress made clear repeatedly and unambiguously throughout the TPS statute that the "Attorney General"—and only the "Attorney General"— possesses the authority to terminate TPS status. And contrary to the government's assertions, Congress never transferred that authority to the DHS Secretary or any other official. For any or all of these reasons, this Court should set aside the agency's unlawful decision to terminate TPS for Ethiopian nationals.

## THE PARTIES

### Plaintiffs

9. **Plaintiff African Communities Together ("ACT")** is a non-profit, membership-based organization that fights for civil rights, opportunity, and a better life for African

immigrants, their families, and their communities across the United States. It was founded in 2013 and is incorporated in New York.

10. ACT has thousands of members nationwide. Its membership is diverse and includes people around the U.S. who are the nationals or descendants of myriad African nations, as well as their U.S.-based family members. ACT's membership has diverse citizenship and immigration statuses and includes TPS holders and/or applicants from Ethiopia and other African countries, including South Sudan and Sudan.

11. ACT's members who are Ethiopian TPS recipients and/or applicants live around the United States, including Massachusetts.

12. ACT brings this action on behalf of itself and its members, including the Individual Plaintiffs.

13. **Plaintiff Samuel Doe** is a Black man who is an Ethiopian national and a TPS holder. He is in his 40s, has lived in the U.S. for years, and is a member of ACT. TPS is his sole form of immigration status and gives him access to work authorization and to state identification and a driver's license.

14. Samuel earns his living in the U.S. as a public-school teacher. In that capacity, he supports community members in their efforts to earn their high school degrees and become educated members of American society. He is a lifelong teacher who values education as a tool for empowering future generations. His students rely on him, and he fears how they could be impacted and how their studies could be disrupted if he were no longer their teacher.

15. Samuel is a devout Christian and regularly attends and volunteers with his community church in whatever capacity is needed. He has cleaned the grounds, helped out with Sunday school, and assisted in administrative tasks there.

16.     Samuel finds both his teaching and his service for his community, family, and friends gratifying. During the COVID-19 pandemic, he worked with a local health department to facilitate medical care for community members.  He is the sole financial provider for his cousins who live outside of the United States and has financially supported friends on occasion.  Losing TPS status would impact not only Samuel but the friends, family, and community who rely on him.

17.     **Plaintiff Stephen Doe** is a Black man in his 30s who is an Ethiopian national and a TPS holder.  He has lived in the U.S. for years and is a member of ACT. TPS is currently his sole form of immigration status.

18.     Stephen has devoted his life to advocating for and supporting people who are unable to take care of themselves or advocate for themselves, whether due to illness, financial burdens, or other reasons. He has provided sustained financial support to people who have been disfigured and disabled by the ongoing armed conflict in Ethiopia and has otherwise worked together with fellow health professionals to raise badly needed funds for areas of Ethiopia whose healthcare infrastructure has been devastated by the ongoing armed conflict there.

19.     Before coming to the U.S., Stephen worked as a healthcare professional in a medical facility with a focus on helping people disfigured by horrific incidents and illnesses. That work and his life experiences nurtured his interest in a specialized field of medical research in which he has since gained expertise in the United States. Stephen currently works full-time contributing to this specialized field. He has been supporting grant applications related to his field and has also been part of team-based scientific research on important issues impacting people's wellbeing in the U.S. He is working hard to prepare for a licensing exam so he can resume professional practice. In his time in the U.S., Stephen is proud to have served as a patient ambassador at a major hospital.

20. Stephen is very family oriented. He and his domestic partner live with a pet, whom they cherish. And Stephen is deeply supportive of his immediate and extended family, who live in the U.S. and outside it.

21. Stephen provides support to his U.S. citizen aunt and uncle who rely on, and have directly benefitted from, his help in navigating the U.S. healthcare system for the care they need for their chronic medical conditions.

22. Stephen also does what he can to support a sibling of his who lives with a chronic and debilitating mental illness that impacts their ability to live independently. Another sibling of Stephen lives and studies in the U.S., and Stephen and they are close. Together, they celebrate birthdays and other special occasions and visit each other when they can. Stephen hopes to be able to celebrate their graduation with them this spring.  Losing TPS status would impact not only Stephen but the family, research team, and community members who rely on him.

23. **Plaintiff Abal Doe** is a Black man in his 20s, a national of Ethiopia, and a TPS holder. He has lived in the U.S. for years, is a member of ACT, and is also an international student.

24. Abal is pursuing higher education in the U.S. to better his life and his family members' lives. Through his educational pursuits here over the past few years, Abal has built strong community connections and maintains many close friendships. He has worked to create on-campus community for African students and has also tutored others on campus.

25. Abal has also developed a strong community through his church. He is a devout Christian, regularly attends church services, and attends church-affiliated events during the week. He teaches Sunday school to the children at the church; and, on Saturdays, the church hosts

classes for children in the community, teaching them to read, write, and learn Amharic. Abal sometimes teaches those classes.

26.      In addition to his community ties through school and church, Abal has loved ones who live in the United States and who he stays in touch with and visits when he can.  Abal's immediate family live outside of the United States. Because his parents are the sole providers for his siblings and struggle to provide for them, it is important for Abal to be able to support himself financially.

27.      TPS is Abal's only source of full work authorization. His international student status only allows him to do limited work on campus, which is not enough to support himself.  His TPS work authorization has enabled him to work off campus. Without the ability to do off-campus work through his TPS authorization, Abal cannot financially support himself.

28.      Through TPS, the Individual Plaintiffs have immigration status, access to related federal benefits (like work authorization), access to related state benefits (like driver's licenses), protection against deportation charges and related confinement within the U.S., and protection against forced removal to Ethiopia—where they and many others face grave and deadly dangers because of ongoing armed conflict and other extraordinary circumstances there.

**Defendants**

29.      **Defendant Markwayne Mullin** is the Secretary of the U.S. Department of Homeland Security. As the highest-ranking officer for DHS, Secretary Mullin has statutory authority over all TPS designation, extension, and termination decisions. He is sued in his official capacity.

30.      **Defendant U.S. Department of Homeland Security** is a Cabinet-level department in the U.S. federal government and is an "agency" within the meaning of 5 U.S.C. § 551(1).  Its components include U.S. Citizenship and Immigration Services ("USCIS"), U.S.

Immigration and Customs Enforcement ("ICE"), and U.S. Customs and Border Protection ("CBP").  DHS, together with its component agencies, is responsible for administering and enforcing the TPS program.  Its highest-ranking officer is its Secretary, and references herein to "the Secretary" correspond to the DHS Secretary.

31.    **Defendant U.S. Citizenship and Immigration Services** is the sub-agency within DHS charged with adjudicating applications for immigration benefits, including TPS.

32.    **Defendant United States of America** includes all other government agencies and departments responsible for changes in TPS policies and the implementation and administration of those policies.

## JURISDICTION AND VENUE

33.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including the Fifth Amendment to the Constitution and the APA, and the case presents a justiciable case or controversy within the meaning of Article III of the U.S. Constitution.

34.    The Court has remedial authority under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, the APA, 5 U.S.C. § 701 *et seq.*, and its common law equitable powers.

35.    The APA waives the Government's sovereign immunity from claims alleging unlawful agency action and "seeking relief other than money damages."  5 U.S.C. § 702. In addition, sovereign immunity does not bar claims against federal officials for non-monetary injunctive relief to prevent violations of federal law.[2]

---

[2] *See Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 697–99 & nn.18–19 (1949); *Shields v. Utah Idaho Cent. R.R. Co.*, 305 U.S. 177, 183–84 (1938).

36.     Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because Defendants are agencies of the United States or officers of the United States acting in their official capacity, and because at least one Plaintiff and putative class representative resides in this judicial district.

## THE STATUTORY SCHEME FOR TPS AND RELATED AGENCY PRACTICES

37.     Congress created TPS as a response to unconstrained executive discretion in immigration humanitarian relief programs.  Prior to 1990, the executive used "extended voluntary departure" to confer blanket nationality-based humanitarian relief, through a process that lacked "any specific . . . criteria."[3]

38.     Congress designed TPS to ensure that future nationality-based protections would be based on "identifiable conditions" rather than "the vagaries of our domestic politics." 101 Cong. Rec. H25811, H25838 (daily ed. Oct. 25, 1989) (statement of Rep. Sander Levine) (debating the immediate precursor to the TPS statute), https://www.congress.gov/101/crecb/1989/10/25/GPO-CRECB-1989-pt18-7-1.pdf.    Congress also sought to replace the "ad hoc, haphazard . . . procedures" that existed before and to provide beneficiaries with certainty about "what [their] rights are, how [an agency] determines what countries merit [protected] status," and "how long [beneficiaries] will be able to stay." *Id.* at H25837 (statement of Rep. Bill Richardson).

39.     Since 1990, the TPS statute has given the executive branch authority to provide humanitarian relief to nationals of designated countries who are already present in the

---

[3] *See* Lynda J. Oswald, *Extended Voluntary Departure: Limiting the Attorney General's Discretion in Immigration Matters*, 85 Mich. L. Rev. 152, 157–60, 178 n.153 (1986) (quoting Letter from Att'y Gen. William F. Smith to Rep. Lawrence J. Smith (July 19, 1983)). The facts in paragraphs 37–195 are alleged as of the date of Plaintiffs' original complaint, and have not been modified to reflect intervening developments in this litigation, including the filing of the administrative record.

United States. *See* 8 U.S.C. § 1254a. The statute provides that the Secretary of DHS may designate a country for TPS where (A) "there is an ongoing armed conflict within the state" and returning nationals "to that state . . . would pose a serious threat to their personal safety"; (B) [there is a natural disaster] or (C) "there exist extraordinary and temporary conditions in the foreign state that prevent . . . nationals of the state from returning to the state in safety, unless the [DHS Secretary] finds that permitting the [noncitizens] to remain temporarily in the United States is contrary to the national interest of the United States." *Id.* § 1254a(b)(1)(A)–(C).

40.     Significantly, Congress included the "national interest of the United States" provision only in subsection (C), for designations based on "extraordinary and temporary conditions"; it does not apply to designations under subsections (A) (armed conflict) or (B) (natural disasters).

41.     The statute first requires the Secretary to consult with "appropriate agencies." 8 U.S.C. § 1254a(b)(1). After that, the Secretary "may designate" a country based on armed conflict, environmental disaster, or other extraordinary conditions. *Id.* A designation lasts between six and eighteen months, effective either upon notice in the Federal Register or "such later date as the [Secretary] may specify." *Id.* §1254a(b)(2).

42.     As long as the Secretary consults appropriate agencies and determines certain country conditions exist, she may designate a country for TPS.

43.     By contrast, Congress limited the Secretary's discretion to periodically review TPS designations. *See* U.S. Gov't Accountability Off., GAO-20-134, *Temporary Protected Status: Steps Taken to Inform and Communicate Secretary of Homeland Security's Decisions* 15–18, 27 (2020) ("GAO Report") (differentiating between the discretion afforded before and after an initial designation), https://www.gao.gov/assets/gao-20-134.pdf.

12

44.     The statutory requirements for periodic review of a designation are clear: "At least 60 days before [the] end of the . . . period of designation, . . . the [Secretary], after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state . . . for which a designation is in effect . . . and shall determine whether the conditions for such designation under this subsection continue to be met."  8 U.S.C. § 1254a(b)(3)(A).

45.     The periodic review process typically begins months before the 60-day deadline.  *See* GAO Report at 20–21.  As part of the process, both USCIS and the U.S. Department of State ("State Department") usually have prepared country conditions memoranda and recommendations for the Secretary.  *See id.* at 15–16; *see also Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1082 (N.D. Cal. 2018), *vacated and remanded sub nom. Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023) (describing the TPS review process).[4]

46.     Customarily, USCIS manages and coordinates the TPS periodic review process for the Secretary, soliciting a country conditions report from the Refugee, Asylum, and International Operations ("RAIO") unit within USCIS and soliciting a country conditions report and recommendation from the State Department.[5]  After considering the materials provided, USCIS typically has prepared for the Secretary a detailed recommendation, based on current and objective country conditions, and called a "Director Memo."[6]

---

[4] The district court's decision was reversed on appeal in a 2-1 ruling on jurisdictional grounds, but a majority of active judges voted to rehear the case en banc, so the panel decision was vacated.  *See Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023).

[5] *See* GAO Report at 15–21; *see also, e.g.*, *Saget v. Trump*, 375 F. Supp. 3d 280, 299–300 (E.D.N.Y. 2019).

[6] *See, e.g.*, GAO Report at 18; *Saget*, 375 F. Supp. 3d at 299–300, 333 ("Plaintiffs seek neither a substantive declaration nor individualized relief. Rather, they seek to prevent the Secretary and (continued…)

47.    Once the Secretary makes her decision, the statute requires that she "provide on a timely basis for the publication of notice of each such determination (including the basis for the determination, and, in the case of an affirmative determination, the period of extension of designation under subparagraph (C)) in the Federal Register."  8 U.S.C. § 1254a(b)(3)(A).

48.    Unless the Secretary timely determines and publishes notice of her decision that the country "no longer continues to meet the conditions for designation," the designation "is extended" automatically for 6 months or "in [her] discretion . . . a period of 12 or 18 months."  8 U.S.C. § 1254a(b)(3)(C).  The statute thus "essentially provides extension as a default."[7]

49.    In contrast, if the Secretary timely "determine[s]" (after consulting appropriate agencies and reviewing objective evidence of country conditions) that a country "no longer continues to meet the conditions for designation under" § 1254a(b)(1), she "shall terminate the designation by publishing notice in the Federal Register."  8 U.S.C. § 1254a(b)(3)(B); *see also, e.g., Saget*, 375 F. Supp. 3d at 372 (construing § 1254a(b)(3) to require "an objective assessment").  Termination "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension."  *Id.*  The statute provides no grounds for the termination of TPS other than a determination that a country no longer meets the conditions for designation.

50.    The Secretary has discretion to further postpone the effective date of a termination "in order to provide for an orderly transition."  8 U.S.C. § 1254a(d)(3).  For the twelve most recent terminations of TPS that preceded the Trump Administration's second term in office,

---

DHS from making TPS determinations based on a subjective goal engineered toward termination rather than on the *objective assessment required by law*.") (emphases added).
[7] *Nat'l TPS All. v. Noem*, 773 F. Supp. 3d 807, 851 (N.D. Cal. 2025), *aff'd*, 150 F.4th 1000 (9th Cir. 2025) (hereinafter, "*NTPSA I* Postponement Decision").

the agency provided at least a six-month period for an orderly transition—and more commonly a twelve- or eighteen-month period.[8]  The practice of furnishing orderly transitions of at least 6 months has been ongoing for over thirty years, and the Trump Administration applied it during its first term in office.  Only four TPS designations have been terminated without any such period, and each of those terminations occurred more than twenty years ago.[9]

51.     To be eligible for TPS, individuals from a designated country must meet stringent requirements, including:  (1) continuous physical presence in the United States from the most recent date of designation; (2) continuous residence in the United States from a (potentially earlier) date designated by the Secretary; (3) satisfaction of the criteria for admissibility as a noncitizen or, for certain grounds of inadmissibility, a waiver of those grounds; (4) a lack of disqualifying criminal history (including misdemeanors in some cases); and (5) the submission of an application, extensive documentation, and fees.  *See* 8 U.S.C. § 1254a(c)(1); *see also* 8 C.F.R. §§ 244.2, 244.4, 244.9.

52.     Further, an individual is ineligible for TPS if "there are reasonable grounds for regarding [them] as a danger to the security of the United States."  *See* 8 U.S.C. § 1254a(c)(2)(B)(ii) (incorporating 8 U.S.C. § 1158(b)(2)(A)).

53.     Congress ensured that people who are granted TPS would enjoy the freedom to live and work in the United States without fear of deportation and related immigration confinement.  Under the statute's clear directives, anyone who receives and maintains TPS "shall [be] authorize[d]" to work in the United States; "shall not be detained" by the Secretary of

---

[8] *See* App. to Mot. to Postpone Effective Date of Agency Action, *Nat'l TPS All. v. Noem*, No. 3:25-cv-05687-TLT (hereinafter, "*NTPSA II*"), 2025 WL 2838324, (N.D. Cal. July 8, 2025) Dkt. 28 (chart documenting the transition periods for all TPS terminations from 1992 to 2018, almost all of which lasted between 6 to 18 months).
[9] *Id.*

Homeland Security on the basis of immigration status; and "shall not [be] remove[d]" from the United States.  8 U.S.C. §§ 1254a(a)(1), (d)(4).  The statute affords protection to qualifying individuals regardless of whether they meet the stringent requirements for asylum or other immigration relief.  *See id.* § 1254a(b)(1).

54.    Individuals who apply for TPS and are *prima facie* eligible for it may receive work authorization and protection from deportation and related immigration confinement while the application is pending.  *See* 8 U.S.C. §§ 1254a(a)(4)(B), (d)(4); 8 C.F.R. §§ 244.10(e).

## ETHIOPIA'S INITIAL TPS DESIGNATION AND ITS EXTENSION AND REDESIGNATION (2022–2025)

55.    Ethiopia is a country in eastern Africa whose nationals are predominantly Black.  Ethiopia was embroiled in a civil war from 2020 to 2022, and although the war formally came to a close with the signing of a Cessation of Hostilities Agreement ("COHA"), Ethiopia has since continued to face significant challenges, including ongoing armed conflict, a severe humanitarian crisis, widespread internal displacement, and restrictions on humanitarian access.

56.    The current armed conflict in Ethiopia began in 2018 with the dissolution of the Ethiopian People's Revolutionary Democratic Front ("EPRDF"), a coalition of four political parties that had existed since 1988 and governed since 1991.[10]  The dissolution was catalyzed by the end of a 20-year border conflict with Eritrea, civil protests and general unrest, ethnic violence, a two-year state of emergency, and the resignation of the prime minister and then-EPRDF chairman

---

[10] *See* Designation of Ethiopia for Temporary Protected Status, 87 Fed. Reg. 76,074, 76,076 (Dec. 12, 2022) (citing International Crisis Group, *Avoiding the Abyss as War Resumes in Northern Ethiopia* (Sept. 7, 2022), https://www.crisisgroup.org/africa/horn-africa/ethiopia/ avoiding-abyss-war-resumes-northern-ethiopia); *Ethiopian People's Revolutionary Democratic Front (EPRDF)* Human Rights Watch (1997), https://www.hrw.org/reports/1997/ethiopia/Ethio97d-02.htm.

in 2018.[11]  Moreover, competition among the former coalition parties pushed the country further toward ethnic strife.[12]  In November 2020, when a constitutional dispute between the federal government and the regional government of Tigray[13] "escalated into conflict amid a prolonged power struggle," civil war broke out, beginning in the Tigray Region and eventually spreading throughout Ethiopia.[14]

57.    The war was marked by hundreds of thousands of deaths—including tens of thousands of civilian deaths—and human rights abuses, including extrajudicial killings, torture, gender-based violence, arbitrary or unjust detentions, and potential human trafficking crimes.[15] And although the COHA was signed in 2022,[16] the agreement caused massive internal displacement and continued human rights abuses.  This conflict and its devastation are well-documented, including by the U.S. State Department.[17]

---

[11] *See Ethiopia PM Hailemariam Desalegn in surprise resignation*, BBC (Feb. 15, 2018), https://www.bbc.com/news/world-africa-43073285; Mirjam van Reisen, *Ethiopia at crossroad: The Role of Eritrea in the Tigray War*, Tilburg University (Dec. 6, 2021), https://www.researchgate.net/publication/356790836; Center for Preventive Action, *Conflict in Ethiopia*, Global Conflict Tracker (Mar. 20, 2025), https://www.cfr.org/global-conflict-tracker/conflict/conflict-ethiopia.

[12] *See, e.g.*, Mahmood Mamdani, *The Trouble with Ethiopia's Ethnic Federalism*, N.Y. Times (Apr. 10, 2024), https://www.nytimes.com/2019/01/03/opinion/ethiopia-abiy-ahmed-reforms-ethnic-conflict-ethnic-federalism.html.

[13] Tigray is a province in northern Ethiopia.

[14] *See Avoiding the Abyss*, *supra* n. 10.

[15] Giulia Paravicini, *In Ethiopia, a secret committee orders killings and arrests to crush rebels*, Reuters (Feb. 23, 2024), https://www.reuters.com/investigates/special-report/ethiopia-violence-committee/.

[16] António Guterres, *Ethiopia: Peace agreement between Government and Tigray 'a critical first step': Guterres*, UN News (Nov. 2, 2022), https://news.un.org/en/story/2022/11/1130137.

[17] U.S. Dep't of State, 2024 Country Reports on Human Rights Practices: Ethiopia, available at https://www.state.gov/reports/2024-country-reports-on-human-rights-practices/ethiopia/; U.S. Dep't of State, 2023 Country Reports on Human Rights Practices: Ethiopia, available at https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/ethiopia/; U.S. Dep't of State, 2022 Country Reports on Human Rights Practices: Ethiopia, available at https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/ethiopia; U.S. (continued…)

58.    The Secretary of Homeland Security first designated Ethiopia for TPS in December 2022, based both on armed conflict, 8 U.S.C. § 1254a(b)(1)(A), and on other extraordinary conditions, 8 U.S.C. § 1254a(b)(1)(C).[18] The designation identified relevant conditions warranting the country's designation for TPS on both grounds, including: escalating intercommunal armed conflict, targeted attacks on civilians, mass displacement related to the armed conflict, mass food insecurity, disease outbreaks, and lack of access to food, water, and health services.[19] Additionally, the designation noted that Ethiopia had been experiencing "one of the most severe droughts in the last forty years, as well as severe flooding. These conditions further contributed to "high levels of acute food insecurity and malnutrition," as well as "widespread death of livestock," which has exacerbated mass internal displacement.[20] At the time of the designation, the Secretary estimated that "up to approximately 26,730 individuals may be eligible for TPS under the designation of Ethiopia."[21]

59.    In 2024, the Secretary extended and redesignated Ethiopia for TPS for another eighteen-month period, based on the continuation of armed conflict and other extraordinary circumstances.[22]

60.    Specifically, with respect to the ongoing armed conflict, DHS noted "the rising insecurity and violence" that led the Ethiopian government to declare a state of emergency

---

Dep't of State, 2021 Country Reports on Human Rights Practices: Ethiopia, available at https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/ethiopia; U.S. Dep't of State, 2020 Country Reports on Human Rights Practices: Ethiopia, available at https://www.state.gov/reports/2020-country-reports-on-human-rights-practices/ethiopia/; *see also* Paravicini, *supra* note 15.

[18] 87 Fed. Reg. at 76,076.

[19] *See id.* a–t 76,076.

[20] *Id*. at 76,077–78.

[21] *Id.* at 76,078.

[22] *See* Extension and Redesignation of Ethiopia for Temporary Protected Status, 89 Fed. Reg. 26,172 (Apr. 15, 2024).

in August 2023, including armed conflict between the Ethiopian National Defense Force ("ENDF") and an armed militia, violent clashes between the Ethiopian federal government and opposition forces, multiple drone strikes in November 2023, extrajudicial killings of civilians and excessive force against them from security forces, and other attacks on civilians, particularly in regions impacted by intercommunal violence.[23]  DHS additionally reported, based on estimates from the International Commission of Human Rights ("ICHR"), that there were "at least 10,000 survivors of conflict-related sexual violence (CRSV) in Tigray alone who sought support between November 2020 and June 2023" and other violent abuses against civilians including ethnic cleansing by armed forces.[24]

61.     With respect to the extraordinary and temporary conditions, DHS found that the severe drought had continued to expand and that approximately five million Ethiopians had been negatively affected by drought-like conditions.  The drought precipitated worsening food insecurity, the further displacement of hundreds of thousands of Ethiopians, and a cholera outbreak.  In other regions, DHS found that flooding had caused significant harm.  In all, there were an estimated 4.3 million internally displaced persons in Ethiopia, 2.9 million of whom were displaced by conflict and the remainder by flooding and droughts.[25]

62.     Furthermore, Ethiopia faced four outbreaks of communicable diseases: cholera, measles, malaria, and dengue.  Addressing these outbreaks had been "difficult" due to "limited access to health services, medical supplies, WASH [Water, sanitation and hygiene]

---

[23] *Id.* at 26,174.
[24] *Id.*
[25] *Id.* at 26,175–76.

services, and trained health care workers[.]"  While efforts were made to vaccinate the population, "sustainable solutions to address root causes of the outbreaks" still needed to be addressed.[26]

## DEFENDANTS' UNLAWFUL REVIEW OF ETHIOPIA'S TPS DESIGNATION AND ITS RESULTING DECISION TO TERMINATE IT

63.     On December 15, 2025, Defendants issued a notice in the Federal Register terminating Ethiopia's TPS designation, effective as of 11:59 p.m. on February 13, 2026.  90 Fed. Reg. 58,028.  The Termination arises out of a review process contaminated by procedural and statutory irregularities driven by DHS's institution of new guidance providing that TPS periodic review should "[f]ocus on conditions described in the original designation," while disregarding intervening conditions relevant to the legal grounds for designations. *See, e.g.*, Decl. of Emilou MacLean ("MacLean Decl."), Ex. 1 at 5 (relevant email exchanges between DHS personnel reflecting policy change), *Nat'l TPS All. v. Noem*, No. 3:25-cv-05687-TLT (N.D. Cal. Nov. 14, 2025) ("*NTPSA II*"), Dkt. 176-2; *see also id*., MacLean Decl., Ex. 14 at 5 (relevant email exchanges between DHS personnel reflecting policy change), Dkt. 176-15.

### *Failure to Consult Appropriate Agencies*

64.     On information and belief, prior to the Termination, and consistent with DHS's new guidance for periodic reviews, Defendant Noem did not meaningfully consult with appropriate federal agencies, as otherwise required by the TPS statute.  *See* 8 U.S.C. § 1254a(b)(3)(A) (stating that the DHS Secretary "after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state" relevant to the legal grounds for designations).  To date, Defendants have not publicly specified any specific consultation. However, discovery obtained in *NTPSA II* reveals that in or around March 2025, DHS stopped receiving country conditions information from the State Department as part of the TPS periodic

---

[26] *Id.* at 26,175–76.

review process, continuing DHS's abrupt shift away from its longstanding practices.[27]   On information and belief, the new guidance rests on a new and unexplained interpretation by Defendants of the TPS statute's periodic review provision at 8 U.S.C. § 1254a(b)(3)(A).

65.   A month before that, in the course of periodic reviews of the TPS designations for South Sudan and Afghanistan, the consultation the Defendants did undertake placed a heavy thumb on the scales in favor of termination:  "The DMs [Director Memos] **should include additional information *that would support different decision outcomes***.  For example, are there improvements that have been made in the country?  What about information about fraud/abuse of the program? . . . There are some stats pending, but [it is not clear] where that will be added."  *See* MacLean Decl., Ex. 15 at 3, *NTPSA II*, Dkt. 176-16 (emphases added).   This does not appear to be an isolated example: Defendant Noem has issued previous terminations under similar conditions, without appropriately conducting the required consultation.[28]

***Failure to Consider Objective and Available Evidence of Country Conditions***

66.   The TPS statute requires Defendant Noem to consider objective and available evidence of country conditions during her periodic review of the TPS designation for Ethiopia.  *See* 8 U.S.C. § 1254a(b)(3)(A); *see also, e.g., Saget*, 375 F. Supp. 3d at 372 (construing § 1254a(b)(3) to require "an objective assessment"). She did not do so.

---

[27] *See* MacLean Decl., Ex. 21 at 1504_003, *NTPSA II*, No. 25-cv-05687-TLT (N.D. Cal. Nov. 4, 2025), Dkt. 176-22; *id*., Ex. 26 at 1524, Dkt. 176-27; *id*., Ex. 27 at 2342, Dkt. 176-28.

[28] *See NTPSA II*, Dkt. 97 (discovery order indicating that Defendant Noem issued the terminations for Nicaragua, Honduras, and Nepal's TPS designations without reviewing country conditions reports from the relevant agencies); *see also supra* n. 27 (discovery produced in *NTPSA II* reflecting shift away from prior DHS policy or practice under which DHS had customarily received country conditions information from the State Department in the course of periodic reviews of TPS designations; *supra* ¶¶ 37–52 *(*"The Statutory Scheme of TPS and Related Agency Practices") (noting the requirement for interagency consultation.).

67.    Instead, she cherry-picked "improvements."  *See* 90 Fed. Reg. at 58,030-21; *see also* MacLean Decl., Ex. 15 at 3, *NTPSA II*, Dkt. 176-16; *id*., Ex. 1 at 5, Dkt. 176-2; *id*., Ex. 2 at 3, Dkt. 176-3 (email exchange among DHS personnel concerning review of Haiti's TPS designation and stating that "we are looking for analysis of 'improvements'"); *id*., Ex. 2 at 10, Dkt. 176-3 (email exchange among DHS personnel concerning country conditions research for periodic reviews of TPS designations, remarking that "Typically DOS [Department of State] and IRAD [DHS's International and Refugee Affairs Division] provide country conditions, but the Department is very focused on research that pertains directly to the original reason for a country's TPS designation, and the ability for the U.S. to successfully return [noncitizens] to that country."). The Secretary's failure to *fully* consider current conditions in Ethiopia relevant to statutory grounds for TPS redesignation was based on the DHS guidance found to be unlawful during the prior Trump Administration.[29]

68.    Defendant Noem's failure to consider current conditions is a notable departure from statutory requirements and normal procedure: "instead of considering all current country conditions as had been done in previous administrations," Defendant Noem "made TPS decisions turn on whether the originating condition or conditions directly related thereto continued to exist, disregarding all other current conditions no matter how bad."[30]  Like the periodic reviews at issue in *NTPSA II*, the periodic review here that resulted in the Termination is "irregular and

---

[29] *See Ramos v. Nielsen*, 336 F. Supp. 3d 1075 (N.D. Cal. Oct. 3, 2018), *vacated and remanded sub nom. Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, op. vacated*, 59 F.4th 1010 (9th Cir. 2023); *see also Centro Presente v. DHS*, 332 F. Supp. 3d 393, 416–17 (D. Mass. 2018) (in challenge alleging unlawful review of TPS designation for El Salvador, finding plaintiffs had plausibly alleged APA violations based on defendants' unexplained shift to use of this policy during the TPS review process).
[30] *Ramos*, 336 F. Supp. 3d at 1105.

suggestive of a pre-determined outcome not based on an objective assessment, in contrast to the requirements of the periodic review provision of the TPS statute, *see* 8 U.S.C. § 1254a(b)(3)(A)."[31]

***Failure to Consider Evidence of Ongoing Armed Conflict***

69.     In her periodic review leading to the Termination, Defendant Noem failed to consider the available, objective evidence of ongoing armed conflict in Ethiopia, including evidence of numerous considerations the Department previously found relevant to periodic review of the armed-conflict basis for Ethiopia's TPS designation.

70.     Defendant Noem's entire explanation for the Termination of Ethiopia's designation based on ongoing armed conflict is summed up in one sentence:  "The Secretary has determined that, while some sporadic and episodic violence occurs in Ethiopia, the situation no longer meets the criteria for an ongoing armed conflict that poses a serious threat to the personal safety of returning Ethiopian nationals."[32]  But Defendant Noem's characterization of the ongoing conflict in Ethiopia as "sporadic and episodic" belies available, objective evidence of conditions concerning ongoing armed conflict that render return unsafe for Ethiopian nationals and that the TPS statute required Defendant Noem to at least consider and assess, *see* 8 U.S.C. § 1254a(3)(b)(A).

---

[31] *See id.* at 1101; *see also Saget*, 375 F. Supp. 3d at 347–50 ("Plaintiffs are likely to succeed in their claim [the acting DHS Secretary] violated the TPS statute by failing to make a 'real merits determination' and by instead issuing 'a pretextual edict,' contravening the evidence-based review the TPS statute requires . . . Such an outcome-determinative process violates the mandatory periodic review process of the TPS statute" and the relevant evidence of the violations reflects that "Defendants changed their interpretation of the TPS statute," "high-ranking officials directed staffers to uncover data they believed would weigh toward termination," and "the Department of State conducted a 'highly unusual' process that departed from past practices.")

[32] 90 Fed. Reg. at 58,030.

71.    A plethora of available and objective evidence establishes that, throughout 2025, armed conflict and related violence has escalated and further endangered the already tenuous 2022 COHA that arose from the civil war.

72.    The escalated armed conflict and related violence have involved Ethiopian government forces, militias and paramilitary groups, and other non-state armed groups in various regions across the country.[33]

73.    Armed conflict has resulted in massive civilian displacement. Recent research estimates that as many as 2.3 million Ethiopia nationals have been internally displaced due to armed conflict and violence.[34]  In Tigray, there are still 878,000 internally displaced people pushed out of their homes during the civil war and an additional 70,000 Tigrayans who fled to Sudan.[35]

74.    In its most recent country report on Ethiopia in 2024, the State Department reported that Ethiopia still faced armed conflict, civil unrest, and violence between the government

---

[33] *See, e.g.,*  Giulia Paravicini, *In Ethiopian, a secret committee orders killings and arrests to crush rebels*, Reuters (Feb. 23, 2024), https://www.reuters.com/investigates/special-report/ethiopia-violence-committee/; Heni Nsaibia et al., *Africa Overview: December 2025*, ACLED (Dec. 8, 2025), https://acleddata.com/update/africa-overview-december-2025 (describing post-COHA violence in the Tigray region); 2024 Country Conditions Report; Tirana Hassan, *2025 World Report: Ethiopia: Events of 2024*, Human Rights Watch (2025), https://www.hrw.org/world-report/2025/country-chapters/ethiopia (describing violence between militias in the Amhara and Oromia regions, which led to a government-imposed state of emergency, and violence against civilians from border skirmishes with Eritrean troops) ("2024 Ethiopia Country Conditions Report"); *Ethiopia Situation Update: 25 June 2025,* ACLED (June 25, 2025), https://acleddata.com/update/ethiopia-situation-update-25-june-2025 (describing violence against civilians caused by border skirmishes with South Sudan force).
[34] *Ethiopia Crisis Response Plan 2025,* International Organization for Migration (IOM) (Feb. 7, 2025) (estimating 3.3 million internally displaced people in Ethiopia with 69% displaced by conflict), https://crisisresponse.iom.int/response/ethiopia-crisis-response-plan-2025.
[35] *See Ethiopia Situation Update:25 June 2025,* ACLED (June 25, 2025), https://acleddata.com/update/ethiopia-situation-update-25-june-2025.

of Ethiopia and paramilitary and militia forces, including government-backed counterinsurgency campaigns across Ethiopia, with numerous reports of unlawful killings, including of civilians.[36]

75.    ACLED—which stands for Armed Conflict and Location and Event Data— reported that in June 2025 increased territorial displacements, internal displacement, and violent clashes led to further civil instability:  "Over the past two weeks [June 2025], the Gambela region of Ethiopia has witnessed a sharp uptick in violence, driven by two concurrent dynamics: localized attacks on civilians and cross-border military clashes involving Ethiopian and South Sudanese forces."[37]  At the same time, armed conflict "erupted between Ethiopian forces and the South Sudan People's Defence Forces (SSPDF) along the border."[38]

76.    In Human Rights Watch's 2025 World Report, HRW reported:  "The human rights situation in Ethiopia remained dire, with government forces, militias, and non-state armed groups committing serious abuses in conflict-affected areas and elsewhere throughout the country."[39]  Specifically, "[f]ighting between the Ethiopian military and militias in the Amhara region resulted in hundreds of civilian deaths and injuries, including attacks against refugees and civilian infrastructure such as hospitals.  The government renewed a sweeping state of emergency for the Amhara region, but its provisions were applied throughout Ethiopia; mass arrests persisted once it expired."[40]

---

[36] *See* 2024 Ethiopia Country Conditions Report, *supra* n. 33.
[37] *See Ethiopia Situation Update: 25 June 2025*, *supra* nn. 33, 35.
[38] *Id.*
[39] *See* Tirana Hassan, *2025 World Report: Ethiopia: Events of 2024*, Human Rights Watch (2025), https://www.hrw.org/world-report/2025/country-chapters/ethiopia.
[40] *Id.*

77. In the first quarter of 2025 alone, there were 632 fatal conflict incidents that resulted in at least one death and over 1,066 reported fatalities.[41] The death toll increased by at least 534 new casualties by mid-year.[42] In the span of just one week in 2025, ACLED estimated 100 acts of political violence caused by clashes between armed groups and security forces, 19 incidents of violence targeting civilians, and at least 208 reported fatalities due to political violence.[43] While casualties are highest in the Amhara region, violence has continued without abatement in Agar, Tigray, Central Ethiopia, Oromia, and other parts of Southern Ethiopia.

78. Throughout 2025, tensions escalated between the federal government and the Tigray People's Liberation Front (TPLF) and between competing armed militant groups, threatening the 2022 peace agreement. In March 2025, the TPLF-led Tigray Defense Force (TDF) forcibly occupied local administrations in the Tigray region.[44] In early November, the TDF expelled and pursued a rival armed group, the Tigray Peace Front, into the Afar region and occupied six border villages, displaced 18,000 residents, and committed violence against local civilians. Meanwhile, the government and TPLF continued to accuse each other of violating the peace deal, and the government accused Eritrea of backing the TPLF, causing regional instability.[45] Tensions came to a head in November 2025 when the Ethiopian National Defense Forces carried

---

[41] *Ethiopia, First Quarter 2025*, ACCORD (Aug. 7, 2025), https://www.ecoi.net/en/file/local/2129159/2025q1Ethiopia_en.pdf (citing data compiled by ACLED).

[42] *Ethiopia Situation Update: 30 April 2025*, ACLED (Apr. 30, 2025) https://acleddata.com/update/ethiopia-situation-update-30-april-2025; *Ethiopia Situation Update: 11 June 2025*, ACLED (June 11, 2025), https://acleddata.com/update/ethiopia-situation-update-11-june-2025; *Ethiopia Situation Update: 25 June 2025*, ACLED (June 25, 2025), https://acleddata.com/update/ethiopia-situation-update-25-june-2025.

[43] *Ethiopia Situation Update: 19 March 2025*, ACLED (Mar. 19, 2025), https://acleddata.com/update/ethiopia-situation-update-19-march-2025.

[44] *Africa Overview: December 2025*, ACLED (Dec. 8, 2025), https://acleddata.com/update/africa-overview-december-2025.

[45] *Id.*

out a drone strike on an armed group in Tigray—the first since the treaty was signed.[46] The strike targeted a TDF camp at the Tigray-Afar border, destroying a heavy weapon and resulting in casualties among TPLF combatants.[47] This assault marks the first military incursion by the government since the end of the civil war and risks a return to civil violence in 2026.

79. The Ethiopian Human Rights Commission, in its report detailing the human rights violations from June 2024 to June 2025, explained that ongoing armed conflicts and recurring security problems in various parts of Ethiopia have led to violations of individuals' rights to life, the right to security of person, and other fundamental rights during the reporting period.[48] Civilians have been killed and subject to injuries due to attacks during the armed conflict between government forces and armed groups. Specifically, it reported prolonged detention, widespread kidnapping carried out by armed and bandit groups, the destruction of property and infrastructure, restriction on movement and disruption of production, and harm to women and children as a result of the conflict.

80. Indeed, the consequences of the ongoing armed conflict in Ethiopia have included dire gender-based violence. An office of the United Nations noted in a May 2025 report that it "remains a critical issue in Ethiopia, predominantly affecting women, girls, older people and people with disabilities in conflict affected regions, camps for internally displaced people and communities facing socioeconomic challenges. Rising cases of conflict-related sexual violence, female genital mutilation/cutting (FGM) and child marriage — fueled by cultural norms, negative

---

[46] *Id.*

[47] *Id.*

[48] *See Annual Ethiopia Human Rights Situation Report*, Ethiopian Human Rights Comm'n (Aug. 22, 2025), https://ehrc.org/download/executive-summary-annual-ethiopia-human-rights-situation-report-from-june-2024-to-june-2025/.

coping mechanisms and socioeconomic pressures — underscore the urgent need for humanitarian intervention."[49]

81.     The U.S. Department of State has noted that "children in conflict areas throughout the country are vulnerable to unlawful recruitment or use by armed groups. Reports allege non-state armed groups may have recruited or used children in Tigray, Amhara, and Oromia. During the reporting period, observers reported government and government-affiliated forces forcibly recruited and used child soldiers."[50]

82.     The Termination does not address any of this available, objective evidence of ongoing armed conflict and its dangers, all of which directly correlate to considerations the prior DHS Secretary deemed relevant to the periodic review of the armed-conflict basis for Ethiopia's TPS designation.  The Termination does not explain Defendant Noem's departure from applying considerations her agency previously deemed material.  Instead, the Termination relied improperly on the Ethiopian government's "cooperat[ion] with U.S. Immigration and Customs Enforcement in facilitating the removal of aliens to Ethiopia" and the fact that certain Ethiopian nationals requested "advance parole documents"[51] for travel to Ethiopia as evidence that the ongoing armed conflict no longer poses a threat to the safety and security of nationals returning to Ethiopia.  Each of those purported rationales is suspect on its face. The supposed facilitation of the Ethiopian

---

[49] *2025 First Standard Allocation* (22 May 2025), U.N. Office for the Coordination of Humanitarian Affairs, Ethiopia Humanitarian Fund, https://reliefweb.int/report/ethiopia/ethiopia-humanitarian-fund-2025-first-standard-allocation-may-2025?_gl=1*1vhsmpw*_ga*MTg5MzA1NzMxNS4xNzY2MDU5NTU1*_ga_E60ZNX2F68*cz E3Njg5ODc2ODQkbzMkZzAkdDE3Njg5ODc2ODQkajYwJGwwJGgw.

[50] *2025 Trafficking in Persons Report: Ethiopia (2025)*, Office to Combat and Monitor Trafficking in Persons, U.S. Dep't of State, https://www.state.gov/reports/2025-trafficking-in-persons-report/ethiopia/.

[51] The Termination notes that the figures for these requests could not include TPS holders because TPS holders do not receive advance parole documents.

government in facilitating the Administration's removals of Ethiopian nationals to Ethiopia is in direct tension with available and objective evidence of the Ethiopian government as a source of violent harm against its nationals, *see* ¶¶ 71–81 *supra*, consideration of which the agency's prior periodic review deemed relevant and that here Defendant Noem departed from without any explanation. Likewise, requests by some Ethiopian nationals for advanced parole for the purpose of temporary travel to Ethiopia does not undermine the available and objective evidence of dangerous conditions there that render *relocation* there unsafe

83.     Notably, Defendant Noem's Termination does not even mention President Trump's September 8, 2025, Continuation of the National Emergency with Respect to Ethiopia, in which he announced that he was continuing for one year the national emergency that President Biden had announced as to Ethiopia because "[t]he situation in and in relation to northern Ethiopia . . . has been marked by activities that threaten the peace, security, and stability of Ethiopia and the greater Horn of Africa region." Yet Defendant Noem's termination announcement paints a very different picture. For example, the Termination—issued just three months after President Trump's extension of the recognition of the national emergency in Ethiopia—states: "While some residual challenges in regions affected by the conflicts remain, there are signs of improvements in the country. . . . These improvements suggest there is no longer an ongoing armed conflict that poses a serious threat to the personal safety of returning Ethiopian nationals."[52]

84.     Defendants' irreconcilable positions are the result of a decision-making process that followed neither the TPS statutory requirements nor those of the APA.

---

[52] 90 Fed. Reg. at 58,030.

*Failure to Consider Evidence of Extraordinary and Temporary Conditions*

85.     In her periodic review leading to the Termination, Defendant Noem also failed to consider available, objective evidence of ongoing, extraordinary, and temporary conditions in Ethiopia, including evidence of numerous factors the Department previously found relevant to its periodic review of the extraordinary-conditions basis for Ethiopia's TPS designation. Rather, her explanation was vague and unsupported, concluding that "the extraordinary and temporary conditions that gave rise to past designations . . . are showing signs of improvement which would allow [Ethiopians] to safely return to the country and live in the regions not affected by the conflict."[53]

86.     As noted above, the prior periodic review, in 2024, considered acute food insecurity; environmental and health concerns, including widespread flooding and disease outbreaks; and barriers to humanitarian access.[54] Available and objective evidence demonstrates that all of these conditions still exist.

87.     Today in Ethiopia, armed conflict, intercommunal violence, and extrajudicial killings and human rights violations executed by government security forces have collided with climate-related hazards, disease outbreaks, food insecurity, and mass-scale internal displacement that create what the United Nations Children's Fund ("UNICEF") calls a "complex humanitarian crisis."[55]

---

[53] *Id*.

[54] 89 Fed. Reg. at 26,172.

[55] *Humanitarian Action for Children: Ethiopia*, UNICEF (2025), https://www.unicef.org/media/166006/file/2025-HAC-Ethiopia.pdf (citing United Nations Office for the Coordination of Humanitarian Affairs, Ethiopia Humanitarian Response Plan 2024, February 2024).

88.    UNICEF estimates that in 2025, over 21.5 million people require humanitarian assistance.[56] That is nearly 20% of the population or 1 in 5 residents of Ethiopia.

89.    The Ethiopian Human Rights Commission published a report detailing human rights and humanitarian crises in Ethiopia from June 2024 to June 2025 that described unsafe conditions arising from the combination of natural disasters, including droughts and floods. These conditions contributed to internal population displacement, and resulted in the closing of more than 3,700 schools.[57]

90.    Moreover, Ethiopia is ranked by the U.S. State Department as a "Tier 2" country for human trafficking.[58] In a 2025 report, the State Department said: "Human traffickers exploit domestic and foreign victims in Ethiopia, and traffickers exploit victims from Ethiopia abroad. Traffickers exploit women and girls from Ethiopia in domestic servitude and sex trafficking throughout the country and boys and men in labor trafficking in traditional weaving, construction, agriculture, forced begging, and street vending."[59] Labor trafficking is a particular issue across rural areas of Ethiopia:  "Labor recruiters frequently target young people from Ethiopia's vast rural areas with false promises of a better life in urban areas; in some cases, traffickers replicate legitimate app-based recruitment tools to fraudulently recruit vulnerable populations and exploit them in forced labor."[60] As a result of armed conflict, the State Department determined, reports of outward migration and trafficking have increased," and "[c]hildren in

---

[56] *Id*.

[57] *See Executive Summary: Annual Ethiopia Human Rights Situation Report (from June 2024 to June 2025)*, Ethiopian Human Rights Commission (Aug. 22, 2025), https://ehrc.org/download/executive-summary-annual-ethiopia-human-rights-situation-report-from-june-2024-to-june-2025/.

[58] *See 2025 Trafficking in Persons Report: Ethiopia*, U.S. Dep't of State (2025), https://www.state.gov/reports/2025-trafficking-in-persons-report/ethiopia/.

[59] *Id.*

[60] *Id.*

conflict areas throughout the country are vulnerable to unlawful recruitment or use by armed groups."[61]

91.    The UN Office for the Coordination of Humanitarian Affairs (OCHA) summarized the reality of the extraordinary conditions in Ethiopia: "In 2025, Ethiopia continues to face overlapping and complex humanitarian challenges driven by conflict, climate shocks, disease outbreaks, and economic hardship. Although national development efforts have made notable progress over the past decade, particularly in expanding access to basic services and reducing poverty, multiple natural and man-made crises have reversed gains in many regions. As a result, millions remain in urgent need of assistance across sectors, including food, nutrition, health, protection, education, water, sanitation and hygiene and shelter."[62]

92.    Instead of considering any of this objective and available evidence of worsening conditions, the periodic review resulting in the Termination appears to have considered only modest positive developments: the United States' "successful transition of its food assistance operations in northern Ethiopia to the Joint Emergency Operations Program" and a nationwide campaign to vaccinate Ethiopian children against measles.[63]

93.    The Termination did not explain why or how any of these developments has obviated the need to consider the conditions that the prior periodic review considered, which available and objective evidence demonstrates still apply and therefore warranted consideration and assessment within Defendant Noem's periodic review.

---

[61] *Id.*

[62] *Ethiopia*, United Nations Office for the Coordination of Humanitarian Affairs (2025), http://www.unocha.org/Ethiopia.

[63] 90 Fed. Reg. at 58,030.

94.     Defendants' failure to consider this evidence and failure to explain its departure from prior practice amounts to a failure to follow the statutory requirements of both the TPS statute and the APA.

***Consideration of U.S. "National Interest," Which Is Contrary to the TPS Statute and Departs from Past Agency Practice Without Explanation***

95.     Defendant Noem relies on the claim that the continued temporary presence of Ethiopian TPS beneficiaries is contrary to the "national interest" of the United States and cites various purported examples.  One such example asserts that "a significant portion of the Ethiopian Temporary Protected Status population have been under administrative investigation for risk to national security, public safety, or for attempting to obtain immigration benefits through fraud or misrepresentation."[64]

96.     It is impossible to know what Defendant Noem is referring to here.  She makes no reference to the numbers or locations of such individuals nor their alleged conduct. In fact, this allegation appears to be boilerplate language lifted directly from prior TPS termination notices from Defendant Noem for Syria, Afghanistan, Haiti, and South Sudan.[65]

97.     Under the statute, TPS protections are unavailable *ab initio* to individuals with disqualifying criminal history (including misdemeanors in some cases), or who are found to be inadmissible on grounds relating to national security, foreign policy, or on many other bases.[66] It is improper to conclude, as the Secretary does here, that the conduct of any single Ethiopian who might be ineligible under these grounds disqualifies the entire Ethiopian population in the United States from TPS.

---

[64] 90 Fed. Reg. at 58,031.
[65] *See*, *e.g.*, 90 Fed. Reg. at 50,486 (South Sudan); 90 Fed. Reg. at 45,401 (Syria); 90 Fed. Reg. at 20,311 (Afghanistan); 90 Fed. Reg. at 54,737 (Haiti);
[66] 8 U.S.C. § 1254a(c)(1)(A); 8 U.S.C. § 1254a(c)(2)(B); 8 U.S.C. § 1182; 8 U.S.C. 1158(b)(2)(A).

98.     The only other allegation relating to the supposed "national interest" relates to the rate of overstays of Ethiopian nationals with B-1 and B-2 visas—i.e. Ethiopian nationals who do not hold TPS.  Defendant Noem makes no effort to explain what if any correlation those overstay rates have with the periodic review or how they implicate the so-called "national interest" she has asserted in reviewing Ethiopia's designation for TPS. Nor does Defendant Noem explain how her reliance on this rationale can possibly square with Congress's deliberate decision *not* to condition individual TPS eligibility on having a particular, or any, immigration status. *See* 8 U.S.C. § 1254a(c) (setting out eligibility requirements).

99.     Furthermore, the consideration of the domestic "national interest" is procedurally improper during a periodic review,  because the statute instructs the Secretary to look only at "the conditions in the foreign state (or part of such foreign state) for which a designation is in effect . . . [and] whether the conditions for such designation . . . continue to be met," 8 U.S.C. § 1254a(b)(3)(A).  Consideration of United States national interests is also procedurally improper in the context of a TPS designation based on ongoing armed conflict, *see* 8 U.S.C. § 1254a(b)(1)(A), and had not been invoked as a basis for *any* terminations prior to 2025, *see* Decl. of Guadalupe Aguirre, Ex. 7 at ¶¶ 4–12 (Decl. of Aaron Reichlin-Melnick), *Dahlia Doe v. Noem*, No. 1:25-cv-08686-KPF (S.D.N.Y. Oct. 21, 2025), Dkt. 20-7; *see also* 8 U.S.C. § 1254a(b)(3)(A) *infra* n. 98 (explaining impropriety of consideration of domestic national interest even in connection with periodic review of designation based on extraordinary and temporary conditions rendering return unsafe).

*Unreasoned Departure from the Past Agency Practice of Orderly Transition Periods*

100.   The Termination was published a mere 60 days prior to the effective date,[67] the minimum required under the statute. This is a significant departure from established policy and practice of affording more orderly transition period of 6 months or longer—and typically 12 to 18 months.[68]

## THE FIRST TRUMP ADMINISTATION'S EFFORTS TO ELIMINATE ACCESS TO TPS PROTECTIONS

101.   The defective periodic reviews resulting in the Ethiopia TPS Termination and the other TPS terminations by Defendant Noem reflect a resumption of the first Trump Administration's attempts to reduce or eliminate access to TPS for non-European countries whose nationals are majority non-white.  Between 2017 and 2018, DHS announced terminations of TPS designations for Sudan, Haiti, Nicaragua, El Salvador, Honduras, and Nepal.  *See Ramos v. Nielsen*, 709 F. Supp. 3d 871, 877–78 (N.D. Cal. 2023).  If those terminations had taken effect, they would have ended TPS protection for approximately 400,000 people, comprising approximately 98 percent of all TPS holders at the time.[69]  In each case, the Secretary announced either a 12- or 18-month orderly transition period, which would have delayed the effective date of termination.

102.   Documents obtained in litigation and Congressional investigations subsequently revealed that the 2017 and 2018 periodic reviews conducted for TPS designations were not based on an objective review of country conditions as required by statute—and as had

---

[67] Extension of South Sudan Designation for Temporary Protected Status, 90 Fed. Reg. 19,217, 19,218 (May 6, 2025).

[68] *See supra* n. 8.

[69] Marcela Valdes, *Their Lawsuit Prevented 400,000 Deportations. Now It's Biden's Call*, N.Y. Times (Apr. 7, 2021), https://www.nytimes.com/2021/04/07/magazine/immigration-el-salvador.html.

been the past practice over multiple administrations, both Democratic and Republican—but rather were part of a "predetermined presidential agenda to end TPS." *See, e.g.*, *Ramos*, 336 F. Supp. 3d at 1094–99 (quoting then-DHS Secretary Duke's assurance to the White House that terminating Nicaragua's TPS would "send a clear signal that TPS in general is coming to a close").[70]

103.    Moreover, every district court to consider animus as a motivating factor in these periodic reviews found that the terminations resulting from them were part of a policy "to decrease the presence of non-white immigrants in the United States."[71]

104.    DHS Secretaries faced unrelenting pressure from the White House to reach its "desired result of terminating TPS" and responded by ordering pretextual periodic reviews and resulting terminations of TPS designations for nearly everyone who held the status. *Ramos*, 336 F. Supp. 3d at 1101.

105.    The courts that reviewed these decisions consistently found that DHS had radically changed the way it approached periodic reviews of TPS designations and justified the terminations by considering a much narrower range of country conditions than had been

---

[70] *See also* Minority Staff of S. Comm. On Foreign Rels., 116th Cong*., Playing Politics with Humanitarian Protections: How Political Aims Trumped U.S. National Security and the Safety of TPS Recipients* 41 (Comm. Print 2019), https://www.congress.gov/116/cprt/SPRT38237/CPRT-116SPRT38237.pdf (finding that the termination decision was influenced by considerations related to upcoming elections and disregarded risks to national security and safety of returnees).
[71] *See, e.g.*, *Saget*, 375 F. Supp. 3d at 368–72 (finding that "evidence of White House . . . animus toward non-white immigrants, including Haitians specifically, raises at the very least serious questions going to the merits of Plaintiffs' equal protection claim" challenging the termination of TPS for Haiti); *see also Ramos*, 336 F. Supp. 3d at 1100 (noting "evidence that President Trump harbors an animus against non-white, non-European [noncitizens] which influenced his (and thereby the Secretary's) decision to end . . . TPS designation[s]"); *Centro Presente*, 332 F. Supp. at 415 ("find[ing] that the combination of a disparate impact on particular racial groups, statements of animus by people plausibly alleged to be involved in the decision-making process, and an allegedly unreasoned shift in policy sufficient to allege plausibly that a discriminatory purpose was a motivating factor in a decision" to terminate TPS for Haiti, El Salvador, and Honduras).

36

considered in the past. *See Saget*, 375 F. Supp. 3d at 346; *Ramos*, 336 F. Supp. 3d at 1097–98; *Centro Presente*, 332 F. Supp. 3d at 412–14; *CASA de Md., Inc. v. Trump*, 355 F. Supp. 3d 307, 321 (D. Md. 2018).

106.    To justify these skewed periodic reviews and resulting terminations and undermine the Congressionally authorized TPS program, political appointees during the first Trump Administration sought to paint TPS holders as criminals and manufactured evidence to support that claim.

107.    The U.S. District Court for the Eastern District of New York found that the Acting Secretary of Homeland Security, Elaine Duke, decided to terminate TPS for Haiti for the sake of "agenda adherence" to the "America first" platform, without regard to her consideration of country conditions as required under the TPS statute.  *Saget*, 375 F. Supp. 3d at 343, 347–48, 359–62.  Additionally, subordinates of then-DHS Secretary John Kelly covertly sought data on the number of Haitian TPS holders who committed crimes and relied on public assistance.  *Id.* at 307–09.   Then-Secretary Kelly and other DHS and USCIS personnel tried to use these data to demonstrate that extending TPS to Haitians would not be in the "national interest," despite the fact that virtually any criminal record would be enough to disqualify an individual applicant for TPS eligibility. *See id.* at 352; *cf.* 8 U.S.C. §§ 1254a (b)(1)(C), (c)(2)(B).  Another federal district court found that "[t]he information sought by the Secretary [Kelly] coincides with racial stereotypes – i.e., that non-whites commit crimes and are on the public dole." *Ramos*, 336 F. Supp. 3d at 1105.

108.    After analyzing "a wealth of record evidence" regarding the terminations of TPS for El Salvador, Haiti, Nicaragua, and Sudan, a federal district court found that "DHS made a deliberate choice to base the TPS decision solely on whether the originating conditions or conditions directly related thereto persisted, regardless of other current conditions no matter how

bad . . . .  The evidence . . . suggests this change may have been made in order to implement and justify a pre-ordained result."  *Id.* at 1092, 1097–98; *see also Centro Presente*, 332 F. Supp. 3d at 416 (denying motion to dismiss and explaining "there is no justification, explicit or otherwise, for Defendants' switch to focusing on whether the conditions that caused the initial designation had abated rather than a fuller evaluation of whether the country would be able to safely accept returnees").

109.    The U.S. District Court for the Eastern District of New York came to the same conclusion after a four-day bench trial regarding Haiti's TPS termination, finding that the termination "was preordained and pretextual" and "was made in part due to political influence," violating the TPS statute's requirement that decisions be based on consideration of country conditions and meaningful consultation with appropriate agencies.  *Saget*, 375 F. Supp. 3d at 346.

110.    Indeed, then-Acting Secretary Duke's writings revealed that "she, in her role at DHS, was largely carrying out or conforming with a predetermined presidential agenda to end TPS."  *Ramos*, 336 F. Supp. 3d at 1099.  Specifically, she expressed that her TPS decision-making was based on "an America first view," a term that invoked President Trump's preference for immigration from majority-white European countries.  *Id.* at 1099–1100, 1104.

111.    As a result of injunctions issued in these cases and subsequent stipulated orders, the terminations sought by the first Trump Administration for El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan did not go into effect.  *See, e.g.*, *Ramos*, 709 F. Supp. 3d at 878–79.  DHS issued new extensions for Haiti and Sudan on May 21, 2021, and April 19, 2022, respectively, effectively overturning their TPS terminations.[72]  *See id.*  And in 2023, DHS rescinded the TPS

---

[72] *See* Designation of Haiti for Temporary Protected Status, 86 Fed. Reg. 41,863 (Aug. 3, 2021); Designation of Sudan for Temporary Protected Status, 87 Fed. Reg. 23,202 (Apr. 19, 2022).

terminations for Honduras, Nicaragua, Nepal, and El Salvador and instead extended TPS designations for those countries. *See id.* In doing so, DHS extensively criticized the defective periodic reviews of the first Trump Administration that had resulted in termination decisions and that had abandoned the statutory requirements of consideration of objective evidence of relevant country conditions and of meaningful consultation with appropriate agencies.[73]

## THE SECOND TRUMP ADMINISTRATION'S PROMISE TO END ACCESS TO TPS

112. Even before she became Secretary of DHS, Defendant Noem publicly committed to ending TPS for reasons unrelated to relevant country conditions and untethered from the bounds of the TPS statute. During her confirmation hearing, she claimed that TPS "has been abused and manipulated by the Biden Administration," and suggested that the "extensions" of TPS were impermissible because "[t]he program was intended to be temporary."[74]

113. Defendant Noem repeatedly asserted that TPS was a program to benefit people who had entered the country "illegally" or who supposedly commit crimes in the United States. In announcing her decision to end TPS for Venezuela, for instance, she said she would not allow Venezuelan TPS holders to "stay here and violate our laws."[75] In her press statement

---

[73] *See* Extension of the Temporary Protected Status Designation for Honduras, 88 Fed. Reg. 40,304, 40,307 (June 21, 2023) ("[T]he conditions in Honduras that gave rise to its TPS designation in 1999 persisted in 2018 and continue to this day."); Extension of the Temporary Protected Status Designation for Nicaragua, 88 Fed. Reg. 40,294, 40,297 (June 21, 2013) (same for Nicaragua); Extension of the Temporary Protected Status Designation for Nepal, 88 Fed. Reg. 40,317 (June 21, 2023) (same for Nepal).

[74] *Homeland Security Secretary Nominee Gov. Kristi Noem Testifies at Confirmation Hearing*, C-SPAN (Jan. 15, 2025), https://www.c-span.org/program/senate-committee/homeland-securitysecretary-nominee-governor-kristi-noem-testifies-at-confirmation-hearing/654484 (at approximately 1:50:54); *see also* NBC News (@NBCNews), *Meet the Press full broadcast* – Feb. 2, YouTube (Feb. 2, 2025), https://www.youtube.com/watch?v=FpeMXrvxHco (at approximately 16:25).

[75] *DHS Sec. Noem Announces End to Temporary Protected Status for Venezuelan Migrants*, Fox & Friends (Jan. 29, 2025), https://www.foxnews.com/video/6367942790112?msockid=30416397acd261bf24f1707bad6860.

announcing the partial vacatur of TPS for Haiti, Defendant Noem emphasized that "TPS is a type of immigration status available to nationals of certain designated countries that allows aliens,[76] *even if they entered the country illegally*, the ability to reside *temporarily* in the U.S."[77]  Defendant Noem further cited Haiti as an "example" of the "exploit[ation]" of the system because "Haiti has been designated for TPS since 2010"; and because "more Haitian nationals, even those who entered the U.S. illegally" have benefited from "each extension."[78]

114.    President Trump, Vice President Vance, and Trump surrogates have likewise expressed their disagreement with TPS and characterized designations as illegal, or, in Vice President Vance's words, "a magic amnesty wand."[79]

115.    Before taking office, both the President and the Vice President made clear their intent to target TPS designations for termination.[80]  President Trump, while campaigning,

---

[76] The term "alien" is used throughout the Immigration and Nationality Act to describe non-citizens, but it and the related term "illegal alien" are considered by some to be a derogatory term used particularly to vilify and dehumanize non-white immigrants without lawful status (or people perceived as such).  *See, e.g.*, Kai Wei et al., *The Role of Language in Anti-Immigrant Prejudice: What Can We Learn from Immigrants' Historical Experiences?*, 8(3) SOC. SCIS. J. 1, 10–11 (2019), https://www.mdpi.com/2076-0760/8/3/93. Notably the current Trump Administration concertedly specified that it would use these terms, as a matter of policy, departing from the contrary policy of the Biden Administration.  *See, e.g.*, Todd Lyons, Acting Director, U.S. Immigr. & Customs Enforcement, *Updated Terminology for Communications Materials and Internal and External Communications* (Mar. 31, 2025), https://www.ice.gov/doclib/foia/policy/memo_CommsTerminology_03.31.2025.pdf.

[77] Press Release, U.S. Dep't of Homeland Sec., Secretary Noem Rescinds Previous Administration's Extension of Haiti's TPS (Feb. 20, 2025), https://www.dhs.gov/news/2025/02/20/secretary-noem-rescinds-extension-haitis-temporary-protected-status (emphases in original).

[78] *Id*.  Here, Defendant Noem presumably meant each "redesignation," because an extension does not allow additional Haitian nationals to benefit from TPS.

[79] Gabe Whisnant, *JD Vance Confronted on Putting Constituents 'at Risk' With Haitian Claims*, Newsweek (Sept. 16, 2024), https://www.newsweek.com/jd-vance-cnn-confronted-ohio-haitian-immigrant-claims-1954036.

[80] *See* Chris Cameron*, Vance Vows an End to Programs for Legal Immigrants*, N.Y. Times (Oct. 22, 2024), https://www.nytimes.com/2024/10/22/us/politics/vance-trump-legal-immigrants.html; (continued…)

said that he would "[a]bsolutely … revoke" TPS from Haitians, saying, "You have to remove the people; you cannot destroy our country . . . In my opinion, it's not legal."[81]

116.    President Trump decried TPS as a "little trick," asserting that Haitian migrants "are illegal immigrants" who were "destroying the town" of Springfield, Ohio.[82]

117.    For his part, Vice President Vance, said that "[w]e're going to stop doing mass grants of Temporary Protected Status.  Of course, you're going to have people fleeing from tyranny, but that happens on a case-by-case basis, not by waving the magic government wand."[83] Because TPS is a statute enacted by Congress to be a mass grant for all eligible individuals (unlike asylum and other forms of fear-based immigration relief grounded in individualized assessments), this statement can only be understood as an attack on TPS itself.  Vice President Vance expressed this view repeatedly while campaigning.[84]

---

Miriam Jordan & Hamed Aleaziz, *Trump Immigration Targets: Ukrainians, Venezuelans, Haitians*, N.Y. Times (Nov. 15, 2024), https://www.nytimes.com/2024/11/15/us/trump-immigrants-temporary-protected-status.html.

[81] Damita Menezes & Ali Bradley, *Trump on Springfield Haitian Migrants: 'They Have to Be Removed'*, NewsNation (Oct. 2, 2024), https://www.newsnationnow.com/politics/2024-election/trump-springfield-haitian-migrants-removed/ (starting at approximately 12:00); *see also* Maggie Astor, *Trump Says He Would Try Again to Revoke Haitian Immigrants' Protections*, N.Y. Times (Oct. 3, 2024), https://www.nytimes.com/2024/10/03/us/politics/trump-haitian-immigrants-legal-status.html.

[82] Charisma Madarang, *Trump Says Legal Haitian Migrants Are Illegal 'As Far As I'm Concerned'*, Rolling Stone (Oct. 9, 2024), https://www.rollingstone.com/politics/politics-news/trump-claims-legal-haitian-migrants-illegal-1235129621.

[83] Timothy Nerozzi, *Trump ends Temporary Protected Status for more than 300,000 Venezuelans in US*, Washington Examiner (Feb. 3, 2025), https://www.washingtonexaminer.com/policy/immigration/3308462/trump-ends-temporaryprotected-status-venezuelans/.

[84] *See, e.g.*, CNN-News 18 (@cnnnews18), *CNN's Dana Bash And JD Vance Clash Over Claims About Haitian Immigrants*, YouTube (Sept. 16, 2024), http://youtube.com/watch?v=djpTr5r0zMQ (at approximately 5:10, disputing anchor's characterization of TPS holders as being in the United States legally and calling TPS designations a "magic amnesty wand"); *Senator JD Vance Campaigns in Raleigh, North Carolina*, C-SPAN (Sept. 18, 2024), https://www.c-span.org/program/campaign-2024/senator-(continued…)

118.     According to the New York Times, Stephen Miller, President Trump's Deputy Chief of Staff and chief architect of his immigration policy platform, and other top advisers flagged the revocation of TPS designations as a priority for the incoming administration, again without consideration of country conditions or the merit of any individual designation.[85]

## DEFENDANTS' RENEWED EFFORTS TO END ACCESS TO TPS

119.     Neither the adverse decisions of federal courts nor DHS's 2024 analysis of conditions in Ethiopia have deterred the second Trump Administration from pursuing its plan to effectively end access to TPS consistent with campaign promises.  To date, the Administration has attempted to terminate the TPS designations of Ethiopia, Somalia, South Sudan, Cameroon, Haiti, Syria, Afghanistan, Nepal, Burma, Nicaragua, Honduras, and Venezuela.  The periodic reviews resulting in these terminations decisions—including the termination of TPS for Ethiopia—reflect preordained outcomes driven by the very sort of partisan politics the statute is intended to exclude from consideration.

120.     On his first day in office, President Trump issued an executive order titled "Protecting the American People Against Invasion."  Exec. Order No. 14,159 § 16(b), 90 Fed. Reg. 8,446 (Jan. 20, 2025) ("Invasion EO").   The supposed "invasion" involved purportedly "unprecedented" levels of irregular entry into the United States.  *Id*. § 1.  The executive order

---

jdvance-campaigns-in-raleigh-north-carolina/649012 (at approximately 41:00, "The media loves to say that the Haitian migrants, hundreds of thousands of them, by the way . . . they are here legally . . . . if Kamala Harris waves the wand illegally and says these people are now here legally.  I'm still going to call them an illegal alien.").

[85] *See* Charlie Savage et al., *Sweeping Raids, Giant Camps and Mass Deportations: Inside Trump's 2025 Immigration Plans*, N.Y. Times (Nov. 11, 2023), https://www.nytimes.com/2023/11/11/us/politics/trump-2025-immigration-agenda.html ("People who were granted temporary protected status because they are from certain countries deemed unsafe, allowing them to lawfully live and work in the United States, would have that status revoked.").

describes immigrants, including lawfully present TPS holders, as invaders committing "vile and heinous acts against innocent Americans." *Id*.

121.    The Executive Order directs the Secretary of Homeland Security to "promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States," including by reviewing "designations of Temporary Protected Status."  Invasion EO § 16(b).  Although Congress did not condition TPS eligibility on having *any* valid immigration status, see 8 U.S.C. § 1254a(c), and although TPS holders are, by definition, lawfully present in the United States, the Executive Order demanded that TPS designations be "appropriately limited in scope" to restrict the "continued presence of illegal aliens in the United States."  *Id*.

122.    Immediately after Defendant Noem was confirmed as Secretary of Homeland Security, Defendants began to implement the Executive Order's mandate, and several of Defendant Noem's termination decisions rely explicitly on this order, including her decision to terminate TPS for Ethiopia, *see* 90 Fed. Reg. 58,031.  In fact, when publicizing the Venezuela TPS vacatur described below, Defendant Noem explained that the vacatur reflected President Trump's "desire" to make sure TPS was "used properly," adding that "when the President gives a directive, the Department of Homeland Security will follow it."[86]

123.    Within days of taking office, Defendant Noem began improperly terminating TPS designations, following the same procedurally improper playbook that was eventually used to terminate Ethiopia's TPS designation.

---

[86] Secretary Kristi Noem (@Sec_Noem), X (Jan. 29, 2025, 3:37 PM), https://x.com/sec_noem/status/1884752724194963594?s=46&t=DFMGDqrcqeJ4X9klKmN2s (statement appears in posted video clip from CNN interview).

***Failure to Consult Appropriate Agencies and to Consider Country Conditions Within Periodic Reviews Conducted in 2025***

124.    In her periodic reviews of TPS designations, Defendant Noem overarchingly has failed to consult with other agencies as required by the TPS statute and has disregarded objective and available evidence of relevant country conditions.  Instead, she relied on pretextual justifications for the terminations, based on unexplained new policies governing her agency's approach to the periodic review process, *see supra* ¶¶ 63–68.  Just days after entering office, Defendant Noem reversed Venezuela's TPS extension, an unprecedented action that a federal court later found to be a pretext to cover her "desire to totally undo" the redesignation signed by then-Secretary Alejandro Mayorkas.[87]  This decision granting preliminary relief was stayed by the Supreme Court in a nonprecedential decision with no analysis.  *See Noem v. Nat'l TPS All.*, 145 S. Ct. 2728 (2025).  The Ninth Circuit later upheld the district court's preliminary relief decision in a detailed opinion, *Nat'l TPS All. v. Noem*, 150 F.4th 1000 (9th Cir. 2025), terminating the Supreme Court's stay.  Meanwhile, the district court issued a decision on summary judgment in the same case, holding that plaintiffs had established that the agency's vacatur and termination decisions were unlawful and/or arbitrary and capricious.[88]  That merits decision and the vacatur were then stayed by the Supreme Court in another nonprecedential decision with no analysis.  *Noem v. Nat'l TPS All.*, No. 25A326, 2025 WL 2812732, at *1 (U.S. Oct. 3, 2025).

125.    Quickly after issuing the Venezuela termination, Defendant Noem then "vacated a decision by the previous administration to extend Haiti's [TPS] by 18 months" as "part of President Trump's promise to rescind policies that were magnets for illegal immigration and

---

[87] *NTPSA I* Postponement Decision, 773 F. Supp. 3d at 855.
[88] *Nat'l TPS All. v. Noem*, No. 25-CV-01766-EMC, 2025 WL 2578045, at *41 (N.D. Cal. Sept. 5, 2025) (hereinafter, "*NTPSA I* Summ. J. Decision").

44

inconsistent with the law."[89]   The same district court held that Defendants' decision "was preordained" and made without "any meaning[ful] analysis and review [of country conditions],"[90] and a separate district court also found the action unlawful and set it aside.  *See Haitian Evangelical Clergy Ass'n v. Trump*, 789 F. Supp. 3d 255, 273 (E.D.N.Y 2025).

126.    On May 12, 2025, DHS terminated Afghanistan's TPS designation. Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. 20,309 (May 13, 2025).  Despite an ongoing State Department warning against any travel to the country "due to civil unrest, crime, terrorism, risk of wrongful detention, kidnapping, and limited health facilities,"[91] Defendant Noem claimed that conditions had "notabl[y] improve[d]."  *Id.* at 20,310.

127.    In her terminations for Cameroon, Nepal, and Honduras, Defendant Noem claimed that notable country conditions improvements justified ending the designations, but she ignored entire categories of conditions that DHS had previously considered.[92]

---

[89] Press Release, U.S. Dep't of Homeland Sec., Secretary Noem Rescinds Previous Administration's Extension of Haiti's Temporary Protected Status (Feb. 20, 2025), https://www.dhs.gov/news/2025/02/20/secretary-noem-rescinds-extension-haitis-temporary-protected-status  (hereinafter "Haiti TPS Termination Press Release").

[90] *NTPSA I* Summ. J. Decision, 2025 WL 2578045, at *34.

[91] *Travel Advisory Afghanistan*, U.S. Dep't of State, https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/afghanistan-advisory.html.

[92] *Compare* Extension of the Temporary Protected Status Designation for Nepal, 88 Fed. Reg. 40,317 (June 21, 2023); Extension and Redesignation of Cameroon for Temporary Protected Status, 88 Fed. Reg. 69,945 (Oct. 10, 2023); *and* Extension of the Temporary Protected Status Designation for Honduras, 88 Fed. Reg. 40,304 (June 21, 2023) *with* Termination of the Designation of Nepal for Temporary Protected Status, 90 Fed. Reg. at 24,151 (June 4, 2025); Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. at 23,697 (June 4, 2025); *and* Termination of the Designation of Honduras for Temporary Protected Status, 90 Fed. Reg. 30,089–92 (July 8, 2025) (not addressing political violence or crime).

45

128.    Discovery produced in litigation challenging Defendants' termination of TPS for Nepal, Honduras and Nicaragua[93] confirms that USCIS drafted decision memoranda recommending termination for Honduras and Nicaragua before drafters had reviewed USCIS country conditions reports.  For Nepal and Nicaragua, USCIS drafted decision memoranda without ever receiving any recommendation or contemporaneous conditions report from the State Department.  *See, e.g.*, Pls.' Reply in Supp. of Mot. for Summ. J. at 1–6 , *NTPSA II*, Dkt. 175 (citing relevant record evidence arising from discovery); *see also generally* MacLean Decl, *NTPSA II*, Dkt. 176, Exs. 1–36 at Dkts. 176-2–176-37.  This process violated the statutory directives to engage in interagency consultation and further evidence Defendants' ends-oriented approach.

129.    Each of these terminations and the failure to consult appropriate agencies demonstrates that the Trump Administration's aim of eviscerating access to TPS has been implemented through decision-making that was predetermined, pretextual, and procedurally deficient.

130.    Reflecting this reality, last month, a district court granted summary judgment against the government, finding that its termination of TPS designations for Honduras, Nepal, and Nicaragua was unlawful under Section 706 of the APA.[94] There, like here, DHS "made a pre-ordained decision to end TPS and influenced the conditions review process to facilitate TPS terminations for Honduras, Nicaragua, and Nepal."[95]

### *Impermissible Consideration of "National Interest" at the Periodic Review Stage*

131.    Defendant Noem also impermissibly based multiple TPS termination decisions primarily on U.S. national interest grounds, which cannot be considered at the periodic

---

[93] *See* Order Regarding Extra-Record Discovery and Deliberative Process Privilege, *NTPSA II*, Dkt. 97.

[94] *NTPSA II*, Dkt. 197 at 38–51.

[95] *Id.* at 42.

review stage of the TPS process.  *See, e.g.*, Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 9,040, 9,042 ("[E]ven assuming the relevant conditions in Venezuela remain both 'extraordinary' and 'temporary,' termination of the 2023 Venezuela TPS designation is required because it is contrary to the national interest to permit the Venezuelan nationals . . . to remain temporarily in the United States.").[96]

132.    Defendant Noem based her termination of Haiti on U.S. "national interest." Haiti, like Venezuela, was designated for TPS on the grounds of extraordinary and temporary conditions.  The Secretary rested her termination decision on her finding that extension of TPS status was not in the U.S. "national interest."  This is procedurally inappropriate, and the facts used to justify the decision—the total societal collapse Haitian citizens are facing—weigh *in favor of* extending TPS status.  Termination of the Designation of Haiti for Temporary Protected Status, 90 Fed. Reg. 28,760, 28,763 (Jul. 1, 2025).

133.    In the terminations culminating from her periodic reviews for the TPS designations of Afghanistan, Haiti, Syria, and Somalia. Defendant Noem used verbatim language for each country, claiming that "DHS records indicate that there are . . . nationals who are TPS recipients who have been the subject of administrative investigations for fraud, public safety, and national security."[97]

---

[96] *See also*, Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti, 90 Fed. Reg. 10,511, 10,513–14 (Feb. 24, 2025); Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. 20,309, 20,311 (May 13, 2025); Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. 23,697, 23,698 (June 4, 2025); Oral Order at 19–20, *Doe v. Noem, 1:25-cv-08686*, (S.D.N.Y. Oct. 20, 2025) (Dkt. 57).

[97] *See* Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. 20,309, 20,311 (May 13, 2025); Termination of the Designation of Syria for Temporary Protected Status, 90 Fed. Reg. 45,398, 45,401 (Sept. 22, 2025); Termination of the Designation of Haiti for Temporary Protected Status, 90 Fed. Reg. 28,760, 28,763 (Jul. 1, 2025); Termination of the Designation of Somalia for Temporary Protected Status, 91 Fed Reg. 1547, 1553 (Jan. 14, 2026).

*Impermissible Breaks from Past Practice*

134.    Until 2025, when the second Trump administration took power, no TPS designation for any country in the 35-year history of the TPS statute had ever been terminated based on "national interest." *See supra* ¶ 99. But in President Trump's second term alone, seven countries' TPS designations have been terminated based exclusively or primarily on Defendant Noem's assessment of "national interest." 90 Fed. Reg. 9040 (Venezuela); 90 Fed. Reg. 20309 (Afghanistan); 90 Fed. Reg. 23697 (Cameroon); 90 Fed. Reg. 28760 (Haiti). These terminations were the first to rely on a purported U.S. "national interest" to terminate a TPS designation. There is a reason for this: U.S. "national interest" is not a factor that can be considered at the periodic review stage, nor for TPS designations for countries facing armed conflict.[98]

135.    Rather than adhere to DHS's longstanding practice of providing at least a six-month orderly transition period when ending a TPS designation of substantial length, the Secretary has denied that there was any such practice. *See e.g.*, Termination of the Designation of Nepal for Temporary Protected Status, 90 Fed. Reg. at 24,153–54 n.24. While acknowledging "that certain previous TPS terminations allowed for an extended transition," she has noted that "certain other TPS designations were terminated without allowing for an extended transition period." *Id*. That is incomplete and inaccurate. DHS maintained a clear practice over the prior

---

[98] *See* 8 U.S.C. § 1254a(b)(3)(A) (during periodic reviews of TPS designations the Secretary "shall review the conditions *in the foreign state*" for which "a designation is in effect under this subsection" (emphases added)); *id*. § 1254(b)(3)(B) (allowing for a termination to result from a periodic review if the Secretary determines that the foreign state no longer continues to meet the *conditions* for designation); *id*. § 1254a(b)(1)(A) (initial designations based on armed conflict in the foreign country with no reference *at all* to domestic "national interest"); *id*. § 1254a(b)(1)(C) (initial designations based on extraordinary and temporary conditions and referencing domestic "national interest" *not* as a "condition" for designating the foreign country *but as an exception* to designating the foreign country); *see also* Oral Order at 19–20, *Doe v. Noem, 1:25-cv-08686*, (S.D.N.Y. Oct. 20, 2025) (Dkt. No. 57) (reviewing the TPS statute and finding that "periodic review, including review for termination, is limited to consideration of country conditions, and not to proclamations of the national interest divorced from those country conditions").

twenty years of providing at least a six-month orderly transition period for any TPS termination. *See supra* ¶ 100.

***Decision-Making Based on Animus***

136. The Trump Administration's ongoing policy of eliminating access to TPS, carried out through the pretextual, politically influenced, and procedurally defective periodic reviews, discussed above, all of which have culminated in termination decisions, is based on race, national origin, and ethnicity-based animus in violation of the Fifth Amendment to the U.S. Constitution. While federal courts have yet to rule on the merits of the equal protection claims included in the previous litigation challenging the terminations discussed above, many interim rulings have recognized a likelihood of success on the merits of the claim that the Trump Administration's terminations are based on unconstitutional animus.[99] This same animus motivated the termination of TPS for Ethiopia.

## DEFENDANTS' TERMINATION WAS MOTIVATED BY DISCRIMINATORY ANIMUS TOWARDS NON-WHITE, NON-EUROPEAN IMMIGRANTS GENERALLY AND BLACK AND AFRICAN IMMIGRANTS SPECIFICALLY

137. President Trump, Defendant Noem, and other members of the Trump Administration have built their political platforms and public-facing personas on unabashed

---

[99] *See, e.g.*, Mem. Op. at 11, *CASA, Inc. v. Noem*, 2025 WL 1907378 (D. Md. July 10, 2025), Dkt. 122 (noting "[a]t this early stage, the Court finds that CASA has adequately pleaded facts in several of these categories of direct and circumstantial evidence that, when read as a whole and in the most favorable light to CASA, permit a reasonable inferenced of a policy or practice of race discrimination in TPS determinations"); Mem. Order Granting Pl's Mot. to Postpone, *NTPSA I*, Dkt. 93 at 59 (stating "[b]ased on the extensive record provided by Plaintiffs, the Court finds that Plaintiffs have raised a substantial claim of unconstitutional animus"); Order Granting Pl. Mot. to Postpone, *NTPSA II*, Dkt. 73 at 29 ("In totality, Plaintiffs have produced sufficient evidence demonstrating racial and discriminatory animus in support of their Fifth Amendment claim. Color is neither a poison nor a crime. Therefore, Plaintiffs have provided sufficient evidence to establish that Plaintiffs will likely succeed on the merits of their Fifth Amendment claim.").

animus toward non-white people, particularly non-white immigrants, and, among them, particularly Black and African immigrants. This animus substantially motivated the Trump Administration's plan to end TPS designations and is evidenced by numerous statements made by Defendant Noem, President Trump, and other Administration officials. A limited sample of those statements follows.

***Defendants Have Espoused White Nationalist and Racist Rhetoric***

138. Defendants and their Administration have consistently used anti-immigrant rhetoric both on the campaign trail and while in office, and have been explicit about their plans to virtually eliminate all forms of immigration to the United States, unlawfully ignoring both the Constitution and duly enacted statutes prescribing U.S. immigration policy.

139. This drive to reduce immigration is motivated by racial animus, and finds support among avowed white nationalists, who have shrouded their animus in the so-called "Replacement Theory," which posits that non-white immigrants will "replace" the white race, and in doing so undermine the country's perceived white foundation, history, and culture.[100]

140. Echoing this ideology, President Trump and his administration have long expressed animus against non-white immigrants in general and non-white TPS-holders in particular.

141. Defendant Noem has endorsed the core premise of Replacement Theory and has described irregular immigration across the southern border as an "invasion happening on purpose… to remake the foundation of this country."[101]

---

[100] *See The 'Great Replacement' Theory, Explained*, Nat'l Immigr. F., (Dec. 1, 2021), https://forumtogether.org/article/the-great-replacement-theory-explained/.
[101] *South Dakota Gov. Kristi Noem Calls on Nikki Haley to Exit 2024 Race*, CBS News (Mar. 5, 2024), https://www.cbsnews.com/video/kristi-noem-calls-on-nikki-haley-to-exit-2024-race/ (at approximately 4:57).

142.    Deputy Chief of Staff for Policy and Homeland Security Advisor to the President Stephen Miller has long "promoted white nationalist literature," and "pushed racist immigration stories" to the media.[102]  The Southern Policy Law Center reviewed 900 emails sent by Miller to media outlets going back to 2015, and found repeated themes of white genocide and a focus on interracial crime.[103]  Miller also lauded historical immigration laws that imposed quotas based on racist assumptions.[104]

143.    While campaigning in 2023 and 2024, President Trump explicitly adopted those racist views, and said that non-white, non-European immigrants "from Africa" and Asia are "poisoning the blood of our country."[105]

144.    In October 2024, during an interview with conservative radio host Hugh Hewitt, President Trump further emphasized his belief about the genetic inferiority of non-white, non-European immigrants.  Speaking about "allowing people to come to an open border," he said, "many of them murdered far more than one person, and they're now happily living in the United

---

[102] Michael Edison Hayden, *Stephen Miller's Affinity for White Nationalism Revealed in Leaked Emails*, S. Poverty L. Ctr. (Nov. 12, 2019).

[103] *Id.*

[104] Adam Serwer, *Trump's White-Nationalist Vanguard*, The Atlantic (Nov. 19, 2019), https://www.theatlantic.com/ideas/archive/2019/11/stephen-miller-alarming-emails/602242/ ("A cache of Miller's emails . . . Show Miller praising racist immigration reactions from a century ago, while bitterly lamenting the law that repealed them.").

[105] *Donald Trump on Illegal Immigrants "Poisoning the Blood of Our Country"*, C-SPAN (Dec. 16, 2023), https://www.c-span.org/clip/campaign-2024/donald-trump-on-illegal-immigrants-poisoning-the-blood-of-our-country/5098439 (at approximately 00:15) (emphasis added); Raheem J. Kassam (@RaheemKassam), *Raheem Kassam Interviews Donald Trump*, YOUTUBE (Sep. 2023), https://www.youtube.com/watch?v=v283kLQbe1M&t=89s (at approximately 1:34 to 1:45).

51

States.  You know now a murderer, I believe this, it's in their genes.  And we got a lot of bad genes in our country right now."[106]

145.    By contrast, President Trump told a predominantly white crowd at a Minnesota campaign rally, that they have "good genes."[107]

146.    President Trump has referred to non-white, non-European immigrants as "animals,"[108] and compared them to snakes that will bite and kill anyone foolish enough to shelter them.[109]  When discussing undocumented immigrants during a March 2024 rally, he stated, "I don't know if you call them people.  In some cases they're not people, in my opinion, but I'm not allowed to say that[.]"[110]  Defendant Noem has referred to non-white immigrants as "dirt bags."[111]

---

[106] Jack Traylor et al., *Trump Suggests Immigrants Have 'Bad Genes' in Latest Disparagement of Migrants*, NBC News (Oct. 7, 2024), https://www.nbcnews.com/politics/donald-trump/trumpsuggests-immigrants-bad-genes-latest-disparagement-migrants-rcna174271.
[107] *Id.*
[108] Miriam Valverde, *In Context: Donald Trump's comments about immigrations, 'animals,'* PolitiFact (May 17, 2018), https://www.politifact.com/article/2018/may/17/context-donald-trumps-comments-about-immigrants-an/ (relying on MS-13 to claim that undocumented immigrants "aren't people. These are animals.").
[109] *See, e.g.*, Dara Lind, *"The Snake": Donald Trump Brings Back His Favorite Anti-Immigrant Fable at CPAC*, Vox (Feb. 23, 2018), www.vox.com/policy-and-politics/2018/2/23/17044744/trump-snake-speech-cpac; *see also* Julie Hirschfeld Davis, *Trump Calls Some Unauthorized Immigrants 'Animals' in Rant*, N.Y. Times (May 16, 2018), www.nytimes.com/2018/05/16/us/politics/trump-undocumented-immigrants-animals.html; *see also* John Bennett, *"Dumping Ground": Trump Echoes Conservative "Project 2025" at First Rally as Felon*, Roll Call  (June 10, 2024), https://rollcall.com/2024/06/10/dumping-ground-trump-echoes-conservative-project-2025-at-first-rally-as-a-felon/ ("[W]e're taking in people that are a disaster for our country. So it's all happening at our border. . . . And we're not going to let it happen, we're not going to let them ruin our country, we're not going to let them destroy our country. . . . The whole country is being turned into an absolute dumping ground[.]").
[110] Ariana Figueroa, *Trump Promises Mass Deportations of Undocumented People. How Would That Work?*, Mo. Indep. (Aug. 23, 2024), https://missouriindependent.com/2024/08/23/trump-promises-mass-deportations-of-undocumented-people-how-would-that-work/.
[111] Secretary Kristi Noem (@Sec_Noem), X (Jan. 28, 2025, 7:35 AM EST), https://x.com/Sec_Noem/status/1884264039158800547 ("Getting the dirt bags off the streets."); CBS Mornings (@CBSMornings), *DHS Secretary Kristi Noem Joins Federal Agents on Immigration Raids in New York*, YOUTUBE (Jan. 29, 2025),
(continued…)

52

147.    In his speech at the Republican National Convention in July 2024, President Trump, repeating the white nationalist talking points discussed above, stated: "[t]he greatest invasion in history is taking place right here in our country.  They are coming in from every corner of the earth, not just from South America, but from Africa, Asia, Middle East . . . ."[112]

148.    On September 23, 2025, President Trump used his platform at the U.N. General Assembly to critique the United Nations' humanitarian aid for migrants as "funding an assault on Western countries and their borders," and warning of "the death of Western Europe."[113]

149.    As recently as November 27, 2025, Trump declared his intent to "permanently pause migration from all Third World Countries,"[114] and claimed that "most" of the 53 million "foreign" people in the United States "are on welfare, from failed nations, or from prisons, mental institutions, gangs, or drug cartels."[115] Trump went as far to say that he intends to deport any foreign national deemed "non-compatible with *Western civilization*."[116]

150.    Over the past few months, the Trump Administration—including DHS and the Department of Labor ("DOL")—have ramped up their symbolic embrace of white nationalist ideology and the animus it carries with it.

---

https://www.youtube.com/watch?v=tODarHnNiNs ("These guys are dirtbags.  They have come in and perpetuated violence in this country.").  The CBS reporter who accompanied Defendant Noem during the New York City raids she referenced has reported that nearly half of those arrested had no criminal history.  *Id.*

[112] *Read the Transcript of Donald J. Trump's Convention Speech*, N.Y. Times (July 19, 2024), https://www.nytimes.com/2024/07/19/us/politics/trump-rnc-speech-transcript.html.

[113] *Trump Speaks at U.N.*, REV, https://www.rev.com/transcripts/trump-speaks-at-un.

[114] Donald J. Trump (@realDonaldTrump), Truth Soc. (Nov. 27, 2025, 11:26 PM), https://truthsocial.com/@realDonaldTrump/posts/115625427648743414.

[115] Donald J. Trump (@realDonaldTrump), Truth Soc. (Nov. 27, 2025, 11:27 PM), https://truthsocial.com/@realDonaldTrump/posts/115625429081411360.

[116] Shivani Tanna & Rishabh Jaiswal, Trump Vows to Freeze Migration from 'Third World Countries' After D.C. Attack, Reuters (Nov. 28, 2025), https://www.reuters.com/world/trump-says-us-will-permanently-pause-migration-third-world-countries-2025-11-28/ (emphasis added).

151.    On October 14, 2025, DHS posted a one-word tweet: "Remigrate."[117] This word "refer[s] to the mass deportation of non-white immigrants," "has ties to white nationalism," and "has been seen as a euphemism for ethnic cleansing."[118]

152.    President Trump has repeatedly embraced this white nationalist call. Earlier in 2025, he stated: "America was invaded and occupied. I am reversing the Invasion. It's called Remigration."[119] President Trump "directed" the "entire Administration to put every resource possible behind this effort, and reverse the tide of Mass Destruction Migration that has turned once Idyllic Towns into scenes of Third World Dystopia. Our Federal Government will continue to be focused on the REMIGRATION of Aliens."[120]

153.    Also in 2025, President Trump called for "the Largest Mass Deportation Operation in History,"[121] saying "[i]t's called "REMIGRATION" and, it will, MAKE AMERICA GREAT AGAIN!"[122]. President Trump has repeatedly called for this "single largest Mass Deportation Program in History,"[123] all while specifically encouraging the immigration of white people, from places like South Africa and Europe.

---

[117] Homeland Security (@DHSgov), X (Oct. 14, 2025, 3:06 PM), https://x.com/DHSgov/status/1978175527329358094.

[118] Connor Greene, *Trump's Department of Homeland Security Embraces a Word with Ties to White Nationalism*, TIME (Oct. 16, 2025), https://time.com/7326233/trump-remigrate- homeland-security/; *see also* Chelsea Bailey, *DHS Issued a Call to 'Remigrate.' Here's the History of the Term Often Associated with Far-Right Groups*, CNN US (Oct. 19, 2025), https://www.cnn.com/2025/10/19/us/remigrate-dhs-explained.

[119] Donald J. Trump (@realDonaldTrump), Truth Soc. (June 12, 2025, 6:45 PM), https://truthsocial.com/@realDonaldTrump/posts/114672816056718064.

[120] Donald J. Trump (@realDonaldTrump), Truth Soc. (June 15, 2025, 8:43 PM), https://truthsocial.com/@realDonaldTrump/posts/114690267066155731.

[121] Donald J. Trump (@realDonaldTrump), Truth Soc. (July 5, 2025, 12:50 PM), https://truthsocial.com/@realDonaldTrump/posts/114801653749329102.

[122] *Id.* (quotation marks in original).

[123] Donald J. Trump (@realDonaldTrump), Truth Soc. (June 15, 2025, 8:43 PM), https://truthsocial.com/@realDonaldTrump/posts/114690267066155731.

154.    In the fall of 2025, DHS posted a series of anti-immigrant posters that demonstrate discriminatory animus through their text and/or images.  *See Figs. A, B*.  DOL has posted similarly charged symbolic language.  *See Figs. C, D, E, F*.  Through Project Firewall, depicted in Figures C–F, DOL coordinates with DHS to constrain the availability of employment-based visas and immigration status.





*Figure A*[124]                                             *Figure B*[125]

---

[124] Graphic posted by U.S. Dep't of Homeland Security (@homelandgov.bskysocial), Bluesky (Oct. 18, 2025, 1:56 PM), https://bsky.app/profile/homelandgov.bsky.social/post/3m3iec6j2xs2m.
[125] Graphic posted by U.S. Dep't of Homeland Security (@homelandgov.bskysocial), Bluesky (Nov. 7, 2025, 11:48 AM),
https://bsky.app/profile/homelandgov.bsky.social/post/3m52jswz7d22e, Bluesky (Nov. 7, 2025, 11:48 AM), https://bsky.app/profile/homelandgov.bsky.social/post/3m52jswz7d22e .



*Figure C[126]*



*Figure D[127]*

---

[126] Graphic posted by U.S. Dep't of Labor (@dol.gov.bskysocial), Bluesky (Oct. 18, 2025, at 6:08 PM), https://bsky.app/profile/dol.gov/post/3m3isfbppcs2f.@dol.gov).

[127] Graphic posted by U.S. Dep't of Labor (@dol.gov.bskysocial), Bluesky (Oct. 17, 2025, at 6:24 PM), https://bsky.app/profile/dol.gov/post/3m3gcseptrs22 (post "pinned" to the top of DOL's Bluesky profile as of Dec. 9, 2025).





*Figure E*[128]                                        *Figure F*[129]

***Defendants' Animus Toward Black, African, and Non-White Immigrants***

155.     During his first Administration, President Trump repeatedly denigrated immigrants from countries designated for TPS.  Most notably, he referred to countries designated for TPS as "shithole" countries in a conversation with legislators about TPS, saying "Why do we need more Haitians?"  He asked officials to "take them out" of the immigration proposal.  He expressed a preference, instead, for immigrants from countries "such as Norway."[130]

---

[128] Graphic posted by U.S. Dep't of Labor (@dol.gov.bskysocial), Bluesky (Oct. 21, 2025, 6:14 PM), https://bsky.app/profile/dol.gov/post/3m3qe5ocyn22p.

[129] Graphic posted by U.S. Dep't of Labor (@dol.gov.bskysocial), Bluesky (Oct. 23, 2025, 10:06 PM), https://bsky.app/profile/dol.gov/post/3m3vrz4sanc2h.

[130] Josh Dawsey, *Trump derides protections for immigrants from 'shithole' countries*, Wash. Post (Jan. 12, 2018), https://www.washingtonpost.com/politics/trump-attacks-protections-for-(continued…)

156.    During the 2024 election campaign, President Trump doubled down on those remarks, reiterating comparisons between "nice countries, you know like Denmark, Switzerland . . . [and] Norway"—all of which are countries whose nationals are majority white—and non-European countries whose nationals are majority non-white, which he described as "unbelievable places and countries, countries that are a disaster."[131]

157.    On December 9, 2025, President Trump tripled down on his prior remarks at an event in Pennsylvania, in which "he boasted about pausing immigration applications from what he called 'third-world countries' including 'hellholes like Afghanistan, Haiti, Somalia and many other countries.'"[132]

158.    In response, someone in the audience yelled out "shithole!", to which President Trump responded by saying:

> "Remember, I said that to the senators that came in, the Democrats.  They wanted to be bipartisan.  So they came in and they said, 'this is totally off the record, nothing mentioned here, we want to be honest,' because our country was going to hell."

> "And we had a meeting, and I say, 'Why is it we only take people from s---hole countries,' right?  Why can't we have some people from Norway, Sweden?  Just a few?  Let's have a few from [] Denmark.  Do you mind sending us a few people?  Send us some nice people.  Do you mind?  But we always take people from Somalia, places that are a disaster, right?  Filthy, dirty, disgusting, ridden with crime."[133]

---

immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html.

[131] Maggie Haberman & Michael Gold, *Trump, at Fund-Raiser, Says He Wants Immigrants from 'Nice' Countries*, N.Y. Times (Apr. 7, 2024), https://www.nytimes.com/2024/04/07/us/politics/trump-immigrants-nice-countries.html ("These are people coming in from prisons and jails. They're coming in from just unbelievable places and countries, countries that are a disaster.").

[132] Lalee Ibssa & Karen Travers, *Trump ramps up anti-immigrant rhetoric, embraces 's---hole countries' phrase*, ABC News (Dec. 10, 2025), https://abcnews.go.com/Politics/trump-ramps-anti-immigrant-rhetoric-embraces-phrase-hole/story?id=128279166.

[133] *Id.; see also Speech: Donald Trump Holds a Political Rally in Mount Pocono, Pennsylvania – Dec. 9, 2025*, Roll Call (Dec. 9, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-political-rally-mount-pocono-pennsylvania=december-9-2025/.

159.    The vitriol against Somalis was on ample display only one week prior, on

December 2, 2025, during a Cabinet meeting, in which President Trump stated:

> I don't want them in our country, I'll be honest with you, OK?  Somebody would say, oh, that's not politically correct. I don't care.  I don't want them in our country. Their country is no good for a reason.  Their country stinks and we don't want them in our country.  I can say that about other countries too.  I can say that about other countries too. We don't want them -- the hell -- we have to rebuild our country. You know, our country is at a tipping point.  We could go bad; we're at a tipping point.  I don't know if people mind me saying that, but I'm saying it.  We could go one way or the other and we're going to go the wrong way if we keep taking in garbage into our country.[134]

---

[134] *Remarks: Donald Trump Holds a Cabinet Meeting at the White House - December 2, 2025*, Roll Call (Dec. 2, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-remarks-cabinet-meeting-december-2-2025/.

On December 2, 2025, the same day as this Cabinet meeting, USCIS instituted a new policy pausing all asylum processing in the U.S. and pausing the processing of immigration benefits applications from people in the U.S. who come from any of the 19 countries whose nationals are subject to entry bans that the President instituted effective June 9, 2025.  The nationals of these countries are majority non-white, including those of 8 countries who are majority Black.  *See* Policy Mem., U.S. Citizenship & Immigr. Serv., Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries (Dec. 2, 2025), https://www.uscis.gov/sites/default/files/document/policy-alerts/PM-602-0192-PendingApplicationsHighRiskCountries-20251202.pdf (citing Presidential Proclamation 10949, *Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats*, Fed. Reg. 22,491 (June 4, 2025), https://www.govinfo.gov/content/pkg/FR-2025-06-10/pdf/2025-10669.pdf).

Days later, on December 16, 2025, President Trump announced an expansion of the entry bans, to take effect January 1, 2026.  The newest entry bans extend to an additional 22 countries, the nationals of which are majority non-white. The nationals of 20 of those countries are majority Black.  Of those 20 countries, 18 are African.  Presidential Proclamation, *Restricting and Limiting the Entry of Foreign Nationals To Protect the Security of the United States*, (Dec. 16, 2025),  https://www.whitehouse.gov/presidential-actions/2025/12/restricting-and-limiting-the-entry-of-foreign-nationals-to-protect-the-security-of-the-united-states/.  On December 18, 2025, the Director of USCIS announced on social media that the processing pause on immigration applications would extend to applicants who are nationals of countries that President Trump had newly designated for entry bans only two days prior.  *See* Camilo Montoya-Galvez, *Trump administration pauses immigration cases for people from another 20 countries*, CBS News, (Dec. 18, 2025), https://www.cbsnews.com/news/trump-administration-pauses-immigration-cases-another-20-countries/.

160.   Only days before that Cabinet meeting, President Trump posted the following on social media: "I am, as President of the United States, hereby terminating, effective immediately, the Temporary Protected Status (TPS Program) for Somalis in Minnesota. Somali gangs are terrorizing the people of that great State, and BILLIONS of Dollars are missing. Send them back to where they came from. It's OVER! President DJT."[135]  Notably, the TPS statute does not authorize the President to effect an immediate termination of TPS, let alone for a subset of beneficiaries within a given U.S. city, over social media.

161.   On the heels of that social-media outburst, more have followed. On December 31, 2025, the President posted, "Much of the Minnesota Fraud, up to 90%, is caused by people that came into our Country, illegally, from Somalia. 'Congresswoman' Omar, an ungrateful loser who only complains and never contributes, is one of the many scammers. Did she really marry her brother? Lowlifes like this can only be a liability to our Country's greatness. Send them back from where they came, Somalia, perhaps the worst, and most corrupt, country on earth. MAKE AMERICA GREAT AGAIN!!!".[136]

162.   And just earlier this week, the President posted, "There is 19 Billion Dollars in Minnesota Somalia Fraud. Fake 'Congresswoman' Illhan [sic] Omar, a constant complainer who hates the USA, knows everything there is to know. She should be in jail, or even a worse punishment, sent back to Somalia, considered one of the absolutely worst countries in the World. She could help to MAKE SOMALIA GREAT AGAIN!"[137]

---

[135] Donald J. Trump (@realDonaldTrump), Truth Soc. (Nov. 21, 2025, 8:37 PM), https://truthsocial.com/@realDonaldTrump/posts/115590786862216464.

[136] Donald J. Trump (@realDonaldTrump), Truth Soc. (Dec. 31, 2025, 10:55 AM), https://truthsocial.com/@realDonaldTrump/posts/115814993074933464 .

[137] Donald J. Trump (@realDonaldTrump), Truth Soc. (Jan. 18, 2026, 10:43 PM), https://truthsocial.com/@realDonaldTrump/posts/115919697262007872; *see also, e.g., id.* (Dec. 31, 2026, 10:55 AM).

163.    President Trump's disregard for immigrants from majority Black countries, including African countries, is nothing new.  On the campaign trail to his current presidency, then-candidate Trump often remarked disparagingly about African immigrants.

164.    In September 2024, candidate Trump told a crowd in Uniondale, New York: "[t]hey are vicious, violent criminals that are being let into our country.  They're people that their countries, who are very smart—they don't want them.  That's why all over the world; a lot of people coming out of jails in the Congo, in Africa . . . They're coming from the Congo, they're coming from Africa, they're coming from the Middle East, they're coming from all over the world."[138]

165.    In August 2024, candidate Trump claimed:

"We have criminals from all over the world pouring into our country right now. Your jobs will never be obsolete. . . . She [then-Vice President Kamala Harris] has allowed millions of people—open border—to flow into our country totally unchecked, totally unvetted. . . . This isn't just from South America — people think it's just South America — this is Africa, Asia, the Middle East.  A lot of people coming from the Congo in Africa, the Congo, rough, rough, rough, and they're prisoners, they're prisoners, and we say 'where do you come from?' 'Africa' 'Where in Africa?' 'Prison' 'What did you do?' 'We don't want to say.'  They turn out to be murderers, these are rough, these are rough people . . . ."[139]

166.    In April 2024, at a speech to law enforcement officials in Grand Rapids, Michigan, candidate Trump claimed that immigrants have "wrecked our country," and that other countries were "sending prisoners, murderers, drug dealers, mental patients, and terrorists . . .  from Congo, from Yemen, from Somalia, from Syria."[140]

---

[138] Donald J. Trump (Shared by @TeamTrump), Truth Soc. (Sep. 18, 2024, 8:17 PM), https://truthsocial.com/@TeamTrump/posts/112996067996354335.

[139] Donald J. Trump (Shared by @TeamTrump), Truth Soc. (Aug. 20, 2024, 3:46 PM), https://truthsocial.com/@TeamTrump/posts/112996067996354335.

[140] *Speech: Donald Trump Addresses Law Enforcement Officials in Grand Rapids - April 2, 2024*, Roll Call (Apr. 2, 2024), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-law- enforcement-officials-grand-rapids-michigan-april-2-2024/.

167.    In June of 2024 candidate Trump said again, "[T]hey come from Africa. They come from Asia. They come from South America. They come from the Middle East. What's happening to our country is unbelievable. They're poisoning our country."[141]

168.    In October 2023, President Trump repeatedly boasted of his successes in excluding Black immigrants, stating for example: "I banned refugees from Somalia, very dangerous places, and from all of the most dangerous places all over the world . . . [s]ome very rough people, some very, very rough people come out of these areas."[142]

169.    In 2022, President Trump claimed that immigrants were "storming" the country, including from "all of Africa."[143]

### Discriminatory Animus is Apparent from Disparate Treatment of White Immigrants

170.    In stark contrast, the Trump Administration has shown a strong bias in favor of immigrant populations it perceives to be white. On February 7, 2025, President Trump signed Executive Order No. 14204, *Addressing Egregious Actions of the Republic of South Africa*, which directs Defendant Noem (among others) to: "[T]ake appropriate steps, consistent with law, to prioritize humanitarian relief, including admission and resettlement through the United States Refugee Admissions Program, for Afrikaners in South Africa who are victims of unjust racial discrimination."[144]

---

[141] *Speech: Donald Trump Attends a Club 47 Birthday Fundraiser in Florida - June 15, 2024*, Roll Call (June 15, 2024), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-club-47-birthday-fundraiser-west-palm-beach-florida-june-14-2024/#108.

[142] *Speech: Donald Trump Holds a Campaign Event in Clive, Iowa - October 16, 2023*, Roll Call (Oct. 16, 2023), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-campaign-event-clive-iowa-october-16-2023/#101.

[143] *Speech: Donald Trump Holds a Political Rally in Robstown, Texas - October 22, 2022*, Roll Call (Oct. 22, 2022), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-political-rally-robstown-texas-october-22-2022/#20.

[144] Exec. Order No. 14204, 90 Fed. Reg. 9,497 (Feb. 12, 2025).

171.    President Trump previously posted on Truth Social that "any Farmer (with family!) from South Africa, seeking to flee that country to reasons of safety, will be invited into the United States of America with a rapid pathway to Citizenship.  This process will begin immediately!"[145]

172.    In October 2025, President Trump announced that the refugee cap for the coming year would be reduced from 125,000 last year, to just 7,500 people for 2026—the majority of whom will be white South Africans.[146]

173.    Although the Administration has relied on visa-overstay rates to justify immigration policy decisions such as terminating TPS for Ethiopia, objective data belies that rationale and reveals it to be pretextual. A report from the Brennan Center that analyzes objective data about visa-overstay rates reveals that nationals of majority-white countries with high numbers of overstays—such as the United Kingdom or Canada—have not been targeted by the Administration's immigration-related policy changes, whereas nationals of countries with very low numbers of overstays—mostly Muslim countries whose nationals are not descended from Europeans and African countries whose nationals are majority Black—are.[147]

**EXTRAORDINARY AND IRREPARABLE HARMS IF TPS FOR ETHIOPIA IS TERMINATED IMMINENTLY AND UNLAWFULLY**

174.    Defendants' decision to terminate TPS imminently and unlawfully for Ethiopia would strip TPS status from more than 5,000 Ethiopian TPS recipients, including the

---

[145] Donald J. Trump (@realDonaldTrump), Truth Soc. (Mar. 7, 2025, at 9:05 AM), https://truthsocial.com/@realDonaldTrump/posts/112894686703859511.

[146] Rebecca Santana, *Trump Limits Annual U.S. Refugees to 7,500. It'll be mostly white South Africans,* PBS News (Oct. 30, 2025), https://www.pbs.org/newshour/nation/trump-limits-annual-refugees-to-u-s-to-7500-itll-be-mostly-white-south-africans.

[147] Margy O'Herron and Doug Rand, *New Entry Bans, Same Faulty Reasoning*, The Brennan Ctr. for Justice (Dec. 19, 2025), https://www.brennancenter.org/our-work/research-reports/new-entry-bans-same-faulty-reasoning.

Individual Plaintiffs and other members of Plaintiff ACT; at least 260 Ethiopian nationals with pending applications for TPS; and the U.S. citizen and lawful permanent resident dependents and immediate relatives of recipients and applicants.  Some of these people, such as the Individual Plaintiffs, have lived in the United States for years and are otherwise deeply embedded in their communities.  Should Defendants' unlawful and imminent Termination take effect after 11:59 p.m. on February 13, 2026, the harms caused to them and many others would be myriad and severe.

175.    For the TPS recipients, including all of the Individual Plaintiffs, those harms can include:  losing TPS as a sole source of immigration status; losing eligibility for related federal benefits (such as work authorization); losing eligibility for related state benefits (such as driver's licenses); facing the risk of deportation charges and of related immigration confinement; facing related, forced separation from loved ones and community in the U.S.; and facing forced removal to Ethiopia and the risks of harm there, including deadly harm, on account of ongoing armed conflict and its ramifications, as well as other, compounded humanitarian crises, spanning severe flooding, deadly outbreaks, mass internal displacement, acute food insecurity, and barriers to accessing humanitarian aid.

176.    For the TPS applicants, the harms include no longer having any basis for consideration of their pending application for TPS, losing related protection against deportation and immigration confinement, losing a pathway to work authorization, and losing access to TPS.

177.    For the Individual Plaintiffs and all other TPS recipients, TPS applicants, and their U.S.-based family members, the harms include the stress and torment of possible forced separation from loved ones and the fear that the applicants and recipients could face grave harm, including death, if forcibly removed to Ethiopia.

178.    All of these harms are compounded by the fact that the Administration has only provided a 60-day wind-down period to Ethiopian TPS recipients, which is insufficient for them, applicants, and their families to be able to plan fairly for their futures and which starkly departs from a longstanding agency practice of more orderly transition periods of at least 6 months but more typically 12–18 months.

179.    The insufficiency of the 60-day wind-down period is compounded by a myriad of severe and new policy changes within DHS that restrict access to alternative forms of immigration status in the U.S., both affirmatively and defensively (within removal proceedings).

180.    One such policy change is a blanket pause on the adjudication of pending, affirmative asylum applications by U.S. Citizenship and Immigration Services ("USCIS"), announced on December 2, 2025.[148]  That blanket pause makes affirmatively accessing asylum ahead of the Termination virtually impossible.

181.    Likewise, affirmative access to any other immigration benefit ahead of the Termination is also very doubtful because of a new policy that USCIS announced on November 27, 2025: under it, "country-specific factors" can receive dispositive, negative weight in the agency's review of any newly filed application for a discretionary immigration benefit.[149] Under this policy, Ethiopians have cause to fear that simply being Ethiopian could be held against them, given the backdrop of the decisions to terminate TPS for Ethiopia and other majority Black

---

[148] *See* Policy Mem., U.S. Citizenship & Immigr. Serv., *Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries*, PA-602,0192 (Dec. 2, 2025), https://www.uscis.gov/sites/default/files/document/policy-alerts/PM-602-0192-PendingApplicationsHighRiskCountries-20251202.pdf.
[149] *Policy Alert – Impact of INA 212(f) on USCIS' Adjudication of Discretionary Benefits*, U.S. Citizenship & Immigr. Services, PA 2025-26 (Nov. 27, 2025) at 2, https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20251127-Discretion.pdf.

countries (Somalia, South Sudan, Cameroon, Haiti) and otherwise given that the U.S. Department of State announced only last week that it is indefinitely pausing the issuance of immigrant visas for Ethiopians and for the nationals of at least 30 other countries that are African or who are majority Black and descended from Africans.[150]

182.    If the Termination of TPS for Ethiopia were to take effect imminently and unlawfully, it would be cold comfort to anyone whom DHS might then target for immigration confinement and removal proceedings that they could raise back-footed legal defenses, in response.

183.    For one thing, through such immigration enforcement actions, Defendants would be subjecting TPS holders and prima-facie-eligible TPS applicants to harms that Congress wanted them *to avoid*. *See* 8 U.S.C. §§ 1254a(1)(A) (protection from deportation), (d)(4) (protection from immigration confinement); 8 C.F.R. § 244.10(e) (protections extend to given applicants). Moreover, Congress established TPS as a form of humanitarian protection that *does not turn* on *individualized* persecution and harm, the way that asylum and related forms of protection do and that not all TPS holders and applicants may be able to establish.

184.    For another thing, the Administration is aggressively seeking to alter access to standard removal proceedings and is eager, instead, to lean hard into an expansive interpretation of its statutory authority to undertake expedited removals with few, if any, procedural rights for the targeted individuals. *See, e.g.*, *Make The Road New York v. Noem*, No. 25-5320, 2025 WL

---

[150] *Immigrant Visa Processing Updates for Nationalities at High Risk of Public Benefits Usage*, U.S. Dep't of State (Jan. 14, 2026), https://travel.state.gov/content/travel/en/News/visas-news/immigrant-visa-processing-updates-for-nationalities-at-high-risk-of-public-benefits-usage.html.

3563313, *14 (D.C. Cir. Nov. 22, 2025) (litigation challenging DHS policy expanding the scope of expedited removal).

185.   Even within standard removal proceedings, the Administration has otherwise severely constrained access to asylum through a litany of restrictive policies.[151]

186.   And the loss of TPS in some instances can also limit the possibility of acquiring an alternative legal status for which an individual would otherwise be eligible but for which another form of active legal status is a prerequisite.[152]

187.   TPS holders, including all of the Individual Plaintiffs, who lose their status may also face a years-long statutory bar to re-entry whether they depart on their own or are deported.[153]

188.   Furthermore, TPS holders who may be entitled to a fear-based form of immigration relief—such as withholding of removal or protection pursuant to the Convention Against Torture—face the prospect of deportation to unsafe countries.  The current Trump Administration has sought to remove people to third countries "without adequate notice and a 'meaningful opportunity' to present a claim under the Convention," even if they may be subject to a fear-based form of relief.  *Dep't of Homeland Sec. v. D.V.D.*, 145 S. Ct. 2153, 2155 (2025)

---

[151] *Practice Advisory – Fighting for a Day in Court: Understanding and Responding to Pretermission of Asylum Applications* (updated Aug. 27, 2025), Nat'l Immigr. Project and Ctr. for Gender and Refugee Studies, https://nipnlg.org/sites/default/files/2025-07/advisory-avoiding-pretermission.pdf; *Practice Advisory – Applying for Asylum After Matter of R-E-R-M- & J-D-R-M- and Matter of S-S-F-M-* (updated Oct. 2025), Nat'l Imm. Justice Ctr., https://immigrantjustice.org/wp-content/uploads/2025/05/Updated-AG-Decisions-Practice-Advisory-Final_Asylum_Oct2025.pdf.

[152] *See Temporary Protected Status: An Overview*, American Immigration Council (Nov. 25, 2025), https://www.americanimmigrationcouncil.org/fact-sheet/temporary-protected-status-tps-overview/ (noting some TPS recipients may be eligible to adjust status).

[153] 8 U.S.C. §§ 1182(a)(9)(A)(ii), (B)(i)(II).

(Sotomayor, J. dissenting).  While this issue is being litigated, the Supreme Court has allowed such third-country removals to move forward.  *Id.*

189.  TPS holders and applicants also face the prospect of losing employment authorization.  This can result in their summary dismissal from their jobs, jeopardizing their and their families' financial stability.  Without stable employment, some TPS holders and applicants risk losing their homes or other material assets, leading to further economic harm.

190.  Many TPS holders also face the imminent loss of their driver's licenses (or state identification cards) and, with them, their mobility and freedom of movement, because in many states driver's licenses and state-issued identification are limited to those with legal immigration status.[154]  In addition, because the Defendant Noem's termination goes into effect so quickly, TPS holders, including all of the Individual Plaintiffs, have been afforded almost no time to make alternative arrangements for themselves and their families.

191.  Compounding the destabilizing harms of loss of legal status, employment authorization, and driver's licenses and state identification cards are the severe risks of family separation, loss of healthcare, psychological harm, and stigma.

192.  The risk of deportation renders TPS holders and applicants vulnerable to separation from U.S. citizen dependents, immediate relatives, and other family and loved ones. There are many Ethiopian TPS holders and applicants in mixed-status families—with children, spouses, partners, elderly parents, and other family members who are U.S. citizens, lawful permanent residents, or who hold other forms of lawful status.  These TPS holders and applicants face the risk of having to choose between being forced to leave their family members behind,

---

[154] *See, e.g., REAL ID Checklist*, California DMV, https://www.dmv.ca.gov/portal/driverlicenses-identification-cards/real-id/real-id-checklist/ (listing documents showing immigration status as requirements for REAL ID driver's licenses).

68

potentially without the ability to reunite with them in the U.S., or bringing their U.S. citizen children (or other family members) to a country that is unsafe and in dire straits, where the children have never lived and, in many cases, have never even visited.

193.    TPS holders and their families will be deprived of employer-sponsored health insurance and in some cases public health care.  Despite having paid into Social Security, TPS holders also face the loss of this crucial benefit.

194.    Meanwhile, the fear of deportation inflicts severe psychological harm on TPS holders and their loved ones.  Ethiopian TPS holders, including the individual Plaintiffs, have been experiencing tremendous emotional and psychological harm since the announcement of the Termination, giving rise to the risk of heightened anxiety, trauma, insomnia, and depression.  The psychological harms resulting from Defendants' actions will only intensify as the effective date approaches.

195.    Ethiopian TPS holders and applicants have also suffered the additional dignitary harm of being subject to an agency action motivated by racial, ethnic, or national-origin discrimination.

## CLASS ACTION ALLEGATIONS

196.    Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure as representative of classes defined as follows:

   a.  All nationals of Ethiopia or individuals without any nationality who last habitually resided in Ethiopia who are present in the U.S. and are current recipients or holders of TPS for Ethiopia (the "Recipient Class");

   b.  All nationals of Ethiopia or individuals without any nationality who last habitually resided in Ethiopia who are present in the U.S. and have pending applications for

69

TPS for Ethiopia that reflect their *prima facie* eligibility for it (the "Applicant

Class"); and

c. All U.S. citizen dependents or immediate relatives of any member of the Applicant

Class or Recipient Class (the "Family Class").

197. The proposed classes are each sufficiently numerous so as to make joinder of all members impracticable. Based on Defendants' own accounting in the Federal Register notice, the Recipient Class consists of approximately 5,001 current TPS holders, and the Applicant Class consists of approximately 263 TPS applicants. *See* 90. Fed. Reg. at 58,031.

198. There are questions of law and fact common to the classes, including:

a. Whether Defendants' decision to terminate Ethiopian TPS was preordained and/or

pretextual, without regard to country conditions and prior to consulting with other

appropriate agencies in violation of the TPS statute and the APA;

b. Whether the TPS statute authorizes the Secretary to consider "national interest" as

a sole justification to terminate TPS;

c. Whether Defendants' decision to terminate TPS was impermissibly motivated by

animus based on race, ethnicity, or national origin, in violation of the Fifth

Amendment; and

d. Whether Defendants' failure to provide more than the minimum 60-day notice

before terminating Ethiopia's TPS designation violates the APA.

e. Whether Defendants' reliance on the domestic national interest in terminating

Ethiopia's TPS designation deviates from past agency practice in violation of the

APA.

199.    Plaintiffs' claims are typical of those of the Recipient, Applicant, and Family classes.

200.    Plaintiffs will fairly and adequately protect and represent the interests of the Recipient, Applicant, and Family classes.  The interests of the Plaintiffs are not antagonistic to the classes.

201.    Proposed class counsel has substantial experience litigating both cases involving challenges to federal immigration policies and class actions.

202.    Defendants' unlawful termination of TPS for Ethiopia applies generally to the entire class, such that class-wide relief is appropriate.

## CAUSES OF ACTION

### COUNT ONE
### Administrative Procedure Act
### 5 U.S.C. § 706(2)(D)
### (All Plaintiffs Against All Defendants)
### [*Failure to Follow Procedures Required by Law*]

203.    Plaintiffs incorporate by reference the above allegations.

204.    The Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*, ensures that federal agencies are accountable to the public by providing a "right of review" to any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action."  5 U.S.C. § 702.  Judicial review is generally limited to "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.

205.    Defendant Noem's periodic review process and the Termination in which it culminated constitute "final agency action for which there is no other adequate remedy in a court,"

71

pursuant to 5 U.S.C. § 704, because the Defendants' Termination results in the TPS holders' loss of TPS "automatically and without further notice or right of appeal."[155]

206.    Under the APA, the Court shall hold unlawful and set aside an agency action, finding, or conclusion found to be "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

207.    The TPS statute requires the Secretary to "consul[t] with appropriate agencies of the Government", "review the conditions in the foreign state… for which a designation is in effect under this subsection," and "determine whether the conditions for designation" continue to be met. 8 U.S.C. § 1254a(b)(3)(A).

208.    Defendant Noem's Termination was procedurally improper in numerous ways, each of which constitutes a violation of the APA.

209.    Defendant Noem failed to consult with appropriate agencies as required by the periodic review procedures.  Defendant Noem additionally failed to review the conditions in Ethiopia as required by the periodic review procedures.

210.    Defendant Noem failed to base her Termination on "whether the conditions for designation" continue to be met and based it instead on a predetermined domestic policy of the Trump Administration to restrict access to TPS for non-white, non-European, African immigrants.

211.    Defendant Noem's Termination relied on "national interest" considerations divorced from the conditions inside Ethiopia, which is procedurally improper during a periodic review.

---

[155] 8 C.F.R. § 244.19.

212.   Defendant Noem's Termination of Ethiopia's designation based on ongoing armed conflict under 8 U.S.C. § 1254a(b)(1)(A) was procedurally improper because it was based on her consideration of "national interest" as a factor, in violation of the TPS statute.

213.   The specific national interest factors Defendant Noem considered (the rate of overstays by Ethiopians with B-1 and B-2 visas, for example) had no nexus to the continued temporary, *lawful* presence of more than five thousand Ethiopian nationals with TPS in the United States, as required under the statute.

214.   Plaintiffs will suffer irreparable injury resulting from the unlawful Termination.

215.   Defendants' Termination of Ethiopia's TPS designation must therefore be held unlawful, set aside, or otherwise vacated.

**COUNT TWO**
**Administrative Procedure Act**
**5 U.S.C. § 706(2)(A)**
**(All Plaintiffs Against All Defendants)**
**[*Departing from Prior Policy Sub Silentio*]**

216.   Plaintiffs incorporate by reference the above allegations.

217.   To engage in procedurally appropriate decision-making, an agency must "display awareness that it is changing position."[156]  Agencies "may not . . . depart from a prior policy sub silentio or simply disregard rules that are still on the books."[157]  And the APA requires a "more detailed justification . . . for disregarding facts and circumstances that underlay . . . the prior policy."[158]

---

[156] *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).
[157] *Id.*
[158] *Id.* at 516.

73

218. Defendants' Termination of the TPS designation for Ethiopia with only 60-days' notice was arbitrary, capricious, and contrary to law in violation of the APA because it was an unacknowledged and unreasoned departure from decades of decision-making practices and procedures.

219. Separately and independently, Defendants' Termination of the TPS designation for Ethiopia violated the APA because it was an unacknowledged and unreasoned departure from decades of decision-making practices and procedures in which domestic U.S. "national interest" divorced from consideration of objective and available evidence of relevant conditions in the designated country was not invoked as a basis for terminating a TPS designation.

220. Separately and independently, Defendants' Termination of the TPS designation for Ethiopia violated the APA because it was an unacknowledged and unreasoned departure from decades of decision-making practices and procedures in which the Secretary's country conditions consideration during periodic review included an assessment of intervening conditions since the most recent designation, redesignation, or extension.

221. Plaintiffs will suffer irreparable injury resulting from the unlawful departure from the prior policy.

222. Defendants' Termination of Ethiopia's TPS designation must therefore be held unlawful, set aside, or otherwise vacated.

## COUNT THREE
### Administrative Procedure Act
### 5 U.S.C. § 706(2)(A) & (C)
### (All Plaintiffs Against All Defendants)
### [*Arbitrary and Capricious, Abuse of Discretion, Contrary to Law*]

223. Plaintiffs incorporate by reference the above allegations.

224. Under the APA, the Court must hold unlawful and set aside an agency action, finding, or conclusion found to be "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A) & (C).

225. Defendants' Termination was arbitrary and capricious, not in accordance with the law, and in excess of statutory authority and limitations for the following reasons, each of which constitutes an independent violation of the APA:

a. Defendants did not consider objective, available evidence of relevant country conditions—including ongoing armed conflict and myriad extraordinary and temporary conditions, including severe drought and flooding, deadly outbreaks, significant internal population displacement, acute food insecurity, and barriers to accessing humanitarian aid;

b. Defendants failed to consult appropriate agencies in the course of their periodic review, including by disregarding relevant and available country conditions findings by the U.S. Department of State;

c. In the Termination of the armed-conflict-based designation, Defendants improperly disregarded and directly contradicted the Department's recent, explicit determination that conditions short of an official or full-blown civil war are still relevant for periodic review of an armed conflict designation under 8 U.S.C. § 1254a(b)(1)(A);

d. Defendants' Termination of the extraordinary and temporary conditions designation failed to address the specific conditions in Ethiopia that the Department had otherwise previously deemed relevant to its periodic review;

e. Defendants' Termination was infected by undue political influence;

75

f. Defendants' Termination was motivated by impermissible racial preferences rather than any rational justification; and

g. Defendants' Termination was predicated on the legally incorrect belief that TPS designations, including the designations of Ethiopia, are themselves illegal, and the belief that TPS holders are present in the United States illegally.

226. Plaintiffs will suffer irreparable injury resulting from the unlawful Termination.

227. Defendants' Termination of Ethiopia's TPS designation must therefore be held unlawful, set aside, or otherwise vacated.

## COUNT FOUR
### Administrative Procedure Act
### 5 U.S.C. § 706(2)(B)
### (All Plaintiffs Against All Defendants)
### [*Contrary to Constitutional Right, Power, Privilege, or Immunity*]

228. Plaintiffs incorporate by reference the above allegations.

229. Under the APA, the Court shall hold unlawful and set aside an agency action, finding, or conclusion found to be "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

230. Defendants' Termination was impermissibly motivated by racial and/or national origin animus against African and other non-white or non-European immigrants, and their pattern of TPS cancellations described herein cannot be explained other than by reference to race and/or national origin.

231. As such, Defendants' Termination violates Plaintiffs' rights to Equal Protection under the Fifth Amendment of the U.S. Constitution and was therefore an act "contrary to constitutional right." *Id.*

76

232.    Plaintiffs will suffer irreparable injury resulting from the unlawful Termination.

233.    Defendants' Termination of Ethiopia's TPS designation must therefore be held unlawful, set aside, or otherwise vacated.

**COUNT FIVE**
**Fifth Amendment**
**U.S. Constitution, Am. 5**
**(All Plaintiffs Against All Defendants)**
**[*Equal Protection Under the Law*]**

234.    Plaintiffs incorporate by reference the above allegations.

235.    The Fifth Amendment contains an implicit guarantee of equal protection that prohibits any official action that is motivated in part by a racially discriminatory intent or purpose.  Classifications based on race or national origin receive exacting scrutiny, and even facially neutral policies and practices will be held unconstitutional when they reflect a pattern unexplainable on grounds other than race or national origin.[159]

236.    Defendants' decision to terminate Ethiopia's TPS designation impermissibly and intentionally discriminates against Plaintiffs because of their race and/or national origin.

237.    Defendants' Termination was motivated by racial and/or national origin animus against African and other non-white or non-European immigrants, and their pattern of TPS cancellations described herein cannot be explained other than by reference to race and/or national origin.

238.    Plaintiffs will suffer irreparable injury resulting from the unlawful Termination.

---

[159] *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).

239.     Defendants' Termination of Ethiopia's TPS designation must therefore be held unlawful, set aside, or otherwise vacated.

**COUNT SIX**
**Administrative Procedure Act**
**5 U.S.C. § 706(2)(B)**
**(All Plaintiffs Against All Defendants)**
**[*Contrary to Constitutional Right, Power, Privilege, or Immunity*]**

240.     Plaintiffs incorporate by reference the above allegations.

241.     Under the APA, the Court shall hold unlawful and set aside an agency action, finding, or conclusion found to be "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

242.     Due process protections extend to "all 'persons' within the United States, including [non-citizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

243.     "Courts analyze procedural due process claims in two steps: first, courts 'ask whether there exists a liberty or property interest'; if so, courts 'ask whether the procedures followed by the [Government] were constitutionally sufficient.'" *D.V.D. v. U.S. Dep't of Homeland Sec.*, 821 F. Supp. 3d 102, 148 (D. Mass. 2026) (quoting *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011)) (Murphy, J.).

244.     TPS holders and applicants have significant liberty and property interests, protected by the Due Process Clause, in obtaining and maintaining TPS status and in the attendant benefits that come with that status.

245.     Specifically, TPS holders and applicants have liberty interests in the work authorization and removal protections that TPS status confers. *See, e.g.*, *Saget*, 375 F. Supp. 3d at 333 ("Protecting liberty interests such as those associated with TPS is vital to the proper functioning of the rule of law[.]"); *Destino v. FCI Berlin, Warden*, 2025 WL 4010424, at *11

(D.N.H. Dec. 24, 2025) (finding that plaintiff had "weighty" liberty interests in "working in the United States" and "living alongside his fiancée and infant child"); *Tenemasa-Lema v. Hyde*, 810 F. Supp. 3d 244, 258 (D. Mass. 2025) (The "disruption of established family ties further compounds [a plaintiff's] deprivation of liberty.") (Murphy, J.); *Bridges v. Wixon*, 326 U.S. 135, 155 (1945) (deportation "visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom"); *Ching v. Mayorkas*, 725 F.3d 1149, 1157 (9th Cir. 2013) ("The right to live with and not be separated from one's immediate family is 'a right that ranks high among the interests of the individual' and that cannot be taken away without procedural due process." (quoting *Landon v. Plasencia*, 459 U.S. 21, 34–35 (1982))).

246.    TPS holders and applicants also have property interests in the work authorization and removal protections that TPS status confers. *See, e.g.*, *Mansor v. USCIS*, 685 F. Supp. 3d 1000, 1013 (W.D. Wash. 2023) ("a prima facie eligible TPS applicant has a property interest in temporary employment authorization subject to due process protections"); *see also Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1122 (N.D. Cal. 2018); *Rodas v. Chertoff*, 399 F. Supp. 2d 697, 702 (E.D. Va. 2005).

247.    TPS holders and applicants also have protected interests in the related state benefits conferred through TPS status, such as driver's licenses. *See, e.g.*, *Bell v. Burson*, 402 U.S. 535, 539 (1971) (A driver's license is a protected interest that, once issued, cannot be revoked or suspended "without that procedural due process required by the Fourteenth Amendment." (citations omitted)); *Mackey v. Montrym*, 443 U.S. 1, 11 (1979) (A person's interest in continuing to hold a valid driver's license "is a substantial one."); *Belezos v. Bd. of Selectmen of Hingham*, 2019 WL 2870733, at *6 (D. Mass. July 3, 2019) ("In general, the 'Due Process Clause applies to the deprivation of a driver's license by the State.'" (quoting *Dixon v. Love*, 431 U.S. 105, 112

79

(1977))); *Raper v. Lucey*, 488 F.2d 748, 752 (1st Cir. 1973) ("freedom to make use of one's own property, here a motor vehicle, as a means of getting about from place to place, whether in pursuit of business or pleasure, is a 'liberty' which under the Fourteenth Amendment cannot be denied or curtailed by a state without due process of law" (citation omitted)).

248.    Once the government grants TPS to an individual, benefits such as protection from removal and employment authorization are mandatory. *See* 8 U.S.C. § 1254a(a)(1)(A)–(B) (providing that, once the Attorney General grants an individual TPS, the Attorney General "shall not remove the alien from the United States" and "shall authorize the alien to engage in employment in the United States"). The use of the compulsory term "shall" makes clear that the Attorney General has no discretion about providing removal and work authorization for those granted TPS. *Compare, e.g.*, *id.* (the Attorney General "*may* grant the alien temporary protected status" (emphasis added)).

249.    Similarly, once an individual applies for TPS and makes a prima facie showing of eligibility, the government must grant that person protection from removal and temporary employment authorization. *See* 8 U.S.C. § 1254a(a)(4)(A) ("In the case of an alien who can establish a prima facie case of eligibility . . . the Attorney General shall provide for the benefits of [protection from removal and work authorization]."); *see also Mansor*, 685 F. Supp. 3d at 1013–14.

250.    The Termination deprived Ethiopian TPS holders and applicants of liberty and property interests without constitutionally adequate safeguards.

251.    Congress included procedural safeguards in the TPS statute in order to protect the liberty and property interests of TPS holders and thus conform with the requirements of the Due Process Clause. *See, e.g.*, *Adame v. Holder*, 762 F.3d 667, 672 (7th Cir. 2014)

("[S]tatutorily required procedures assure compliance with constitutional due process requirements, and . . . a petitioner may have a legal claim when she can show statutory procedural shortfalls[.]") (citing *Portillo-Rendon v. Holder*, 662 F.3d 815, 817 (7th Cir. 2011)).

252.    Those procedures reflect the application of the "three-part balancing test articulated in *Mathews*[]," *D.V.D.*, 821 F. Supp. 3d at 148, namely "(1) 'the private interest that will be affected by the official action;' (2) 'the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;' and (3) 'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail,'" *Hernandez-Lara v. Lyons*, 10 F.4th 19, 28 (1st Cir. 2021) (quoting *Mathews v Eldridge*, 424 U.S. 319, 335 (1976)).

253.    For example, 8 U.S.C. § 1254a provides that TPS status may be terminated only "after consultation with appropriate agencies of the Government." 8 U.S.C. § 1254a(b)(3)(A)–(B).

254.    But prior to the Termination, the Secretary did not meaningfully consult with appropriate federal agencies, as otherwise required by the TPS statute. *See* 8 U.S.C. § 1254a(b)(3)(A); *supra* ¶¶ 64–65, 124–130.

255.    Similarly, the decision to terminate TPS designations must be based on a "review [of] the conditions in the foreign state," and the statute requires publication of the actual "basis for the determination" in the Federal Register. 8 U.S.C. § 1254a(b)(3)(A)–(B).

256.    But here, the Secretary's decision-making was predetermined, pretextual, and procedurally deficient. *See supra* ¶¶ 95–98, 112–173; *see also supra* ¶¶ 102–108.

257. Accordingly, Defendants' Termination violates Plaintiffs' liberty and property rights guaranteed by the Due Process Clause under the Fifth Amendment of the U.S. Constitution and was therefore an act "contrary to constitutional right." 5 U.S.C. § 706(2)(B).

258. Defendants' Termination of Ethiopia's TPS designation must therefore be held unlawful and set aside.

**COUNT SEVEN**
**Fifth Amendment**
**U.S. Constitution, Am. 5 (All Plaintiffs Against All Defendants)**
*[Due Process Clause]*

259. Plaintiffs incorporate by reference the above allegations.

260. The Due Process Clause of the Fifth Amendment to the U.S. Constitution provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

261. Plaintiffs have significant liberty and property interests, protected by the Due Process Clause, in a non-arbitrary decision as to the continuation of TPS for Ethiopia.

262. Defendants' termination of TPS arbitrarily deprives Plaintiffs of the process to which they are entitled, as shown by, for example, the Administration's departure from and apparent disregard of the process for termination of TPS set forth in 8 U.S.C. § 1254a.

263. Plaintiffs will suffer irreparable injury resulting from the termination of the TPS designations without due process of law.

264. Defendants' Termination of Ethiopia's TPS designation must therefore be held unlawful, set aside, or otherwise vacated.

**COUNT EIGHT**
**Administrative Procedure Act**
**5 U.S.C. § 706(2)(C)**
**(All Plaintiffs Against All Defendants)**
*[Agency Action in Excess of Statutory Authority]*

265.    As authorized by Federal Rule of Civil Procedure 8(d)(2)–(3), Plaintiffs plead in the alternative and incorporate the foregoing allegations to the extent they are consistent with the allegations that follow.

266.    Federal agencies are creatures of statute; they may act only in accordance with authority that Congress bestows. *See, e.g.*, *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022); *see also La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 357 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it.").

267.    The APA directs that a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions" issued "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

268.    The DHS Secretary's Termination of Ethiopia's TPS status was unlawful and must be set aside because it exceeded the Secretary's statutory authority. Congress expressly authorized one—and only one—executive official to terminate TPS designations: the Attorney General.

269.    Specifically, the TPS statute provides that a foreign-state designation "shall remain in effect until the effective date of the termination of the designation under paragraph (3)(B)." 8 U.S.C. § 1254a(b)(2)(B); *see also Nat'l TPS Alliance v. Noem*, 166 F.4th 739 762–63 & n.12 (9th Cir. 2026) (paragraph (3)(B) supplies the sole process for ending a TPS designation). And paragraph (3)(B) names who may act: "[i]f the *Attorney General* determines under subparagraph (A) that a foreign state . . . no longer continues to meet the conditions for designation . . . the *Attorney General* shall terminate the designation[.]" 8 U.S.C. § 1254a(b)(3)(B) (emphases added).

270. In 1991, the Department of Justice ("DOJ") and the former Immigration and Naturalization Service ("INS") adopted regulations governing TPS. *See* Temporary Protected Status, 56 Fed. Reg. 618 (Jan. 7, 1991) (codified at 8 C.F.R. part 244) ("This interim rule implements a new section, 244A of the Immigration and Nationality Act, established by section 302."). Those regulations delegated significant operational aspects of TPS to INS, including the authority to initially find individual aliens eligible and award protected status, *see id.* at 619 (codified as 8 C.F.R. § 244.2), and the authority to receive and process applications for protected status, *see id.* at 620 (codified as 8 C.F.R. §§ 244.6, 244.7).

271. The regulations, however, did not authorize any subordinate official to exercise the Attorney General's authority to designate or terminate foreign states pursuant to 8 U.S.C. § 1254a. On the contrary, they defined an eligible state to mean a "foreign country or part thereof as designated *by the Attorney General* pursuant to section 244A(b) of the Act." *See id.* at 619 (codified as 8 C.F.R. § 244.1) (emphasis added).

272. In practice, the Attorney General made all country designations, extensions, and terminations under the Act. *See, e.g.*, Extension of Designation of Somalia; Under Temporary Protected Status Program, 60 Fed. Reg. 39005 (July 31, 1995); Termination of Designation of Angola Under the Temporary Protected Status Program, 68 Fed. Reg. 3896 (Jan. 27, 2003).

273. In 2002, Congress passed the Homeland Security Act, which created DHS. Homeland Security Act of 2002, Pub L. No. 107-296, 116 Stat. 2135.

274. The Homeland Security Act charged the DHS Secretary "with the administration and enforcement of this chapter [*i.e.*, the INA] and all other laws relating to the immigration and naturalization of aliens *except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the* President, *Attorney General*, the Secretary of

84

State, the officers of the Department of State, or diplomatic or consular officers[.]" 8 U.S.C. § 1103 (emphases added).

275.    At the time, the termination of TPS status was a "power[]," "function[]," or "dut[y]" "conferred upon the . . . Attorney General," and so was expressly reserved to that office.

276.    The Act also created the Bureau of Citizenship and Immigration Services as a branch of DHS and "transferred from the Commissioner of Immigration and Naturalization to the Director of the Bureau of Citizenship and Immigration Services" specific functions of INS. *See* 6 U.S.C. § 271. Among the functions transferred were "all . . . adjudications performed by the Immigration and Naturalization Service immediately before" the effective date of the act. *Id.* § 271(b)(5).

277.    TPS terminations were not "performed by [INS] immediately before" the Homeland Security Act's "effective date," and so that function was not transferred to DHS by operation of 6 U.S.C. § 271.

278.    In addition, the Act required the President to submit an executive reorganization plan to Congress detailing "[t]he transfer of agencies, personnel, assets, and obligations to the Department" of Homeland Security. 6 U.S.C. § 542(a)(1).

279.    In accordance with that provision, the President issued an executive reorganization plan, which purported to "[t]ransfer the . . . functions of the Immigration and Naturalization Service"—including delegated functions "performed by" INS "immediately before" the transfer—to DHS. *See* 6 U.S.C. § 542 note. But the reorganization plan made no mention of TPS; nor did it address those powers expressly vested in the *Attorney General* under the INA. *See id.*

85

280.   DHS has pointed to 6 U.S.C. § 557 as a source of TPS authority. *See* 6 U.S.C. § 557 ("With respect to any function transferred by or under this chapter (including under a reorganization plan that becomes effective under section 542 of this title) and exercised on or after the effective date of this chapter, reference in any other Federal law to any department, commission, or agency or any officer or office the functions of which are so transferred shall be deemed to refer to the Secretary, other official, or component of the Department to which such function is so transferred.").

281.   But that provision does not independently transfer any authority.  It just simplified the process of amending the code by altering certain statutory "references" to "any function" that was actually "transferred by or under" the Homeland Security Act. *See* 6 U.S.C. § 557. TPS termination authority was not so "transferred."

282.   Beginning in spring 2003, and through to the present, the DHS Secretary began to issue foreign-state designations pursuant to the Attorney General's authority under 8 U.S.C. § 1254a. *See* Extension of the Designation of Honduras Under Temporary Protected Status Program, 68 Fed. Reg. 23744 (May 5, 2003).

283.   In the first TPS designation following the implementation of the Homeland Security Act of 2002, the DHS Secretary addressed "what authority . . . the Secretary of the Department of Homeland Security ha[s] to extend the designation of Honduras under the TPS program." *Id.* (capitalization altered). The DHS Secretary took the position that: "On March 1, 2003, the Immigration and Naturalization Service (INS) transferred from the Department of Justice to the Department of Homeland Security (DHS) pursuant to the Homeland Security Act of 2002, Public Law 107–296. The responsibilities for administering the TPS program were transferred to the Bureau of Citizenship and Immigration Services (BCIS)." *Id*. The DHS Secretary cited no

other source of authority for exercising the Attorney General's power to issue, extend, or terminate TPS designations.

284.     Because no statute authorizes the DHS Secretary to exercise TPS termination authority, the DHS Secretary exceeded her statutory authority by purporting to terminate Ethiopia's TPS status.

285.     The Termination constitutes "final agency action for which there is no other adequate remedy in a court," pursuant to 5 U.S.C. § 704, because the Defendants' Termination results in the TPS holders' loss of TPS automatically and without further notice or right of appeal.

286.     The Termination must be set aside because it was issued "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

287.     Declare that the Defendants' December 15, 2025 termination of TPS for Ethiopia was unlawful under the APA and unconstitutional under the Due Process Clause of the Fifth Amendment;

288.     Declare that the decision to provide only 60 days' notice before the termination of TPS for Ethiopia takes effect was unlawful under the APA;

289.     Set aside or otherwise vacate the termination of TPS for Ethiopia as beyond Defendants' authority and/or unlawful under the APA;

290.     Postpone or stay the termination of TPS for Ethiopia from taking effect or being put into effect;

291.     Enjoin and restrain all Defendants, and their officers, agents, servants, employees, attorneys, and all other persons who are in active concert or participation with any of them, from enforcing the termination of TPS for Ethiopia;

292. Order Defendants to take all steps necessary to ensure that the TPS designation for Ethiopia remains in full force and effect unless and until it lawfully expires or is lawfully terminated;

293. Award Plaintiffs' attorneys' fees and costs under 28 U.S.C. § 2412 and any other applicable statute or regulation; and

294. Award such other and further relief that the Court may deem just, equitable, and proper.

Dated: July 13, 2026          Respectfully Submitted,

/s/ *Joy Chen*
Joy Chen (BBO No. 714192)
COVINGTON & BURLING LLP
One International Place
Suite 1020
Boston, MA 02110-2627
(617) 603-8821
JChen@cov.com

/s/ *Paul Killebrew*
Mark H. Lynch (*pro hac vice*)
Stephen Petkis (*pro hac vice*)
Daniel G. Randolph (*pro hac vice* admission pending)
Paul Killebrew (*pro hac vice*)
Ayana M. Lindsey (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001
(202) 662-6000
MLynch@cov.com
SPetkis@cov.com
DRandolph@cov.com
PKillebrew@cov.com
ALindsey@cov.com

/s/ *Sarah Leadem*
Sarah Leadem (*pro hac vice*)
COVINGTON & BURLING LLP

88

Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
(415) 591-6000
SLeadem@cov.com

*/s/ Nargis Aslami*
Nargis Aslami (BBO No. 714848)
Melissa Keaney (*pro hac vice* admission pending)
Collin Poirot (*pro hac vice*)
Abbey Rutherford (*pro hac vice*)
MUSLIM ADVOCATES
1032 15th Street N.W. #362
Washington, D.C. 20005
(202) 897-2622
Nargis@muslimadvocates.org
Melissa@muslimadvocates.org
Collin@muslimadvocates.org
Abbey@muslimadvocates.org

*/s/ Erik Crew*
Erik Crew (*pro hac vice*)
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
(949) 603-7411
ecrew@haitianbridge.org

*Counsel for Plaintiffs African Communities Together, Samuel Doe, Stephen Doe, Abal Doe, and the Proposed Class*

89

## CERTIFICATE OF SERVICE

I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ *Paul Killebrew*
Paul Killebrew

90