UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

AFRICAN COMMUNITIES TOGETHER, et al.,

Plaintiffs,

v.

MARKWAYNE MULLIN, *in his official capacity as Secretary of Homeland Security*, et al.,

Defendants.

Case No. 26-cv-10278-BEM

**OPPOSITION TO
PLAINTIFFS' RENEWED EMERGENCY MOTION FOR ADMINISTRATIVE STAY
AND TO POSTPONE EFFECTIVE DATE OF AGENCY ACTION**

**INTRODUCTION**

Last month, the Supreme Court rejected challenges materially indistinguishable from Plaintiffs' challenges to the termination of two other countries' Temporary Protected Status ("TPS") terminations, reversing district courts that had postponed those terminations. *See Mullin v. Doe*, No. 25–1083, 2026 WL 1825840 (U.S. June 25, 2026). That decision came after the Supreme Court twice stayed other district court orders postponing the termination of another country's TPS designation. *See Noem v. Nat'l TPS Alliance*, 145 S. Ct. 2728, 2729 (2025); *Noem v. Nat'l TPS Alliance*, 146 S. Ct. 23, 24 (2025). And Plaintiffs now concede that the First Circuit should summarily reverse the Court's previous postponement order. *See* Plaintiffs-Appellees' Response, No. 26-1376, at 5 (July 21, 2026).

Plaintiffs invite the Court to try again, offering two (supposedly) new claims—an *ultra vires* claim and a procedural due process claim. *See* Doc. No. 71, ¶¶ 259-286. But Plaintiffs, scraping ever deeper into the proverbial barrel, have run out of the barely-colorable arguments

they advanced previously and are now openly flirting with the bounds of Rule 11. Their second-string claims have no prospect of succeeding where their first-round picks have already admittedly failed. The Court should deny Plaintiffs' Renewed Emergency Motion, Doc. No. 72.

The Court should also immediately dissolve the administrative stay entered last Friday. Doc. 82. The submission of this brief marks the end of the briefing schedule, and the Court has not scheduled a hearing on Plaintiffs' motion. With the submission of this brief, the Court is thus fully "equipped to rule," so its "obligation to apply the *Nken* factors is triggered." *United States v. Texas*, 144 S. Ct. 797, 799 (2024) (Barrett, J., concurring). That is, the Court may maintain interim relief only if it reaches a reasoned conclusion that the moving party is likely to succeed on the merits, and the other non-merits stay factors favor it. *Id.* at 799. Maintaining an administrative stay for more than a trivial period following the submission of this brief would be wholly unwarranted, and it would fly in the face of Congress's express bar on judicial review of TPS terminations and the Supreme Court's recent and resounding vindication of that bar and of the Secretary's decision-making in this area. The rule of law requires that the Court's rulings, including on interim relief, be ruled by law. Avoiding an assessment of the law by needlessly prolonging a merits-blind administrative stay does precisely the opposite.

Plaintiffs lack any prospect of success that could support continued interim relief. To start, Plaintiffs' procedural due process claim is not "new." It raises the same alleged process defects that Plaintiffs asserted previously and that the Supreme Court deemed categorically unreviewable. Plaintiffs now affix a constitutional label to those same regurgitated allegations, but that is a transparent attempt to evade Congress's limits on judicial review and the Supreme Court's holding effectuating that limitation, by the simple expedient of labeling. Additionally, Plaintiffs' *ultra vires* claim is non-statutory in nature, so it is plainly foreclosed by the judicial review bar. And it fails

2

on its own terms. It is premised on Plaintiffs' belief that the termination of Ethiopia's TPS designation was invalid because only the Attorney General—not the Secretary of Homeland Security—has authority over TPS determinations. But if that preposterous claim were true, it would only mean that Ethiopia was not lawfully designated for TPS in the first instance, since that designation was made by the Secretary of Homeland Security and is thus *ultra vires* if Plaintiffs were correct. Plaintiffs' apparent position that a purportedly *ultra vires* grant of TPS status by the Secretary of Homeland Security is inviolate but a subsequent termination by the same officer is unlawful is, charitably, simply unserious.

Plaintiffs' new claims are unreviewable and fail on their merits. Plaintiffs have failed to establish irreparable harm, and the balance of equities and public interest weigh against preliminary relief. The Government and the public share an interest in ensuring that the Secretary can carry out the responsibilities, assigned by Congress, to weigh the statutory factors governing TPS designations and make TPS determinations. And in this case, as the Secretary found, the conditions for Ethiopia's TPS designation are no longer met. Delay of the Secretary's determination threatens to undermine the United States' foreign policy and national interest, particularly where Congress has provided the Secretary with broad discretion to assess conditions in foreign countries and reach determinations regarding TPS.

For these reasons and those discussed below, Plaintiffs' Renewed Emergency Motion should be denied, and the Court should immediately dissolve the administrative stay. Should this Court fail to do so, Defendants reserve the right to seek swift appellate reversal of such defiance of binding Supreme Court authority.

**BACKGROUND**

I.    **Procedural Background**

Plaintiffs commenced this action on January 22, 2026, claiming that the termination of Ethiopia's TPS designation violated the Administrative Procedure Act ("APA") and their equal protection rights.  Doc. No. 1.  On April 8, 2026, this Court postponed the effective date of the termination under 5 U.S.C. § 705 after concluding that Plaintiffs were likely to succeed on their APA claims.  Doc. No. 56.

On April 9, 2026, Defendants appealed this Court's Order.  Doc. No. 57.  The Parties thereafter jointly moved to hold the appeal in abeyance pending the Supreme Court's forthcoming decisions in two similar cases challenging the termination of TPS designations for Syria and Haiti.

On June 25, 2026, the Supreme Court held that "the TPS statute's judicial-review bar applies to all non-constitutional claims," reserved ruling on whether the judicial-review bar applies to constitutional claims, and held that an equal-protection claim—analogous to the one asserted by Plaintiffs here—was not viable.  *Mullin*, 2026 WL 1825840, at *10–13.  On the heels of that decision, Plaintiffs filed an Amended Complaint to add "new" claims: (1) procedural due process claims under the Due Process Clause; and (2) an excess of authority claim under the APA or as a freestanding, non-statutory *ultra vires* claim.  Doc. No. 71, ¶¶ 259-286.  Plaintiffs simultaneously filed a Renewed Emergency Motion for Administrative Stay and to Postpone Effective Date of Agency Action based on these "new" claims.  Doc. No. 72.

On July 22, 2026, Plaintiffs filed another Emergency Motion for Administrative Stay, which Defendants opposed.  Doc. Nos. 78, 81. On July 24, 2026, this Court entered an administrative stay pending resolution of Plaintiffs' Renewed Emergency Motion for Administrative Stay and to Postpone Effective Date of Agency Action.  Doc. No. 82.  Plaintiffs'

motion for relief under § 705 is premised entirely on their procedural due process and *ultra vires* claims. *Id.*

## II.    Legal Background

### A.    The TPS Statute

The Immigration Act of 1990 established a program to create a means for providing temporary and discretionary protection in the United States for aliens from designated countries experiencing ongoing armed conflict, "extraordinary and temporary conditions" that temporarily prevent nationals of the country from safely returning, or an environmental disaster that temporarily renders the country unable to adequately handle the return of its nationals.  Pub. L. No. 101-649, 104 Stat. 4978 (1990).  The statute authorizes the Secretary,[1] "after consultation with appropriate agencies of the Government," to designate countries for TPS if the Secretary finds that certain conditions are met.  *See* 8 U.S.C. § 1254a(b)(1)(A); 8 U.S.C. § 1254a(b)(1)(C).  If the Secretary later determines that the foreign state "no longer continues to meet the conditions for designation," the Secretary "shall terminate the designation[.]" 8 U.S.C. § 1254a(b)(3)(B).  "There is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection."  8 U.S.C. § 1254a(b)(5)(A).

### B.    The Homeland Security Act

The Homeland Security Act of 2002, Pub. L. No. 107-296, § 1517, 116 Stat. 2135 (codified at 6 U.S.C. § 101 *et seq.*) (the "Act"), established the Department of Homeland Security ("DHS") and, among other things, charged it with certain functions that had previously been administered

---

[1] As discussed below, Congress transferred the Attorney General's TPS authority to the Secretary of Homeland Security. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, § 1517, 116 Stat. 2135, 2311 (2002) (codified at 6 U.S.C. § 557); 8 U.S.C. § 1103(a).

by the Attorney General.  Relevant here, the "administration and enforcement" of all laws "relating to the immigration and naturalization of aliens" was transferred to the Secretary of DHS, subject to limited exceptions for certain "powers, functions, and duties conferred upon the President, Attorney General, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers[.]"  8 U.S.C. § 1103(a)(1).

Rather than update all laws that previously vested these immigration functions with the Attorney General, the Act incorporated a reference provision which provided:

> With respect to any function transferred by or under this chapter…reference in any other Federal law to any department, commission, or agency or any officer or office the functions of which are so transferred shall be deemed to refer to the Secretary, other official, or component of the Department to which such function is so transferred.

6 U.S.C. § 557.

## LEGAL STANDARD

"The same standard that governs the issuance of a stay under § 705 is the standard that governs the issuance of a preliminary injunction." *California v. Kennedy*, No. 25-cv-12019-NMG, 2025 WL 2807729, at *3 (D. Mass. Oct. 1, 2025).  Accordingly, to obtain their requested relief, Plaintiffs "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest."  *Winter v. NRDC*, 555 U.S. 7, 20 (2008).  The moving party "bears the burden of satisfying each of these four elements," using evidence to support its contentions.  *Akebia Therapeutics, Inc. v. Azar*, 443 F. Supp. 3d 219, 225 (D. Mass. 2020).  But, even then, "[a] preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter*, 555 U.S. at 24.

**ARGUMENT**

**I.    Plaintiffs' *ultra vires* claim is unreviewable and not likely to succeed on the merits**

Plaintiffs claim that the Secretary's decision to terminate Ethiopia's TPS designation was *ultra vires* because, in their view, only the Attorney General has the authority to terminate a country's TPS designation. Doc. 73 at 13. This claim is unreviewable from the start because it is a non-constitutional claim, and the Supreme Court has held that "the TPS statute's judicial-review bar applies to *all* non-constitutional claims." *Mullin*, 2026 WL 1825840, at *10 (emphasis added). The Court cannot and should not proceed further.

Plaintiffs' sole contrary argument is that the judicial-review bar does not apply because § 1254a(b)(5)(A) refers only to the Attorney General. Doc. 73 at 10-11. But that gets *Doe* wrong: The Supreme Court squarely held that the statute barred judicial review of a TPS determination made by the Secretary of Homeland Security. *See Doe*, 2026 WL 1825840, at *4. Confining the review bar solely to decisions of the Attorney General is a non-starter in the wake of that decision.

Even if Plaintiffs' *ultra vires* claim were reviewable, it fails on the merits. To start, Plaintiffs are correct that when Congress created TPS in 1990, it "repeatedly and unambiguously made clear that the "Attorney General"—and only the "Attorney General"—possessed the authority to terminate a TPS designation. *See* Doc. 73 at 8 (citing 8 U.S.C. § 1254a(b)(3)(B), (d)(3)). Plaintiffs are also correct that, in the decade that followed, the Attorney General decided when to designate a country for TPS and when to extend or terminate a TPS designation. Doc. 73 at 8.

That changed after Congress created the Department of Homeland Security ("DHS") and reorganized responsibility for numerous Executive Branch immigration functions. A straightforward reading of the statutes, the Supreme Court's decision last month, every lower-court

7

decision for the past 24 years, and longstanding Executive Branch practice confirm that the Secretary of Homeland Security holds the statutory authority to designate countries for TPS and to extend or terminate those designations.

**Statutes.**   In 2002 Congress passed the Homeland Security Act which unambiguously transferred all immigration functions—including TPS-related functions—from the Attorney General to the DHS Secretary.  *See* 8 U.S.C. § 1103 (charging the Secretary of DHS "with the administration and enforcement" of all laws "relating to the immigration and naturalization of aliens," subject to limited exceptions for duties specifically conferred on the President, Attorney General, or other executives).  Section 1103(a) carves out functions conferred upon the Attorney General, but this same section specifies that these conferred—and thus reserved—functions pertain to those previously exercised by the Executive Office for Immigration Review (EOIR):  "The Attorney General shall have such authorities and functions under this chapter and all other laws relating to the immigration and naturalization of aliens as were exercised by [EOIR], or by the Attorney General with respect to [EOIR] . . ."  8 U.S.C. § 1103(g).  EOIR did not previously administer the TPS statute.  Therefore, the Attorney General did not retain such functions, which have been transferred to the Secretary.  If, as Plaintiffs contend, § 1103(a) reserved to the Attorney General *all* functions that the Attorney General previously exercised, then § 1103(g) would prove redundant: There would be no need to specify that the Attorney General continues to have the functions that the Attorney General previously exercised with respect to EOIR, because § 1103(a) would have already reserved those functions to the Attorney General.  And it is a cardinal rule of statutory construction that courts should "avoid" interpreting a statute in a way that would render "some words altogether redundant."  *Gustafson v. Alloyd Co.*, 513 U.S. 561, 574 (1995).

Congress did not change the TPS statute's text to refer to the Secretary of Homeland Security because it did not need to. Instead, it relied on a series of transfer and reference-updating provisions built into the Homeland Security Act to accomplish the shift in authority. While 8 U.S.C. § 1103 charged the Secretary with the "administration and enforcement" of the immigration laws, 6 U.S.C. § 557 operated to update all other federal laws with respect to functions that were transferred to the Secretary under the Act:

> With respect to any function transferred by or under this chapter…reference in any other Federal law to any department, commission, or agency or any officer or office the functions of which are so transferred shall be deemed to refer to the Secretary, other official, or component of the Department to which such function is so transferred.

*Id.* Because TPS administration was a function of the Attorney General that was transferred to DHS, Section 557 operates to update every reference to the Attorney General in 8 U.S.C. § 1254a to mean the Secretary of Homeland Security. *Id.* Since passage of the Homeland Security Act in 2002, and for more than two decades, the Secretary of Homeland Security has consistently exercised authority over the designation, extension, and termination of TPS for dozens of countries.

**Judicial Constructions.** Reflecting the statutes' clarity, every court discussing the issue for the last 24 years has recognized the transfer of TPS authority to the Secretary of Homeland Security. It is controlling that the Supreme Court has clearly stated that "[r]esponsibility for TPS decisions rests with the Secretary of Homeland Security." *Doe*, 2026 WL 1825840, at *4. This was no offhand or unreasoned statement. As support, the Supreme Court cited 6 U.S.C. §§ 552(d) and 557—making clear that it specifically considered and accepted the transfer of TPS authority from the Attorney General to the Secretary. *Id.* And throughout its decision, the Supreme Court

9

unequivocally interpreted the TPS statute as pertaining to the Secretary. That analysis controls this case.

Lower courts have universally adopted this construction, too. The Eleventh Circuit in *Mejia Rodriguez v. DHS*, 562 F.3d 1137 (11th Cir. 2009), recognized that although the TPS statute references the Attorney General, decision-making authorities were transferred to the Secretary of DHS by statute (citing 8 U.S.C. § 1103(a)). The district court in *Saget v. Trump*, 375 F. Supp. 3d 280, 297 (2019), likewise recognized 8 U.S.C. § 1103 and 6 U.S.C. § 557 as the basis for the transfer of TPS designation authority to the Secretary. More recently, in *CASA, Inc. v. Noem*, 792 F. Supp. 3d 576, 582 (2025), the District of Maryland explicitly described 6 U.S.C. § 557 as "conferring certain authorities granted by statute to the Attorney General, including those relating to TPS, to the Secretary of Homeland Security." The district courts in *National TPS Alliance v. Noem*, 773 F. Supp. 3d 807 (2025), *National TPS Alliance v. Noem*, 798 F. Supp. 3d 1108 (2025), and the Ninth Circuit in its 2025 and 2026 decisions in that same litigation, *National TPS Alliance v. Noem*, 150 F.4th 1000 (2025), *National TPS Alliance v. Noem*, 166 F.4th 739 (2026), all proceeded on the premise that the Secretary of Homeland Security exercises the authority granted by 8 U.S.C. § 1254a. Plaintiffs have not cited a single decision in which a court has concluded the Secretary of Homeland Security lacked the authority to designate a country for TPS or terminate a country's TPS designation.

**Executive Branch Constructions.** Moreover, the consistent, unbroken practice of DHS exercising TPS authority—including designating, extending, and terminating TPS for dozens of countries over more than two decades—constitutes a contemporaneous and long-standing administrative construction of the transfer that courts have universally accepted. *See, e.g.*, *Loper Bright Ent. v. Raimondo*, 603 U.S. 369, 386 (2024) (recognizing that "the longstanding practice of

the government—like any other interpretive aid—can inform a court's determination of what the law is" (alterations accepted; internal quotation marks omitted)); *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014); *see W. Va. v. Env't Prot. Agency*, 597 U.S. 697, 747 (2022) (Gorsuch, J., concurring) ("A 'contemporaneous' and long-held Executive Branch interpretation of a statute is entitled to some weight.").

Finally, as a practical matter, Plaintiffs' theory is self-defeating. Even if this Court were to accept it, that would only mean that the Secretary lacked authority to *designate* Ethiopia for TPS in the first instance. Plaintiffs do not contend otherwise and offer no theory to distinguish the authority to terminate from the authority to designate. Both provisions of the TPS statute refer to the "Attorney General." 8 U.S.C. § 1254a(b)(1), (b)(3)(B). If the Court were to find that the Secretary lacks authority over TPS determinations—such that the termination of Ethiopia's TPS designation lacks effect—it would likewise mean that Ethiopia's initial TPS designation (and subsequent extensions) lacked legal effect as well. Plaintiffs' success on the law would strip them of the very protections they seek to maintain, making this claim self-refuting. Indeed, it is a striking tell of how profoundly unmeritorious Plaintiffs' claims have become: even *accepting* their arguments would compel a conclusion that they are not entitled to relief here.

Plaintiffs attempt to address this reality in four makeweight sentences jammed into a footnote. Doc. 73 at 10 n.8. All acknowledge that success on this theory would doom the validity of Ethiopia's TPS designation. Each is merely an attempt to squeeze a little more time out of what would be, in their theory, a TPS designation that has violated the law since day one. The first is an unattractive appeal to remedial hyper-formalism. The second misreads *Regents*, as the passage at issue rested on the conclusion that the program in question was *not* wholly unlawful ab initio— but no similar escape hatch would be unavailable if Plaintiffs' theory were to succeed. *See DHS*

11

*v. Regents*, 591 U.S. 1, 28-29 (2020) (criticizing decisionmaker's reasoning which "treated the Attorney General's conclusion regarding the illegality of benefits as sufficient to rescind both benefits and forbearance, without explanation"). And the third is a mystifying reference to "mutually explicit understandings" creating "vested due process interests." To the extent Plaintiffs mean by this to assert a substantive due process right to maintaining a TPS designation that they argue has been *ultra vires* from the start, nothing in the Nation's history or tradition could begin to support that argument. *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). And to the extent they instead mean to argue that they have a procedural due process claim, that argument fails for the reasons explained below.

## II.    Plaintiffs' due process claim is unreviewable and unlikely to succeed on the merits.

Plaintiffs allege that they have protected liberty and property interests "in their TPS status and its attendant benefits, which include removal protection and work authorization." Doc. No. 73 at 21. To safeguard their liberty and property interests, Plaintiffs submit that a TPS designation may only be terminated after "consultation with appropriate agencies of the Government" and a "review" of the "conditions in the foreign state." Doc. No. 73 at 24 (citing 8 U.S.C. § 1254a(b)(3)(A)). But Plaintiffs claim that the Secretary "flouted these procedural safeguards" by "fail[ing] to consult with appropriate agencies before terminating Ethiopia's TPS designation" and failing to provide "notice of the actual basis for the determination." Doc. No. 73 at 25. In Plaintiffs' view, there was a "plain disconnect between the decision to terminate Ethiopia's TPS designation and the explanation provided," causing Plaintiffs to conclude that the termination was "preordained" and "pretextual." Doc. No. 73 at p. 25. Plaintiffs' due process claim fails for four reasons.

12

*First*, and most fundamentally, § 1254a(b)(5)(A) bars review of this claim.  That provision bars "judicial review" of decisions to terminate TPS, without distinguishing between statutory and constitutional claims any more than it distinguishes between procedural and substantive claims.

The Supreme Court reserved the question whether the judicial review bar applies to constitutional claims.  But this Court should now hold that it applies to constitutional claims too— particularly as its text makes no such constitutional-versus-non-constitutional distinction.  But even if some constitutional claims could theoretically proceed despite the blanket prohibition on "judicial review" of TPS termination decisions, it is particularly clear that Plaintiffs' "due process" claim is barred because it is a straightforward retread of the same claims the Supreme Court already held were covered by the judicial-review bar.

The plaintiffs in *Doe*—like Plaintiffs here—sought to challenge a TPS termination "based on alleged procedural errors," including that the Secretary did not adequately consult with appropriate federal agencies and that the Secretary's decision was pretextual, preordained, and politically motivated.  *Doe*, 2026 WL 1825840, at *8; *see also* Doc. No. 71, ¶¶ 208-211.  The Supreme Court, however, held that the judicial-review bar applied to precisely those claims.  *Id.* at *8–9.  And, in so doing, it took care to emphasize the "importan[ce]" of "ensur[ing] that challengers cannot avoid a judicial-review bar by creative pleading or clever lawyering," such as labeling as "procedural" claims that are really substantive in nature.  *Id.* at *10.  Our "Constitution deals with substance, not shadows[.]"  *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Colleg*e, 600 U.S. 181, 230 (2023).

Plaintiffs illustrate the foresight of that discussion in *Doe*, attempting to circumvent the Supreme Court's endorsement of the judicial-review bar by admittedly seeking to challenge the *same* alleged procedural violations under a constitutional label.  The Court should look beyond the

13

mere "constitutional" label and recognize this claim for what it clearly is: a challenge based on the Secretary's purported failure to adhere to *statutory* requirements. *See Jimenez-Nieves v. United States*, 682 F.2d 1, 6 (1st Cir. 1982) (Breyer, J.) ("In examining a complaint we are bound to look beyond the literal meaning of the language used to ascertain the real cause of the complaint."). "Any other result would elevate form over substance and allow parties to evade" the TPS judicial-review bar "by relabeling their" statutory claims as constitutional ones. *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211 (1985).

It would be extraordinary if Plaintiffs could—like the flip of a switch—so easily and completely sidestep § 1254a(b)(5)(A) by restyling the same *previously unreviewable* procedural disputes as constitutional ones. Under Plaintiffs' theory, the Secretary's alleged failure to meaningfully consult with appropriate agencies was unreviewable before—but has become reviewable now—merely because they have repackaged this alleged statutory violation into a putative constitutional one. If that were how things worked, what is the significance of the Supreme Court's conclusion that the judicial review bar applies to claims based on alleged procedural errors? *All of the claims* that *Doe* took off the table could be reasserted as procedural due process claims. Indeed, that is precisely what Plaintiffs' amendments to their complaint seek to accomplish. *See* Doc. No. 71, ¶ 254 (seeking to vacate the termination because "the Secretary did not meaningfully consult with appropriate federal agencies"); *id.*, ¶ 265 (seeking to vacate the termination because "the Secretary's decision-making was predetermined, pretextual, and procedurally deficient").

*Second*, the procedural due process constraints that Plaintiffs seek to invoke do not apply to the government's determinations to designate, extend, or terminate a TPS designation. *See, e.g., Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915) ("Where a rule of

14

conduct applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption."); *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 245-46 (1973) (distinguishing, for due process purposes, between agency decisions that "adjudicate disputed facts in particular cases" and those that involve "the formulation of a basically legislative-type judgment, for prospective application only"). These constraints instead come into play when the government "adjudicate[es]" an individual's "rights or liabilities." *Harper v. Werfel*, 118 F.4th 100, 115 (1st Cir. 2024); *see Trager v. Peabody Redevelopment Auth.*, 367 F. Supp. 1000, 1002 (D. Mass. 1973) ("The procedural due process requirements of notice and hearing attach themselves wherever there is need for an adjudicative hearing."). They do not, by contrast, apply where—as here—the government "weigh[s] general information and ideas affecting relatively large numbers of people . . . whose rights are affected as part of" the government's execution of "an overall [legislative] scheme." *Id.* at 1002. Plaintiffs' procedural due process claim is predicated on the "three-part balancing test articulated" in *Mathews v. Eldridge*, 424 U.S. 319 (1976). Doc. No. 73 at 21. But *Mathews* is entirely the wrong framework, as it applies to "individual adjudications." *Garcia-Rubiera v. Fortuno*, 665 F.3d 261, 272 (1st Cir. 2011). Plaintiffs have no prospect of succeeding on a challenge based on *Mathews* to the termination of Ethiopia's TPS designation.

*Third*, Plaintiffs' allegations turn exclusively on statutory procedural requirements and thus fail to state a due process claim on their own terms. Plaintiffs claim that Ethiopia's TPS designation was terminated without due process of law based solely on their allegations that the Secretary failed to follow certain "procedural safeguards in *the TPS statute*." *See* Doc. No. 73 at 23 (emphasis added). But, as "[t]he First Circuit has . . . confirmed," "not every statutory violation has a 'constitutional dimension' or is '[ ]tethered to the abridgment of constitutional rights.'" *United States v. Sabean*, 2016 WL 5721135, at *7 (D. Me. Oct. 3, 2016) (citing *United States v.*

15

*Adams*, 740 F.3d 40, 43 (1st Cir. 2014)); *see Arguello v. Noem*, No. 2:25-cv-00786-RJS, 2025 WL 2896849, at *6 (D. Utah Oct. 9, 2025) ("a statutory violation does not necessarily amount to a constitutional procedural due process violation").

The two cases that Plaintiffs cite on this issue helpfully illustrate the point. *See* Doc. No. 73 at 23. In *Portillo-Rendon v. Holder*, 662 F.3d 815 (7th Cir. 2011) (Easterbrook, J.), the Seventh Circuit took pains to distinguish between alleged due process violations and alleged statutory or regulatory violations: "it is appropriate to consider the Constitution only if the statute and regulations are deficient." *Id.* at 817. The court explained that if an agency failed to provide the "process required by the statute," the court could "provide relief on statutory grounds." *Id.* And it cautioned that "intoning 'due process'" would not "cover" the same ground as the procedural protections afforded by statutes and regulations. *Id.* Subsequently, in *Adame v. Holder*, 762 F.3d 667 (7th Cir. 2014), the Seventh Circuit cited *Portillo-Rendon* and included a parenthetical explanation stating that "a petitioner may have a legal claim when she can show statutory procedural shortfalls." *Id.* at 672. The point being that an agency's failure to abide by statutory procedures may give rise to a *statutory* claim—not a constitutional one.

In short, a failure to abide by statutory *procedural* requirements would only amount to a due process violation if those requirements encompassed or were coextensive with the demands of the Due Process Clause itself. And Plaintiffs' due process claim does not allege or even suggest that the Due Process Clause itself—independent of the TPS statute—would require the Secretary to consult with appropriate agencies or publish the basis for her determination in the Federal Register before terminating a country's TPS designation. Accordingly, Plaintiffs' due process claim fails on its merits.

16

*Last*, to assert a procedural due process claim, Plaintiffs must "first" show that "there exists a liberty or property interest" to which they have "a legitimate claim of entitlement." *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989); *see Olim v. Wakinekona*, 461 U.S. 238, 250 (1983) ("Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement."). Where a statute creates a benefit, the plaintiff must "have more than a unilateral expectation of it." *The Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). "[A] benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005). Accordingly, a statute may give rise to a legitimate claim of entitlement only where it places "substantive limitations" on the government's exercise of discretion, *Wakinekona*, 461 U.S. at 249, and "mandat[es] the outcome to be reached upon a finding that the relevant criteria have been met," *Thompson*, 490 U.S. at 462.

Plaintiffs have no legitimate claim of entitlement to Ethiopia's TPS designation being extended. The TPS statute provides in relevant part that—in deciding whether to extend or terminate a designation—the Secretary "shall determine whether the conditions for such designation under this subsection continue to be met." 8 U.S.C. § 1254a(b)(3)(A). It does not, however, impose any "substantive limitations" on the Secretary in determining whether these conditions continue to be met. *Wakinekona*, 461 U.S. at 249. And while the statute mandates *termination* in specified circumstances, it does not mandate *extending* a country's TPS designation upon a finding that certain criteria have been met. In other words, it does not channel agency direction by providing that, if certain "substantive predicates are present, a particular outcome must follow." *Thompson*, 490 U.S. at 463 (citing *Hewitt v. Helms*, 459 U.S. 460, 472 (1983)).

17

And insofar as Plaintiffs claim a constitutional entitlement to have the Secretary follow the TPS statute's procedural provisions before terminating a TPS designation, that "would be an entitlement to nothing but procedure," which the Supreme Court has deemed "inadequate" to form the basis of a protected interest under the Due Process Clause. *Town of Castle Rock*, 545 U.S. at 764.

*Last*, for the reasons already explained in Defendants' opposition to Plaintiffs' first motion for a stay based on these alleged procedural faults, Plaintiffs' underlying claims of procedural irregularities all fall flat. Doc. No. 46. The termination complied with the statute and the APA; plaintiffs due-process framing just superadds problems on a foundation that was already baseless.

## III.    The non-merits considerations governing stay motions favor Defendants.

Plaintiffs have also failed to show that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. Plaintiffs assert that without TPS they would lose immigration status and potentially be subject to deportation. Doc. No. 73 at 26. But any harms flowing from the loss of temporary protection from removal and its associated benefits inhere in the statutory scheme that Congress designed. Under the TPS statute, TPS recipients receive *temporary* protection from removal. *See* 8 U.S.C. § 1254a(b)(1)(B)(i) ("substantial, but temporary"), (b)(1)(B)(ii) ("unable, temporarily"), (b)(1)(C) ("extraordinary and temporary"), (g) ("remain in the United States temporarily"). The statute does not allow for indefinite protection. Because the loss of temporary benefits flows from the statute itself, Plaintiffs cannot show that their alleged harms "directly result from the action which [they] seek[] to enjoin." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

In any event, "removal alone," let alone the mere possibility of future removal after removal proceedings have been completed, "cannot constitute the requisite irreparable injury" to

18

justify a stay. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs argue that their removal to Ethiopia or unnamed other countries "will" result in "deadly danger." Doc. No. 73 at 26. But that speculative prediction does not establish a clear likelihood that such harm will occur. And the severity of an alleged harm does not speak to its likelihood of occurring. Moreover, in the former Secretary's unreviewable judgment, the number of Ethiopian nationals that have requested advanced parole documents for travel back to Ethiopia evidences their ability to safely return. 90 Fed. Reg. at 58,030. Plaintiffs clearly disagree, but in matters involving such foreign policy judgments, the Court should defer to the Executive Branch. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010) ("when it comes to collecting evidence and drawing factual inferences in this area, the lack of competence on the part of the courts is marked, and respect for the Government's conclusions is appropriate" (quotation marks and citation omitted)).

Moreover, the Supreme Court has already concluded, twice, that the government suffers irreparable harm from erroneous stays of TPS terminations. *See Noem v. Nat'l TPS Alliance*, 145 S. Ct. 2728 (2025); *Noem v. Nat'l TPS Alliance*, 146 S. Ct. 23, 24 (2025). The harm to the government and the public interest is particularly acute and concrete here because the then-serving Secretary of Homeland Security determined Ethiopia's TPS designation "is contrary to the national interest" for several reasons. *Termination of the Designation of Ethiopia for Temporary Protected Status*, 90 Fed. Reg. 58,028 (Dec. 15, 2025). The Secretary found that enforcement of immigration laws is "critically important to the national security and public safety of the United States" and that, according to the Fiscal Year 2025 Department of Homeland Security Entry/Exit Overstay Report, Ethiopia had a B-1/B-2 visa overstay rate of 8.27% and an F, M, and J visa overstay rate of 13.95%--over 250% higher and 330% higher, respectively, than the average visa overstay rates

19

of all countries. *Id.* at 58,031. The Secretary found that these overstay rates pose a direct challenge to the national interest by eroding immigration laws. *Id.*

There is no public interest in further perpetuating this stay where Plaintiffs' claims lack merit.

## CONCLUSION

For the reasons described above, Plaintiffs' Renewed Motion for Administrative Stay and Stay of Effective Date of Agency Action should be denied.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

Dated: July 27, 2026          By:    */s/ Nicole M. O'Connor*
NICOLE M. O'CONNOR
Assistant United States Attorney
U.S. Attorney's Office
1 Courthouse Way, Ste. 9200
Boston, MA 02210
(617) 748-3112
nicole.o'connor@usdoj.gov

## CERTIFICATE OF SERVICE

I, Nicole M. O'Connor, Assistant U.S. Attorney, certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Nicole M. O'Connor*
NICOLE M. O'CONNOR
Dated: July 27, 2026          Assistant U.S. Attorney