UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

AFRICAN COMMUNITIES TOGETHER, et al.,

Plaintiffs,

v.

MARKWAYNE MULLIN, *in his official capacity as Secretary of Homeland Security*, et al.,

Defendants.

Case No. 26-cv-10278-BEM

**(LEAVE TO FILE GRANTED JULY 29, 2026)**

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

### I.   INTRODUCTION

Defendants respectfully move to dismiss Plaintiffs' amended complaint, which asserts eight claims asking the Court to review and set aside the Secretary of Homeland Security's termination of Ethiopia's Temporary Protected Status ("TPS") designation. *See* Doc. No. 71.  The amended complaint should be dismissed because (1) 8 U.S.C. § 1254a(b)(5)(A) prohibits judicial review of Plaintiffs' claims regarding a TPS termination; (2) 8 U.S.C. § 1252(f)(1) independently precludes courts from enjoining or restraining the operation of the TPS statute; and (3) Plaintiffs' allegations fail to state a plausible claim under either the Administrative Procedure Act (APA) or the Constitution.  The Court should therefore dismiss the amended complaint for lack of jurisdiction or, alternatively, for failure to state a claim.

### II.   BACKGROUND

#### A.   Ethiopia's TPS Designation.

The Secretary of Homeland Security is authorized to designate a foreign country for TPS if the Secretary finds that "there is an ongoing armed conflict within the state and, due to such

conflict, requiring the return of aliens who are nationals of that state to that state . . . would pose a serious threat to their personal safety," 8 U.S.C. § 1254a(b)(1)(A), or if the Secretary finds that there are "extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States."  8 U.S.C. § 1254a(b)(1)(C).

Initial TPS designations are discretionary and must be periodically reviewed to determine whether the conditions underlying a country's TPS designation continue to be met.  8 U.S.C. § 1254a(b)(2), (b)(3)(A).  The Secretary must "consult[] with appropriate agencies," and, if he determines that a country's TPS designation is no longer justified, must "terminate the designation by publishing notice in the Federal Register of th[at] determination."  8 U.S.C. § 1254a(b)(3)(A), (B).  The notice must explain the "basis for the determination." *Id.*

Ethiopia was initially designated for TPS on December 12, 2022, on the dual bases of ongoing armed conflict and extraordinary and temporary conditions in Ethiopia that prevented nationals of Ethiopia from safely returning.  *Designation of Ethiopia for [TPS]*, 87 Fed. Reg. 76,074 (Dec. 12, 2022).  Following the initial designation, Ethiopia's TPS was extended and re-designated on April 15, 2024, for an additional eighteen months, expiring on December 12, 2025. *Extension and Redesignation of Ethiopia for [TPS]*, 89 Fed. Reg. 26,172 (Apr. 15, 2024).  On December 15, 2025, then-Secretary Noem announced that Ethiopia's TPS designation would be terminated on February 13, 2026.  *Termination of the Designation of Ethiopia for [TPS]*, 90 Fed. Reg. 58,028 (Dec. 15, 2025).

The Secretary determined that "the situation in Ethiopia no longer meets the criteria for an ongoing armed conflict that poses a serious threat to the personal safety of returning Ethiopian

2

nationals" for several reasons. *Id.* at 58,029. *First*, the conflict in the Tigray and Oromia regions that led to the initial TPS designation resolved when both parties signed a "Cessation of Hostilities" agreement in November 2022. *Second*, although there was increased conflict into early 2024, a peace agreement was reached and "political violence has been decreasing in the region." *Id.* *Lastly*, an April 2025 Armed Conflict Location & Event Data Project report observed a decrease in clashes and "signs of improvements in the country." *Id.* The Secretary underscored that in September 2025 the Ministry of Finance released a "record-breaking national budget of $33.7 billion for their fiscal year that focuses heavily on Ethiopia's infrastructure and human development needs." *Id.* The Secretary noted that while "some sporadic and episodic violence" remains, considering these recent improvements, "the situation no longer meets the criteria for an ongoing armed conflict that poses a serious threat to the personal safety of returning Ethiopian nationals." *Id.* at 58,030.

Additionally, the Secretary determined that a "review of the extraordinary and temporary conditions that gave rise to past designations such as internal displacement, food insecurity, and disease outbreaks" are "showing signs of improvement" which would "allow aliens to safely return to the country and live in the regions not affected by the conflict." *Id*. The Secretary observed that 3.3 million internally displaced people have returned to their area of origin as of June 2024. *Id.* Moreover, as of July 2025, Ethiopia has enhanced access to food and basic social services via the Joint Emergency Operation Program. 90 Fed. Reg. at 58,030. In August 2025, Ethiopia successfully completed its 2025 nationwide integrated measles campaign. *Id.* This involved routine vaccination of more than 300,000 children, among other health services. *Id.* Based on these developments, the Secretary determined that Ethiopia is "not experiencing extraordinary and

temporary conditions to the same extent as when the country was designated for [TPS], and these conditions no longer hinder the safe return of aliens to Ethiopia." *Id.*

The Secretary also underscored that enforcement of the immigration laws is "critically important to the national security and public safety of the United States", and that, according to the Fiscal Year 2025 Department of Homeland Security Entry/Exit Overstay Report, Ethiopia had a B-1/B-2 visa overstay rate of 8.27% and an F, M, and J visa overstay rate of 13.95%—over 250% higher and over 330% higher, respectively, than the average visa overstay rates of all countries. *Id.* at 58,031. According to the Secretary, these overstay rates pose a direct challenge to the national interest by eroding immigration laws and overburdening immigration enforcement. *Id.*

### B.    This Litigation.

On January 22, 2026, a nonprofit interest organization called African Communities Together and three Ethiopian TPS holders filed this putative class action against the Secretary, DHS, USCIS, and the United States. Doc. No. 1. Plaintiffs sought judicial review and relief under the APA, claiming that the Secretary's termination of Ethiopia's TPS designation was arbitrary and capricious and not in accordance with law. *Id.* at pp. 71-76.

Plaintiffs asserted that the Secretary's termination was procedurally improper because she failed to consult with appropriate agencies, gave pretextual reasons for the termination (when she had already "predetermined" to end TPS protections), and impermissibly considered the U.S. national interest in making her determination. *Id.* at p. 72. They also claimed that the Secretary unreasonably departed from past practice by giving TPS holders only 60 days' notice of the termination and, again, by considering the domestic "national interest" in making her decision. *Id.* at p. 63. And they claimed that the Secretary purportedly disregarded certain "available [and] objective evidence" that prior administrations found "relevant." *Id.* at pp. 74-75. Plaintiffs also

claimed that the Secretary's termination determination was motivated by racial animus and therefore violated the equal-protection component of the Due Process Clause of the Fifth Amendment. *Id.* at pp. 76-77.

On April 8, 2026, this Court postponed the effective date of the termination under 5 U.S.C. § 705 after concluding that Plaintiffs were likely to succeed on their APA claims. Doc. No. 56. On April 9, 2026, Defendants appealed this Court's Order. Doc. No. 57. The Parties thereafter jointly moved to hold the appeal in abeyance pending the Supreme Court's forthcoming decisions in two similar cases challenging the termination of TPS designations for Syria and Haiti.

On June 25, 2026, the Supreme Court held that "the TPS statute's judicial-review bar applies to all non-constitutional claims," reserved ruling on whether the judicial-review-bar applies to constitutional claims, and held that an equal-protection claim—analogous to the one asserted by Plaintiffs here—was not viable. *Mullin v. Doe*, No. 25-1083, 2026 WL 1825840, *10-13 (U.S. June 25, 2026). On the heels of that decision, Plaintiffs filed the instant amended complaint, re-asserting five claims from their original complaint and adding "new" ones: (1) two claims premised on purported procedural due process violations (Counts Six and Seven); and (2) an excess of authority claim under the APA or as a free standing, non-statutory *ultra vires* claim (Count Eight). Doc. No. 71, ¶¶ 259-286. Plaintiffs simultaneously filed a Renewed Emergency Motion for Administrative Stay and to Postpone Effective Date of Agency Action based on these "new" claims. Doc. No. 72. Plaintiffs' motion for relief under § 705 is premised entirely on their procedural due process and *ultra vires* claims. *Id.*

On July 22, 2026, Plaintiffs filed another Emergency Motion for Administrative Stay. Doc. No. 78. On July 24, 2026, this Court entered an administrative stay pending resolution of

Plaintiffs' Renewed Emergency Motion for Administrative Stay and to Postpone Effective Date of Agency Action.  Doc. No. 82.

## III.   STANDARD

A court should dismiss claims under Rule 12(b)(1) when it lacks jurisdiction to decide them.  That includes where, as here, § 1254a(b)(5)(A) applies.  *See Ramos v. Wolf*, 975 F.3d 872, 888 (9th Cir. 2020) (treating § 1254a(b)(5)(A) as a "jurisdictional statute"), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023).  "When a district court considers a Rule 12(b)(1) motion, it must credit the plaintiff's well-pled factual allegations and draw all reasonable inferences in the plaintiff's favor."  *Merlonghi v. United States*, 620 F.3d 50, 54 (1st Cir. 2010). "A plaintiff, however, may not rest merely on unsupported conclusions or interpretations of law." *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995) (citation omitted).  "[T]he party invoking the jurisdiction of a federal court carries the burden of proving its existence."  *Taber Partners, I v. Merit Builders, Inc.*, 987 F.2d 57, 60 (1st Cir. 1993).

In addition, a court should dismiss claims under Rule 12(b)(6) when the underlying allegations fail "to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A court should thus dismiss a claim "if the complaint does not set forth 'factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory.'"  *United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 384 (1st Cir. 2011) (quoting *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008)).  In making this determination, the court should disregard legal conclusions but must treat "[n]on-conclusory factual allegations" as true. *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011).

6

Ordinarily, the dispositive question in an APA case concerns "not whether the facts set forth in a complaint state a plausible claim but, rather, whether the administrative record sufficiently supports the agency's decision." *Atieh v. Riordan*, 727 F.3d 73, 76 (1st Cir. 2013). "This does not mean, however, that Rule 12(b)(6) can never be in play in an APA [case]." *Id.* at 76 n.4. As the First Circuit has explained, "[s]uch a motion may be appropriate in certain circumstances," including where, as here, "the agency claims that the underlying premise of the complaint is legally flawed (rather than factually unsupported)." *Id.*

## IV.    ARGUMENT

### A.    Section 1254a(b)(5)(A) prohibits judicial review of Plaintiffs' claims.

The TPS statute unambiguously provides that "[t]here is no judicial review of *any* determination of the [Secretary] with respect to the designation, *or termination* or extension of a designation, of a foreign state" for TPS. 8 U.S.C. § 1254a(b)(5)(A) (emphasis added). The statute clearly commits TPS termination determinations to the Secretary's unreviewable authority and precludes courts from hearing lawsuits challenging the legality of those determinations. Plaintiffs' lawsuit seeks to challenge—indeed, set aside or vacate—the Secretary's determination to terminate Ethiopia's TPS. The Court should therefore dismiss this case based on a straightforward application of § 1254a(b)(5)(A).[1]

The plain meaning of the statute's terms confirms its broad sweep. The modifier "any"— in the phrase "any determination"—sweeps broadly and encompasses determinations "of

---

[1] In all events, to sue a federal agency and its officials, a plaintiff must identify an express waiver of sovereign immunity and show that its claim falls within the waiver's scope. *See FAA v. Cooper*, 566 U.S. 284, 290 (2012). Although the APA contains a limited waiver of sovereign immunity for claims seeking non-monetary relief, it does not affect "other limitations on judicial review," and does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought. 5 U.S.C. § 702. Moreover, the APA does not permit challenges to "agency action" that "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Here,

'whatever kind.'" *Patel v. Garland*, 596 U.S. 328, 338 (2022).  The term "respecting" likewise "has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject."  *Doe*, 146 S. Ct. at 2133 (citing *Patel*, 596 U.S. at 339).  Indeed, the Supreme Court has held similar jurisdiction-stripping language in the INA was expansive enough to preclude judicial review of factual findings.  *Patel*, 596 U.S. at 337-40 (statute barring review of "any judgment regarding the granting of relief/" covers "any authoritative decision" on the matter).  Accordingly, all of Plaintiffs claims are barred by 8 U.S.C. § 1254a(b)(5)(A).

At minimum, and as recently held by the Supreme Court, 8 U.S.C. § 1254a(b)(5)(A) "applies to all non-constitutional claims."  *Doe*, 2026 WL 1825840, *10.  The Supreme Court reasoned that this bar on judicial review applies not only to the substantive TPS determination, but also to claims based on purported procedural errors and any subsidiary determinations as well.  *Id.* at *8, 10. That fully resolves Plaintiffs' admittedly non-constitutional claims in Counts One through Three and Count Eight.

Perhaps realizing that non-constitutional claims are unreviewable under *Doe*, Plaintiffs frame Counts Six and Seven of their amended complaint in terms of purported due process violations.  Plaintiffs allege that they have protected liberty and property interests "in their TPS status and in the attendant benefits that come with that status."  Doc. No. 71, ¶ 244.  To safeguard their liberty and property interests, Plaintiffs allege that a TPS designation may be terminated only after the Secretary "meaningfully consult[s] with appropriate federal agencies" and conducts a "review" of the "conditions in the foreign state."  Doc. No. 71, ¶¶ 253-254 (citing 8 U.S.C.

---

the TPS statute contains a direct limitation on judicial review, expressly (or, at minimum, impliedly) forbids the relief Plaintiffs seek, and commits TPS termination determinations to the Secretary's discretion.  8 U.S.C. § 1254a(b)(5)(A).  Plaintiffs therefore cannot rely on the APA's waiver of sovereign immunity to bring their claims.

§ 1254a(b)(3)(A)).  Plaintiffs further allege the Secretary disregarded these processes and instead reached a conclusion that was "preordained" and "pretextual."  Doc. No. 71, ¶ 256, 262. Plaintiffssay that rises to the level of a due process violation, but their due process claims fail for four reasons.

*First*, and most fundamentally, § 1254a(b)(5)(A) bars review of these claims.  That provision bars "judicial review" of decisions to terminate TPS, without distinguishing between statutory and constitutional claims any more than it distinguishes between procedural and substantive claims.  The Supreme Court reserved the question whether the judicial review bar applies to constitutional claims.  But even if some constitutional claims could theoretically proceed despite the blanket prohibition on "judicial review" of TPS termination decisions, it is particularly clear that Plaintiffs' "due process" claim is barred because it is a straightforward retread of the same claims the Supreme Court already held were covered by the judicial-review bar.

The plaintiffs in *Doe*—like Plaintiffs here—sought to challenge a TPS termination "based on alleged procedural errors," including that the Secretary did not adequately consult with appropriate federal agencies and that the Secretary's decision was pretextual, preordained, and politically motivated.  *Doe*, 2026 WL 1825840, at *8; *see also* Doc. No. 71, ¶¶ 208-211.  The Supreme Court, however, held that the judicial-review bar applied precisely to those claims.  *Id.* at *8–9.  And, in so doing, it took care to emphasize the "importan[ce]" of "ensur[ing] that challengers cannot avoid a judicial-review bar by creative pleading or clever lawyering" such as labeling as "procedural" claims that are substantive in nature.  *Id.* at *10.  Plaintiffs illustrate the foresight of that decision, attempting to circumvent the Supreme Court's endorsement of the judicial-review bar by admittedly seeking to challenge the *same* alleged procedural violations under a constitutional label.  The Court should look beyond the mere "constitutional" label and

recognize these claims for what they clearly are: challenges based on the Secretary's purported failure to adhere to *statutory* requirements. *See Jimenez-Nieves v. United States*, 682 F.2d 1, 6 (1st Cir. 1982) (Breyer, J.) ("In examining a complaint we are bound to look beyond the literal meaning of the language used to ascertain the real cause of the complaint."). "Any other result would elevate form over substance and allow parties to evade" the TPS judicial-review bar "by relabeling their" statutory claims as constitutional ones. *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211 (1985).

It would be extraordinary if Plaintiffs could—like the flip of a switch—so easily and completely sidestep § 1254a(b)(5)(A) by restyling the same *previously unreviewable* procedural disputes as constitutional ones. Under Plaintiffs' theory, the Secretary's alleged failure to meaningfully consult with appropriate agencies was unreviewable before—but has become reviewable now—merely because they have repackaged this alleged statutory violation as constitutional one. If that were how things worked, what is the significance of the Supreme Court's conclusion that the judicial review bar applies to claims based on alleged procedural errors? *All of the claims* that *Doe* took off the table could be reasserted as procedural due process claims. Indeed, that is precisely what Plaintiffs' amended complaint seeks to accomplish. *See* Doc. No. 71, ¶ 254 (seeking to vacate the termination because "the Secretary did not meaningfully consult with appropriate federal agencies"); *id.*, ¶ 265 (seeking to vacate the termination because "the Secretary's decision-making was predetermined, pretextual, and procedurally deficient").

*Second*, the procedural due process constraints that Plaintiffs seek to invoke do not apply to the government's determinations to designate, extend, or terminate a TPS designation. *See, e.g.*, *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915) ("Where a rule of conduct applies to more than a few people, it is impracticable that everyone should have a direct

10

voice in its adoption."); *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 245-46 (1973) (distinguishing, for due process purposes, between agency decisions that "adjudicate disputed facts in particular cases" and those that involve "the formulation of a basically legislative-type judgment, for prospective application only"). These constraints instead come into play when the government "adjudicate[es]" an individual's "rights or liabilities." *Harper v. Werfel*, 118 F.4th 100, 115 (1st Cir. 2024); *see Trager v. Peabody Redevelopment Auth.*, 367 F. Supp. 1000, 1002 (D. Mass. 1973) ("The procedural due process requirements of notice and hearing attach themselves wherever there is need for an adjudicative hearing."). They do not, by contrast, apply where—as here—the government "weigh[s] general information and ideas affecting relatively large numbers of people . . . whose rights are affected as part of" the government's execution of "an overall [legislative] scheme." *Id.* at 1002. Plaintiffs' procedural due process claims are predicated on the "three-part balancing test articulated" in *Mathews v. Eldridge*, 424 U.S. 319 (1976). Doc. No. 71, ¶ 252. But *Mathews* is entirely the wrong framework, as it applies to "individual adjudications," not the sort contemplated in determining TPS designations. *Garcia-Rubiera v. Fortuno*, 665 F.3d 261, 272 (1st Cir. 2011). Plaintiffs cannot state a claim for relief based on *Mathews*.

*Third*, Plaintiffs' allegations turn exclusively on statutory procedural requirements and thus fail to state a due process claim on their own terms. Plaintiffs claim that Ethiopia's TPS designation was terminated without due process of law based solely on their allegations that the Secretary failed to follow certain "procedural safeguards in *the TPS statute*." *See* Doc. 71, ¶ 251 (emphasis added). But, as "[t]he First Circuit has . . . confirmed," "not every statutory violation has a 'constitutional dimension' or is '[ ]tethered to the abridgment of constitutional rights.'" *United States v. Sabean*, 2016 WL 5721135, at *7 (D. Me. Oct. 3, 2016) (citing *United States v.*

*Adams*, 740 F.3d 40, 43 (1st Cir. 2014)); *see Arguello v. Noem*, No. 2:25-cv-00786-RJS, 2025 WL 2896849, at *6 (D. Utah Oct. 9, 2025) ("a statutory violation does not necessarily amount to a constitutional procedural due process violation").

The two cases that Plaintiffs reference in their amended complaint on this issue illustrate the point.  *See* Doc. No. 71, ¶ 251.  In *Portillo-Rendon v. Holder*, 662 F.3d 815 (7th Cir. 2011) (Easterbrook, J.), the Seventh Circuit took pains to distinguish between alleged due process violations and alleged statutory or regulatory violations: "it is appropriate to consider the Constitution only if the statute and regulations are deficient." *Id.* at 817.  The court explained that if an agency failed to provide the "process required by the statute," the court could "provide relief on statutory grounds." *Id.*  And it cautioned that "intoning 'due process'" would not "cover" the same ground as the procedural protections afforded by statutes and regulations. *Id.*  Subsequently, in *Adame v. Holder*, 762 F.3d 667 (7th Cir. 2014), the Seventh Circuit cited *Portillo-Rendon* and included a parenthetical explanation stating that "a petitioner may have a legal claim when she can show statutory procedural shortfalls." *Id.* at 672.  The point being that an agency's failure to abide by statutory procedures may give rise to a *statutory* claim—not a constitutional one.

In short, a failure to abide by statutory *procedural* requirements would only amount to a due process violation if those requirements encompassed or were coextensive with the demands of the Due Process Clause itself.  And Plaintiffs' due process claims do not allege or even suggest that the Due Process Clause itself—independent of the TPS statute—would require the Secretary to consult with appropriate agencies or publish the basis for her determination in the Federal Register before terminating a country's TPS designation.  Accordingly, Plaintiffs' due process claims are nothing more than statutory claims dressed up as purported constitutional violations. For this reason, they are barred by § 1254a(b)(5)(A) and, in any event, fail on their merits.

12

*Last*, to assert a procedural due process claim, Plaintiffs must "first" show that "there exists a liberty or property interest" to which they have "a legitimate claim of entitlement." *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989); *see Olim v. Wakinekona*, 461 U.S. 238, 250 (1983) ("Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement."). Where a statute creates a benefit, the plaintiff must "have more than a unilateral expectation of it." *The Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). "[A] benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005). Accordingly, a statute may give rise to a legitimate claim of entitlement only where it places "substantive limitations" on the government's exercise of discretion, *Wakinekona*, 461 U.S. at 249, and "mandat[es] the outcome to be reached upon a finding that the relevant criteria have been met," *Thompson*, 490 U.S. at 462.

Plaintiffs have no legitimate claim of entitlement to Ethiopia's TPS designation being extended. The TPS statute provides in relevant part that—in deciding whether to extend or terminate a designation—the Secretary "shall determine whether the conditions for such designation under this subsection continue to be met." 8 U.S.C. § 1254a(b)(3)(A). It does not, however, impose any "substantive limitations" on the Secretary in determining whether these conditions continue to be met. *Wakinekona*, 461 U.S. at 249. And while the statute mandates *termination* in specified circumstances, it does not mandate *extending* a country's TPS designation upon a finding that certain criteria have been met. In other words, it does not channel agency discretion by providing that, if certain "substantive predicates are present, a particular outcome must follow." *Thompson*, 490 U.S. at 463 (citing *Hewitt v. Helms*, 459 U.S. 460, 472 (1983)).

13

And insofar as Plaintiffs claim an entitlement to have the Secretary follow the TPS statute's procedural provisions before terminating a TPS designation, that "would be an entitlement to nothing but procedure," which the Supreme Court has deemed "inadequate" to form the basis of a protected interest under the Due Process Clause. *Town of Castle Rock*, 545 U.S. at 764.

**B.      Section 1252(f)(1) precludes Plaintiffs' requested relief.**

In addition, granting Plaintiffs' requested relief would impermissibly restrain the Secretary's operation of the TPS statute in violation of 8 U.S.C. § 1252(f)(1), which strips "court[s] (other than the Supreme Court)" of "jurisdiction" to "enjoin or restrain the operations of part IV of this subchapter," in any "action or claim" by any "party" (with one exception not relevant here). This provision "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022).

Section 1254a is one of the statutory provisions that § 1252(f)(1) covers. In the U.S. Code, § 1254a appears in part V of the relevant subchapter. The public law enacted by Congress, however, strips lower courts of the authority to enjoin or restrain "the provisions of chapter 4 of title II," which contains the TPS statute (section 244 of the INA as amended). Illegal Immigration Reform and Immigrant Responsibility Act of 1996, div. C, Pub. L. No. 104-208, §§ 306 (enacting § 1252(f)), 308 (specifying section 244 as part of chapter 4), 110 Stat. 3009. When the enacted text and the U.S. Code conflict, the enacted text prevails. *U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 448 (1993) ("United States Code is 'prima facie' evidence that a provision has the force of law, 1 U.S.C. § 204(a), [but] it is the Statutes at Large that provides the 'legal evidence of laws,' [1 U.S.C.] § 112. . . .").

14

This Court previously found that § 1252(f)(1) does not bar Plaintiffs' claims because "Plaintiffs do not seek to enjoin or restrain the operation of" the TPS statute." Doc. No. 56, p. 30. Critically, though, § 1252(f)(1) is not limited to injunctions; it applies to any orders that "enjoin *or restrain*" a covered statute's operation, "[r]egardless of the nature of the action or claim[.]" § 1252(f)(1) (emphasis added). Thus, whether Plaintiffs' requested relief—"[s]et[ting] aside or otherwise vacat[ing] the termination of TPS for Ethiopia" under the APA—constitutes an *injunction* misses the point. Indeed, the word "restrain" must have independent meaning from "enjoin." Congress provided in the neighboring provision that no court shall "enjoin the removal of any alien" in certain circumstances. *Id.* § 1252(f)(2). The variation in the side-by-side provisions indicates that "restrain" was an intentional addition that carries separate meaning and broadens the sweep of § 1252(f)(1) beyond injunctions. *See City & County of San Francisco v. Environmental Prot. Agency*, 604 U.S. 334, 344 (2025).

The dispositive inquiry is thus not whether Plaintiffs seek an injunction but instead whether they seek an order that "enjoins or restrains the operation of" the TPS statute. The answer is clearly yes. Granting Plaintiffs' requested relief would assuredly "restrain" the Secretary from exercising his authority under the TPS statute, compel the expenditure of finite governmental resources implementing a TPS designation that is contrary to the national interest, and preclude Executive officials from enforcing immigration laws in the way the Executive Branch deems appropriate. *See Aleman Gonzalez*, 596 U.S. at 549 ("restrain" means to "check, hold back, or prevent (a person or thing) from some course of action"); *see also Black's Law Dictionary* 1314 (defining "[r]estrain" as meaning to "limit" or "put compulsion upon") (emphasis omitted). Section 1252(f)(1) therefore applies and precludes the Court from granting Plaintiffs' requested relief.

C.    **Plaintiffs' allegations fail to state a claim on the merits.**

Even if Plaintiffs' claims were reviewable, they fail on their merits.

1.    **The Court should dismiss Count One.**

Plaintiffs first assert that the Court should set aside Defendants' termination of Ethiopia's TPS designation because it was made "without observance of procedure required by law."  Doc. No. 71, ¶ 206 (citing 5 U.S.C. § 706(2)(D)).  They specifically assert that the termination "was procedurally improper" because the Secretary allegedly "failed to consult with appropriate agencies"; based her determination "on a predetermined domestic policy of the Trump administration to restrict access to TPS for non-white, non-European, African immigrants"; and "relied on 'national interest' considerations divorced from the conditions inside Ethiopia." *Id.* at ¶¶ 206-211.  Those allegations fail to state a plausible claim.

**Consultation.**  Plaintiffs allege that the Secretary "did not consult meaningfully consult with appropriate agencies as required by statute."  Doc. No. 71, ¶ 64.  To start, the termination notice itself confirms that the Secretary made her determination "after consulting with appropriate U.S. Government agencies."  90 Fed. Reg. at 58,028.  And the administrative record further confirms correspondence between the Department of Homeland Security ("DHS") and the State Department in October 2025 before the termination occurred.  Ethiopia TPS AR000330.  The TPS statute requires nothing more.  For example, nothing in the statute requires the Secretary to engage in face-to-face meetings, send two emails instead of one, convey or receive a specific amount of information, or discuss set topics.  To the extent Plaintiffs allege the Secretary should have engaged in different modes of consultation, ruling for them on such a theory would contravene the principle that courts undertaking APA review may not substitute their own discretionary judgments for those of the agency, *see FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021), and that courts

are "'generally not free to impose' additional judge-made procedural requirements on agencies that Congress has not prescribed and the Constitution does not compel," *Garland v. Ming Dai*, 593 U.S. 357, 365 (2021) (quotation marks omitted).

In support of its order granting Plaintiffs' motion to postpone, the Court cited the seventh edition of Black's Law Dictionary (1990), which defined "[c]onsultation" as the "[a]ct of asking the advice or opinion of someone" (*See* Doc. No. 56 at 15, quoting Black's Law Dictionary (7th ed. 1999). But that is precisely what DHS's email exchange with the Department of State shows. At bottom, no definition of consultation requires a specific level of consultation.

**Predetermined.** Plaintiffs next allege that the Secretary's reasons for terminating Ethiopia's TPS designation were "pretext" for a "predetermined domestic policy of the Trump administration to restrict access to TPS." Doc. No. 71, ¶ 210. But, to start, there is no such thing as a "predetermination" claim. As the Supreme Court explained when reversing the Fifth Circuit's holding that the prior administration cancelled certain protocols because it lacked a sufficiently "open mind," an "agency's *ex ante* preference for terminating [a prior administration's action]— like any other feature of an administration's policy agenda—should not be held against the" ultimate agency decision. *Biden v. Texas*, 597 U.S. 785, 812 (2022). Nor is there any requirement that an agency have an "openminded attitude" in considering an action. *Little Sisters of the Poor v. Pennsylvania*, 591 U.S. 657, 685 (2020). Instead, as long as an agency complies with "the APA's objective criteria," courts may not "rebuke[]" agencies for "purported attitudinal deficiencies" such as having a preferred policy outcome. *Id.* at 674, 685.

17

Consequently, *even if* Plaintiffs had plausibly alleged that the termination in this case was predetermined, which they have not, that would not establish a violation of the APA.[2] That is distinct from a claim of pretext, which the Supreme Court has permitted only upon evidence that the agency's "sole stated reason" for taking an action was "contrived." *Dep't of Commerce v. New York*, 588 U.S. 752, 756 (2019). And even when it comes to a claim of pretext, it is "typical"— not a basis to set an agency action aside—for an agency to "have both stated and unstated reasons for a decision." *Id.* Pleading a pretext claim thus requires asserting plausible factual allegations that, accepted as true, would establish that all the agency's stated reasons were less than genuine, which Plaintiffs have not done.

### 2. The Court should dismiss Count Two.

Plaintiffs next claim that the Court should set aside Defendants' termination of Ethiopia's TPS designation because it allegedly departed from DHS's past practice in two ways. *First*, Plaintiffs allege that the Secretary's decision to provide Ethiopian TPS holders "with only 60-days' notice" of the termination was "an unacknowledged and unreasoned departure from decades of decision-making practices and procedures." Doc. No. 71, ¶ 218. The INA, however, provides that, "[n]otwithstanding any other provision of law . . . no court shall have jurisdiction to review . . . any . . decision or action of . . . the Secretary of Homeland Security the authority for which is specified under this subchapter to be in [her] discretion." 8 U.S.C. § 1252(a)(2)(B)(ii). One provision of that subchapter—i.e., the TPS statute—allows the Secretary to publish a termination notice 60 days in advance, 8 U.S.C. § 1254a(b)(3)(B), and specifies that the decision to provide

---

[2] The administrative record reflects that the Secretary engaged in an extensive and thorough review process—including consideration of an array of evidence and analyses from the U.S. Department of State and U.S. Citizenship and Immigration Services (USCIS)—further belying any notion that the Secretary had "predetermined" to terminate Ethiopia's TPS designation no matter what her review revealed.

for a longer transition period remains in the Secretary' discretion. *See* 8 U.S.C. § 1254a(d)(2) (stating that the Secretary "may" provide for a longer transition period). Section 1252(a)(2)(B)(ii) thus independently precludes the Court from reviewing the Secretary's discretionary decision regarding whether to provide more than 60 days' notice of the effective date of a TPS termination.

Moreover, Plaintiffs' claim would fail in any event. As just discussed, the TPS statute explicitly allows the Secretary to publish a termination notice 60 days in advance. 8 U.S.C. § 1254a(b)(3)(B) (termination "shall not be effective earlier than 60 days after the date the notice is published"). And the relevant regulations make clear that TPS protections can end "upon the sixtieth (60th) day after the date notice of termination is published in the Federal Register." 8 C.F.R. § 244.19; *see also* 8 C.F.R. § 244.13(b). In her discretion, the Secretary "may" provide for a longer transition period. 8 U.S.C. § 1254a(d)(2). But the government has never made a "hard-and-fast commitment" to offer longer periods of notice—nor has it taken an "earlier [agency] position" that could have conferred a legitimate reliance interest on a TPS recipient. *FDA v. Wages and White Lion Invs., LLC*, 604 U.S. 542, 573-85 (2025). Even if the agency's past choices of wind-down periods for other countries could create a "hard-and-fast commitment," those past choices reflect variation, not consistency, on the length of wind-down periods.

*Second*, Plaintiffs claim that the Secretary impermissibly considered the "domestic U.S. 'national interest'" in a break with past practice. Doc. No. 71, ¶ 219. But, again, § 1252(a)(2)(B)(ii) strips courts of "jurisdiction to review . . . any . . decision or action of . . . the [Secretary] the authority for which is specified under this subchapter to be in [her] discretion." And the TPS statute plainly vests the Secretary with discretion to decide whether "permitting the [affected] aliens to remain temporarily in the United States is contrary to the national interest of the United States." 8 U.S.C. § 1254a(b)(1)(C).

19

Moreover, the Secretary *must* consider the "national interest" in deciding whether a country continues to meet the conditions for designation in § 1254a(b)(1)(C).  And nowhere does the TPS statute constrain what the Secretary can consider when deciding what is in the national interest— let alone require her to focus solely on foreign country conditions.  The question of what serves the national interest offers "no meaningful standard against which to judge the agency's exercise of discretion."  *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993); *see Trump v. Hawaii*, 585 U.S. 667, 684-86 (2018) (where President has discretion to determine if alien's entry "would be detrimental to the interests of the United States," courts should not inquire "into the persuasiveness of the President's justifications"); *Webster v. Doe*, 486 U.S. 592, 600 (1988) ("'in the interest of the United States' . . . exudes deference" and lacks "meaningful judicial standard of review").  The Secretary's consideration of domestic interests in evaluating the United States' "national interest" thus could not have been arbitrary and capricious as a matter of law.

### 3.    The Court should dismiss Count Three.

In Count Three, Plaintiffs allege that Defendants' termination of Ethiopia's TPS designation was arbitrary and capricious, an abuse of discretion, and contrary to law for several reasons.  Doc. No. 71, ¶¶ 223-227.  Specifically, they allege that the termination was a predetermined political decision, that the termination was motivated by racial animus, that the Secretary failed to consult appropriate agencies, and that the Secretary failed to consider certain "objective, available evidence" of country conditions that prior administrations or other agencies had found "relevant."  *Id.*  The first three allegations fail for the reasons described above, pp. 15-

20

17, *infra*, and below, pp. 20-24, *supra*. And the last allegation—a purported failure to consider "objective, available evidence"—similarly does not suffice state a claim.

The statute provides that the Secretary "shall review the conditions in the foreign state." 8 U.S.C. § 1254a(b)(3)(A). It does not remotely prohibit the Secretary—in evaluating those conditions—from making judgment calls or assessments over which different people could disagree. In essence, Plaintiffs take issue with the way in which the Secretary weighed the evidence—alleging that she "cherry picked" certain positive improvements in Ethiopia while overlooking "evidence of relevant country conditions"—such as "severe drought and flooding, deadly outbreaks, and significant internal population displacement." Doc. No. 71, ¶ 225(a). But when reviewing agency action under the APA, a court "may not substitute its judgment for that of the agency, even if it disagrees with the agency's conclusions." *River St. Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009).

### 4.      The Court should dismiss Counts Four and Five.

In Counts Four and Five, Plaintiffs allege that Defendants' termination was impermissibly motivated by racial and/or national origin animus against African and other non-white or non-European immigrants," and therefore violated the equal-protection component of the Due Process Clause of the Fifth Amendment. Doc. No. 71, ¶¶ 228-239. The Supreme Court already rejected these allegations as unlikely to support an equal protection claim in materially similar circumstances, as discussed further below. *Doe*, 146 S. Ct. at 2139-40.

As an initial matter, in citing *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977), Plaintiffs seem to allege that the Court should apply "exacting scrutiny" to their equal-protection claims. Doc. 71, ¶ 235 n. 159. The Supreme Court's decision in *Trump v. Hawaii*, 585 U.S. 667 (2018), however, prescribes that rational-basis review governs constitutional

challenges to Executive Branch immigration policies like the challenged termination and that such policies pass muster so long as they are "plausibly related" to the government's policy objective. *Id*. at 704.  That deferential review reflects that "decisions in these matters may implicate 'relations with foreign powers,' or involve 'classifications . . . defined in the light of changing political and economic circumstances,'" which are judgments "'frequently of a character more appropriate to either the Legislature or the Executive.'"  *Id*. at 702 (citation omitted).[3]

Like the policy at issue in *Hawaii*, TPS termination determinations involve unique country-specific determinations that both "implicate relations with foreign powers" and "involve classifications defined in the light of changing political and economic circumstances," *id.*, precisely the situation in which the Supreme Court has repeatedly applied rational-basis review. The TPS statute requires the Secretary to determine whether a foreign state is able "to handle adequately the return" of its nationals and whether conditions in the country prevent the country's nationals "from returning to the state in safety."  8 U.S.C. § 1254a(b)(1).  Such determinations are fraught with potential implications for our relations with the relevant country.

Ethiopia's TPS designation was terminated because "Ethiopia no longer continues to meet the conditions for [TPS]" under the TPS statute, 90 Fed. Reg. at 58,028, and her determination easily passes rational-basis review.  That determination reflected the Secretary's judgment that permitting Ethiopian nationals to remain temporarily in the U.S. is contrary to our "national interest," considering the foreign policy, public safety, and national security considerations that she identified.  *Id.*  It was thus "plausibly related" to the government's foreign relations interests,

---

[3] In addition, nationality-based classifications drawn by Congress or the Executive under the immigration laws are reviewed for rational basis. *See Kandamar v. Gonzales*, 464 F.3d 65, 73-74 (1st Cir. 2006); *Narenji v. Civiletti*, 617 F.2d 745, 747 (D.C. Cir. 1979). Moreover, as in *Kandamar*, "[t]here is nothing in this record to demonstrate outrageous discrimination." 464 F.3d at 74 (citing *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 491 (1999)).

border security priorities, and the objectives of the TPS program. *Hawaii,* 585 U.S. at 704-05. Her determination was fully consistent with Congress's goal of providing temporary relief to aliens until the conditions necessitating that relief come to an end.

Even under heightened scrutiny, Plaintiffs' minimal allegations fail to state a claim. Under *Arlington Heights*, to establish an equal protection claim, Plaintiffs would need to prove that a racially "discriminatory purpose has been a motivating factor in the [government's] decision." 429 U.S. at 265-66. Plaintiffs summarily assert that the Secretary's termination determination "cannot be explained other than by reference to race and/or national origin." Doc. No. 71, ¶ 237. But the Court need not and should not credit that conclusory assertion, *Iqbal*, 556 U.S. at 678, particularly because it ignores the strong, race-neutral explanation the Secretary provided as to why Ethiopia no longer meets the criteria for TPS. 90 Fed. Reg. 58,029-58,031. It also ignores the foreign policy, public safety, and national security considerations cited by the Secretary in support of her determination. 90 Fed. Reg. 58,030-58,031. And none of Plaintiffs' remaining allegations establish a discriminatory purpose.

Plaintiffs allege that President Trump and the Secretary have made statements evoking "white nationalist" and anti-immigration rhetoric. Doc. No. 71, ¶¶ 138-169. But the cited statements raise no plausible inference of discriminatory intent. Furthermore, many were "remote in time and made in unrelated contexts," and thus "do not qualify as 'contemporary statements' probative of the decision at issue." *DHS* v. *Regents of the Univ. of Cal.*, 591 U.S. 1, 35 (2020) (opinion of Roberts, C.J.) (quoting *Arlington Heights*, 429 U.S. at 268); *see Ramos*, 975 F.3d at 898 (noting that President Trump's statements "occurred primarily in contexts removed from and unrelated to TPS policy or decisions"). Some statements arose during the campaign trail—just like the statements *Hawaii* rejected. None reflects any kind of racial or national-origin animus.

Indeed, the Supreme Court considered these purported statements in *Doe* and observed that none were "overtly racial, and in substance all expressed policy views that could rest on race-neutral justifications."  2026 WL 1825840, *12.  The court went on to find that the statements were "insufficient" to show that the TPS termination was based on race.  *Id.*  The same is true here.

Moreover, Plaintiffs' allegations concerning statements made by President Trump— besides mischaracterizing the statements themselves—could not plausibly show animus by *the Secretary*.  *See, e.g.*, *Staub* v. *Proctor Hosp.*, 562 U.S. 411, 418 (2011); *Ramos*, 975 F.3d at 897 ("We doubt that the 'cat's paw' doctrine of employer liability in discrimination cases can be transposed to th[e] particular context" of TPS terminations.).  Otherwise, courts could invalidate any agency official's actions based on mere allegations that a more senior government official harbored some discriminatory motive.  That theory would also invite impermissible intrusion on privileged Executive Branch deliberations, see *United States* v. *Nixon*, 418 U.S. 683, 708 (1974), and potential litigant-driven discovery that would disrupt the President's execution of the laws, *Nixon* v. *Fitzgerald*, 457 U.S. 731, 749-50 (1982).

Plaintiffs' suggestion that the Secretary's termination determinations this year have had a "disparate impact on particular racial groups" similarly fails to state a claim.  Doc. No. 71, ¶ 102 n. 70 (citation omitted).  Of course, the relevance of any disparate impact naturally depends on the specific demographics at issue.  And, here, almost "every country that has been designated for TPS since its inception has been 'non-European' . . . and most have majority 'non-white' populations." *Ramos*, 975 F.3d at 898.  Thus, under Plaintiffs' logic, "almost any TPS termination in the history of the program would bear 'more heavily' on 'non-white, non-European' populations and thereby give rise to a potential equal protection claim," which "cannot be the case."  *Id.*  Indeed, the Supreme Court has squarely rejected this type of "disparate impact" evidence as sufficient to state

24

a plausible equal protection claim.  *Regents*, 591 U.S. at 34 ("[B]ecause Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. . . . Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds.").

Plaintiffs' claim of national origin discrimination is even weaker.  First, it fails for the same reasons as the equal-protection claim: The race-neutral explanation the Supreme Court credited in *Doe* defeats an equal-protection claim regardless of whether it is labeled race or national-origin discrimination. The Supreme Court credited the administration's opposition to TPS generally, reflected in its termination of every designation that came up for review, "13 in all." 2026 WL 1825840, at *5. A policy applied consistently to the nationals of numerous countries is not evidence that any one nationality was singled out.

Second, Plaintiffs claim that classifications based on "national origin receive exacting scrutiny," Compl. ¶ 235, but that is incorrect. Distinctions drawn among nationalities by the Executive are a permissible feature of immigration law and "must be upheld so long as they are not wholly irrational." *Rajah v. Mukasey*, 544 F.3d 427, 438 (2d Cir. 2008) (alterations and quotation marks omitted)); *see Doe*, 2026 WL 1825840, at *16 (Thomas, J., concurring) ("[O]ur immigration laws have distinguished among aliens based on their national origin from the beginning," and "applicants for immigration are treated differently based on their nationality as a matter of course."); *Kandamar v. Gonzales*, 464 F.3d 65 (1st Cir. 2006) ("Congress may permissibly set immigration criteria based on an alien's nationality or place of origin").  Indeed, TPS designations expressly distinguish based on national origin, and if such distinctions were unconstitutional, TPS itself would be impermissible.

In sum, Plaintiffs' allegations fail to support a claim that the Secretary's TPS determination was motivated by racial animus or national origin, even if the *Arlington Heights* test were applied. Based on materially similar evidence, the Supreme Court found that the plaintiffs in *Doe* were unlikely to prove their equal protection claim. Accordingly, Plaintiffs have failed to state an equal-protection claim.

### 5.    The Court should dismiss Counts Six and Seven

Plaintiffs' procedural due process claims fail for the reasons discussed in Section IV(A) above and for the reasons discussed in Section IV(C)(1)-(3). *See also Olim v. Wakinekona*, 461 U.S. at 250 ("Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement."). Accordingly, counts six and seven should be dismissed.

### 6.    The Court should dismiss Count Eight.

Finally, as noted above, Plaintiffs' excess-of-statutory-authority and/or *ultra vires* claim is unreviewable from the start because it is a non-constitutional claim, and the Supreme Court has unequivocally held that "the TPS statute's judicial-review bar applies to *all* non-constitutional claims." *Doe*, 2026 WL 1825840, at *10 (emphasis added). The Court cannot and should not proceed further.

Even if Plaintiffs' *ultra vires* claim were reviewable, it fails on the merits. In 2002 Congress created the Department of Homeland Security and reorganized responsibility for numerous Executive Branch immigration functions. A straight-forward reading of the statutes, the Supreme Court's decision last month, every lower-court decision for the past 24 years, and longstanding Executive Branch practice confirm that the Secretary of Homeland Security holds the statutory authority to designate countries for TPS and to extend or terminate those designations.

26

**Statutes.** The Homeland Security Act of 2002, Pub. L. No. 107-296, § 1517, 116 Stat. 2135 (codified at 6 U.S.C. § 101 *et seq.*) (the "Act"), established DHS and reorganized responsibility for numerous Executive Branch immigration functions. Relevant here, the "administration and enforcement" of all laws "relating to the immigration and naturalization of aliens" was transferred to the Secretary of DHS. 8 U.S.C. § 1103(a)(1). Section 1103(a) carves out functions conferred upon the Attorney General, but this same section specifies that these conferred—and thus reserved—functions pertain to those previously exercised by the Executive Office for Immigration Review (EOIR): "The Attorney General shall have such authorities and functions under this chapter and all other laws relating to the immigration and naturalization of aliens as were exercised by [EOIR], or by the Attorney General with respect to [EOIR] . . ." 8 U.S.C. § 1103(g). EOIR did not previously administer the TPS statute. Therefore, the Attorney General did not retain such functions, which have been transferred to the Secretary. If, as Plaintiffs contend, § 1103(a) reserved to the Attorney General *all* functions that the Attorney General previously exercised, then § 1103(g) would prove redundant: There would be no need to specify that the Attorney General continues to have the functions that the Attorney General previously exercised with respect to EOIR, because § 1103 would have already reserved those functions to the Attorney General. And it is a cardinal rule of statutory construction that courts should "avoid" interpreting a statute in a way that would render "some words altogether redundant." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 574 (1995).

Congress did not change the TPS statute's text to refer to the Secretary of Homeland Security because it did not need to. Instead, it relied on a series of transfer and reference-updating provisions built into the Homeland Security Act to accomplish the shift in authority. While 8 U.S.C. § 1103 charged the Secretary with the "administration and enforcement" of the immigration

27

laws, 6 U.S.C. § 557 operated to update all other federal laws with respect to functions that were transferred to the Secretary under the Act:

> With respect to any function transferred by or under this chapter…reference in any other Federal law to any department, commission, or agency or any officer or office the functions of which are so transferred shall be deemed to refer to the Secretary, other official, or component of the Department to which such function is so transferred.

*Id.* Because TPS administration was a function of the Attorney General that was transferred to DHS, Section 557 operates to update every reference to the Attorney General in 8 U.S.C. § 1254a to mean the Secretary of DHS. *Id.* Since passage of the Homeland Security Act in 2002, and for more than two decades, the Secretary of Homeland Security has consistently exercised authority over the designation, extension, and termination of TPS for dozens of countries.

**Judicial Constructions.** Reflecting the statute's clarity, every court to discuss the issue for the last 24 years has recognized the transfer of TPS authority to the Secretary of Homeland Security. It is controlling that the Supreme Court has clearly stated that "[r]esponsibility for TPS decisions rests with the Secretary of Homeland Security." *Doe*, 2026 WL 1825840, at \*4. This was no offhand or unreasoned statement. As support, the Supreme Court cited 6 U.S.C. §§ 552(d) and 557—making clear that it specifically considered and accepted the transfer of TPS authority from the Attorney General to the Secretary. *Id.* And throughout its decision, the Supreme Court unequivocally interpreted the TPS statute as pertaining to the Secretary. That analysis controls this case.

Lower courts have universally adopted this construction, too. The Eleventh Circuit in *Mejia Rodriguez v. U.S. Dep't of Homeland Sec.*, 562 F.3d 1137 (11th Cir. 2009), recognized that although the TPS statute references the Attorney General, decision-making authorities were transferred to the Secretary of DHS by statute (citing 8 U.S.C. § 1103(a)). The district court in

28

*Saget v. Trump*, 375 F. Supp. 3d 280, 297 (2019), likewise recognized 8 U.S.C. § 1103 and 6 U.S.C. § 557 as the basis for the transfer of TPS designation authority to the Secretary.  More recently, in *CASA, Inc. v. Noem*, 792 F. Supp. 3d 576, 582 (2025), the District of Maryland explicitly described 6 U.S.C. § 557 as "conferring certain authorities granted by statute to the Attorney General, including those relating to TPS, to the Secretary of Homeland Security."  The district courts in *National TPS Alliance v. Noem*, 773 F. Supp. 3d 807 (2025), *National TPS Alliance v. Noem*, 798 F. Supp. 3d 1108 (2025), and the Ninth Circuit in its 2025 and 2026 decisions in that same litigation, *National TPS Alliance v. Noem*, 150 F.4th 1000 (2025), *National TPS Alliance v. Noem*, 166 F.4th 739 (2026), all proceeded on the premise that the Secretary of Homeland Security exercises the authority granted by 8 U.S.C. § 1254a.  Plaintiffs have not cited a single decision in which a court has concluded the Secretary of Homeland Security lacked the authority to designate a country for TPS or terminate a country's TPS designation.

**Executive Branch Constructions.**  Moreover, the consistent, unbroken practice of DHS exercising TPS authority—including designating, extending, and terminating TPS for dozens of countries over more than two decades—constitutes a contemporaneous and long-standing administrative construction of the transfer that courts have universally accepted.  *See, e.g.*, *Loper Bright Ent. v. Raimondo*, 603 U.S. 369, 386 (2024) (recognizing that "the longstanding practice of the government—like any other interpretive aid—can inform a court's determination of what the law is" (alterations accepted; internal quotation marks omitted)); *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014); *see also W. Va. v. Env't Prot. Agency*, 597 U.S. 697, 747 (2022) (Gorsuch, J., concurring) ("A 'contemporaneous' and long-held Executive Branch interpretation of a statute is entitled to some weight.").

29

Finally, as a practical matter, if this Court were to adopt Plaintiffs' theory, it would mean that the Secretary lacked authority to *designate* Ethiopia for TPS in the first instance. Both provisions of the TPS statute refer to the "Attorney General." 8 U.S.C. § 1254a(b)(1), (b)(3)(B). If the Court were to find that the Secretary lacks authority over TPS determinations—such that the termination of Ethiopia's TPS designation lacks effect—it would likewise mean that Ethiopia's initial TPS designation (and subsequent extensions) lacked legal effect as well. Plaintiffs' success on the law would strip them of the protections they seek to maintain, making this claim self-defeating.

## V.   CONCLUSION

For the reasons described above, the Court should dismiss the amended complaint.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

Dated: July 29, 2026                 By:   */s/ Nicole M. O'Connor*
                                           NICOLE M. O'CONNOR
                                           Assistant United States Attorney
                                           U.S. Attorney's Office
                                           1 Courthouse Way, Ste. 9200
                                           Boston, MA 02210
                                           (617) 748-3266
                                           Nicole.O'Connor@usdoj.gov

**CERTIFICATE OF SERVICE**

I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ Nicole M. O'Connor
NICOLE M. O'CONNOR
Assistant U.S. Attorney