**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AFRICAN COMMUNITIES TOGETHER; SAMUEL DOE; STEPHEN DOE; and ABAL DOE, on behalf of themselves and all others similarly situated,<br><br>    *Plaintiffs*,<br><br>    v.<br><br>MARKWAYNE MULLIN, in his official capacity as Secretary of the U.S. Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; and UNITED STATES OF AMERICA,<br><br>    *Defendants*. | Civil Action No. 1:26-cv-10278-BEM<br><br>**(MOTION FOR LEAVE TO FILE OVERSIZED BRIEF PENDING)** |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

BACKGROUND .................................................................................................................... 1

STANDARD OF REVIEW ..................................................................................................... 3

    I.    This Court May Review Plaintiffs' Claims and Grant the Relief Plaintiffs
    Seek. ........................................................................................................................... 4

        A.    The TPS Statute's Review Bar Does Not Preclude Review of
        Plaintiffs' Claims. ....................................................................................... 4

        B.    1252(f)(1) Does Not Prohibit Plaintiffs' Requested Relief. ....................... 6

    II.    Plaintiffs Have Adequately Stated Claims on the Merits. ..................................... 8

        A.    Plaintiffs Have Adequately Pleaded Their *Ultra Vires* Claim
        (Count VIII). ................................................................................................ 8

        B.    Plaintiffs Have Adequately Pleaded Their Procedural Due Process
        Claims (Counts VI and VII)....................................................................... 16

        C.    Plaintiffs Have Adequately Pleaded Their Equal Protection Claims
        (Counts IV and V)....................................................................................... 21

    III.    Plaintiffs Do Not Oppose Dismissal of Counts One, Two, and Three. ................ 26

CONCLUSION..................................................................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Afr. Cmtys. Together v. Mullin*,
--- F. Supp. 3d ----, 2026 WL 2274504 (D. Mass. Aug. 7, 2026)...................................*passim*

*Anderson ex rel. Dowd v. City of Bos.*,
375 F.3d 71 (1st Cir. 2004)...............................................................................................23

*Armstrong v. Manzo*,
380 U.S. 545 (1965)...........................................................................................................19

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).............................................................................................................4

*Batalla Vidal v. Nielsen*,
291 F. Supp. 3d 260 (E.D.N.Y. 2018) ...............................................................................21

*Bi-Metallic Inv. Co. v. State Bd. of Equalization*,
239 U.S. 441 (1915)...........................................................................................................21

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of Bos.*,
996 F.3d 37 (1st Cir. 2021)................................................................................................23

*Bos. Taxi Owners Ass'n, Inc. v. City of Boston*,
180 F. Supp. 3d 108 (D. Mass. 2016) ...............................................................................26

*Brito v. Garland*,
22 F.4th 240 (1st Cir. 2021).................................................................................................6

*Brown v. Gardner*,
513 U.S. 115 (1994)...........................................................................................................14

*Butler v. Balolia*,
736 F.3d 609 (1st Cir. 2013)..............................................................................................22

*CASA, Inc. v. Noem*,
792 F. Supp. 3d 576 (D. Md. 2025).....................................................................................7

*Centro Presente v. DHS*,
332 F. Supp. 3d 393 (D. Mass. 2018) ...............................................................................24

*City & Cnty. of S.F. v. EPA*,
604 U.S. 334 (2025)...........................................................................................................14

*City of Arlington v. FCC*,
    569 U.S. 290 (2013)..............................................................................................................8

*Cleveland Bd. of Educ. v. Loudermill*,
    470 U.S. 532 (1985)............................................................................................................18

*Cooper Indus., Inc. v. Aviall Servs., Inc.*,
    543 U.S. 157 (2004)..............................................................................................................5

*In re Coughlin*,
    33 F.4th 600 (1st Cir. 2022)..............................................................................................12

*Cruz v. Bondi*,
    2025 WL 3295485 (D.R.I. Nov. 26, 2025)......................................................................19

*Davis v. Mich. Dep't of Treasury*,
    489 U.S. 803 (1989)............................................................................................................11

*de Rodriquez v. Hyde*,
    2026 WL 220416 (D. Mass. Jan. 28, 2026)....................................................................19

*DHS v. Regents of the Univ. of Calif.*,
    591 U.S. 1 (2020)....................................................................................................15, 16, 27

*Doe v. Mullin*,
    2026 WL 2279577 (N.D. Ill. Aug. 7, 2026) ........................................................ *passim*

*Doe v. Noem*,
    817 F. Supp. 3d 27 (D. Mass. 2026) ................................................................................18

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000)............................................................................................................11

*FTC v. Mandel Bros., Inc.*,
    359 U.S. 385 (1959)............................................................................................................11

*Garcia-Rubiera v. Fortuño*,
    665 F.3d 261 (1st Cir. 2011)..............................................................................................20

*Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*,
    559 U.S. 280 (2010)............................................................................................................11

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995)............................................................................................................11

*Harper v. Werfel*,
    118 F.4th 100 (1st Cir. 2024)............................................................................................21

*Hill v. U.S. Dep't of the Interior*,
151 F.4th 420 (D.C. Cir. 2025)..............................................................................20

*Jennings v. Rodriguez*,
583 U.S. 281 (2018)..............................................................................................18

*Ky. Dep't of Corr. v. Thompson*,
490 U.S. 454 (1989)..............................................................................................17

*Lamie v. U.S. Tr.*,
540 U.S. 526 (2004)..............................................................................................10

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)..............................................................................................14

*Louisiana v. U.S. Dep't of Energy*,
90 F.4th 461 (5th Cir. 2024) .................................................................................15

*Mansor v. USCIS*,
685 F. Supp. 3d 1000 (W.D. Wash. 2023)........................................................16, 17

*Mathews v. Eldridge*,
424 U.S. 319 (1976)..............................................................................................20

*Mhany Mgmt., Inc. v. Cnty. of Nassau*,
819 F.3d 581 (2d Cir. 2016)..................................................................................23

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
339 U.S. 306 (1950)..............................................................................................19

*Mullin v. Doe*,
609 U.S. ----, 146 S. Ct. 2121 (2026) .............................................................. *passim*

*Nat'l Ass'n of Broads. v. FCC*,
39 F.4th 817 (D.C. Cir. 2022)..................................................................................8

*NLRB v. Noel Canning*,
573 U.S. 513 (2014)..............................................................................................14

*Perez-Escobar v. Moniz*,
792 F. Supp. 3d 224 (D. Mass. 2025) ...............................................................18, 19

*Rombot v. Souza*,
296 F. Supp. 3d 383 (D. Mass. 2017) ...................................................................19

*Romer v. Evans*,
517 U.S. 620 (1996)..........................................................................................22, 25

*Sackett v. EPA*,
    598 U.S. 651 (2023)................................................................................................14

*Saget v. Trump*,
    375 F. Supp. 3d 280 (E.D.N.Y. 2019) ...................................................................17

*Santiago v. Puerto Rico*,
    655 F.3d 61 (1st Cir. 2011)....................................................................................3, 4

*Senra v. Town of Smithfield*,
    715 F.3d 34 (1st Cir. 2013)....................................................................................19

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944)................................................................................................14

*Smith v. Town of Clarkton*,
    682 F.2d 1055 (4th Cir. 1982) ...............................................................................24

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009)................................................................................................15

*Texas v. United States*,
    50 F.4th 498 (5th Cir. 2022) ....................................................................................6

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021)................................................................................................15

*U.S. Dep't of Agric. v. Moreno*,
    413 U.S. 528 (1973)................................................................................................25

*United States v. 1.04 Acres of Land, More or Less, Situate in Cameron Cnty.*,
    538 F. Supp. 2d 995 (S.D. Tex. 2008) ...................................................................11

*United States v. Fla. E. Coast Ry. Co.*,
    410 U.S. 224 (1973)................................................................................................21

*United States v. Rubalcava Gonzales*,
    179 F. Supp. 3d 917 (E.D. Mo. 2016).....................................................................11

*Valentin v. Town of Natick*,
    707 F. Supp. 3d 88 (D. Mass. 2023) ......................................................................24

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977)..............................................................................22, 23, 24, 25

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) ................................................................................20

v

*Webb v. Injured Workers Pharmacy, LLC*,
    72 F.4th 365 (1st Cir. 2023)................................................................................................3

*Webster v. Doe*,
    486 U.S. 592 (1988)....................................................................................................1, 4, 5

*Webster v. Fall*,
    266 U.S. 507 (1925)................................................................................................................5

*Whitman v. United States*,
    574 U.S. 1003, 135 S. Ct. 352 (2014)....................................................................................5

*Withrow v. Larkin*,
    421 U.S. 35 (1975)..............................................................................................................18

*Zerezghi v. USCIS*,
    955 F.3d 802 (9th Cir. 2020) ..............................................................................................17

**Constitutional Provisions**

U.S. Const., amend. V................................................................................................... *passim*

**Regulations**

8 C.F.R. § 244.1 ....................................................................................................................17

**Rules**

Fed. R. Civ. P. 12(b)(1).........................................................................................................3

Fed. R. Civ. P. 12(b)(6).........................................................................................................3

**Statutes**

5 U.S.C. § 706(2) .........................................................................................................6, 8, 15

6 U.S.C. § 271.........................................................................................................................9

6 U.S.C. § 542.........................................................................................................................9

6 U.S.C. § 552(d)..................................................................................................................13

6 U.S.C. § 557...................................................................................................................9, 13

8 U.S.C. § 1103(a) .................................................................................................9, 10, 12, 13

8 U.S.C. § 1103(g) ......................................................................................................; *passim*

8 U.S.C. § 1186a.....................................................................................................................9

8 U.S.C. § 1252(b)(9) ...............................................................................................................5

8 U.S.C. § 1252(f)(1) ........................................................................................................4, 6, 7

8 U.S.C. § 1254a .............................................................................................................. *passim*

8 U.S.C. § 1255(l) ....................................................................................................................9

8 U.S.C. § 1255(m) ..................................................................................................................9

8 U.S.C. § 1532 ......................................................................................................................11

8 U.S.C. § 1533(a)(1)..............................................................................................................11

Pub. L. No. 112-58, § 1, 125 Stat. 747 (Nov. 23, 2011)...........................................................9

Pub. L. No. 109–162, § 803, 119 Stat. 3054 (Jan. 5, 2006)......................................................9

**INTRODUCTION**

Defendants have asked this Court to dismiss all of Plaintiffs' claims, relying mainly on the Supreme Court's decision in *Mullin v. Doe*, 609 U.S. ----, 146 S. Ct. 2121 (2026). Defendants read *Mullin* far beyond what it held.

To be sure, *Mullin* has consequences. Plaintiffs acknowledge that their original APA claims—based on allegations that the DHS Secretary violated various statutory requirements set out in the TPS statute—are no longer viable. *See infra* § III.

But *Mullin* did not consider—let alone address or resolve—whether TPS termination authority is vested in the Attorney General or the DHS Secretary. Nor did *Mullin* conclude that constitutional challenges to TPS termination decisions are unreviewable. To the contrary, *Mullin* expressly declined to reach that question and *affirmed* that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Mullin*, 146 S. Ct. at 2137 (quoting *Webster v. Doe*, 486 U.S. 592, 603 (1988)).

Nothing prevents this Court from reviewing Plaintiffs' *ultra vires*, procedural due process, and equal protection claims. And for the reasons discussed below and in Plaintiffs' prior briefing, all of those claims should survive a motion to dismiss. Plaintiffs have adequately stated claims that the Secretary's purported termination of Ethiopia's TPS designation (the "Termination") was *ultra vires*; that the Termination deprived TPS holders of protected liberty and property interests without constitutionally adequate process; and that the Termination violated equal protection because it was discriminatory and infected with unconstitutional animus. Defendants' Motion should be denied.

**BACKGROUND**

On January 22, 2026, Plaintiffs filed their Complaint, asserting five causes of action on behalf of African Communities Together and three individual plaintiffs who face the loss of their

TPS status.  ECF 1.  Three days later, Plaintiffs moved for emergency relief under 5 U.S.C. § 705 asking this Court to postpone the termination of Ethiopia's Temporary Protected Status ("TPS") designation on the ground that the Termination resulted from a defective periodic review process that violated the Administrative Procedure Act ("APA") and the Constitution.  ECF 14.  After Defendants produced the Certified Administrative Record, Plaintiffs submitted supplemental briefing addressing the record.  ECF 43.

On April 8, 2026, this Court granted Plaintiffs' motion for postponement, concluding that Plaintiffs were likely to succeed on their APA claims.  ECF 56 ("Postponement Op.").  Defendants appealed the following day.  ECF 57.  On April 17, 2026, the parties jointly moved to hold further proceedings in abeyance pending the Supreme Court's ruling in *Mullin*.  ECF 60.  The Court granted that request on April 20, 2026.  ECF 61.

On June 25, 2026, the Supreme Court issued its decision in *Mullin*, 146 S. Ct. 2121 (2026). The Court held that the TPS statute's judicial review bar precluded review of the plaintiffs' challenges to the "determination" to terminate the TPS designations of Syria and Haiti.  *Id.* at 2127–28, 2130.  The Court addressed the Haiti plaintiffs' equal protection challenge only in the context of determining whether interim relief was warranted and based only on public statements, and concluded that plaintiffs were unlikely to succeed on the merits.  *Id*. at 2137–40.  The parties did not raise, and the Court did not consider, whether Congress failed to transfer TPS authority from the Attorney General to the Department of Homeland Security ("DHS") Secretary.

Plaintiffs filed an Amended Complaint on July 13, 2026 raising new claims.  ECF 71. Specifically, Plaintiffs allege that the termination of Ethiopia's TPS designation deprived Plaintiffs of procedural due process (Counts VI and VII).  Plaintiffs also allege that the DHS Secretary acted without statutory authority in terminating TPS for Ethiopia (Count VIII).  Plaintiffs simultaneously

filed a renewed emergency motion seeking an administrative stay and postponement of the agency action based on these newly asserted claims. ECF 72.

On July 22, 2026, Plaintiffs moved for an emergency administrative stay. ECF 78. The Court granted that motion pending resolution of Plaintiffs' renewed request for postponement. ECF 82. One week later, Defendants filed the instant Motion to Dismiss. ECF 90 ("Mot.").

On Friday, August 7, two district courts considering challenges to the termination of TPS designations of Burma and South Sudan issued opinions addressing similar *ultra vires* and procedural due process claims. *See Afr. Cmtys. Together v. Mullin*, --- F. Supp. 3d ----, 2026 WL 2274504 (D. Mass. Aug. 7, 2026) (hereinafter "*South Sudan Op.*"); *Aung Doe v. Mullin,* 2026 WL 2279577 (N.D. Ill. Aug. 7, 2026) (hereinafter "*Burma Op.*"). These courts concluded that the claims were reviewable but rejected the claims on the merits on flawed grounds, as explained further below. One of the opinions also addressed an equal protection claim and concluded that it should survive dismissal because, based on the plaintiffs' allegations, it was "plausible that the plaintiffs could uncover evidence" in discovery to prove discrimination. *Burma Op.*, 2026 WL 2279577, at *10–12.

## STANDARD OF REVIEW

When reviewing a motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), the court accepts all well-pleaded factual allegations in the complaint as true and draws all reasonable inferences in Plaintiffs' favor. *See Santiago v. Puerto Rico*, 655 F.3d 61, 72 (1st Cir. 2011); *Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365, 371 (1st Cir. 2023). A Rule 12(b)(1) motion tests only whether the court has subject-matter jurisdiction; a Rule 12(b)(6) motion tests whether Plaintiffs have stated a legally cognizable claim. *See* Fed. R. Civ. P. 12(b)(1), (6). To survive dismissal under Rule 12(b)(6), a complaint need only allege sufficient facts "to

3

state a claim to relief that is plausible on its face." *Santiago*, 655 F.3d at 72 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009)).

**ARGUMENT**

**I.    This Court May Review Plaintiffs' Claims and Grant the Relief Plaintiffs Seek.**

Defendants identify two purported statutory barriers to Plaintiffs' claims and requested relief, but neither applies.  The TPS statute's judicial review bar, 8 U.S.C. § 1254a(b)(5)(A), does not preclude review of Plaintiffs' *ultra vires* claim because—on its face—the review bar only applies to actions taken by the "Attorney General" rather than by the DHS Secretary, an issue the Supreme Court did not address in *Mullin*.  Likewise, the Supreme Court in *Mullin* expressly declined to resolve whether the review bar precludes the consideration of constitutional claims, reaffirming that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear."  *Mullin*, 146 S. Ct. at 2137 (quoting *Webster v. Doe*, 486 U.S. at 603).  Nor did anything in *Mullin* disturb this Court's prior holding that the injunctive relief bar of 8 U.S.C. § 1252(f)(1) does not prohibit postponement or vacatur of unlawful agency action. The Court therefore may review Plaintiffs' claims and grant the relief Plaintiffs seek.

**A.    The TPS Statute's Review Bar Does Not Preclude Review of Plaintiffs' Claims.**

**1.    *1254a(b)(5)(A) Does Not Bar Review of Plaintiffs'* Ultra Vires *Claim.***

As Plaintiffs have explained, the TPS statute's review bar (whose text applies only to actions taken by the "Attorney General") does not foreclose Plaintiffs' *ultra vires* claim, and neither does *Mullin*.  *See* ECF 73 at 10–14.[1]  No party in *Mullin* advanced the argument that the Attorney General alone holds TPS termination authority; instead, the parties assumed the Secretary

---

[1] The TPS statute's review bar provides: "There is no judicial review of any determination of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection."  8 U.S.C. § 1254a(b)(5)(A).

4

possessed that authority, and the Court focused solely on the meaning of "determination," never addressing the statute's "Attorney General" language. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511 (1925); *see also Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) (referencing *Webster v. Fall* and declining to resolve an issue based on a prior Supreme Court decision which "did not address" key, relevant considerations); *Whitman v. United States*, 574 U.S. 1003, 135 S. Ct. 352, 353–54 (2014) (prior decision's "drive-by ruling … deserve[d] little weight" in part because the decision included "scarcely any explanation" on the issue).

### 2.    *1254a(b)(5)(A) Does Not Bar Review of Constitutional Claims.*

As Plaintiffs have explained, *see* ECF 73 at 18–19, the TPS statute's review bar does not reach Plaintiffs' constitutional claims, which are pleaded in Counts Four through Seven of the Amended Complaint, ECF 71 ¶¶ 228–264. The Government conceded at oral argument in *Mullin* that it would "have to be fighting with [Supreme Court precedent] … to argue that there's no judicial review of [] constitutional claims" under § 1254a(b)(5)(A). ECF 73 at 18 (citing Tr. of Oral Arg. 26:22–27:8, *Mullin*, No. 25-1083 (U.S. Apr. 29, 2026)). The Court declined to extend the review bar to constitutional claims, instead proceeding directly to the merits of the equal protection challenge and reaffirming that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Id*. (quoting *Webster v. Doe*, 486 U.S. at 603). Congress expressed no such "clear" intent to bar constitutional claims here—as it has done elsewhere, *cf.* 8 U.S.C. § 1252(b)(9)—and the review bar therefore poses no obstacle to Plaintiffs' due process or equal protection claims, *see* ECF 73 at 18–19.

**B.      1252(f)(1) Does Not Prohibit Plaintiffs' Requested Relief.**

Defendants additionally argue that 8 U.S.C. § 1252(f)(1) precludes Plaintiffs' requested relief, but that argument fails for at least two distinct reasons.

*First*—as this Court found in April—even if § 1252(f)(1) applied to the TPS statute, it would not cover declaratory relief or vacatur under 5 U.S.C. § 706(2). The Court noted that § 1252(f)(1)'s limitation on courts' authority to "enjoin or restrain the operation of" the laws to which it applies is "no bar to Plaintiffs' claims because Plaintiffs do not seek 'to enjoin or restrain the operation of' the TPS statute." Postponement Op. at 30. The Court further noted that "the First Circuit has directed that section 1252(f)(1) does not prevent a district court from hearing a claim for declaratory relief" and extended that conclusion to postponement and vacatur. *Id.* at 31 (quoting *Brito v. Garland*, 22 F.4th 240, 251–52 (1st Cir. 2021)). The district court presiding over the Burma TPS case similarly found that § 1252(f)(1) "does not limit declaratory relief" and "does not preclude vacatur or postponement under the APA." *Burma Op.*, 2026 WL 2279577, at *3. That court discussed a number of reasons supporting this conclusion, noting in particular that neither vacatur nor postponement are an injunction, which is the obvious meaning of "enjoin" in § 1252(f)(1), because "vacatur and postponement operate directly on the agency action at issue" and "neither compel[] nor restrain[] further agency decision-making." *Id.* (citing *Texas v. United States*, 50 F.4th 498, 529 (5th Cir. 2022)). Addressing whether "restrain" in § 1252(f)(1) might refer to vacatur or postponement, the court noted that "one obvious reason to include the word 'restrain' would be to encompass temporary restraining orders," which, like injunctions, are distinct from vacatur and postponement. *Id.* at *4.

*Second*, section 1252(f)(1) does not apply to the TPS statute. Section 1252(f)(1) limits a court's ability "to enjoin or restrain the operation of the provisions of part IV *of this subchapter*"

(emphasis added).[2]  The TPS statute, 8 U.S.C. § 1254a, is in Part V of the same subchapter, not

Part IV.  *Burma Op.*, 2026 WL 2279577, at *2 ("The TPS statute … is in part V, not part IV.  So,

based on the U.S. Code, 8 U.S.C. § 1252(f)(1) does not apply to the TPS statute.").  This is not an

unimportant distinction.  Part IV focuses on a broad range of enforcement-related actions, while

Part V focuses on adjustment and changes in status, including TPS.  *See CASA, Inc. v. Noem*, 792

F. Supp. 3d 576, 595 (D. Md. 2025) (determining that the fact that each subsection "bears no

relationship to the other" supports the conclusion § 1252(f)(1) does not apply to § 1254a).

Defendants point to the text of the original public law of the provision, arguing that it

appears to move the TPS statute to Part IV.  Mot. 14.  But Defendants' argument conflicts with

decades of Supreme Court precedent that identifies the portion of the Immigration and Nationality

Act (the "INA") subject to the bar on injunctive relief in § 1252(f)(1) as either Part IV subchapter

II or 8 U.S.C. §§ 1221–1232—*i.e.*, the "specific sections that are presently contained within Part

IV of subchapter II."  *CASA*, 792 F. Supp. 3d at 595 (collecting cases).  And there are good reasons

to conclude that Congress intended for the TPS statute to reside in Part V.  For example, in the

Burma TPS case, the district court explored whether the TPS statute functionally fits in Part IV or

Part V and noted that, as part of the act that included § 1252(f)(1), Congress restructured and

renamed Parts IV and V: "[C]hapter 4 was renamed 'Inspection, Apprehension, Examination,

Exclusion, and Removal,' and chapter 5 was renamed 'Adjustment and Change of Status.'"  *Burma*

*Op.*, 2026 WL 2279577, at *2.  The court noted that "[t]he TPS statute seems to fit most naturally"

---

[2] Section 1252(f)(1) provides in full: "Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." 8 U.S.C. § 1252(f)(1).

in Part V, suggesting that Congress intended the TPS statute to be right where it is in the U.S. Code—Part V. *Id.*

## II.    Plaintiffs Have Adequately Stated Claims on the Merits.

### A.    Plaintiffs Have Adequately Pleaded Their *Ultra Vires* Claim (Count VIII).

It is fundamental that "administrative agencies granted executive authority by Congress may operate only within the bounds Congress has set." Postponement Op. at 1–2. Because agencies are creatures of statute, "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress," so "when they act beyond their jurisdiction, what they do is ultra vires." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). Consistent with those principles, an agency bears the burden to "identify statutory authority for any action it takes." *Nat'l Ass'n of Broads. v. FCC*, 39 F.4th 817, 819 (D.C. Cir. 2022).

Defendants have failed to carry that burden here. When Congress established the TPS scheme in 1990, it unambiguously assigned the authority to terminate TPS designations to the Attorney General. And Congress never transferred that authority to the DHS Secretary or any other official. The DHS Secretary therefore acted *ultra vires* in purporting to terminate Ethiopia's TPS designation, and the Termination must be "set aside." 5 U.S.C. § 706(2). Defendants' Motion should be denied as to Count VIII.

#### 1.    *The TPS Statute's Text Unambiguously Vests Authority in the Attorney General, Not the Secretary of Homeland Security.*

Congress expressly authorized one—and only one—executive official to terminate TPS designations: the Attorney General. The TPS statute provides: "If the *Attorney General* determines … that a foreign state … no longer continues to meet the conditions for [TPS] designation … the *Attorney General* shall terminate the designation." 8 U.S.C. § 1254a(b)(3)(B) (emphases added). The Secretary is not mentioned; nor is any other government official.

8

Throughout the TPS statute, Congress consistently vested authority to designate countries for TPS, extend TPS designations, grant TPS status, and provide work authorization in the Attorney General. *See* 8 U.S.C. § 1254a(a)(1), (b)(1), (b)(3)(C).

Defendants rely on just three provisions—8 U.S.C. § 1103(a), 8 U.S.C. § 1103(g), and 6 U.S.C. § 557—to argue otherwise, but none transfers TPS authority from the Attorney General to the DHS Secretary.

**8 U.S.C. § 1103(a).** Section 1103(a) undermines rather than supports Defendants' position. Mot. 27. Section 1103(a) generally transfers immigration functions to DHS while expressly carving out powers, functions, and duties "conferred upon" the "Attorney General" under the INA (Chapter 12 of Title 8) and "all other laws relating to the immigration and naturalization of aliens." 8 U.S.C. § 1103(a)(1); *see* ECF 71 ¶¶ 274–275. By its terms, that exception preserves powers and functions that Congress expressly vested in the Attorney General, notwithstanding the transfer of *other* immigration functions to DHS.[3]

---

[3] Reading section 1103(a) to mean what it says is not at all "implausible," nor would adopting that reading "significantly undermine the Secretary's role as primary administrator of the immigration laws." *Burma Op.*, 2026 WL 2279577, at *7–8. By its plain terms, section 1103(a) is just a default rule providing that immigration-related powers are *generally* vested in the DHS Secretary *unless* Congress expressly vests them in the Attorney General (or the other officials subject to the "except" clause). That default rule is subject to a number of other provisions that transferred powers from the DOJ to DHS, including a provision that transferred functions from the Immigration and Naturalization Service ("INS") (within DOJ) to the U.S. Citizenship and Immigration Services (within DHS), *see* 6 U.S.C. § 271; and a Reorganization Plan that allowed for additional transfers as directed by the President, *see* 6 U.S.C. § 542. And Congress has modified the section 1103(a) default rule on multiple occasions since passing the Homeland Security Act in 2002 by replacing specific "Attorney General" references in the INA with references to the Homeland Security Secretary. *See, e.g.*, Pub. L. No. 112-58, § 1, 125 Stat. 747 (Nov. 23, 2011) (amending 8 U.S.C. § 1186a by replacing "Attorney General" with "Secretary of Homeland Security" throughout section); Pub. L. No. 109–162, § 803, 119 Stat. 3054 (Jan. 5, 2006) (amending 8 U.S.C. § 1255(l) and (m) by replacing "Attorney General" with "Secretary of Homeland Security" in multiple places and specifying allocation of responsibility between those officials with respect to the adjustment of status for victims of trafficking).

TPS authority clearly falls squarely within that exception.  Congress vested authority to designate, extend, and terminate TPS in the Attorney General, not in the INS or any other sub-agency.  *See* 8 U.S.C. § 1254a.  And because section 1254a is housed within Chapter 12 of Title 8 (the INA), TPS authority is among the powers reserved to the Attorney General by the section 1103(a)(1) exception.  Far from transferring TPS authority, section 1103(a)(1) confirms that TPS authority remained with the Attorney General after DHS's creation.

**8 U.S.C. § 1103(g).**  Because section 1103(a) undermines any theory that TPS authority was transferred, Defendants argue that section 1103(g) limits section 1103(a)(1) so that *only* EOIR-related immigration powers were retained by the Attorney General.  *See* Mot. 27.  But that interpretation—apparently contrived for the first time in response to Plaintiffs' claims—has fatal defects and cannot be squared with the statute.

*First*, Defendants' theory—unlike Plaintiffs'—requires adding words to the statute.  For example, Defendants read section 1103(g) as being exhaustive—*i.e.*, setting forth the *only* immigration-related powers that were reserved to the Attorney General—but section 1103(g) does not include the word "only" or any comparable language.  Similarly, Defendants read section 1103(a)'s "except" clause as including a cross-reference to section 1103(g).  *See* ECF 84 at 8 (asserting that section 1103(a) "specifies" that the powers reserved to the Attorney General are those in section 1103(g)).  But no such cross-reference exists.  A theory that requires rewriting the statute it interprets is surely wrong.  *See Lamie v. U.S. Tr.*, 540 U.S. 526, 538 (2004) (declining to "read an absent word into the statute").

*Second*, Defendants' view requires accepting that the "authorities and functions" tied to EOIR were the only immigration-related powers that remained with the Attorney General when DHS was created, but that is easily refuted.  For example, through the Antiterrorism and Effective

10

Death Penalty Act of 1996, Congress established an alien terrorist removal court that is comprised of Article III district court judges selected by the Chief Justice; it entirely bypasses EOIR. *See* 8 U.S.C. § 1532. Under the statute, only the "Attorney General" may initiate removal proceedings "by filing an application with the removal court." 8 U.S.C. § 1533(a)(1). And just weeks ago, it was the Attorney General who filed a high-profile "application to remove" an "alien terrorist" in order to commence removal proceedings in the court.[4] Under Defendants' theory, only the DHS Secretary had authority to file that application. This is hardly the only example of non-EOIR immigration powers that remained with the Attorney General after DHS's creation. *See, e.g.*, *United States v. Rubalcava Gonzales*, 179 F. Supp. 3d 917, 929 (E.D. Mo. 2016) (directing denaturalization certificate to Attorney General per 8 U.S.C. § 1451(f)); *United States v. 1.04 Acres of Land, More or Less, Situate in Cameron Cnty.*, 538 F. Supp. 2d 995, 997 (S.D. Tex. 2008) (noting Attorney General's exercise of land acquisition authorities under 8 U.S.C. § 1103(b)).

It is not an option to simply disregard this proof that Defendants' theory is incorrect, on the grounds that "[t]hose specific issues are not before the Court." *South Sudan Op.*, 2026 WL 2274504, at *4 n.3. "It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)). Courts therefore have a "*duty* to construe statutes, *not isolated provisions*." *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 290 (2010) (emphasis added); *see also Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995) (provisions must be interpreted as part of a "symmetrical and coherent regulatory scheme"); *FTC*

---

[4] *See* Press Release, DOJ, Off. of Pub. Affs., Department of Justice Files First Case in U.S. Alien Terrorist Removal Court to Deport Afghan Alien Who Supported Her Family's Plans for Election-Day Shooting (July 30, 2026), https://perma.cc/2CXR-BXFN.

*v. Mandel Bros., Inc.*, 359 U.S. 385, 389 (1959) (court must endeavor to "fit, if possible, all parts into an harmonious whole").  At a minimum, the applicable "statutory scheme" that must be harmonized here includes the INA—chapter 12 of title 8 of the U.S. Code—which houses the TPS statute and is explicitly cross-referenced in the two statutory provisions that Defendants cite as the basis for the transfer of TPS termination authority.  *See* 8 U.S.C. § 1103(a), (g) (referring to "this chapter [*i.e.*, the INA] and all other laws relating to the immigration and naturalization of aliens").  Nor can the statutory analysis be artificially cabined to section 1103, when Plaintiffs' statutory authority claim is principally grounded in the TPS statute, which exists outside section 1103 and expressly vests TPS termination authority in the "Attorney General."  8 U.S.C. § 1254a.[5]

*Third*, Defendants' theory creates surplusage, because in their view section 1103(a)'s reservation of powers for the Attorney General is the *exact same* reservation of powers contained in section 1103(g).  Plaintiffs' reading of the statute gives independent meaning to both of those provisions: Section 1103(a) is a broad reservation of immigration-related powers vested in the *Attorney General specifically*, while section 1103(g) is a narrower provision focused on ensuring that powers exercised by the *EOIR* remain with DOJ.  There is one potential redundancy under that reading because section 1103(g) as an aside also reserves powers exercised "by the Attorney General with respect to" the EOIR.  But redundancies are common in statutes to clarify meaning or as a "belt-and-suspenders" approach.  *See In re Coughlin*, 33 F.4th 600, 608–09 (1st Cir. 2022).

---

[5] Defendants are no doubt aware that these non-EOIR examples of Attorney General immigration authorities refute their EOIR-only theory.  When faced with those examples in the South Sudan and Somalia lawsuits, Defendants pivoted to a new theory that section 1103(g) provides only an "example" of the powers that were reserved to the Attorney General—a theory that actually aligns with *Plaintiffs*.  *See Afr. Cmtys. Together v. Mullin*, No. 25-cv-13939 (D. Mass.), ECF 107 at 11–12; ECF 117 at 8–9; ECF 118 at 8; *Afr. Cmtys. Together v. Mullin*, No. 26-cv-11201 (D. Mass.), ECF 102 at 20–21; ECF 103 at 17–18.  Judge Saris recognized that Defendants had advanced two contradictory theories of interpretation and *rejected* the theory that Defendants most recently endorsed.  *South Sudan Op.*, 2026 WL 2274504, at *2 n.1 (noting two different readings); *id.* at *3 (adopting reading "*initially* espoused by Defendants" (emphasis added)).

12

That easily explains any minor overlap between sections 1103(a) and 1103(g).

**6 U.S.C. § 557.**  This is the third statutory provision that Defendants cite as the basis for the Secretary's authority.  But Defendants acknowledge that it is just a "reference-updating" provision, which "operated to update all other federal laws *with respect to functions that were transferred to the Secretary under the Act*."  ECF 84 at 9 (emphasis added); *see also South Sudan Op.*, 2026 WL 2274504, at *3 n.2 (explaining that 6 U.S.C. §§ 552(d) and 557 are "housekeeping provisions" that apply only "wherever a substantive transfer of authority has occurred").  In other words, for functions that were *not* transferred—like TPS termination authority—section 557 does not apply.

### 2. *Neither* Mullin *Nor Any Other Decision Forecloses Plaintiffs'* Ultra Vires *Claim.*

Defendants assert that the Supreme Court's decision in *Mullin* forecloses the *ultra vires* claim.  Mot. 8, 28.  But they point to no evidence that the parties ever presented—or that the Court ever considered—the question whether the authority to terminate a TPS designation is vested exclusively in the Attorney General.  When interpreting the scope of the TPS statute's review bar, the Supreme Court focused on the word "determination," *see Mullin*, 146 S. Ct. at 2134–37, not the review bar's "Attorney General" language (which appears nowhere in the opinion).  Defendants make much, Mot. 28, of *Mullin*'s reference in the background section to 6 U.S.C. §§ 552(d) and 557, but again, as Defendants acknowledge, those are just housekeeping provisions. The Supreme Court made no mention of 8 U.S.C. § 1103(a) or (g), the provisions on which Defendants now hang their hat.  Because no party in *Mullin* contested the Secretary's TPS termination authority, the Court's assumptions regarding that authority cannot be treated as a binding determination of the issue.  *See supra* § I.A.1; *see also Burma Op.*, 2026 WL 2279577, at *6 (concluding that the government "overreads" *Mullin* because "[n]o party … raised the issue of

13

who has TPS authority in the first place under the statute," and the Supreme Court merely assumed the "undisputed premise that the jurisdictional bar … applied to the Secretary's determinations.").

### 3. *Past Agency Practice Does Not Amount to a Delegation of Statutory Authority.*

Defendants fall back on their own practice and understanding that TPS authority is vested in DHS, Mot. 29, but that counts for close to nothing because "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024).  Indeed, courts routinely reject agencies' long-held statutory interpretations when they cannot be squared with the relevant statute.[6]  The mere fact that the DHS Secretary has adopted a "practice" of administering the TPS statute is entitled to zero weight because—following *Loper Bright*—only an *interpretation* may be afforded "respect" depending "upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to *persuade*."  *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944) (emphasis added).  There is no such thing as a persuasive "practice."  *Contra Burma Op.*, 2026 WL 2279577, at *8; *South Sudan Op.*, 2026 WL 2274504, at *3.[7]  And Defendants' new interpretive theory grounded in section 1103(g) is not "consisten[t] with earlier … pronouncements" or otherwise persuasive. *See Skidmore,* 323 U.S. at 140.  Indeed, Defendants can make no claim to consistency because

---

[6] *See, e.g.*, *Sackett v. EPA*, 598 U.S. 651, 679 (2023) (rejecting EPA's decades old interpretation); *City & Cnty. of S.F. v. EPA*, 604 U.S. 334, 355–57 (2025) (same for EPA interpretation); *Brown v. Gardner*, 513 U.S. 115, 122 (1994) (same for Department of Veterans Affairs interpretation).

[7] Historical practice—typically measured by centuries—is still relevant when it comes to interpreting the *constitutionality* of statutes.  *See, e.g., NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014) (considering "long settled and established practice" when evaluating "constitutional provisions regulating the relationship between Congress and the President" (citation modified)). But an agency cannot claim deference on a matter of statutory interpretation based on its practice alone.

they *abandoned* that theory in other TPS lawsuits in this District roughly a week after announcing it.  *See supra* note 5.

### 4. *Plaintiffs'* Ultra Vires *Claim Is Not "Self-Defeating."*

Defendants maintain that Plaintiffs' *ultra vires* argument is "self-defeating" based on the view that it would necessarily invalidate the initial TPS designation.  *See* ECF 84 at 11.  That argument fails for at least three reasons.

*First*, Plaintiffs' claim is brought under the APA and challenges a single final agency action: the TPS *termination* decision for Ethiopia.  *See* ECF 71 ¶¶ 265–286.  If Plaintiffs prevail on that claim, this Court is authorized under the APA to "set aside" *only that particular* agency action.  5 U.S.C. § 706(2).  Article III similarly "restricts" this Court's jurisdiction to relief that redresses the particular "executive action" that has caused Plaintiffs' injuries.  *See, e.g.*, *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).  Any challenge to Ethiopia's TPS *designation* would need to be the subject of a separate lawsuit of doubtful justiciability.  In Defendants' view, this is all just "remedial hyper-formalism."  ECF 84 at 11.  To the contrary, these jurisdictional principles are central to our constitutional structure.  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 422 (2021) (relating Article III standing to "separation of powers" (citation omitted)).  For that reason, Plaintiffs are aware of no case (and Defendants have cited none) rejecting a claim simply because its *logic* could result in a decision that adversely affects Plaintiffs' interests in a hypothetical separate lawsuit directed to a separate agency action.

*Second*, if the Executive Branch were at any point to rescind TPS status for Ethiopian TPS holders on the basis that their TPS status was unlawful, that rescission would constitute a new agency action that would be subject to the APA and further review in the courts.  *See, e.g.*, *DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1, 24–28 (2020); *see also Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 476 (5th Cir. 2024) (explaining *Regents* "held that even when an agency

15

determines that its previous decision was illegal, it still must go on to consider alternatives to simply revoking the prior action"). *Mullin* would not apply to such a claim because the TPS statute's review bar would not apply, and the entire action would operate outside the bounds of the TPS statute but within the constraints of the APA. *Contra South Sudan Op.*, 2026 WL 2274504, at *4 n.4. Defendants press a crabbed reading of *Regents*, suggesting it was limited to scenarios where the government determines that a program is unlawful only in part. But *Regents* made clear that even "illegal" programs must be "wound down" in a way that considers "reliance interests" and is otherwise consistent with the APA. 591 U.S. at 13, 25, 30. In any event, the Executive Branch very well could identify a separate basis for authority for a TPS designation—or conclude that at least *part* of the TPS program is independently authorized on other grounds—rather than rescinding it *in toto*. *See Mullin*, 146 S. Ct. at 2128 (explaining that, prior to the TPS statute's enactment, "the Executive Branch sometimes provided similar relief as a matter of discretion without any express statutory authorization"). The availability of those alternatives places any future TPS rescission squarely within the *Regents* framework.

*Third*, procedural due process would apply to any rescission. *See infra* § II.B.

### B.      Plaintiffs Have Adequately Pleaded Their Procedural Due Process Claims (Counts VI and VII).

Plaintiffs have plausibly alleged procedural due process claims because Defendants deprived them of protected liberty and property interests using procedures that were constitutionally insufficient.

#### 1.      *Plaintiffs Have Constitutionally Protected Liberty and Property Interests.*

To start, Plaintiffs clearly have liberty and property interests that the Constitution protects: protection from removal and work authorization. *See, e.g.*, *Mansor v. USCIS*, 685 F. Supp. 3d 1000, 1013 (W.D. Wash. 2023) (holding that "a prima facie eligible TPS applicant has a property

16

interest in temporary employment authorization subject to due process protections"); *Saget v. Trump*, 375 F. Supp. 3d 280, 333 (E.D.N.Y. 2019) ("Protecting liberty interests such as those associated with TPS is vital to the proper functioning of the rule of law."); ECF 73 at 14–16 (summarizing cases).

Defendants insist otherwise by pointing out that the conferral of TPS status is in some respects discretionary. Mot. 2, 13. But that ignores that removal protection and work authorization are *mandatory* once a country has been designated for TPS and an applicant makes a prima facie showing of eligibility. *See* 8 U.S.C. § 1254a(a)(1)(A)–(B), (4)(B); 8 C.F.R. § 244.1; *Mansor*, 685 F. Supp. 3d at 1013 (concluding that TPS eligibility criteria are not discretionary and section 244.1 "is sufficiently mandatory to entitle an applicant to a determination of prima facie eligibility, and with it, temporary employment authorization"). Defendants also ignore that, once a TPS designation is effective, it is automatically extended until the deciding official issues a valid termination decision. *See* 8 U.S.C. § 1254a(b)(2)(B), (3)(C). And that termination decision must be based on a determination that the relevant country no longer meets the designation conditions. *See* 8 U.S.C. § 1254a(b)(3)(B). Absent that determination, no designation may be terminated.

In other words, when it comes to the issuance of TPS benefits and to the extension of a TPS designation, the TPS statute "mandat[es] the outcome to be reached upon a finding that the relevant criteria have been met." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 462 (1989). That is sufficient to establish a cognizable liberty and property interest under the Due Process Clause. *See, e.g.*, *id.* at 463 (due process interest exists where "a particular outcome must follow" when certain "substantive predicates are present"); *Zerezghi v. USCIS*, 955 F.3d 802 (9th Cir. 2020) (finding constitutionally protected interest in immigration petition because approval is

17

nondiscretionary once eligibility criteria are met); *Doe v. Noem*, 817 F. Supp. 3d 27, 55 (D. Mass. 2026) (same).

### 2.      *The Secretary Violated Procedural Safeguards that Are Constitutionally Mandated.*

Defendants inaccurately assert that Plaintiffs' claims do not allege that the Due Process Clause itself—independent of the TPS statute—would require the Secretary to follow any of the procedures of the TPS statute.  Mot. 11.  Plaintiffs allege exactly that: At least *some* of the procedures in the TPS statute would be constitutionally required even if they did not appear in the statutory text.  ECF 71 ¶¶ 251–257, 262.  For example, the publication requirement ensures that there is meaningful notice of the actual reasons for the government's decision.  *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985).  And the consultation requirement protects Plaintiffs' right to a neutral decisionmaker who has not made a preordained decision before reviewing the evidence.  *See Perez-Escobar v. Moniz*, 792 F. Supp. 3d 224, 226 (D. Mass. 2025).  All of these safeguards mitigate the risk of an erroneous deprivation.  *See Withrow v. Larkin*, 421 U.S. 35, 47 (1975) (due process forbids practice that poses "risk of actual bias or prejudgment").  The particular character of these procedural safeguards may not precisely map onto the procedures that apply in more typical adjudication settings.  But that is unsurprising because "[d]ue process is flexible" and "calls for such procedural protections as the particular situation demands."  *Jennings v. Rodriguez*, 583 U.S. 281, 314 (2018).[8]

---

[8] The district court in the Burma TPS matter overlooked these authorities in concluding that none of the TPS statute's applicable procedural safeguards are constitutionally required.  *See Burma Op.*, 2026 WL 2279577, at *9–10.  For example, the Due Process Clause independently requires notice that is "reasonably calculated" to "convey the required information," *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950), and which provides a "meaningful opportunity to respond," *Senra v. Town of Smithfield*, 715 F.3d 34, 39 (1st Cir. 2013); *see also Armstrong v. Manzo*, 380 U.S. 545, 552 (1965).  A notice that is inaccurate, false, or misleading does not satisfy those requirements.

18

Nor is there anything unusual about Plaintiffs' claim that violating a statute may *also* violate due process. One district court has already recognized as much in addressing an identical procedural due process claim asserting overlapping violations of the TPS statute. *See Burma Op.*, 2026 WL 2279577, at *9 (holding that claim was inherently constitutional and not barred by *Mullin* even though it also involved "statutory violations"). Courts routinely recognize that statutory and regulatory procedures can reflect procedural due process protections such that violating those procedures violates the Due Process Clause. *See, e.g.*, *Rombot v. Souza*, 296 F. Supp. 3d 383, 388 (D. Mass. 2017) ("[W]here an immigration regulation is promulgated to protect a fundamental right derived from the Constitution or a federal statute, like the opportunity to be heard, and [ICE] fails to adhere to it," the challenged action violates due process.) (citation modified); *Cruz v. Bondi*, 2025 WL 3295485, at *9 (D.R.I. Nov. 26, 2025) (similar); *de Rodriquez v. Hyde*, 2026 WL 220416, at *4 (D. Mass. Jan. 28, 2026) (concluding that the government "failed to adhere to their own regulations, and in the process, violated Petitioner's procedural due process rights"); *Perez-Escobar*, 792 F. Supp. 3d at 226 (similar).[9]

### 3.    *The Secretary's TPS Termination Is Adjudicative in Nature.*

Defendants contend that due process does not apply to a TPS termination because it affects a group of people. *See* Mot. 10–11. That argument fails because it depends on a false binary: As the First Circuit has explained, "the line between legislative and adjudicative action for purposes of procedural due process analysis is not always easy to draw." *Garcia-Rubiera v. Fortuño*, 665 F.3d 261, 274 (1st Cir. 2011). Governmental actions fall along a "continuum" between "generally-

---

[9] Defendants are also wrong in asserting that Plaintiffs press "all" of their statutory claims under a constitutional label. For example, the due process claims do not cover certain statutory procedural deficiencies that Plaintiffs previously pressed under their APA claims, such as the impermissible consideration of the national interest and departures from past agency practice. *See* ECF 71 ¶¶ 53–56. Rather, Plaintiffs' due process claim focuses on a subset of the statutory violations identified, and each is tethered to a line of due process precedent.

applicable legislative actions" and individualized adjudications like that at issue in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *Fortuño*, 665 F.3d at 272. Critically, procedural due process protections apply even when a governmental action is not at the far, purely individualized end of the spectrum. *See id.* at 274.

Applying this framework, the TPS termination is sufficiently adjudicative to trigger due process protections. It is a determination made about a single country based on the application of particular statutory criteria—specifically the "conditions in the foreign state." 8 U.S.C. § 1254a(b)(1)(C). The decision requires evaluating country-specific facts, consulting with other government officials about conditions in a specific country, and publishing the basis for the country-specific termination. The resulting termination immediately and directly deprives a defined class of current TPS holders of benefits previously conferred by law, including protection from removal and authorization to work. Given these "elements of an individualized adjudicative process" versus a legislative rule in a deprivation of interests, due process applies. *Fortuño*, 665 F.3d at 275; *see also Hill v. U.S. Dep't of the Interior*, 151 F.4th 420, 434 & n.6 (D.C. Cir. 2025) (distinguishing between deprivations that are "the direct consequence of a statute" and those resulting from "individualized determination[s] or adjudication[s]").

These principles explain why courts have applied procedural due process to broad immigration policies that affect defined groups. *See, e.g., Washington v. Trump*, 847 F.3d 1151, 1164–65 (9th Cir. 2017) (procedural due process challenge to first travel ban Executive Order, which applied categorically to broad classes of noncitizens through a generally applicable policy); *Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 283–85 (E.D.N.Y. 2018) (procedural due process challenge to rescission of Deferred Action for Childhood Arrivals). Like those cases, this one "involve[s] government action that directly impact[s] individuals' due process rights." *Contra*

20

*South Sudan Op.*, 2026 WL 2274504, at *5 n.5.  Indeed, this Court has already determined that "[i]f the effective date of the termination is not postponed, individual Plaintiffs will lose access to their livelihoods and immediately face arrest and removal."  Postponement Op. at 25.  In other words, Plaintiffs will lose the very liberty and property interests that are constitutionally protected. *See supra* § II.B.1.  And it is no answer to say that Plaintiffs will be afforded individualized process down the road (*e.g.*, in connection with removal proceedings), because at that point, there will be no opportunity to contest the Termination.

Defendants' authorities do not compel a different result.  For example, a TPS termination decision is a far cry from the prospective, generally applicable rules at issue in *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 245–46 (1973) and *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915).  *Harper v. Werfel,* 118 F.4th 100, 115 (1st Cir. 2024), is equally inapposite.  There the court found that the plaintiff lacked any cognizable protected interest, and the court did not address whether procedural due process rights are limited to individualized adjudications.  *Id*. at 112–14.

### C.    Plaintiffs Have Adequately Pleaded Their Equal Protection Claims (Counts IV and V).

*Mullin* does not, as Defendants suggest, Mot. 21, foreclose Plaintiffs' equal protection challenges to the termination of Ethiopia's TPS designation.  First, *Mullin* was not a final decision on the merits, but a preliminary, "predictive" evaluation based on public statements alone.  *Mullin*, 146 S. Ct. at 2137.  It therefore does not foreclose Plaintiffs from proceeding to discovery based on allegations that establish a plausible equal protection claim.  Second, *Mullin* reviewed evidence of discrimination through the lens of *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), and did not consider the separate doctrinal ground of

21

*Romer v. Evans*, 517 U.S. 620 (1996), which prohibits governmental action driven by bare animus toward a disfavored group.

### 1. *Plaintiffs Should Be Permitted to Proceed to Discovery on Their Equal Protection Claims.*

The Court in *Mullin* was explicit that in evaluating the district courts' grant of interim relief, it was making "only a predictive—not a final—decision about the outcome of the case." *Mullin*, 146 S. Ct. at 2137. Accordingly, *Mullin* does not preclude Plaintiffs—who rely on a different factual record, a different theory of liability, and are in a different procedural posture— from moving forward with their equal protection claims. Indeed, another district court recently came to that exact conclusion. *See Burma Op.*, 2026 WL 2279577, at *11 (*Mullin* is not "controlling" with respect to an equal protection claim at the motion-to-dismiss stage because *Mullin* applied a "likelihood of success standard based on only public statements"; the "Supreme Court did not decide that the plaintiffs had failed to state a plausible claim" or foreclose the possibility that plaintiffs "could uncover evidence that might have changed the outcome in *Mullin*.").

The question at this stage is whether Plaintiffs plausibly allege their claims and are entitled to litigate them. *See Butler v. Balolia*, 736 F.3d 609, 616 (1st Cir. 2013) ("Plausibility does not demand a showing that the claim is likely to succeed."). Plaintiffs plausibly allege that, under *Arlington Heights*, the Termination was "based on race, national origin and ethnicity-based animus in violation of the Fifth Amendment to the U.S. Constitution." *See* ECF 71 ¶¶ 136–173, 230–231, 236–237.

To state an equal protection claim, plaintiffs must allege that "a discriminatory purpose [was] a motivating factor" in the challenged government action. *Arlington Heights*, 429 U.S. at 265–66. Plaintiffs can establish a discriminatory purpose in one of two ways: (1) where a "clear

pattern, unexplainable on grounds other than race, emerges from the effect of the state action[,]" or (2) discriminatory intent can be inferred from "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of Bos.*, 996 F.3d 37, 45 (1st Cir. 2021) (citing *Arlington Heights*, 429 U.S. at 266). "Factors bearing on discriminatory intent may include 'the degree of disproportionate racial effect, if any, of the policy; the justification, or lack thereof, for any disproportionate racial effect that may exist; and the legislative or administrative historical background of the decision.'" *Bos. Parent*, 996 F.3d at 45 (citing *Anderson ex rel. Dowd v. City of Bos.*, 375 F.3d 71, 83 (1st Cir. 2004)).

Plaintiffs have alleged facts supporting an inference of an intent to discriminate against non-white, non-European immigrants generally, and Black and African immigrants specifically. For example, the Amended Complaint includes allegations detailing statements and actions of Secretary Noem, President Trump, and others in his Administration evincing an intent to discriminate against majority Black and African nations. *See* ECF 71 ¶¶ 138–169. Plaintiffs also allege that both Secretary Noem and President Trump have repeatedly used "charged code words" in describing policy goals that dehumanize non-white, non-European countries and immigrants. *See*, *e.g.*, *id.* ¶¶ 155, 164 (alleging that Defendants have referred to such nations as "shithole" countries and described immigrants from those places as "vicious" and "violent"); *see also Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 609 (2d Cir. 2016) (internal citation omitted) (cited in *Valentin v. Town of Natick*, 707 F. Supp. 3d 88, 99 (D. Mass. 2023)) (use of "charged code words" may serve as "evidence of discriminatory intent by sending a clear message and carrying the distinct tone of racial motivations and implications").

23

Further, Plaintiffs' allegations regarding the historical background of the decision to terminate TPS for Ethiopia indicate that it was part of "a series of official actions taken for invidious purposes." *Arlington Heights,* 429 U.S. at 267. The decision to terminate TPS for Ethiopia was the eleventh in as many months, and Defendants' abrupt, unacknowledged, and unreasoned shifts in policy when issuing the determination, *see* ECF 71 ¶ 63, evince discriminatory motive, *Centro Presente v. DHS*, 332 F. Supp. 3d 393, 415 (D. Mass. 2018) (holding that plaintiffs plausibly alleged that TPS terminations violated equal protection where terminations rested on an "unreasoned shift in policy").

Finally, Plaintiffs plausibly allege that the disparate "impact of the official action … bears more heavily on" non-white, non-European immigrants generally, and Black and African immigrants specifically: The Amended Complaint alleges that simultaneously with its blanket terminations of TPS for non-white, non-European countries, the Administration has encouraged admission of white Afrikaners from South Africa. *See* ECF 71 ¶¶ 170–173. Also, as the Supreme Court acknowledged in *Mullin*, the TPS designation for Ukraine will come up for review in October, which will shed further light on the motivations behind Defendants' so-far "unbroken record of TPS terminations." 146 S. Ct. at 2139–40.

Permitting Plaintiffs to move forward on their equal protection claims is particularly appropriate here, where Plaintiffs have not yet had the opportunity to engage in extra-record discovery. *See Smith v. Town of Clarkton*, 682 F.2d 1055, 1064 (4th Cir. 1982) ("[O]fficials acting in their official capacities seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority."). Allowing this case to proceed to discovery is also appropriate in view of this Court's finding that the stated reasons for Ethiopia's termination were likely not the actual reasons for the decision.

24

Postponement Op. at 24–25.  Plaintiffs have plausibly alleged that the decision was actually motivated, at least in part, by an intent to discriminate against non-white, non-European immigrants generally, and Black and African immigrants specifically.  Defendants' motion to dismiss these claims should be denied.

### 2.    *Plaintiffs Have Plausibly Alleged Animus Toward Disfavored Groups.*

"[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare … desire to harm a politically unpopular group cannot constitute a legitimate governmental interest."  *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973).  For this reason, governmental action "born of animosity toward the class of persons affected" does not survive constitutional scrutiny.  *Romer*, 517 U.S. at 634.  Plaintiffs have plausibly alleged that Defendants terminated Ethiopia's TPS designation due to bare animus towards non-white, non-European immigrants generally, and Black and African immigrants specifically.  ECF 71 ¶¶ 136–173, 230–231, 236–237.  That is sufficient to survive a motion to dismiss.

*Mullin* does not suggest otherwise.  In *Mullin*, the Court evaluated whether race was "a motivating factor" in Haiti's termination, applying *Arlington Heights.  See* 429 U.S. at 266.  As described above (*supra* § II.C.1), Plaintiffs have plausibly alleged unlawful discrimination under that standard.  But Plaintiffs have also pleaded discrimination under the separate doctrinal test of *Romer* and *Moreno*.  To state an equal protection claim under *Romer*, a plaintiff must plead that a governmental enactment singles out a specific group for disfavored legal status and general disability, and that the classification is motivated by animus rather than advancing a legitimate state interest.  *See Bos. Taxi Owners Ass'n, Inc. v. City of Boston*, 180 F. Supp. 3d 108, 118 (D. Mass. 2016) (citations omitted).  Plaintiffs plausibly allege that the Termination was effected through a "pretextual, politically influenced, and procedurally defective periodic review[],"

25

ECF 71 ¶ 136, that was "based on race, national origin and ethnicity-based animus in violation of the Fifth Amendment to the U.S. Constitution," *see id.* ¶¶ 136–173, 230–231, 236–237.

Defendants argue that Plaintiffs' animus theory ignores a so-called "strong, race-neutral explanation"—*i.e.*, the explanation in the Federal Register Notice that conditions in Ethiopia had improved dramatically. Mot. 23. But this Court has already concluded that Plaintiffs are likely to succeed in showing that this explanation was preordained and pretextual. Postponement Op. at 24–25. The Court also explained that the Federal Register's stated rationale was "demonstrably untrue as revealed by the administrative record itself" and "at best, irrelevant to the determination," suggesting that "Defendants were casting about for explanations to justify a predetermined outcome." *Id.* at 24. These same findings confirm that *Mullin* does not compel the dismissal of Plaintiffs' equal protection claim.

### III.    Plaintiffs Do Not Oppose Dismissal of Counts One, Two, and Three.

In light of the Supreme Court's decision in *Mullin*, Plaintiffs do not oppose dismissal of Counts One, Two, and Three of the Amended Complaint. Those Counts pleaded APA claims challenging the Secretary's termination of Ethiopia's TPS designation on the premise that the Secretary possessed termination authority under the TPS statute and was subject to the TPS statute's procedural requirements. ECF 71 ¶¶ 203–227. If the Secretary possesses the authority to issue TPS designations and terminations—as Counts One, Two, and Three assumed—then Plaintiffs acknowledge that *Mullin* forecloses the review of those claims. *See Mullin*, 146 S. Ct. at 2127.

Alternatively, if *the Attorney General* possesses the exclusive authority to issue TPS designations and terminations—which Plaintiffs maintain is the best reading of the statutory scheme, *see supra* § II.A.1,—then Counts One, Two, and Three would be *reviewable* because the text of the TPS statute's judicial review bar, § 1254a(b)(5)(A), refers only to the Attorney General,

26

not the DHS Secretary.  However, Plaintiffs acknowledge that—assuming the Attorney General possesses the exclusive authority to issue TPS designations and terminations—Counts One, Two, and Three are not viable on the merits because the DHS Secretary under that reading is not subject to the TPS statute's procedural requirements, which formed the basis for violations alleged in those Counts.[10]

**CONCLUSION**

For the foregoing reasons, this Court should deny Defendants' Motion to Dismiss.

Dated: August 10, 2026                              Respectfully Submitted,

                                                    */s/ Paul Killebrew*
                                                    Mark H. Lynch (*pro hac vice*)
                                                    Stephen Petkis (*pro hac vice*)
                                                    Daniel G. Randolph (*pro hac vice*)
                                                    Paul Killebrew (*pro hac vice*)
                                                    Ayana M. Lindsey (*pro hac vice*)
                                                    COVINGTON & BURLING LLP
                                                    One CityCenter
                                                    850 Tenth Street, NW
                                                    Washington, D.C. 20001
                                                    (202) 662-6000
                                                    MLynch@cov.com
                                                    SPetkis@cov.com
                                                    DRandolph@cov.com
                                                    PKillebrew@cov.com
                                                    ALindsey@cov.com

                                                    */s/ Joy Chen*
                                                    Joy Chen (BBO No. 714192)
                                                    COVINGTON & BURLING LLP
                                                    One International Place
                                                    Suite 1020
                                                    Boston, MA 02110-2627

---

[10] If the DHS Secretary were in the future to rescind or wind down Plaintiffs' or other Ethiopian nationals' TPS protections on the grounds that the TPS program is *ultra vires* or otherwise unlawful, nothing would preclude a separate challenge to that future agency action grounded not in the TPS statute's particular procedural requirements, but instead based on the APA. *See Regents*, 591 U.S. at 24–29.

27

(617) 603-8821
JChen@cov.com

/s/ Sarah Leadem
Sarah Leadem (*pro hac vice*)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
(415) 591-6000
SLeadem@cov.com

/s/ Nargis Aslami
Nargis Aslami (BBO No. 714848)
Melissa Keaney (*pro hac vice*)
Collin Poirot (*pro hac vice*)
Abbey Rutherford (*pro hac vice*)
MUSLIM ADVOCATES
1032 15th Street N.W. #362
Washington, D.C. 20005
(202) 897-2622
Nargis@muslimadvocates.org
Melissa@muslimadvocates.org
Collin@muslimadvocates.org
Abbey@muslimadvocates.org

/s/  Erik Crew
Erik Crew (*pro hac vice*)
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
(949) 603-7411
ecrew@haitianbridge.org

*Counsel for Plaintiffs African Communities
Together, Samuel Doe, Stephen Doe, Abal
Doe, and the Proposed Class*

28

## <u>CERTIFICATE OF SERVICE</u>

I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Paul Killebrew*
Paul Killebrew
